George F. Carpinello, Esq.
Adam R. Shaw, Esq.
Jeffrey S. Shelly, Esq.
BOIES, SCHILLER & FLEXNER LLP
30 South Pearl Street
Albany, New York 12207
(518) 434-0600

Charles Juntikka
CHARLES JUNTIKKA & ASSOCIATES LLP
1250 Broadway, 24th Floor
New York, NY  10001
(212) 315-3755

*Attorneys for Plaintiffs*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ORRIN S. ANDERSON, <br><br> Debtor, | |
| ORRIN S. ANDERSON, A/K/A ORRIN ANDERSON, A/K/A ORRIN SCOTT ANDERSON, <br><br> Debtor and Plaintiff <br> on behalf of himself <br> and all others similarly <br> situated, <br><br> v. <br><br> CREDIT ONE BANK, N.A. <br><br> Defendant. | Chapter 7 <br><br> Case No. 14-22147 (RDD) <br><br> Adv. Pro. No. 15-08214 (RDD) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS

Plaintiff, Orrin S. Anderson, submits this Memorandum of Law in Support of his Motion to Compel Discovery from Defendant Credit One Bank, N.A. ("Credit One" or "Credit One Bank") and for appropriate sanctions and other relief.

## PRELIMINARY STATEMENT

Plaintiff brings this motion because Credit One indisputably:

1. Has not fully searched for responsive documents;
2. Is withholding responsive documents;
3. Is hiding behind the cloak of its Related Sherman Entities;
4. Refuses to provide a knowledgeable 30(b)(6) witness.
5. Has submitted false affidavits of discovery compliance; and
6. Has misrepresented material facts to the Court.

Despite repeated warnings from this Court, Credit One continues to disregard the requirements of the Federal Rules of Civil Procedure and this Court's explicit orders, and refuses to produce responsive documents and a knowledgeable corporate designee for deposition. The testimony of Credit One's witnesses and the Court filings of its counsel have misrepresented facts that are central to this case by falsely claiming that Credit One receives *no* notice of bankruptcy discharges. The March 22, 2016 Amended Verification ordered by this Court – Credit One's second chance to state under oath that it has performed a proper search and has no further responsive documents – has been proven to be false by the testimony of its officers and employees. Moreover, Credit One's 30(b)(6) designee was devoid of knowledge on the crucial issues in this case and, as shown by the later testimony of other deponents, her testimony was riddled with inaccuracies on the few subjects to which she could testify. Accordingly, Plaintiff respectfully asks this Court to compel Credit One to produce *all* responsive documents in its possession, custody or control (whether in its Las Vegas offices or the offices of the Related Sherman Entities); provide Plaintiff with a deponent knowledgeable as to each and every topic set forth in Plaintiff's

30(b)(6) notice; sanction Credit One for its repeated and continuing failure to comply with the Federal Rules of Civil Procedure and this Court's orders, to include the costs and fees of this and prior motion; find an adverse inference against Credit One; preclude Credit One from introducing any evidence concerning its policy of not correcting or deleting tradelines that have been discharged in bankruptcy; and require the testimony before this Court of the two principals of Credit One and Sherman Financial, Ben Navarro and Brett Hildebrand.

To date, Credit One has produced just 136 documents totaling 9,741 pages. This production consists of nothing more than: (1) Mr. Anderson's personal account and credit report information; (2) forty-one different versions (1,038 pages) of the sales contracts to Midland which only involved the sale and purchase that included Mr. Anderson's tradeline; (3) Credit One's manuals; (4) the industry's Credit Reporting Guide; (5) a twenty page string of just three email chains; (6) Credit One's privilege log; (7) a one-page spreadsheet of buyers; and (8) nineteen pages that Credit One subpoenaed from non-parties. *Not one* document was produced concerning Credit One's policy and decision-making to *not* report the discharge of debts that have been sold to third-parties.

## THE SHERMAN UMBRELLA INCLUDES CREDIT ONE BANK AND ALL OF THE RELATED SHERMAN ENTITIES

As described below, under the Sherman umbrella, the typical credit card servicing operations of most banks – the servicing of customer accounts and the servicing of sold charged-off accounts – are respectively handled by Credit One and Resurgent, with Sherman Capital Markets overseeing the entire operation. From the few documents and limited testimony thus far, Plaintiff has been able to piece together the following labyrinth that makes up this umbrella of companies.

2

Credit One Bank is owned by Credit One Financial. Both are located in the same facility in Las Vegas, Nevada. Credit One Financial was a C corporation owned by the Sherman Financial Group, LLC ("Sherman Financial Group") up until December 31, 2012 and, at that time, Credit One Financial elected to change its status to an S corporation. At that time, Sherman Financial Group's ownership of Credit One Financial was transferred to the individuals and trusts that own Sherman Financial Group. (Hughes Tr. at 161:1-4 Ex. A)[1].

The management services of Sherman Financial Group are performed by Sherman Capital Markets, LLC ("Sherman Capital Markets"), and Sherman Capital Markets also provides those services to the other Related Sherman Entities known as Sherman Originator III, FNBM, LLC ("FNBM"), MHC Receivables, LLC ("MHC"), PYOD, LLC ("PYOD"), Resurgent Capital Services, LP, ("Resurgent"), and LVNV Funding, LLC ("LVNV"). Sherman Financial Group owns these other Related Sherman Entities. Sherman Capital Markets also provides services to Credit One Bank by "facilitating th[e] flow of their charge-offs" (Mazolli Tr. At 12:20-13:22 Ex. B), and it's not clear if it provides services to Credit One Financial. (*Id.* at 12:5-15). Only Credit One Bank, Sherman Capital Markets and Resurgent have employees, all of the other entities are merely holding companies (having only officers and board members) (Emmerich Tr. at 35:21-23; 25:1-4 Ex. C). The employees of Sherman Capital Markets and Resurgent are located in two locations in South Carolina.

