# Exhibit A

Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

```
In re:                                  )
                                        ) Adv. Proc. No.
ORRIN S. ANDERSON,                      ) 15-08214 (RDD)
                                        )
       Debtor.                          ) Bankr. Case No.
_____ ) 14-22147 (RDD)
                                        )
ORRIN S. ANDERSON, a/k/a ORRIN          )
ANDERSON, a/k/a ORRIN SCOTT             )
ANDERSON,                               )
                                        )
       Debtor and Plaintiff on          )
       behalf of himself and all        )
       others similarly situated,       )
                                        )
   v.                                   )
                                        )
CREDIT ONE BANK, N.A.,                  )
                                        )
       Defendant.                       )
_____ )
```

DEPOSITION OF GEORGE HUGHES

Taken on June 2, 2016

At 9:31 A.M.

300 South Fourth Street, Suite 800

Las Vegas, Nevada


Reported by:  Jennifer Clark, RDR, CRR, CCR #422

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 42

```
 1  are you referring to Sherman Financial Group,
 2  LLC?
 3      A.  Yes.
 4      Q.  Is there any other entity that
 5  you consider to be Sherman Financial other
 6  than Sherman Financial Group, LLC?
 7      A.  No.
 8      Q.  So when that's used by the bank
 9  or by Credit One Financial, when it shows up
10  in paperwork and it says "Sherman Financial,"
11  what's being referred to there is Sherman
12  Financial Group, LLC; is that correct?
13      A.  I believe so.
14      Q.  Do you have an understanding as
15  to why Sherman Financial became the owner of
16  Marin National Bancorp in March of 2005?
17      A.  Yes.
18      Q.  What's your understanding?
19      A.  The Qvale family was looking to
20  sell the bank for effectively, I think,
21  estate-planning purposes.  Kjell was an
22  elderly individual.
23      Q.  And do you have an
24  understanding -- who at that time owned or
25  ran Sherman Financial?
```

Page 43

```
 1      A.  I believe it to be Ben Navarro
 2  and Brett Hildebrand ran Sherman Financial.
 3      Q.  Do they still run it?
 4      A.  Yes.
 5      Q.  Do you have an understanding as
 6  to why those individuals in Sherman Financial
 7  wanted to purchase Marin National Bancorp
 8  from Mr. -- or from Kjell?
 9      A.  Not specifically.
10      Q.  Well, you understood that he
11  wanted to sell it for estate-planning
12  purposes.  The flip side to that is it had to
13  make sense for them in some way.
14      A.  Diversifying their financial -- I
15  think it made a good business decision.  They
16  evaluated it, and it was a good business
17  decision.  I don't know specifically what
18  motivated them.
19      Q.  And Credit One Financial, who
20  you're here testifying for, has no
21  understanding as to why those individuals
22  wanted to purchase what was then Credit One
23  Financial.
24      A.  Well, what was then Marin
25  National Bancorp.
```

Page 44

```
 1      Q.  Right, right.  But I take it the
 2  knowledge that Credit One Financial has today
 3  includes the knowledge of Marin National
 4  Bancorp prior to that name change in 2006,
 5  does it not?
 6      A.  Yes.
 7      Q.  Well, does Credit One Financial
 8  have any understanding as to why Sherman
 9  Financial Group purchased it back in March
10  of 2005?
11          MR. SLODOV:  Asked and answered.
12      Objection.
13          THE WITNESS:  For the -- I'm not
14      sure exactly how to answer.  The bank
15      was being shopped to be sold, so there
16      were various people evaluating, and it
17      made financial sense to them.  They have
18      wanted to get into this business.
19  BY MR. SHELLY:
20      Q.  And if I understand your prior
21  testimony, the only asset that Marin National
22  Bancorp had at that time that could be
23  purchased in a sale of Marin National Bancorp
24  was its holding in First National Bank of
25  Marin; correct?
```