After Credit One originates a credit card account with a consumer, it immediately transfers any receivables from that account to MHC at par value. (Hughes Tr. at 61:13-62:9 Ex. A). Credit One, however, retains the account. MHC, in turn, immediately transfers that receivable to FNBM

---

[1] Despite being designated to testify to the structure and relationship between and among Credit One and the other Sherman Entities, the 30(b)(6) designee of the Related Sherman Entities, Jon Mazolli, could not name these individuals or trusts. (Mazolli Tr. at 9:2-11:2; 14:7-23 Ex. B).

at par value, and that receivable stays with FNBM as long as the account is performing.  FNBM, not Credit One, is the funding vehicle for these receivables. (Mazolli Tr. at 49:16-17 Ex. B).  The source of these funds, however, is unknown because the Related Sherman Entities' 30(b)(6) designee was directed "not to disclose the identity of these funding organizations." (*Id.* at 50:8-12).   Because MHC and FNBM have no employees, Credit One performs all of the servicing for MHC and FNBM.

According to Credit One's deponents, once an account becomes non-performing and is charged-off, the receivable is transferred back to MHC by FNBM, and the account (or debt) is transferred to MHC by Credit One. (Scott Tr. at 57:5-14 Ex. D).  MHC then sells the "married up" account and receivable to Sherman Originator III. (*Id.* at 85:19-86:3).

The Related Sherman Entities' deponents tell a slightly different story: once an account becomes non-performing and is charged-off, the receivable is sold directly to Sherman Originator III by FNBM, and the account (or debt) is transferred to MHC by Credit One.  MHC then sells the account to Sherman Originator III.  Under this scenario the "marriage of the account and receivable occurs at Sherman Originator III.  (Emmerich Tr. at 25:16-20, 26:1-25 Ex. C; Mazolli Tr. at 44:18-19 Ex. B.  Mr. Mazolli did not know why the account goes to MHC before Sherman Originator III, and he did not know if MHC pays Credit One for the account (Mazolli Tr. at 46:3-47:21 Ex. B) or whether Sherman Originator III pays MHC for the account. (*Id.* at 52:5-14).

Nevertheless, however that process actually takes place, by the time Sherman Originator III obtains ownership, the account and receivable have come together.  (*Id.* at 52:20-53:3)  Such sales of the charged-off accounts and receivables occur in pools that are gathered up on a monthly basis.  (Scott Tr. at 32:24-34:1 Ex. D).

Sherman Originator III then sells these pools to either Sherman Originator[2] or to "an unaffiliated buyer." (Mazolli Tr. at 26:11-22 Ex. B).  When asked to identify these "ultimate third party" buyers, Mr. Mazolli was directed by counsel for the Related Sherman Entities "not to answer that question."  (*Id.* at 27:2-19).  The decision-maker behind such sales, *i.e.,* the entity "that actually offer[s] up these pools to either Sherman Originator or to those third parties" is Sherman Capital Markets.  (*Id.* at 55:20-56:6).

Sherman Originator sells its pools to PYOD and LVNV.  PYOD's pools consist of accounts where the debtor is deceased.  LVNV's pools consist of two types of debts: (1) those where a bankruptcy has been filed (but *not* a discharge), and (2) those not in bankruptcy but which have been charged off.  (Scott Tr. at 34:22-25; 116:3-120:11 Ex. D).  Both PYOD's and LVNV's accounts are serviced by Resurgent.  *Id.*  According to the 30(b)(6) designee of the Related Sherman Entities, Resurgent *deletes* any and all of the bankrupt accounts that go to LVNV or PYOD.  (Emmerich Tr. at 4:17-6:10 Ex. C).  This has always been the policy, and she does not know who decided on that policy or why they decided to follow such a policy.  (*Id.* at 5:23-6:10).  She also testified that these two Related Sherman Entities would also follow this same policy of *deletion* if they became aware of a discharge in bankruptcy after obtaining ownership of an account.  (*Id.* at 29:16-32:6).

> If Resurgent received a call – an account has been discharged in bankruptcy and is still reporting, Resurgent would immediately investigate that account to determine the validity of that dispute and if that is true, if there is somehow a trade line still reporting after a discharge in bankruptcy, it would be removed immediately.

> (Emmerich Tr. at 29:24-30:6 Ex. C).

---

[2]  Although Plaintiff had previously asked why there was a "III" after "Sherman Originator" and if there were other Sherman Originators (Hughes Tr. at 137:9-22 Ex. A), it was not until the 30(b)(6) deposition of the Related Sherman Entities that Sherman Originator was disclosed to Plaintiff.  (Emmerich Tr. at 7:5-16 Ex. C; Mazolli Tr. at 26:11-13 Ex. B).

This testimony by the Related Sherman Entities begs two questions:

1. How is Resurgent deleting the Credit One tradelines in bankruptcy that are now in the hands of LVNV and PYOD?

2. If those tradelines are being deleted, why isn't Credit One (or some other Related Sherman Entity like Resurgent) deleting the tradelines that are in the hands of buyers other than LVNV and PYOD?

Not a single witness could answer these questions.

Underscoring that last question is the fact that Credit One already *keeps and deletes* all bankrupt accounts with a balance of less than $100 rather than include them in debt pools sold to third-parties or one of the other Related Sherman Entities.  (Scott Tr. at 48:22-49:14 Ex. D). Indeed, when asked why Credit One does not delete the bankrupt accounts it sells to third-parties (in the same manner it deletes bankrupt accounts less than $100), Ms. Scott very reluctantly said: "I don't know."  (*Id.* at 50:19-56:14).  That is the same basic answer Plaintiff has heard from all of the deponents:  They don't know, it's just the way it has always been done.