Page 45

```
 1      A.  Correct.
 2      Q.  What other knowledge does Credit
 3  One Financial have regarding Sherman
 4  Financial other than what you've just talked
 5  about?  Does it know anything about the
 6  current structure of Sherman Financial?
 7      A.  Generally.
 8      Q.  Could you give me that general
 9  knowledge.
10      A.  That it has a debt-buying
11  business; that it has a Mexico banking
12  operation.
13      Q.  Anything else?
14      A.  The credit card operation that
15  we're talking about but --
16      Q.  What do you mean by "a
17  debt-buying business"?
18      A.  They purchase debt.
19      Q.  What kind of debt are you
20  referring to?
21      A.  Consumer loans of various types.
22      Q.  Does that include credit card
23  debt?
24      A.  Yes.
25      Q.  And does Sherman Financial do
```

12 (Pages 42 to 45)



Page 46

1  that itself, or does it do it through some
2  other entity?
3      A.   Through other entities, I
4  believe.
5      Q.   Do you know the names of any of
6  those other entities?
7      A.   Not specifically.  I think you
8  had maybe mentioned one of them previously,
9  but they're -- I don't have -- or Credit One
10 Financial doesn't have knowledge of their
11 purchasing practices, entities, or asset
12 holding -- you know, their process.
13     Q.   Well, where is Sherman Financial
14 located?
15     A.   They have offices in South
16 Carolina.
17     Q.   Is that where Credit One
18 Financial gets its direction from?
19     A.   No.
20     Q.   Where does Credit One Financial
21 get its direction from?
22     A.   From the board.
23     Q.   And the board -- does it consist
24 of any individuals other than the officers
25 that we've already talked about?

Page 47

1      A.   Yes.
2      Q.   Who is on the board of Credit One
3  Financial?
4      A.   Ben Navarro, Brett Hildebrand.
5      Q.   Anyone else?
6      A.   Chris Jones, Scott Silver, Robert
7  Dejong, Berkman Hong, Mike Lauer.
8      Q.   Mr. Navarro and Mr. Hildebrand,
9  you had indicated as being some of the owners
10 of Sherman Financial.  First of all, do you
11 know if they're the only owners of Sherman
12 Financial, or are there other owners?
13     A.   I'm not aware to the specific
14 detail of all the owners.
15     Q.   Well, do you know if --
16     A.   But presumably, there are other
17 owners, yes.
18     Q.   Why presumably?
19     A.   I know it's management team owned
20 but not the specific ownerships.
21     Q.   The other individuals that you
22 mentioned on the board of Credit One
23 Financial, are they in any way on the
24 management team of Sherman Financial?
25     A.   No.

Page 48

1      Q.   Other than being on the board of
2  Credit One Financial, does Mr. Jones, Chris
3  Jones, have any position within any of the
4  Sherman entities that I've referred to
5  earlier?
6      A.   Yes.
7      Q.   What entities would they be?
8      A.   Do not know specifically.
9      Q.   But you do know he's affiliated
10 with some -- at least one other entity within
11 that group.
12     A.   Correct.
13     Q.   Do you have any understanding as
14 to why he's on the board of Credit One
15 Financial?
16     A.   He was involved with the initial
17 transaction, evaluating it.
18     Q.   Anything else?
19     A.   His -- I think some previous
20 experience and knowledge in the financial
21 services.
22     Q.   What sort of previous experience
23 and knowledge are you referring to?
24     A.   I don't have the specific.
25     Q.   But you know he's been in some

Page 49

1  ways involved in the financial service
2  business at least prior to the acquisition by
3  Mr. Navarro and Mr. Hildebrand in 2005; is
4  that correct?
5      A.   Yes.
6      Q.   Have you had any personal
7  dealings with Mr. Jones?
8      A.   Yes.
9      Q.   In what way?
10          MR. SLODOV:  Objection.  Beyond
11     the scope.
12          THE WITNESS:  About -- at the
13     time of the transaction.
14 BY MR. SHELLY:
15     Q.   At the time of the name change
16 and the sale -- or the sale, rather?
17     A.   The sale.
18     Q.   The sale, actually.  Okay.
19          What was your involvement with
20 him at the time of the sale of Marin National
21 Bancorp?
22     A.   Information exchange based upon
23 the transaction evaluation.  Financial
24 metrics.
25     Q.   Was Mr. Jones working for

13 (Pages 46 to 49)