## CREDIT ONE CANNOT LIMIT ITS PRODUCTION BY HIDING BEHIND THE RELATED SHERMAN ENTITIES

Credit One contends that Plaintiff should seek any additional documents from its Related Sherman Entities – and *not* Credit One – even though Credit One clearly has access to such documents.  Indeed, Credit One's counsel admits that he has already personally sought and received documents from the Related Sherman Entities that Credit One then produced to Plaintiff (Ex. E at 9).  And *all* of the emails produced by Credit One were also obtained by defense counsel from one of the Related Sherman Entities.  (Lanham Tr. at 220:17-222:10 Ex. F).  "Mr. Shelly: Which Sherman? Mr. Slodov: That is a good question."  (*Id.* at 221:6-8).  When asked if he

received these emails from a "non-party to this action," defense counsel replied: "I'm going to waffle on that." (*Id.* at 221:16-22).[3]

In any event, the Related Sherman Entities themselves have limited their production to just a subset of the contracts already produced by Credit One (along with Bills of Sale and Assignment between FNBM and Sherman Originator III for the calendar year 2015)[4]. As shown above, all of these Entities work in tandem and enjoy unfettered access among themselves: wherever responsive documents lie that are in the possession, custody or control of Credit One, without regard to the physical location of those documents, they must be produced to Plaintiff. Indeed, Ms. Scott testified to the totality of Credit One's access, custody and control of the documents of the Related Sherman Entities, and their similar access, custody and control of Credit One's documents, when she admitted that Resurgent presently houses all of Credit One's media[5] for the sale of Credit One's debts, while Credit One previously housed all of "Sherman's" media until the IT department at Credit One ran out of "storage space." (Scott Tr. at 102:23-103:16; 161:9-162:24 Ex. D). This storage was free of charge and without any contractual relationship. (*Id.* at 161:22-162:15).

---

[3] In addition to this clear access, and the practical ability to possess the documents of the Related Sherman Entities, one of the three email chains produced in this case shows that those Entities are directly involved in the litigation strategy of this case. Credit One 2277 (previously filed under seal, and attached to the Court's courtesy copy of Plaintiff's current filing as Ex. G). There can be no doubt that there is unrestricted back-and-forth access between these Entities and Credit One.

[4] Plaintiff served subpoenas on each of the Related Sherman Entities requesting "Documents explaining or describing your affiliation or business relationship with Defendant, FNBM, LLC, MHC Receivables, LLC or Sherman Originator III." Ex. H (Request No. 28)). However, Plaintiff has received *no* such documents, just the contracts and Bills of Sale and Assignment described above.

[5] This "media" of Credit One consists of "up to 24 months of statements, the application, a copy of the application, and the most recent account agreement." (Scott Tr. at 103:12-15 Ex. D).

Further demonstrating the complete linkage between Credit One and the Related Sherman

Entities is the fact that Ben Navarro and Brett Hildebrand, who run Sherman Financial Group

(Hughes Tr. at 42:23-43:4 Ex. A) are also directors and owners of Credit One Financial (which

owns Credit One Bank). *Id*. at 46:20-22; 47:8-20.

It is Credit One and Sherman Financial that orchestrate the process whereby Sherman

Originator sells Credit One debt to third parties, thereby contributing to the millions of dollars

received by their co-owners. This joint process was confirmed by Vicki Scott:

> "Q:    Who has the final say on whether or not debt is going to be
>        sold to third party buyers?...
>
> A:    The bank jointly makes the decision with Sherman."

(Scott Tr. at 22:20-24 Ex. D)

Clearly this operation is run as one big Sherman ship.

Confirming this connection, Credit One's own website states "our Affiliates include the

Sherman Financial Group LLC family of companies; including Resurgent Capital Services, L.P."

Therein, Credit One defines Affiliates as "companies related by common ownership or control."

https://www.creditonebank.com/privacy-policy.aspx. And the testimony of the Related Sherman

Entities' 30(b)(6) designee also confirms that Credit One is "an affiliate" of Sherman Financial

Group. (Mazolli Tr. at 97:9-11 Ex. B). To help Plaintiff fully understand this connection, Mr.

Mazolli was specifically designated to testify as to "the structure and relationship between and

among Credit One and the other Sherman Entities but, as he testified, "I don't know the full balance

of the relationship between Sherman Financial Group and Credit One Bank." (*Id.* at 96:18-20;

98:13-18).

This continuing obfuscation of this self-serving arrangement must stop. Without full

disclosure from *all* of the Sherman Entities including Credit One, Plaintiff and this Court cannot

begin to understand the decision-making, policies, and transactions concerning the issues in this case. If Credit One and the Related Sherman Entities seek to continue this subterfuge, they should be ordered to substantiate their relationship under oath. Having their owners and directors, Mr. Navarro and Mr. Hildebrand, testify before the Court at the hearing of this matter should clarify the true relationship of Credit One and these Related Sherman Entities.

## **CREDIT ONE HAS NOT PROVIDED ITS RESPONSIVE DOCUMENTS**

More than one year ago, this Court put Credit One on notice that it must produce all of its documents concerning the practices and policies of Credit One concerning credit reporting and the sale of debt that is subsequently discharged. June 15, 2015, Hearing Tr. at 46:10-15 Ex. I. Credit One stated that "we will not withhold anything if you order us to produce it." *Id*. at 45:4-5. The Court emphatically told Credit One that it must produce such documents and "identify [] people with knowledge on it." *Id*. at 43:5-8.

Nevertheless, eight months ago, after it became clear that Credit One was still withholding documents, this Court again had to warn Credit One:

> If you do this one more time, if you pick and choose what you are free to respond to on discovery based on your sense of what the merits are, I will rule against your company. I will draw an adverse interest right then.

Dec. 9, 2015 Tr. at 17:2-5, Ex. J.

The Court reiterated:

> So get your act together, check the documents, make sure you haven't given your clients a free pass on what they can produce and not produce, and produce it or risk sanctions or provide the declaration under oath.

*Id*. at 18:6-9.

On January 18, 2016, Credit One Bank, N.A. ("Credit One") issued the Court-ordered Verification that it had produced all of its responsive documents. (Ex. K). However, on January 27, 2016, Credit One's 30(b)(6) designee (the same individual who executed that Verification) testified to facts that proved the Verification to be incorrect. As a result, five months ago, the Court ordered Credit One to provide another verification outlining all of the steps it had taken to produce responsive documents in this case. Credit One stated that this Amended Verification would be "a step-by-step ... accounting of where documents were looked for and what documents were looked for. But the end result is, you know, that Credit One does not have any further documents to provide." Feb. 22, 2016 Tr. at 17:2-5 Ex. L. One month later, on March 22, 2016, Credit One finally issued an Amended Verification purportedly explaining how the respective departments of Credit One Bank were told to identify and locate responsive documents. (Ex. M).