Page 58

1   Q. Okay. Let me just see if I
2  understand this correctly. You're saying
3  that Credit One Bank has receivables;
4  correct? That it sells. What do you mean
5  when you say "receivables"?
6   A. Credit card receivables.
7   Q. And to a layperson, what would
8  that mean?
9   A. A purchase at Wal-Mart.
10  Q. Okay. On a credit card would
11 create a credit card receivables. And that
12 receivable is transferred from Credit One
13 Bank to MHC; is that correct?
14  A. Correct.
15  Q. That's the first part of this --
16 this transaction.
17  A. That's correct.
18  Q. How is that -- and is that
19 done -- what's the timing of that? I go in.
20 I make that purchase at Wal-Mart. How long
21 does it take for that purchase at Wal-Mart to
22 get into the hands of MHC?
23  A. I'll provide an example. Maybe
24 would be the easiest.
25  Q. Okay. Sure.

Page 59

1   A. Easiest way.
2   Q. Because I'm trying to come up
3  with an example, and I'm sure you can come up
4  with a better one than I can, so yeah, go
5  right ahead.
6   A. Because settlement by each
7  merchant may take a various amount of time.
8   Q. Right.
9   A. Depending on when they close out
10 their day.
11  Q. Okay.
12  A. But that purchase at Wal-Mart is
13 received by the bank, say -- today is the
14 2nd, June 2. On June 3, that would be in the
15 bank's settlement for June 2. And on June 3,
16 that receivable would be sold.
17  Q. So the timing -- the beginning of
18 this sale process is when it's settled by
19 Credit One Bank -- when it becomes part of
20 the settlement of Credit One Bank; correct?
21  A. Yes.
22  Q. How long does it take -- not just
23 how long, but how does that receivable get
24 transferred from Credit One Bank at the time
25 of the settlement to MHC? What's that

Page 60

1  process? How does that occur?
2   A. So Credit One Bank -- to make
3  sure I'm understanding, so you want to know
4  the example of a purchase amount perhaps.
5   Q. Okay. Sure. You got a
6  settlement.
7   A. There's a $100 settlement.
8   Q. It's a receivable. It's settled
9  at the bank.
10  A. At the bank.
11  Q. How does that get to MHC?
12  A. MHC purchases it the next -- the
13 day after that -- of that settlement for that
14 $100.
15  Q. Okay.
16  A. So they transfer funds to the
17 bank.
18  Q. That occurs a day after the
19 settlement, so the receivable is with the
20 bank for a day?
21  A. I mean, technically, it's today.
22 The settlement of yesterday that we know
23 today.
24  Q. Okay.
25  A. So it's not really -- I'd say

Page 61

1  it's less than a day.
2   Q. And that process occurs -- I take
3  it it's not -- you don't have clerks sitting
4  around looking at all these things. It's all
5  done electronically via the computers; is
6  that correct?
7   A. Correct, it's -- yes.
8   Q. And you said there's a transfer
9  of funds from MHC to the bank, and the bank
10 transfers, at the same time, that receivable
11 to MHC; is that correct?
12  A. Uh-huh, yes.
13  Q. And do you know, does MHC pay the
14 bank a premium to purchase that receivable?
15 What's the --
16  A. Par.
17  Q. Par. Okay.
18      So there's no -- there's no
19 financial benefit bestowed upon the bank in
20 selling that receivable to MHC; is that
21 correct?
22  A. Not on the individual receivable
23 basis.
24  Q. On any sort of a basis with those
25 receivables? I mean, as a group? You say

16 (Pages 58 to 61)



Page 62

```
 1   not on an individual basis.  If I add
 2   thousands and thousands of them together,
 3   would there be any financial benefit in that
 4   transfer?
 5       A.   No.
 6       Q.   So in the sale of those
 7   receivables, the bank really nets zero in
 8   terms of profit; correct?
 9       A.   Correct.
10       Q.   Why does Credit One Bank do that?
11   Why do they sell it to MHC?  What's the
12   rationale behind that?
13       A.   It's the structure the regulators
14   wanted in place at the time of the sale to
15   Sherman.
16       Q.   The regulators?
17       A.   Our primary regulator, the OCC,
18   Office of the Comptroller of the Currency.
19       Q.   Do you have any understanding why
20   they wanted that sort of a structure set up?
21       A.   They wanted the receivables off
22   balance sheet of the bank.
23       Q.   And do you know why they wanted
24   that?
25       A.   To not -- so we wouldn't -- to
```