At best, that Amended Verification was deceptive; at worst it was false and not what was promised. It provides no insight into the scope of Credit One's search for responsive documents. It provides a list of five systems that "maintain" Credit One's documents, *i.e.*, CAS, Microsoft Office Sharepoint Workspace, Microsoft Outlook, R1, and OpenText Case 360. However, the Amended Verification does not state that these five systems are the only repositories of documents at Credit One – nowhere does it state that these are the only places to look for documents. Indeed, the Amended Verification itself acknowledges that at least one of the supplemental documents located and produced in March of this year had been "segregated and maintained on a separate drive." Ex. M ¶ 22. Subsequent deposition testimony has also uncovered private files and hard drives that have not been searched. *See* pp. 12-15, *infra.* Even one of the five systems identified, *i.e.*, the OpenText Case 360 document management system, was apparently not searched, as there is no attestation that this system was searched. *See* Ex. M ¶ 17 (listing just four of the five systems,

excluding OpenText Case 360).    More importantly, there is no explanation of what subject

matters were sought by Credit One – no search terms, no topics, no parameters at all are set forth

in the Amended Verification.  The only clue within its 24 paragraphs concerning what was actually

sought is that "in-house counsel orally communicated with supervisory staff…to identify and

locate responsive documents."  Ex. M ¶ 16.  This coyly worded statement tells us *nothing* about

what was used as a guide or as a basis to determine what was a responsive document.  We know

some of the locations *where* Credit One could search, but *what* Credit One actually searched for is

unknown.  In any event, it is now clear that responsive documents exist at Credit One which were

never produced – indeed, no one even searched many of Credit One's document repositories.

It became obvious at the subsequent depositions of three different Credit One's Bank

officers and employees that Credit One had not done what the Court ordered it to do, nor what

Credit One promised the Court it would do or what it claims it had done.  "Newly discovered"

documents produced the night before the third deposition (which should have been located and

produced last year), and the testimony of these Credit One officers and employees, show that

Credit One has still not yet performed a thorough search for responsive documents and continues

to withhold documents from Plaintiff.  Indeed, the deponent who found these "new" documents,

Vicki Scott (Credit One's VP of Collections), admitted that *no one* looked through her personal

files to respond to Plaintiff's document requests.

As examples of specific documents not produced, Plaintiff's July 28, 2015 First Request

for Production of Documents ("RFPs") sought documents concerning: (i) the sale of consumer

debts to third-parties (RFP No. 2); (ii) the collection or receipt of money on consumer debts that

have been sold (RFP No. 3);  (iii) the relationship with buyers of consumer debt after the sale

occurs (RFP No. 4); (iv) policies for reporting to consumer reporting agencies about consumer

debts, including about consumer debts that have been discharged in bankruptcy or about consumer debts that have been sold (RFP No. 6); (v) the valuation of consumer debts sold to third parties (RFP No. 17); (vi) the policy for selling debts that are discharged in bankruptcy (RFP No. 19); and (vii) the terms by which Credit One sells debts to third parties (RFP No. 21).  Nevertheless:

- Vicki Scott, the Vice President of Collections for Credit One Bank, testified on June 3, 2016, to the existence of Credit One monthly spreadsheets listing third party buyers, none of which have been produced to Plaintiff.  Moreover, although Credit One created a one-page spreadsheet of buyers to provide to Plaintiff, *no* other documents relating in any way to the twelve buyers other than Midland has been produced.

- Credit One produced the purchase and sale agreement with Midland Funding but has produced *no* agreements with any other third party.  We know that Credit One has agreements with at least a dozen third-parties.

- At the December 9, 2015, Hearing, counsel for Credit One stated that "we plan on providing additional contracts" (Dec. 9, 2016, Tr. at 24:19-20 Ex. J), yet *not one* additional contract has been produced since that date.

- Ms. Scott also explained how the servicing performed by Credit One for MHC, FNBM, and others, allows for the transfer and sale of consumer debt to third parties and the related entity Sherman Originator III.  All of those servicing contracts, however, have not been produced.

- Ms. Scott admitted that these sales and purchase contracts are on "the recovery drive," yet, other than the draft Midland contracts that defense counsel obtained from the Related Sherman Entities, *none* have been produced.  Indeed, they weren't even sought by Credit One:

  "Q:    Had you ever searched that recovery drive, prior to your request to Mary[6] last week, for documents that are responsive in this case?

  A:    No."

  Scott Tr. at 177:21-25 Ex. D.

---

[6] "Mary" is the subordinate that Ms. Scott asked to look for documents to review in the week prior to Ms. Scott's deposition.

- Ms. Scott also admitted that, even though she knows she has emails "having to do with a sale" (*id.* at 176:14-15), no one searched her emails. (*Id.* at 175:25-176:15; 177:1-4).

- *No* documents concerning Credit One's policy and practice of *not* notifying the credit reporting agencies about of its sold tradelines which were discharged in bankruptcy have been produced by Credit One. Credit One's 30(b)(6) designee could not explain how Credit One adopted such a policy and practice (Lanham Tr. at 117:12-121:8 Ex. F), but she believed it was "not obligated" to do anything different. (*Id.* at 123:13-125:15; 80:18-22; 181:2-7). However, she knew there were Credit One emails and discussions concerning these issues with in-house counsel (*Id.* at 117:18-122:9). Credit One's counsel precluded Ms. Lanham from testifying about those conversations at her deposition, yet *no* documents concerning this issue are listed on Credit One's privilege log as being withheld for privilege. (Ex. N). This begs the question: where are these documents?