Page 63

```
 1   not fund the loans with insured deposits, so
 2   they wanted a different structure.
 3       Q.   When you say "to not fund the
 4   loans with the insured deposits," what loans
 5   are you referring to?
 6       A.   The receivable.  They wanted the
 7   receivables off balance sheet, to be financed
 8   off balance sheet, to be sold on a
 9   non-recourse basis.
10       Q.   Previously, they were funded with
11   insured deposits?
12       A.   They were funded on balance
13   sheet, yes.
14       Q.   And that occurred within the
15   prior Marin -- First National Bank of Marin
16   structure?
17       A.   Correct.
18       Q.   Okay.  So this change in this
19   process that the OCC wanted, that occurred
20   with the sale of Marin National Bancorp to
21   Sherman Financial Group and the new structure
22   that was ultimately set up, Credit One Bank;
23   is that correct?  Did it happen with the
24   transaction or the name change?
25       A.   Transaction.
```

Page 64

```
 1       Q.   And do you know why, in
 2   particular with that transaction, the OCC
 3   wanted that change?
 4       A.   Nothing further than I've already
 5   told you.
 6       Q.   Do you know why the OCC didn't
 7   want the prior owners to set up such a
 8   process?
 9       A.   I do not.
10       Q.   You just know that when the new
11   owners came on, they wanted this change to
12   occur.
13       A.   Correct.
14       Q.   And when you're talking about
15   insured deposits that existed at that time,
16   that would be people with savings accounts,
17   things like that, at First National Bank of
18   Marin; is that correct?
19       A.   Savings account, time
20   certificates of deposit.
21       Q.   Anything else that would be
22   considered an insured deposit?
23       A.   No.
24       Q.   Does Credit One Bank currently
25   hold any insured deposits?
```

Page 65

```
 1       A.   Yes.
 2       Q.   What insured deposits does it
 3   currently hold?
 4       A.   From Credit One Financial.
 5       Q.   It holds insured deposits from
 6   Credit One Financial.  What insured deposits
 7   does it hold from Credit One Financial?
 8       A.   A CD.
 9       Q.   One CD?
10       A.   Correct.
11            (Pages 66 through 75 were
12            deemed confidential and are
13            bound separately.)
```