Accordingly, Plaintiff requests the production of all responsive documents pursuant to RFPs Nos. 2, 3, 4, 6, 17, 19 and 21 including, but not limited to: (1) all spreadsheets listing the third-party buyers of the sold debts that originated with Credit One Bank, as testified to by Ms. Scott on June 3, 2016; (2) all contracts for the sale of consumer debt to *all* third-party buyers and Sherman Originator III by Credit One Bank, MHC Receivables, LLC, or FNBM, LLC; (3) all servicing contracts that Credit One Bank has with (i)  MHC Receivables, LLC, (ii) FNBM, LLC, (iii) Sherman Originator III, (iv) Resurgent Capital Services, L.P., (v) Sherman Financial Group LLC, (vi) PYOD LLC, and any other Sherman entities; and (4) *all* documents concerning Credit One's policies and practices relating to credit reporting and discharges in bankruptcy.

Plaintiff's RFPs also sought documents concerning: (i) the identification of consumer debts that are subject to pending  bankruptcy proceedings or have been discharged in bankruptcy (RFP No. 5); (ii) updating or changing the status of consumer debts reported to credit reporting agencies (RFP No. 13); (iii) policies for updating or changing the status of consumer debts in response to consumer inquiries (RFP No. 14); (iv) consumer debts that have been discharged in bankruptcy and have been reported as "charged off" or "past due" or similar notations (RFP No. 16);  (v) the

deletion of consumer debts from credit reports (RFP No. 18); and (vi) Credit One's responses to consumers' inquiries regarding delinquent debt (RFP No. 25). Nevertheless:

- In its responses to Plaintiff's First Request for Production of Documents, "Credit One states that when it receives notice of a bankruptcy filing, the notice is scanned, indexed, and associated with the respective file, and as to accounts that have been sold, the notices are provided to the respective purchaser of the account." Ex. O at 14, 17, 18, 19 & 20. Despite those statements, however, *not one* document concerning bankruptcy filings or communications with third parties has been produced by Credit One other than its manuals.

- Lisa Cooper-Tippett testified to the existence of quarterly reports of disputes made by consumers, including disputes concerning credit reporting as it relates to bankruptcy discharges, which have never been produced by Credit One.

- Literally on the eve of Ms. Scott's deposition, Credit One produced a series of flow-chart type documents called "process flows" that defense counsel became aware of only after Ms. Scott asked a subordinate in her department to get together any documents from her files which dealt with bankruptcy or credit reporting to review for her deposition.[7] These documents – easily located by that subordinate – should have been produced last year as well, and calls into question how many other documents are simply sitting at Credit One waiting for someone to find (if only someone would look).

    "Q:    You didn't actually have any sort of a search—an actual formal search, either a word search of data that's electronically housed at Credit One or a manual search of the various hard documents that may be in the file cabinets or on hard drives such as your own hard drive, even for documents that might be responsive in this case, did you"?

    A:    No."

    Scott Tr. at 170:10-19 Ex. D

---

[7] Although defense counsel became aware of these documents by *at least* Tuesday, May 31, 2016, they were not produced to Plaintiff until the night of Thursday, June 2, 2016, just twelve hours before Ms. Scott's deposition. The documents found by Ms. Scott's rudimentary search of her files should have been produced pursuant to Plaintiff's initial document requests. Similarly, the quarterly dispute reports that Ms. Cooper-Tippett testified to should also have been produced pursuant to those initial requests. There should have been no need for Plaintiff's counsel to ask for their production at the deposition last month, and certainly no need to re-request them in writing.

As Ms. Scott explained: "we produced what we thought was needed." *Id.* at 170:5-6.

- Credit One Financial's designee, George Hughes, the CEO and Treasurer of Credit
  One Financial and the custodian of its documents (Hughes Tr. at 158:7-14),
  admitted that Credit One Financial was not even aware that a subpoena to produce
  documents had been served upon it by Plaintiff in this case, and *never* looked for
  any documents. (*Id.* 148:3-151:22).[8]

- At the December 9, 2015, Hearing, counsel for the Related Sherman Entities told
  the Court that none of those entities perform credit reporting and have no
  documents relating to that issue.    (Dec. 9, 2015, Tr. at 21:18-20 Ex. J).
  Contradicting that statement is the testimony of the Related Sherman Entities
  30(b0(6) designee, Meghan Emmerich, that upon the filing of a bankruptcy, the
  trade lines of LVNV Funding, LLC and PYOD, LLC are deleted[9] by Resurgent
  Capital Services. (Emmerich Tr. at 4:17-6:9, 16:9-16, and 36:15-37:16 Ex. C).
  And Resurgent actually has contracts "with each of the three credit bureau reporting
  agencies."    (*Id*. at 40:7-9).    All three of those entities (LVNV, PYOD and
  Resurgent) are Related Sherman Entities.  Ms. Emmerich also testified that "Anson
  Street" and "East Bay" – two Related Sherman Entities, Plaintiff was not previously
  aware of – also had Resurgent do their credit reporting.  (*Id*. at 17:19-19:3).  Yet
  not one document concerning such credit reporting and deletions has been
  produced.

To show that it has met its obligations to respond to Plaintiff's document requests, Credit

One relies on just four (4) documents: (1) the contracts that govern the sale of Mr. Anderson's

debt; (2) Credit One's Recovery Manuals; (3) a one-page "historical" spreadsheet of third-party

purchasers[10]; and (4) Credit One's Back Office Manuals.  These few documents cannot, and do

---

[8]  Similarly, the 30(b)(6) designee for the Related Sherman Entities did not know if anyone had,
in fact, searched for responsive documents at Sherman Financial Group, Sherman Capital Markets,
MHC or FNBM.  (Emmerich Tr. at 27:25-28:15; 29:11-15 Ex. C).  She could only testify that a
search had been performed at PYOD, Resurgent, Sherman Originator III, and LVNV.  (*Id.* at
27:20-22).

[9]  This policy of deleting bankrupt accounts belies Credit One Bank's contention that it cannot and
need not alter the reporting of such accounts.