17 (Pages 62 to 65)



```
                                                          Page 74
 1          *** C O N F I D E N T I A L ***
 2              CERTIFICATE OF DEPONENT
 3    PAGE  LINE  CHANGE     REASON
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13              *   *   *   *   *
14        I, George Hughes, deponent herein, do
15    hereby certify and declare under the penalty of
16    perjury that the within and foregoing transcription,
17    including my corrections reflected above, is a true
18    and correct transcription of my testimony contained
19    therein; that I have read, corrected, and hereby
20    affix my signature to said deposition.
21        Executed this _____ day of _____, 2016,
22    at _____.
                 (City/State)
23
24
              _____
25              George Hughes, Deponent
```

```
                                                          Page 75
 1          *** C O N F I D E N T I A L ***
 2              CERTIFICATE OF REPORTER
 3
 4    STATE OF NEVADA    )
                         SS:
 5    COUNTY OF CLARK    )
 6
 7        I, Jennifer Clark, a Certified Court Reporter
      licensed by the State of Nevada, do hereby certify:
 8    That I reported the deposition of George Hughes,
      commencing on June 2, 2016.
 9
          That prior to being deposed, the witness was
10    duly sworn by me to testify to the truth; that I
      thereafter transcribed my said stenographic notes
11    into written form; that the typewritten transcript
      is a complete, true, and accurate transcription of
12    my said stenographic notes; and that review of the
      transcript was requested.
13
          I further certify that I am not a relative,
14    employee, or independent contractor of counsel or of
      any of the parties involved in the proceeding, nor a
15    person financially interested in the proceeding, nor
      do I have any other relationship that may reasonably
16    cause my impartiality to be questioned.
17        IN WITNESS WHEREOF, I have set my hand in my
      office in the County of Clark, State of Nevada, this
18    19th day of June, 2016.
19
20
21
22
              _____
23              Jennifer Clark, RDR, CRR, CCR 422
24
25
```

```
                                                          Page 76
 1              *   *   *   *
 2    BY MR. SHELLY:
 3        Q.   Getting back to that process that
 4    you started out with describing, the transfer
 5    of receivable from Credit One Bank to MHC,
 6    and you described that to me at par value and
 7    that it occurs after settlement, it then goes
 8    from MHC to FNBM; is that correct?
 9        A.   FNBM, LLC, yes.
10        Q.   I'm just going to call it FNBM,
11    if that's okay with you.
12        A.   That's fine.
13        Q.   I won't use the LLC on -- you
14    know, like we weren't talking about Sherman
15    Financial as opposed to Sherman Financial
16    Group, LLC.  If you're confused, though, when
17    I say it at any point, just let me know, and
18    we'll straighten it out.
19             So it goes from MHC to FNBM.  Can
20    you describe that process similar to the way
21    you described the process of that receivable
22    going from Credit One Bank to MHC.  I'm
23    trying to understand how that occurs from MHC
24    to FNBM.
25        A.   Effectively exactly the same.
```

```
                                                          Page 77
 1        Q.   So it's done at par value.
 2             How long does it take for that --
 3    that receivable to settle at MHC?  Does it
 4    happen instantaneously?
 5        A.   Yes.
 6        Q.   So once the computer moves it
 7    from Credit One Bank to MHC, at that very
 8    moment, it's settled, and at that very same
 9    moment, it's then transferred to FNBM; is
10    that correct?
11        A.   Correct.
12        Q.   So MHC is really just strictly a
13    pass-through mechanism from Credit One Bank
14    to FNBM; correct?
15        A.   Correct.
16        Q.   And when MHC sells that
17    receivable to FNBM, there's no -- it's done
18    at par value, so there's no financial benefit
19    that inures to MHC or to Credit One Bank as a
20    result of that transfer to FNBM; correct?
21        A.   Correct.
22        Q.   And why does that transfer take
23    place?
24        A.   FNBM is the financing vehicle,
25    the entity.
```

20 (Pages 74 to 77)



Page 78

1    Q.    Okay.  The financing vehicle
2  for -- for the purchase of these receivables
3  or financing vehicle for something beyond
4  that?
5    A.    Well, it's a structured finance
6  where FNBM holds the assets and has a
7  borrowing facility associated with those
8  assets that receive funds from lenders, and
9  the assets are collateral for that asset.
10  They're effectively an asset-backed borrowing
11  facility.
12    Q.    Could you try to simplify that
13  for me in layperson's -- I think I understand
14  what you're saying, and correct me if I'm
15  wrong.
16          They use -- once they get these
17  receivables, they use that as an asset to be
18  able to get money loaned to FNBM that it can
19  then use for the purchase of those
20  receivables from MHC, which MHC can then use
21  to purchase those receivables from Credit One
22  Bank; is that correct?
23    A.    Correct.
24    Q.    Anything about what I just said
25  that doesn't quite jibe, or is that exactly

Page 79

1  how it occurs?
2    A.    No.  I think that's exactly how
3  it occurs.
4    Q.    Okay.
5          (A recess was taken from
6          11:03 A.M. to 11:13 A.M.)
7  BY MR. SHELLY:
8    Q.    I just wanted to backtrack for a
9  second.  You had mentioned about Mr. Lauer,
10  who was previously with MGIC.  Is there
11  anyone else at Credit One Financial that has
12  ever been affiliated with MGIC?
13    A.    No, not that I'm aware of.
14    Q.    And are you aware of any other --
15  any relationship that MGIC has had with any
16  Sherman entity other than its -- I think you
17  described it as prior ownership of Sherman
18  Financial Group -- yeah, ownership interest
19  in Sherman Financial Group?
20    A.    No.
21    Q.    Okay.
22    A.    None that I'm aware of.
23    Q.    Getting back to this transfer
24  process that we talked about, we talked about
25  from Credit One Bank to MHC, and you told me