[10]  Contrary to Defendant's contention, Credit One Document 09346 (attached hereto as Ex. P) is
*not* an "historical list of third party buyers."  First, there is nothing "historical" contained in that
document.  More importantly, it is nothing more than an Excel spreadsheet created for production
in this case.  It is a March 11, 2016 snapshot of third-party buyers, yet *none* of the data that was
used to create it was produced to Plaintiff.  Nor were any of the crucial documents from which this

not, excuse Credit One's continuing failure to produce – or even look for – the underlying documents and data involving Credit One's implementation of these contracts and manuals. No documents have been produced showing transactions pursuant to these contracts, or the daily use of these manuals. The above contracts and manuals do not exist in a vacuum.[11] Credit One has produced *no* regular reports, logs, consumer requests, memos, emails or any records showing that duties required by these contracts or procedures in these manuals were performed or discussed.

For example, Credit One admits that its Back Office Manuals contain "a thorough explanation of how Credit One handles and documents bankruptcy sales, and identifying instructions for handling such notices." (Ex. E at 5, n. 4). Yet, not one document was produced in which Credit One actually handled or documented such a notice. Similarly, despite Credit One's reliance on its single-page "historical" list of third-party buyers (Ex. E at 9), Plaintiff has not received a single document directly concerning a third-party buyer other than the contract to Midland for Mr. Anderson's debt. Plaintiff has received *nothing* – not one contract or email – concerning the twelve other buyers on that spreadsheet.

Additionally, Plaintiff's document requests cannot be answered by a single document in the same manner in which an interrogatory can be satisfied by a single document. For example, Credit One acknowledges that Plaintiff requested "emails, memos, meeting minutes, ACDV's concerning any request to change how a debt is being reported to the CRAs" Ex. E at 5). In response Credit One simply says that it "produced its Back Office Manuals," *(Id.*, n.4). But Credit

---

data was derived (e.g. the underlying contracts, transactional documents or emails concerning these third-party buyers) produced by Credit One.

[11] Nor were they created out of thin air. Indeed, there are no documents concerning the thought-process or corporate policies that went into the creation any of these documents.

One cannot satisfy that request with just one responsive document – Plaintiff is entitled to *all* documents that are responsive to that (and every) request.

Accordingly, Plaintiff requests the production of all responsive documents pursuant to RFPs Nos. 5, 13, 14, 16, 18, and 25 including, but not limited to: (1) the quarterly dispute reports testified to by Ms. Cooper-Tippett on June 1, 2016, as well as all of the underlying data and information used to create those reports; and (2) all "process flows" from all departments within Credit One Bank that are similar to those testified to by Ms. Scott on June 3, 2016 and produced to Plaintiff on June 2, 2016, which deal with bankruptcy, credit reporting, charge-offs, the sale of consumer debt, or any of the issues in this case. Similarly, Credit One Financial should also be ordered to actually search for responsive documents.

## CREDIT ONE'S PRIOR 30(b)(6) DESIGNEE PROVIDED FALSE TESTIMONY AND LACKED THE REQUISITE PREPARATION AND KNOWLEDGE

In response to the very first question asked of her, Credit One's 30(b)(6) designee demonstrated her complete lack of knowledge:

> "Q:    I'm going to start off by asking you, prior to this lawsuit, was Credit One aware of Plaintiff's discharge in bankruptcy and the discharge of the debts Plaintiff owed to Credit one?
>
> A:    No, we were not.
>
> Q:    So Credit One became aware of his discharge in bankruptcy after this lawsuit was commenced?"
>
> A:    Correct."

(Lanham Tr. at 6:11-20 Ex. F).

That answer is demonstrably incorrect. This adversary proceeding against Credit One commenced on *January 30, 2015.* (Docket No. 1). But the *May 6, 2014* list of creditors receiving

notice of this Court's discharge of Mr. Anderson's debt plainly includes "Credit One Bank, P.O.

Box 98873, Las Vegas, NV 89193."  (See Ex. Q).  Thus, contrary to Ms. Lanham's purportedly

"knowledgeable" testimony, Credit One knew, in fact, of Plaintiff's discharge *more than eight*

*months before this lawsuit*.  This canard is perpetuated by defense counsel's claim that Credit One

"does not receive bankruptcy discharge notices and does not process credit report updates on

bankruptcy discharges because it no longer owns the account" (Ex. E at 6, n.7) and Ms. Scott's

testimony that "[t]he bank does not know" about discharges in bankruptcy because "[w]e are not

notified, that is correct."  (Scott Tr. at 6:17-7:8 Ex. D).

Ms. Lanham's inability to testify to pertinent questions as Credit One's 30(b)(6) designee

shows either a lack of preparation by Credit One, or that Credit One simply lacks knowledge as to

its own operations.  For example:

- Topics 14(a), (c), (d), ( p) and (q)[12] concern all aspects of the sale of consumer debt,
  yet Ms. Lanham did not know:

  (i)     whether the contracts between Credit One and MHC, which outline the
          specifics of  the debt transfers, covered a given time period (Lanham Tr. at
          13:13-17 Ex. F);

  (ii)    what Credit One did with its receivables and debt prior to 2009 (*Id.* at 15:6-
          12);

  (iii)   why Credit One sold (and continues to sell) its receivables and debt to MHC
          beginning in 2009 (*Id.* at 16:8-15);

  (iv)    the benefit Credit One receives from this practice (*Id.* at 17:18-22);

  (v)     why MHC sells the receivables to FNBM (*Id.* at 20:5-8);

  (vi)    why MHC sells charged off debt (purchased from Credit One) to Sherman
          Originator (*Id.* at 24:22-25);

---

[12]   Ex. R is a copy of Plaintiff's December 8, 2015 Rule 30(b)(6) Deposition Notice to Defendant
Credit One, including these Deposition Topics.

      (vii)  why MHC was chosen as the debt buyer (*Id.* at 27:9-15); and

      (viii)  the names of debt buyers prior to 2009 (*Id.* at 28:13-29:5).