Page 80

1  that that was done at the request of the
2  regulators.
3          This transfer process from MHC of
4  the receivables to FNBM, was that also
5  something that was requested or required by
6  the regulators?
7    A.    I'm not aware that -- the
8  specific was -- they requested it be off
9  balance sheet.
10    Q.    Once it went -- that receivable
11  went from Credit One Bank to MHC, was it off
12  balance sheet?
13    A.    Yes.
14    Q.    So any transfer after that fact
15  really was not required by the regulators; is
16  that correct?
17    A.    That be my -- my opinion.  Yeah,
18  I would think that would be correct.
19    Q.    And Credit One Financial set up
20  that transfer from its subsidiary, Credit One
21  Bank, to MHC to satisfy the request of the
22  OCC to get that receivable off of its balance
23  sheet; correct?
24    A.    That was, I think -- sorry.
25          The proposed structure was the

Page 81

1  one -- the proposed structure to move it off
2  balance sheet, to have the transfer from, at
3  the time, First National Bank of Marin to
4  MHC Receivables, was at the, I guess,
5  direction, so to speak, of the regulators and
6  with their approval of that structure.
7    Q.    And that initial transfer that
8  you just described from First National Bank
9  of Marin to MHC, that satisfied that
10  direction of the OCC; correct?
11    A.    I'm not certain.
12    Q.    Is Credit One Financial certain?
13  I mean, certainly they set up such a
14  structure to satisfy those -- that
15  requirement; correct?
16    A.    I don't recall if the structure
17  was the pass-through that's in existence
18  today or just the MHC at that time, because
19  it was set up at the same time.  The
20  understanding is FNBM, LLC needed to be set
21  up for the financing to be in place as a
22  bankruptcy-remote entity.
23    Q.    Whose understanding was that when
24  you said the understanding was that --
25    A.    Credit One Financial's

21 (Pages 78 to 81)



Page 134

1  Q. So the bank has not always sent
2  out such letters.
3  A. I'm not certain. I don't believe
4  it always has.
5  Q. Do you know why it started
6  sending out such letters?
7  MR. SLODOV: Objection. I'm just
8  going to make a point of clarification.
9  You're asking to his personal knowledge
10  again, or is this Credit One Financial?
11  MR. SHELLY: Credit One
12  Financial.
13  BY MR. SHELLY:
14  Q. Well, I mean, Credit One
15  Financial is its subsidiary. Does it know
16  why its subsidiary started sending out these
17  letters?
18  A. No.
19  Q. Do you know if the bank, after it
20  sends out such letters or after it sells such
21  accounts, continues to receive payments from
22  its customers on that debt?
23  A. I'm sorry. What was the first
24  part of that?
25  Q. After the bank either sends out

Page 135

1  one of these letters or sells the account to
2  some other entity through MHC, does the bank
3  ever receive payments from its customers on
4  those debts?
5  A. It would at times.
6  Q. And what does it do with those
7  payments?
8  A. Remits those on to the buyer.
9  Q. And how does it know who the
10  buyer is? How does it know where to send
11  that payment?
12  A. There's -- my understanding,
13  there's a coding at the account level to
14  track who they're sent to.
15  Q. And that coding at the account
16  level, is that done at the bank, or is that
17  done at FDR?
18  A. FDR is the system of record where
19  all that --
20  Q. So the bank would utilize its
21  records at FDR to determine who the purchaser
22  was, and it would remit -- send that payment
23  to that purchaser; is that correct?
24  A. Yes.
25  Q. Does it keep any of that payment,

Page 136

1  or does it send the full payment to the
2  purchaser?
3  A. It sends the full payment.
4  Q. Has that always been the case?
5  A. Yes.
6  Q. And does it receive any fee back
7  from the purchaser for forwarding that
8  payment that it received?
9  A. No.
10  Q. Has it ever received any?
11  A. No.
12  THE WITNESS: Can we take a
13  break?
14  MR. SHELLY: Sure.
15  (A luncheon recess was taken
16  at 12:28 P.M.)
17  * * * * *