- One of the emails that defense counsel obtained from an unknown Sherman entity (Credit One 2262-2268, Ex. S (previously filed under seal, and attached to the Court's courtesy copy of Plaintiff's current filing)) shows that other Sherman entities PYOB and LVNV Funding LLC, were involved in the purchase and transfer of consumer debt that originated with Credit One. LVNV ultimately listed the final buyer of that debt as "Sherman Financial Group."[13] Other than Sherman Financial Group, Mrs. Lanham had no idea who these entities are, or how they are related to Sherman. (Lanham Tr. at 255:12-258:10 Ex. F). Indeed, she was utterly baffled by such a sale. *Id.*

- Ms. Lanham also did not know:

      (i)    the locations of MHC (*Id.* at 48:23-25) and FNBM (*Id.* at 49:10-15);

      (ii)   whether or not MHC does any business other that acquiring receivables and debts from Credit One (*Id.* at 49:2-8); or

      (iii)  who updated bankruptcy information. Was it Credit One alone or along with Resurgent? (*Id.* at 51:23-52:8).

- Topics 1 and 2 of the 30(b)(6) subpoena concern the "overall corporate structure," yet Ms. Lanham did not know:

      (i)    Sherman Financial Group's interest in Credit One Financial (the present owner of Credit One Bank) (*Id.* at 9:7-14);

      (ii)   if anyone else has an interest in Credit One Bank (*Id.* at 9:15-18);

      (iii)  whether or not Credit One Financial existed at the time that Sherman Financial Group owned Credit One Bank (*Id.* at 10:5-8); or

      (iv)  why Credit One Financial was set up to own Credit One Bank (*Id.* at 10:17-20).

---

[13] Inexplicably, Sherman Financial Group's 30(b)(6) designee, Mr. Mazolli, stated the Sherman Financial Group has never owned any debt. **"**Sherman Financial Group itself… definitely within the last eight-plus years that I've worked here *has never bought an account*." (Mazolli Tr. at 84:21-24 (emphasis added); 84:10-12 Ex. B). Credit One Doc. No. 9741 (Ex. T), an October 17, 2013 letter from Credit One to one of its customers, proves that statement to be wrong: "please be advised that ownership of this account has been transferred to Sherman Financial."

- Topic 14(n) concerns Credit One's decision-making to determine whether a consumer debt should be charged off.  Ms. Lanham had no idea:

  (i)    who created the computerized procedure for processing charged off accounts *Id.* at 33:7-14);

  (ii)   when this procedure was created (*Id.* at 33:15-34:8); and

  (iii)  if there have been any updates to the procedure (*Id.* at 34:14-35:9).

- Topic 14(f) specifically seeks information on how Credit One determines which consumer debts are subject to bankruptcy or have been discharged.  According to Ms. Lanham this work is done by Resurgent.  She did not know:

  (i)    who owns Resurgent, the entity that determines which of Credit One's accounts are in bankruptcy (*Id.* at 47:2-11);

  (ii)   whether or not Resurgent does work for any other Sherman entities (*Id.* at 48:17-22);

  (iii)  Resurgent's access to Credit One's debt data systems, and what information Resurgent looks at within those systems.  (*Id.* at 64:20-66:12).

- Topic 14(k) concerns Credit One's "reporting of and collection of consumer debts that have been discharged in bankruptcy," yet Ms. Lanham did not know:

  (i)    If Credit One is able to update such Credit reports (*Id.* at 284:6); and

  (ii)   If there is anything preventing Credit One from updating such credit reports (*Id.* at 287:2).

- Topic 7 concerns Credit One's retention, storage and deletion of documents, yet Ms. Lanham had no idea how long documents are kept.  (*Id.* at 66:13-68:22).  Although she knows that Credit One's retention policies have been altered "a number of different times" (*Id.* at 70:3), she does not know when or why they were changed.  (*Id.* at 69:21-70:9).  And, when asked if she knows how long Credit One keeps emails, she said: "Not specifically. No."  (*Id.* at 70:24-71:5).

The June 2, 2016 deposition of George Hughes, the 30(b)(6) designee for Credit One Financial, further highlights the inadequate testimony previously provided by Credit One Bank's 30(b)(6) designee.  Mr. Hughes, who is also the Chief Financial Officer, Executive Vice President,

Cashier and Controller of Credit One Bank, made it clear that he was testifying to the knowledge of Credit One Financial (which is merely the holding company of Credit One Bank) and not upon the knowledge of the Bank. Despite that limitation, however, he was able to testify to facts and details on behalf of Credit One Financial concerning Credit One Bank's operations and policies that the Bank's own designee was simply unable to provide.

For example, he knew why Credit One Bank sold its receivables to MHC (who then sold them to another Sherman entity, FNBM), (Hughes Tr. at 61:8-64:5 Ex. A); yet Credit One Bank's designee, Ms. Lanham, had no idea why that sale occurred. (Lanham Tr. at 16:8-15; 17:12-13 Ex. F). He also explained how Credit One Bank received funds from FNBM through MHC (Hughes Tr. at 76:3-79:3 Ex. A), but Ms. Lanham had no idea if Credit One Bank received any fundings from MHC or any other Sherman entity (Lanham Tr. at 236 Ex. F). Similarly, contrary to the testimony of Ms. Lanham that Resurgent handled the identification and "scrubbing" of the bankrupt accounts[14] for Credit One Bank (*Id.* at 46:9-25; 52:9-53:23; 307:7-16 Ex. F), the designee for Resurgent (another Sherman entity) testified that Resurgent did absolutely *no* such work for Credit One Bank (Mazolli Tr. at 101:17-103:1 Ex. B). The fact that Resurgent does *no* work for Credit One Bank, was corroborated by Credit One Financial's designee, Mr. Hughes. (Hughes Tr. at 138:6-139:16 Ex. A).

Such an unprepared and unknowing witness does not satisfy the requirements of Fed. R. Civ. P. 30(b)(6). Plaintiff is entitled to a knowledgeable representative of the Bank to be sworn to provide that factual information on behalf of the Bank. Clearly, Credit One Bank's designee did not have the requisite knowledge to testify on behalf of the Bank. These subsequent depositions

---

[14]    The electronic process through which Credit One Account holders who have filed for bankruptcy are identified and separated from the performing accounts.

taken by Plaintiff simply underscore Credit One Bank's failure to provide a proper designee. Indeed, with respect to Ms. Lanham, even Credit One's counsel acknowledged that "I don't think she had a full – full knowledge of all the details that you were inquiring of." (*Id.* at 8-13). Most importantly, not one of the six people deposed in this case thus far has been able or willing to answer what this Court has identified as a "fundamental point": "what is keeping them from informing the credit reporting agencies that the debt has been discharged?" (Feb. 22, 2016 Hearing Tr. at 25:11-17 Ex. L). The only attempt at an explanation was given by Ms. Scott: "The bank does not own the account. That's what's stopping us from doing it." (Scott Tr. at 11:7-9 Ex. D). Of course, like most of the testimony given so far, that is plainly incorrect. The bank can, in fact, notify the credit reporting agencies of a discharge despite having sold the debt.