Page 137

1  LAS VEGAS, NEVADA; JUNE 2, 2016
2  1:14 P.M.
3  -o0o-
4
5  EXAMINATION (Resumed)
6  BY MR. SHELLY:
7  Q. This is just a question. I'm
8  curious. Maybe you know the answer.
9  Sherman Originator III, do you
10  know why it's called three?
11  A. No, I don't.
12  Q. Do you know if there was a two
13  and a one or if there's a four?
14  A. No, I don't.
15  Q. Okay. Just curious more than
16  anything else about that one.
17  Going through those, those other
18  entities that we talked about whether or not
19  you had any knowledge about them was PYOD,
20  LLC, if you know what they are and what they
21  do?
22  A. I do not.
23  Q. Have you ever heard of them
24  before today?
25  A. I think I've heard of them or --

35 (Pages 134 to 137)



Page 158

1    A.    I'm not sure it's segregatable,
2  but I don't know exactly how or the structure
3  or the maintenance of that.
4    Q.    Okay.  It's segregatable.  Do you
5  know if it is, in fact, segregated?
6    A.    It's segregate.
7    Q.    Who is responsible to maintain
8  the documents of Credit One Financial?
9    A.    From a financial perspective, the
10 finance group of Credit One Bank, myself.
11   Q.    So you would be the person
12 responsible for maintaining the --
13   A.    I would be the person responsible
14 for maintaining financial documentation.
15   Q.    Okay.
16   A.    Whatever that is.
17   Q.    Did you receive any notification
18 of a litigation hold as it may relate to this
19 case and the documents in the possession of
20 Credit One Financial?  Not the bank but
21 Credit One Financial.
22   A.    I believe so.
23   Q.    You're not sure, though?
24   A.    Well, my understanding, separate
25 of this, of document hold would be to not

Page 159

1  destroy anything, but nothing has been
2  destroyed.  So I can't recall specifically --
3    Q.    Okay.
4    A.    -- to be quite frank.
5    Q.    But as far as you know, as the
6  person maintaining the documents at Credit
7  One Financial, you're not aware, then, of the
8  destruction of any records of Credit One
9  Financial that -- at any point in time since
10 the creation of Credit One Financial.  Is
11 that correct?
12   A.    Yeah, nothing that's -- yes, that
13 would be -- I think that's a fair statement.
14         MR. SHELLY:  All right.  I think
15    that's all I have.
16         MR. SLODOV:  All right.  I have a
17    couple questions.
18
19              EXAMINATION
20 BY MR. SLODOV:
21   Q.    Mr. Hughes, Counsel -- Mr. Shelly
22 began by defining for you Sherman entities,
23 and one of the questions I wanted to clear
24 up, is Credit One Financial a Sherman entity?
25   A.    Credit One Financial is not a

Page 160

1  Sherman entity.
2    Q.    Is Credit One Bank a Sherman
3  entity?
4    A.    No.
5    Q.    From what you testified to in
6  2006, First National Bank of Marin was
7  acquired as well as Marin --
8    A.    National Bancorp.
9    Q.    -- National Bancorp were acquired
10 by Sherman Financial Group; is that correct?
11   A.    Correct.
12   Q.    Did there come a point in time
13 after 2006 that that relationship changed?
14   A.    Yes.
15   Q.    And when was that?
16   A.    I believe it was December 31,
17 2012.
18   Q.    And can you explain for the
19 record how the relationship changed.
20   A.    Credit One Financial and Credit
21 One Bank elected to change its corporate
22 status from C corp -- a C corporation to an
23 S corporation.
24   Q.    And how did that affect ownership
25 or control of Credit One Financial?

Page 161

1    A.    The ownership of Credit One
2  Financial was transferred to the respective
3  ownership of Sherman Financial as individuals
4  or trusts.
5    Q.    So prior to December 31, 2012,
6  would it be fair to say that Sherman
7  Financial Group held an ownership interest in
8  the stock of Credit One Financial?
9    A.    Correct.
10   Q.    Do you recall what the percentage
11 ownership was?
12   A.    100 percent.
13   Q.    And after December 31, 2012, was
14 there --
15   A.    Zero.
16   Q.    Zero.  Okay.
17         And does Credit One Financial
18 dictate policy, practice, or procedure to its
19 subsidiary, Credit One Bank?
20   A.    No.
21   Q.    In terms of the manner in which
22 Credit One Financial relates to Credit One
23 Bank, would it be fair to say that Credit One
24 Financial is a holding company that has no
25 operations of its own?

41 (Pages 158 to 161)