## SANCTIONS UNDER RULE 37, INCLUDING AN ADVERSE INFERENCE, ARE PROPER.

Rule 37 of the Federal Rules of Civil Procedure provides that, if a party fails to obey a discovery order, the court "may issue further just orders" to sanction a disobedient party. This includes directing that certain facts be taken as established, precluding the party from supporting its claims or introducing certain matters in evidence, striking the party's pleadings or portions of its pleadings, rendering a default judgment against the party, or holding the party in contempt. Fed.R.Civ.P. 37(b)(2)(A). The Rule further provides that, "[i]nstead of or in addition to [any other sanction], the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed.R.Civ.P. 37(b)(2)(C).

Although not explicitly listed in Rule 37, it also permits a court to sanction a party that has wrongfully destroyed documents or has withheld documents it was obligated to produce by giving

an "adverse inference" instruction.  The court may inform the jury of the nature of the party's misconduct and then instruct the jury that it may, or even that it should, draw inferences against the non-producing or destroying party.  *Mali v. Fed. Ins. Co.*, 720 F.3d 387, 392 (2d Cir. 2013).

"It is well settled that the court has broad discretion to determine the type of sanction to impose upon a party, based on all the facts of the case." *AAIpharma Inc. v. Kremers Urban Dev. Co.*, No. 02cv9628 (BSJ)(RLE), 2006 WL 3096026, at *5 (S.D.N.Y. Oct. 31, 2006) (citation omitted). The court's discretion should be guided by a number of factors, including:

(1)     the willfulness of the non-compliant party or the reason for the noncompliance;
(2)     the efficacy of lesser sanctions;
(3)     the prejudice to the other party;
(4)     the duration of the period of noncompliance; and
(5)     whether the non-compliant party had been warned of the consequences of his noncompliance.

*King Harvest Dev., Ltd. v. Li*, No. 08cv8494 (DAB)(DF), 2010 WL 5174326, at *3 (S.D.N.Y. Dec. 10, 2010) (citations omitted).  In addition to addressing misconduct, sanctions also serve to deter future misconduct. *See Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir.1988) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); additional citation omitted).  A court may grant an adverse inference instruction as a sanction for the nonproduction of evidence, upon a showing "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the …claim or defense [of the other party] such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir.2002) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir.2001)).

Once a court, has made a factual determination that would warrant giving an adverse inference instruction as a sanction, the particular instruction will again lie within the discretion of the court. *See Mali*, 720 F.3d at 392-93. Upon finding that evidence was wrongfully withheld, a court ''[may] … simply [tell] the jury those facts and nothing more; or it [may] add[ ] that the jury could, but need not, draw inferences against [the sanctioned party] based on those facts; or … that the jury should draw adverse inference against [the sanctioned party] based on those facts….'' Id. at 392 (emphasis in original; citing Fed.R.Civ.P. 37(b)(2)(A)). The court has ''the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing—a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case.'' *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir.1999) (citation omitted); *see also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir.1999).

Thus, when "explanations for non-disclosure [are] shifting, poorly supported and of questionable credibility" (*DeCastro v. Kavadia*, 309 F.R.D 167, 172 (S.D.N.Y. 2015)) – as is the case here – such a willful non-production of evidence may properly result in "an adverse inference instruction" and the award of "reasonable attorney's fees and costs they incurred in moving for sanctions." *Id.*

## <u>CONCLUSION</u>

As a result of Credit One's obvious and continuing failure to conduct a proper search for responsive documents and provide a knowledgeable and prepared 30(b)(6) designee, Plaintiff respectfully requests the Court to: (1) compel Credit One to immediately search all individual and department files at Credit One and *all* Related Sherman Entities, whether electronic or hard files, for responsive documents to all of Plaintiff's RFPs; (2) provide dates within the next month for a 30(b)(6) deposition of a Credit One designee to testify to all of the information known or reasonably available to Credit One on each of the topics previously set forth in Plaintiff's

December 8, 2015 Notice of Deposition and by the Court at the February 22, 2016 Hearing; (3)

provide Plaintiff with the costs and fees of this motion and all prior motions to compel; (4) order

principals Ben Navarro and Brett Hildebrand to appear before the Court to testify as to the

relationship between Credit One and all the Related Sherman Entities; to identify those documents

that relate to Credit One's policy not to correct or delete tradelines of discharged debt; and to

identify all persons having knowledge of the origin, and reasons for, such policy; (5) find a

negative inference against Credit One that, for the purposes of illegally collecting discharged debt,

it has intentionally decided not to correct credit reports of tradelines that originated with Credit

One that have been subsequently discharged in bankruptcy; and (6) preclude Credit One from

introducing any evidence concerning its policy of not correcting or deleting tradelines that have

been discharged in bankruptcy; and (7) whatever further relief the Court deems appropriate in light

of Credit One's continuing disregard of its discovery obligations under the Federal Rules and this

Court's Orders.


DATED: August 8, 2016                 **BOIES, SCHILLER & FLEXNER LLP**

                            By:      /s/ George F. Carpinello
                                   George F. Carpinello
                                   Adam R. Shaw
                                   Jeffrey S. Shelly
                                   30 South Pearl Street
                                   Albany, NY  12207
                                   (518) 434-0600

                                   **CHARLES JUNTIKKA & ASSOCIATES LLP**
                                   Charles Juntikka
                                   1250 Broadway, 24th Floor
                                   New York, NY  10001
                                   (212) 315-3755

                                   *Counsel for Plaintiff Orrin Anderson*