# Exhibit B

Confidential

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

ORRIN S. ANDERSON, AKA          CASE NO.
ORRIN ANDERSON, AKA ORRIN       14-22147 (rdd)
SCOTT ANDERSON,
                                CHAPTER 7
    Debtor.
-------------------------------------------------
IN RE:

ORRIN S. ANDERSON, AKA          ADV. CASE NO.
ORRIN ANDERSON, AKA ORRIN       15-08214 (rdd)
SCOTT ANDERSON

    DEBTOR AND PLAINTIFF,
    ON BEHALF OF HIMSELF
    AND ALL OTHERS
    SIMILARLY SITUATED,
        v.
CREDIT ONE BANK, N.A.,
    DEFENDANT.
-------------------------------------------------

DEPOSITION OF:    JON C. MAZZOLI

DATE:             June 16, 2016

TIME:             11:37 AM

LOCATION:         Residence Inn - Charleston Airport
                  5035 International Boulevard
                  Charleston, SC

TAKEN BY:         Counsel for the Plaintiff

REPORTED BY:      TERRI L. BRUSSEAU, RPR, CRR



Page 6

1  Resurgent Capital Services, LP, LVNV Funding, LLC
2  and Sherman Capital Markets, LLC.
3  BY MR. SHELLY:
4      Q.  Okay.  Is that your understanding as
5  well?
6      A.  Yes.
7      Q.  Okay.  Does the -- Sherman Capital
8  Markets have servicing agreements with any of the
9  others that you just mentioned?
10     A.  I don't know the structure of the
11 servicing agreements.  They provide services but I
12 don't know if it's a servicing agreement that goes
13 through one of the other entities to touch the
14 other ones.
15     Q.  Okay.
16     A.  But I perform services for --
17     Q.  You personally?
18     A.  -- most of the companies other than
19 Credit One Financial, Credit One Bank and LVNV
20 Funding -- I'm sorry, I do provide services for
21 LVNV Funding -- Resurgent Capital Services.
22     Q.  Resurgent you do not provide servicing
23 to?
24     A.  Not in an official capacity.
25     Q.  What do you mean by that?

Page 7

1      A.  I interact with those people on a
2  regular basis but they have a full structure.
3      Q.  Okay.  Which of the other -- other than
4  Capital -- Financial -- Sherman Capital, which of
5  these other entities have servicing agreements, if
6  any, with Credit One Bank or Credit One Financial?
7          MR. BRESSLER:  Objection, form.
8          THE WITNESS:  I -- I'm not aware of the
9  underlying servicing agreements and whatnot in
10 particular.  I know very little about the structure
11 of Credit One Bank or Credit One Financial.
12 BY MR. SHELLY:
13     Q.  Okay.  Do you have any understanding --
14 and again, it's not your understanding but do you
15 have an understanding of the eight entities that
16 you were subpoenaed to appear here for today as to
17 their servicing agreements with Credit One Bank,
18 Credit One Financial?
19     A.  I don't -- don't think I have full and
20 complete knowledge on the relationships back into
21 Credit One Financial and Credit One Bank.  I don't
22 believe there were servicing agreements but that
23 would need to be verified.
24     Q.  Okay.  You didn't make an attempt to
25 verify that prior to today?

Page 8

1      A.  I didn't think I was going to have to
2  touch Credit One Bank or Credit One Financial.
3      Q.  Okay.  And why -- why didn't you think
4  that?
5          MR. BRESSLER:  Because he is not being
6  offered as a witness on behalf of those two
7  entities as you've been informed.
8          MR. SHELLY:  No, I know that.  He's
9  being offered as a witness for the eight entities
10 that were subpoenaed and I'm asking about their
11 servicing agreements that they have with those two
12 other entities.
13         MR. BRESSLER:  Because that's not
14 covered by the topic.
15         MR. SHELLY:  Okay.
16 BY MR. SHELLY:
17     Q.  So when it says, the structure and
18 relationships between and among Credit One and the
19 other Sherman entities, you don't understand that
20 the other Sherman entities include the eight that
21 you were subpoenaed to appear here today for?
22     A.  I may have misunderstood your question
23 but I don't know the answer to it and I know a lot
24 about the relationship and structure but I don't
25 know that specific fact.

Page 9

1      Q.  Okay.  All right.  Well, let's start
2  with Sherman Financial Group.  It's my
3  understanding and correct me if I'm wrong that
4  Sherman Financial Group is owned by Sherman Capital
5  Markets, is that correct?
6      A.  Yes.
7      Q.  Okay.  And who are the people that make
8  up Sherman Capital Markets?
9      A.  In terms of employees?
10     Q.  Employees and -- and owners.
11     A.  They're two completely separate groups
12 or -- there's overlap but they're two groups.
13     Q.  Okay.
14     A.  So which company again did you ask,
15 Sherman Capital or Sherman Financial?
16     Q.  Sherman Capital Markets.
17     A.  Yeah.  Sherman Capital Markets has many
18 employees, I don't know the exact number, but it's
19 many employees serving all the typical business
20 functions.  The owners are a collection of
21 individuals, family trusts and --
22     Q.  How many owners?
23     A.  -- various entities.
24         MR. BRESSLER:  Well, I'm going to
25 object.  There's nothing in your subpoena touching



## Page 10

```
 1   upon ownership.
 2           MR. SHELLY:  Well, it has to do with
 3   the structure.
 4           MR. BRESSLER:  Has nothing to do with
 5   the ownership.
 6           MR. SHELLY:  Well, I disagree.  I think
 7   it does.
 8           MR. BRESSLER:  The word ownership is
 9   different than the word structure and there's
10   nothing in here that obligates him to testify as to
11   ownership.
12           MR. SHELLY:  Okay.
13   BY MR. SHELLY:
14      Q.  Okay.  Can -- can you tell me how many
15   owners there are?
16      A.  I don't know the number of owners.
17      Q.  Okay.  Are -- there are individuals?
18      A.  Yes.
19      Q.  Are you one of the individuals?
20      A.  Actually, I don't know if there are
21   individuals but there are --
22           MR. BRESSLER:  If you don't know, you
23   don't know.
24           THE WITNESS:  Yeah, I don't know if
25   there are individuals.  I as an individual do not
```

## Page 11

```
 1   own any shares but I do -- my -- a trust -- I'm
 2   sorry, an LLC controlled by me owns some shares.
 3   BY MR. SHELLY:
 4      Q.  Okay.  And when you say it has many
 5   employees, are we talking a dozen employees, a
 6   hundred employees, how many employees do you have
 7   roughly?
 8      A.  I would guess approximately 50 but that
 9   is a little bit of a guess.
10      Q.  Okay.  And -- and other than owning
11   Sherman Financial Group, what activities does
12   Sherman Capital Markets engage in?
13      A.  Let me clear up a point here.  There
14   is -- and I forget the trailing -- Sherman Capital
15   Markets, the company that provides services and has
16   the 50 employees, does not own Sherman Financial
17   Group.
18      Q.  Okay.
19      A.  It is a separate entity that provides
20   services into it.  So the Sherman Financial Group
21   which owns many businesses -- you know, the Sherman
22   Capital Markets people do not work for Sherman
23   Financial Group.  They work for the Sherman Capital
24   Markets which provide services but Sherman
25   Financial Group -- Sherman Capital Markets, the
```

## Page 12

```
 1   company I work for, does not own SFG.
 2      Q.  Who -- who does Sherman Capital Markets
 3   provide those services for?
 4      A.  The Sherman companies.
 5      Q.  And what are those services?
 6      A.  General management services so tax,
 7   accounting, business management.
 8      Q.  And it doesn't do it for -- for each
 9   and every one of those entities?
10      A.  Which entities are you referring to
11   again, the eight that are listed here?
12      Q.  Correct.
13      A.  No, it does not provide -- I don't
14   believe it provides services in an official
15   capacity to Credit One Financial.  It does provide
16   them to Sherman Financial Group, Sherman Originator
17   III, FNBM, MHC, PYOD, Resurgent Capital Services,
18   LVNV Funding and Sherman Capital Markets itself
19   is -- is its company.
20      Q.  And what -- what about Capital One
21   Bank?
22           MR. BRESSLER:  Capital One Bank?
23   BY MR. SHELLY:
24      Q.  Excuse me, Credit One Bank.
25      A.  Yeah.  I don't believe it provides any
```

## Page 13

```
 1   services in a -- an official capacity.
 2      Q.  Okay.  But in -- in an unofficial
 3   capacity how does it provide services?
 4           MR. BRESSLER:  Objection, beyond the
 5   scope.
 6   BY MR. SHELLY:
 7      Q.  He's going to object and -- and unless
 8   he directs you not to answer you --
 9      A.  Okay.
10           MR. BRESSLER:  And I'll give a
11   little --
12   BY MR. SHELLY:
13      Q.  -- still have to answer.
14           MR. BRESSLER:  I'll give a little
15   leeway, Jeff, just so you know --
16           MR. SHELLY:  Yeah.
17           MR. BRESSLER:  -- as to scope.  If it
18   goes too for or too much time's wasted then we'll
19   direct him.
20           THE WITNESS:  Yeah.  We work together
21   facilitating this flow of their charge-offs and
22   so --
23           MR. SHELLY:  Let's stop a second here.
24           (The proceedings were interrupted.)
25           (Off-the-record conference.)
```



Page 14

1  THE WITNESS: Is there a question
2  outstanding?
3  BY MR. SHELLY:
4  Q. No.
5  A. Okay.
6  Q. You're -- we were talking about Sherman
7  Financial Group. Who does own Sherman Financial
8  Group? You said it's not Sherman Capital Markets.
9  A. Again, that's a collection of
10 individuals. There is a -- an entity over it but
11 it's just fundamentally a collection of the
12 individuals and family trusts.
13 Q. What -- what is that entity called?
14 A. It's --
15 MR. BRESSLER: I'm going to object,
16 beyond the scope.
17 THE WITNESS: I don't recall. I may
18 recall it while we're talking but I do not recall
19 right this second.
20 BY MR. SHELLY:
21 Q. Okay. But this is the entity that --
22 that owns Sherman Financial Group?
23 A. Um-hum.
24 Q. And Sherman Capital Markets, is that
25 owned in any way by Sherman Financial Group or is

Page 15

1  that a completely separate entity?
2  A. It is a completely separate entity.
3  Q. Okay. And the only way it's affiliated
4  with the Sherman Financial Group and the other
5  groups that fall under the Sherman Financial -- the
6  other entities that fall under Sherman Financial
7  Group are through the servicing agreements?
8  MR. BRESSLER: Object to the form.
9  THE WITNESS: I believe so.
10 BY MR. SHELLY:
11 Q. Okay. Does it have overlapping
12 employees or officers?
13 A. I don't believe Sherman Financial Group
14 has any employees and the officers would -- there
15 would be some overlap.
16 Q. Okay. Who are the officers of Sherman
17 Financial Group?
18 A. I don't know --
19 MR. BRESSLER: I'm going to object
20 beyond the scope.
21 THE WITNESS: I don't know the officers
22 of Sherman Financial Group.
23 BY MR. SHELLY:
24 Q. Okay. And then you note in the
25 definition there it lists the -- the eight entities

Page 16

1  we talked about but it also says, or any other
2  entity affiliated or owned by Sherman Financial
3  Group, LLC. Are all eight of those entities other
4  than Credit One Financial and Credit One Bank owned
5  or affiliated by -- with Sherman Financial Group?
6  MR. BRESSLER: We've got to make it
7  clear just because of the names. You don't -- we
8  have two lists in front of the witness.
9  MR. SHELLY: Okay.
10 MR. BRESSLER: All right. So you have
11 one list --
12 MR. SHELLY: Well, let's take this list
13 away.
14 MR. BRESSLER: Okay.
15 MR. SHELLY: Let's mark the subpoena to
16 Sherman Financial Group as Exhibit 1.
17 (DFT. EXH. 1, Subpoena To Testify At A
18 Deposition In A Bankruptcy Case For Adversary
19 Proceeding, was marked for identification.)
20 BY MR. SHELLY:
21 Q. And then the entities that I'm going to
22 be referring to as the related entities today will
23 include all eight listed in Definition Number 10
24 including Credit One Financial and Credit One Bank
25 and any other entity affiliated or owned by Sherman

Page 17

1  Financial Group.
2  MR. BRESSLER: And I'll object to that
3  definition.
4  BY MR. SHELLY:
5  Q. Okay. Do you understand what I'm
6  talking about when I talk about Sherman entities
7  based on that definition?
8  MR. BRESSLER: You -- you can't include
9  Credit One as a Sherman entity. There's no Credit
10 One Bank listed in your definition here either.
11 THE WITNESS: What is the definition of
12 affiliated?
13 BY MR. SHELLY:
14 Q. What does it mean to you?
15 MR. BRESSLER: Objection. It's not for
16 him to define it. How are you defining the word
17 affiliated, sir? It's your subpoena.
18 BY MR. SHELLY:
19 Q. My answer (sic) still stands.
20 A. Yeah, I can't answer because I don't
21 know what you mean by affiliated.
22 Q. Okay.
23 A. So if it means they know each other,
24 then the answer is yes. If it goes to the maximum
25 amount of interrelationship, the answer is no so

Page 26

1  the deposition here?
2     A.  Correct.
3     Q.  Okay.  You say there's something
4  incorrect on that?
5     A.  Yes.  The second instance of -- so we
6  pass accounts that we -- this regards the
7  receivables that are assigned to Credit -- the
8  Credit One charge-offs.  They go from FNBM to
9  Sherman Originator III.  The document is incorrect
10 to the extent it says they go to Sherman
11 Originator.  From Sherman Originator III they go to
12 either Sherman Originator or an unaffiliated
13 borrower -- or buyer, rather, so the instance of
14 Sherman Originator III should be deleted.
15    Q.  Okay.  When you say they go to an
16 unaffiliated buyer, what -- what are you referring
17 to?
18    A.  There could be companies that, you
19 know, buy a portion of the charged-off receivables
20 that are completely independent and, you know,
21 there's a -- the market of many -- many debt buyers
22 we sell to a small number of them.
23    Q.  Which debt buyers do you sell to?
24    A.  I'm under a confidentiality agreement
25 with them so I don't know if I'm able to disclose

Page 27

1  that.
2     MR. BRESSLER:  You don't have to
3  disclose it.
4     MR. SHELLY:  Well, you can designate
5  this portion of the transcript as confidential.
6     MR. BRESSLER:  He's not going to
7  testify as to it.  It's beyond the scope.
8     MR. SHELLY:  It's not.  It's not.  It
9  has to do with the -- explain the entire structure
10 of the relationship from origination of a trade
11 line to the ultimate sale to a third party.
12    MR. BRESSLER:  He is not --
13    MR. SHELLY:  And I'm asking who the
14 ultimate third party is.
15    MR. BRESSLER:  He's not going to
16 answer.
17    MR. SHELLY:  Okay.  You're directing
18 him not to answer that question?
19    MR. BRESSLER:  That's right.
20    MR. SHELLY:  Okay.
21 BY MR. SHELLY:
22    Q.  How many -- how many current
23 third-party buyers are there?
24    A.  One.
25    Q.  One.  Okay.  How many were there last

Page 28

1  year?
2     A.  Two.
3     Q.  The year before that?
4     A.  I believe two but I'm not a hundred
5  percent certain.
6     Q.  How about the year before that?
7     A.  It will have been one or two.
8     Q.  And the year before that?
9     A.  Again, it will have been one or two for
10 several years back and I don't think it was ever
11 more than three.
12    Q.  So you don't think -- you don't think
13 that Sherman Originator III has ever sold
14 charged-off consumer debt to any more than three
15 unaffiliated third-party buyers?
16    A.  I believe that's true for the Credit
17 One charged-off debt.  For non-Credit One the list
18 would get larger and it would be probably between
19 ten and 20.
20    MR. BRESSLER:  Just to be clear we're
21 only talking about Credit One charged-off debt?
22    THE WITNESS:  Correct.
23 BY MR. SHELLY:
24    Q.  So --
25    A.  Credit One charged-off debt.

Page 29

1     Q.  It is one, two or at the most three
2  third-party buyers?
3     A.  Right.
4     Q.  And that's going back to what time?
5     A.  Back to as long as I've worked at
6  Sherman which would go eight years --
7     Q.  Okay.
8     A.  -- eight-plus years.
9     Q.  Do you know if it goes back to the
10 origination of the -- I guess it would -- the
11 Credit One Bank itself?
12    A.  If what goes back?
13    Q.  That practice of just selling to no
14 more than three.
15    A.  I don't have the definitive answer but
16 I believe that it's -- it's never been a large
17 number.
18    Q.  Okay.  And the -- the ten or 20 that
19 you're talking about that Sherman Originator III
20 sells to, that's debt that came in from other
21 credit card companies that Sherman Originator III
22 had purchased or that -- you said other consumer
23 debt as well, doctors and things like that.  That's
24 going to these ten or 20?
25    A.  Yeah, Sherman Originator III -- no



Page 42

1  what nonperforming accounts should be put into a
2  pool and then offered to Sherman Originator III?
3      A.  I'm sorry, restate the question.
4      Q.  Yeah.  Is there -- is there a servicing
5  agreement or some sort of an agreement whereby FNBM
6  relies upon the bank to set up these pools of
7  nonperforming receivables to sell to Sherman
8  Originator III?
9          MR. BRESSLER:  Objection, form.
10         THE WITNESS:  I don't believe there is.
11 The bank is under -- the bank services the accounts
12 for -- the receivables, rather.  I'm sorry, the
13 bank services the receivables for FNBM.
14 BY MR. SHELLY:
15     Q.  Right.
16     A.  I have not read that servicing
17 agreement so I don't know the particular -- you
18 know, the scope.  It is a broad agreement though.
19 They -- while the -- until the receivables are sold
20 while they're owned by FNBM the bank provides the
21 services associated with those accounts --
22     Q.  Okay.
23     A.  -- those receivables, sorry.
24     Q.  But you don't know whether or not --
25 whether or not the pulling together of

Page 43

1  nonperforming receivables and offering them to
2  Sherman Originator III is part of any agreement
3  between FNBM or Credit One Bank, is that correct?
4      A.  I do not know the answer to that
5  question.
6      Q.  So you don't know why that practice was
7  set up?
8          MR. BRESSLER:  Objection, form.
9          THE WITNESS:  Yeah, it's -- I don't
10 really understand your -- the practice has -- it
11 has to be performed.  If you're going to sell
12 something you have to put it on a list.
13 BY MR. SHELLY:
14     Q.  Okay.
15     A.  So that's why -- the specific answer to
16 your question, that's why it is done.  Who's doing
17 it under what direction I do not know the answer.
18     Q.  Yeah, that's what I was wondering, if
19 you know why the bank was chosen if, in fact, the
20 bank -- I think you said the bank is the one that
21 does this.  You don't know if it's pursuant to an
22 agreement or something else.  I'm wondering if you
23 know why the bank is the one performing this
24 decision-making and offering that pool to Sherman
25 Originator III.

Page 44

1          MR. BRESSLER:  Objection, form.
2          THE WITNESS:  The bank will be the only
3  entity that knows when the receivable hits 180 days
4  past due and -- and it knows that because it is the
5  servicing agent for FNBM so nobody else can do that
6  work.
7  BY MR. SHELLY:
8      Q.  Okay.  Okay.
9      A.  Now, theoretically maybe you could
10 insert somebody but the entities we're talking
11 about, nobody has the information that -- to
12 perform that task.
13     Q.  Okay.  What is it that the bank is
14 offering to Sherman Originator III, is it the
15 receivable, is it the account?  What exactly are
16 they offering in this pool to Sherman Originator
17 III?
18     A.  The bank does not offer anything.  FNBM
19 sells the receivable and MHC sells the account.
20     Q.  Okay.  Would -- would Sherman
21 Originator purchase a pool of just receivables
22 without the account being offered by MHC?
23         MR. BRESSLER:  Objection, form, scope.
24         THE WITNESS:  You could do that but we
25 don't.  It would make it a more difficult asset to

Page 45

1  liquidate.
2  BY MR. SHELLY:
3      Q.  Okay.  What -- can you explain that to
4  me, why it would be more difficult?
5          MR. BRESSLER:  Objection, scope.
6          THE WITNESS:  There are rights that are
7  under the account that may or may not be under the
8  receivable.  It'll all depend on the relationship
9  between the consumer and the -- and the bank but
10 the industry, there are people who sell
11 receivables.  We don't typically buy them that way
12 but there are people who do so I don't know how --
13 BY MR. SHELLY:
14     Q.  Okay.
15     A.  -- that side works.
16     Q.  So I understand in terms of receivable
17 it gets to FNBM, it becomes nonperforming, the
18 receivable is offered to Sherman Originator III as
19 part of a pool, this nonperforming receivable,
20 correct?
21     A.  Correct.
22     Q.  Okay.  And you said that the account
23 which was with the bank is now being sold by MHC to
24 Sherman Originator III when these pools are being
25 offered.

Page 46

1    A. When --
2    Q. Can you explain that process to me?
3    A. Yes. When an account is charged-off,
4 the assign -- the account -- when a receivable is
5 charged off, the account is charged off
6 contemporaneously and the account is assigned to
7 MHC and then MHC assigns that to Sherman Originator
8 III.
9    Q. Okay. Why -- why is it assigned to
10 MHC?
11    A. I --
12      MR. BRESSLER: Objection, scope.
13      THE WITNESS: Yeah, I don't know the --
14 the particular answer but FNBM is a special-purpose
15 vehicle designed to hold receivables so it's a
16 structure that's common in the industry but I don't
17 know the particular legal reasons why they are set
18 up that way.
19 BY MR. SHELLY:
20    Q. Okay. But you understand that the --
21 MHC receives that account from the bank when the
22 charge-off occurs?
23    A. Correct.
24    Q. I understand this pooling takes place
25 and it's kind of held for about a month within the

Page 47

1 bank and then it's offered up on a monthly basis.
2 Is that your understanding as well?
3      MR. BRESSLER: Objection, scope.
4      THE WITNESS: Pools are sold on a
5 monthly basis and a specific amount of time that
6 they're in there will typically be -- from the last
7 cutoff date to the next cutoff date will be the
8 pool.
9 BY MR. SHELLY:
10    Q. Okay. Do you know if MHC receives the
11 charged-off account the moment the account becomes
12 charged off or does that occur at the time of being
13 offered up to Sherman Originator III?
14    A. I'm not certain.
15      MR. BRESSLER: Objection, form.
16      THE WITNESS: I'm not certain. I know
17 that they are charged off when Sherman Originator
18 III acquires them but I do not know if they were
19 charged off in the books and records of the -- of
20 Credit One Bank on the date it charged off, the day
21 after or immediately prior to the sale.
22 BY MR. SHELLY:
23    Q. Okay. What does -- what does MHC
24 provide to the bank in exchange for receiving the
25 account that's been charged-off?

Page 48

1      MR. BRESSLER: Objection, form.
2      THE WITNESS: I do not know the answer
3 to that question.
4      MR. BRESSLER: Scope.
5 BY MR. SHELLY:
6    Q. So you don't know if they -- they
7 provide and pay for it or any sort of compensation
8 whatsoever but you do know that they receive
9 that --
10    A. Yes.
11    Q. -- that account?
12    A. Yeah, they -- they will -- they
13 represent and warrant in the contract that we buy
14 the accounts from and assignment documents that
15 they have right, title and interest to everything
16 they're selling but --
17    Q. The bank does?
18    A. Yeah, yeah, but I don't -- no, no, we
19 don't -- the selling entities will. I do not know
20 what compensation is paid. I would assume that a
21 charged-off account has very, very little value,
22 perhaps zero. The charged-off receivable has
23 value.
24    Q. Okay. But whatever the value of that
25 charged-off account is, Sherman Originator III

Page 49

1 wants that account to be linked with the receivable
2 that it's being offered by FNBM in these pools, is
3 that correct?
4    A. Yes, we greatly prefer that it's
5 linked.
6    Q. Okay. In terms of the -- the actual
7 receivable itself, is MHC the first -- the
8 performing receivable when it goes from the bank to
9 MHC to FNBM, what sort of compensation is occurring
10 in that process, if any?
11    A. FNBM buys the receivable from the bank
12 at par.
13    Q. They buy it from the bank or from MHC?
14    A. I'm sorry, from MHC.
15    Q. Okay.
16    A. MHC buys it from the bank at par who
17 sells it to FNBM at par.
18    Q. Do you have any understanding as to why
19 that structure was set up?
20    A. Again, that goes to the -- the
21 financing structure and so the, you know,
22 financing -- financiers would have played a role in
23 figuring out exactly how that's going to work.
24    Q. Okay. Do you know who I would talk to
25 at -- within the Sherman entities to find out why



Page 50

1  that particular structure was set up?
2      A.  Again, that's similar to the -- the
3  structure -- same answer as when we asked why
4  there's Sherman Originator III and LVNV.  The CFO,
5  the CEO and outside counsel and the counsel of the,
6  you know, financiers would probably be the people
7  who might know.
8      Q.  Who -- who's financing the money to
9  FNBM and MHC to purchase these receivables?
10         MR. BRESSLER:  I'm going to object and
11 instruct the witness not to disclose the identity
12 of the funding organizations.
13 BY MR. SHELLY:
14     Q.  Are those funding organizations part of
15 the Sherman entities?
16     A.  No.  There is -- the funding entities
17 do not provide a hundred percent financing so some
18 of the capital that is used to pay for these
19 receivables, whether it's capital that was sent to
20 the merchant who participated in the origination of
21 the receivable and -- and whatnot but the par
22 value, to the extent any money is taken from
23 anybody who's not FNBM, it is an external entity.
24     Q.  Okay.  External -- unaffiliated in any
25 way whatsoever with any of the Sherman entities or

Page 51

1  any of the people at Sherman?
2      A.  Yes.
3          MR. BRESSLER:  Objection to form.
4  BY MR. SHELLY:
5      Q.  And what does Sherman Originator III
6  offer to FNBM for the pools that it purchases from
7  FNBM?
8      A.  It will be a percentage of the face
9  value of the accounts on the charge-off date which
10 varies from time to time based on market conditions
11 and -- just market conditions.
12     Q.  Can you give me a range of those
13 percentages?
14     A.  It's been as low as five cents and as
15 high as the mid teens.
16         MR. BRESSLER:  And just for the record
17 why don't we mark this entire transcript
18 confidential for attorney's eyes only.
19         MR. SHELLY:  We can do that.  I --
20 there's a confidentiality order in place.  You can
21 review it and let me know, you know, what needs to
22 be marked confidential.
23         MR. BRESSLER:  For the time being.
24         MR. SHELLY:  For the time being, for
25 sure.

Page 52

1          MR. BRESSLER:  Sure.
2          MR. SHELLY:  That's fine.  I won't go
3  into that.
4  BY MR. SHELLY:
5      Q.  And then MHC, what does Sherman
6  Originator III give MHC for the accounts that it's
7  receiving from -- from them?
8      A.  I believe it's zero.
9      Q.  Zero?  Okay.  You say you believe it's
10 zero.  Is there a way you could find that out?
11     A.  I could find it out.
12     Q.  Okay.  What would you have to do?
13     A.  I'd go back and try and dig through
14 some documents and see if I could find it.
15     Q.  Okay.
16         MR. BRESSLER:  It's beyond the scope,
17 objection.
18 BY MR. SHELLY:
19     Q.  I'm not asking you to do that, I'm just
20 wondering how you would do it.  Somebody in this
21 case has testified that the -- that the account and
22 the receivable are married up and sold to Sherman
23 Originator III.  Does that happen, that marriage
24 occur at Sherman Originator III, the account and
25 the receivable come together there or do they come

Page 53

1  together before they get to Sherman Originator III?
2      A.  They come together at Sherman
3  Originator III.
4      Q.  Okay.  And they're always paired up,
5  you wouldn't be buying accounts and receivables
6  that don't match each other, correct?
7      A.  Correct.
8      Q.  That's pretty common.  I just wanted
9  to -- you're not -- you're not -- there's a reason
10 why you're doing it that way, is because it's more
11 valuable to you as you testified, correct?
12     A.  Correct.
13     Q.  All right.  What does Sherman
14 Originator III then do in terms of the -- how does
15 it marry up that -- strike that.
16         How does it marry up the -- the account
17 and the receivable?
18         MR. BRESSLER:  Objection, scope.
19         THE WITNESS:  Yeah.  It's -- it's just
20 done before assignment.  We know we've bought the
21 two of them to be paired together and it's paired
22 together.
23 BY MR. SHELLY:
24     Q.  Okay.  And I think you testified that
25 at that point in time Sherman Originator III sells



Page 54

1  either to Sherman Originator or to one, two or
2  possibly three unaffiliated buyers, correct?
3       A.  Correct.
4       Q.  Okay.  Do you have an understanding as
5  to why MHC and FNBM don't sell their -- their
6  account and receivable directly to Sherman
7  Originator as opposed to Sherman Originator III?
8       A.  Sherman Originator is part of the
9  financing structure and so those documents will
10 require that structure.
11      Q.  Okay.  Do you know if there's any
12 reason why MHC or FNBM themselves could not
13 directly sell the pooled account or the pooled
14 receivables that they own?
15      MR. BRESSLER:  Objection, form and
16 scope.
17      THE WITNESS:  I don't know of a legal
18 reason it could not do so.  There may be one but I
19 don't know of it or there may be something in the
20 financing documents and I don't know of it but it's
21 just Sherman -- I'm sorry -- yeah, Sherman Capital
22 Markets and the Sherman group are active players in
23 that market and we buy a lot of pools and are
24 probably more efficient at marketing it and dealing
25 with all the documents and account media and

Page 55

1  everything that need to be acquired to handle the
2  assets.
3  BY MR. SHELLY:
4       Q.  Okay.
5       A.  It's our core business and they don't
6  have expertise in it.
7       Q.  How is Resurgent involved, if at all,
8  in this process that we've described so far?
9       A.  They are not involved other than we
10 have to pass them the chain of title documents and
11 tell them that the accounts will be coming but
12 they're not involved in the underlying transaction
13 itself.
14      Q.  Okay.  When you say we have to, who's
15 passing it on to them?
16      A.  Sherman Originator III and it's
17 actually people who work for Sherman Capital
18 Markets under the servicing agreement of Sherman
19 Originator III.
20      Q.  So Capital Markets has the servicing
21 agreement with -- with III.  Do people -- is it
22 people within Sherman Capital Markets that actually
23 offer up these pools to either Sherman Originator
24 or to these third parties?
25      A.  Yes.

Page 56

1       Q.  And who are those people?
2       A.  We have business development people so
3  there's a couple of those and once we've found
4  somebody who will -- you know, that we've selected
5  to be a buyer, the deal management department will
6  work with them on a monthly basis.
7       Q.  Okay.  But you only have one buyer
8  currently.  Is there just one person that's in
9  charge of that process for the unaffiliated buyers?
10      A.  Well, what will happen is we will put
11 it out to market on a periodic basis, pretty much
12 annually, and solicit bids and so there will be a
13 couple people involved in soliciting bids, then
14 there will be some people involved in selecting the
15 winning bidder and then there will be some people
16 involved in facilitating the monthly transactions
17 thereafter.
18      Q.  Okay.  And what about the sale to
19 Sherman Originator from Sherman Originator III, are
20 there people at Capital Markets that handle that
21 transaction?
22      A.  Yes.
23      Q.  And -- and who are they?
24      A.  That would typically be the people in
25 deal management.

Page 57

1       Q.  Any people in particular?
2       A.  I would be involved in that.  Aaron
3  Ziegler would be involved in it.
4       Q.  How is a determination made as to what
5  debt is to be offered to third-party unaffiliated
6  buyers and to Sherman Originator?
7       A.  It is a strategic decision based on the
8  price that the market is offering versus what we
9  think is the value of the accounts.
10      Q.  Okay.  Can you explain that to me, what
11 you mean by that?
12      A.  There are many strategic considerations
13 but the two most important ones are probably that
14 we want to get a high price for the paper.  We want
15 the highest available because we'll only sell to
16 eminently qualified buyers.  We want to get a high
17 price and we want to maintain a presence in the
18 market so that if we want to sell more in a given
19 month, we have a -- a way to -- to sell it.  So
20 we'll take an estimate of what we think is going to
21 be the available flow and make an internal decision
22 on the range that we probably want to keep and the
23 range that we probably want to sell.
24      Q.  And who makes that decision?
25      A.  It would be the people at Sherman

Page 94

1   BY MR. SHELLY:
2       Q.  Okay.
3       A.  -- I do not know the full bounds of the
4   relationships that they had.
5       Q.  Okay.  But you're here today testifying
6   for MHC about its relationship with Credit One Bank
7   and what you know is what you've -- you've just
8   testified to?
9       A.  Um-hum.
10      Q.  Okay.  How about Sherman Financial
11  Group, what, if any, relationship does it have with
12  Credit One Bank?
13          MR. BRESSLER:  I'm going to object.
14  You've asked all these questions already.
15          MR. SHELLY:  Well, I -- I have.  I --
16  we -- we've talked about some of this but I haven't
17  asked these.
18          MR. BRESSLER:  You actually have.
19          MR. SHELLY:  Okay.
20          MR. BRESSLER:  And I'm going to object
21  but if you want to just waste time doing it
22  again --
23          MR. SHELLY:  I want to make sure
24  because he's testified -- we've talked about
25  various entities, we've talked about the group.  I

Page 95

1   just want to make sure as to these entities that
2   we're talking about here, which ones actually have
3   relationships with Credit One Bank and which ones
4   don't.
5           MR. BRESSLER:  The only ones --
6           MR. SHELLY:  I just want to verify
7   that.
8           MR. BRESSLER:  Just so that it's clear,
9   in your Schedule 1, Note 1 it's the relationship
10  specifically as to the transfer, sale or servicing
11  of debt originating with Credit One so ask about
12  those issues, the transfer, sale or servicing of
13  debt or receivables originating with Credit One
14  Bank.  That's what your request for -- is for and
15  that's what he's prepared to and being designated
16  to testify to.
17          MR. SHELLY:  The -- the -- Number 1
18  says, the structure and relationship between and
19  among Credit One and the other Sherman entities.
20  That's what I'm asking him about.  I'm asking him
21  about the relationship which includes the
22  following --
23          MR. BRESSLER:  But then you said
24  specifically.  You say specifically as to these
25  items.

Page 96

1           MR. SHELLY:  Right.
2           MR. BRESSLER:  That's what you're
3   asking about.
4           MR. SHELLY:  No, no, no, I'm not.
5           MR. BRESSLER:  And you -- I'll --
6           MR. SHELLY:  I'm including --
7           MR. BRESSLER:  -- give you leeway --
8           MR. SHELLY:  Yeah.  That's not --
9           MR. BRESSLER:  -- but I'm telling you
10  that he's been prepared for what you've asked here.
11          MR. SHELLY:  Okay.
12          MR. BRESSLER:  And what's your
13  question?
14  BY MR. SHELLY:
15      Q.  The question is the relationship, if
16  any, that Sherman Financial Group has with Credit
17  One Bank.
18      A.  I don't know the full balance of the
19  relationship between Sherman Financial Group and
20  Credit One Bank.  Again, I know a lot about the
21  flow of the charge-offs but I don't know the full
22  scope of that relationship.
23      Q.  Okay.  Do you know anything about the
24  scope of that relationship?
25          MR. BRESSLER:  I'm going to object to

Page 97

1   form.  I'm just asking you to define relationship.
2           THE WITNESS:  I just said I know a lot
3   about the relationships relating to charge-off
4   receivables.  I know very little or nothing beyond
5   the --
6   BY MR. SHELLY:
7       Q.  Okay.
8       A.  -- the flow of charge-off --
9       Q.  The very little that you do know, what
10  is that?
11      A.  You know, they're an affiliate and --
12      Q.  Credit One Bank is an affiliate of
13  Sherman Financial Group?
14          MR. BRESSLER:  Objection, form.
15          THE WITNESS:  You know, they're -- we
16  purchased the bank in 2005 so I don't know how
17  much -- that was before I got here and I'm not
18  involved in the -- even discussions of the bank's
19  operation so I don't know what it does.
20  BY MR. SHELLY:
21      Q.  Okay.
22      A.  All right?
23      Q.  Okay.  Your -- your knowledge as to the
24  relationship with them -- with -- between Credit
25  One Bank and Sherman Financial Group has to do with

Page 98

```
 1   the actual servicing of debt and receivables?
 2        A.  Yes.  And even more specifically to the
 3   charged-off debt and receivables.
 4        Q.  Okay.
 5        A.  So I, you know -- incident --
 6   incidental to that I know things like -- that the
 7   performing receivables are passed over before they
 8   charge off to FNBM so I know that but I don't
 9   really know -- you know, I'm not involved in -- in
10   bank --
11        Q.  Right.
12        A.  -- day-to-day operations in any --
13        Q.  And whatever the business relationship
14   is, other than those collections, the business
15   relationship between Sherman Financial Group and
16   Credit One Bank you really don't have any
17   knowledge?
18        A.  No.
19        Q.  Okay.  Sherman Originator III, what
20   relationship, if any, does it have with Credit One
21   Bank?
22        A.  It is a customer of Credit One Bank.
23        Q.  Okay.  Other than being -- it's a
24   customer of Credit One Bank?
25        A.  I'm sorry, it's a customer of FNBM who
```

Page 99

```
 1   has a relationship with Credit One Bank.
 2        Q.  Okay.  But does Sherman Originator III
 3   itself have any sort of direct relationship with
 4   Credit One Bank?
 5        A.  No.
 6        Q.  Okay.  FNBM, does it have any sort of
 7   direct relationship with Credit One Bank?
 8        A.  Yes, it receives the receivables of
 9   Credit One Bank and finances them for Credit One
10   Bank.
11        Q.  But doesn't it receive them through
12   MHC, it doesn't receive them directly from Credit
13   One Bank?
14        A.  I'm sorry, you're correct, it receives
15   them from MHC and to the best of my knowledge,
16   there's no other relationship.  It's a bankruptcy
17   remote vehicle that just sits there and holds so
18   it's a --
19        Q.  So FNBM itself does not have a direct
20   relationship with Credit One Bank, it's MHC that
21   has that direct relationship and MHC then transfers
22   that to FNBM, is that correct?
23        MR. BRESSLER:  Objection to form.
24        THE WITNESS:  Yeah.  If we talk about
25   the receivables I can speak with authority there
```

Page 100

```
 1   but to say they have no relationship, I don't know
 2   the answer to that.
 3   BY MR. SHELLY:
 4        Q.  Okay.
 5        A.  So, you know --
 6        Q.  Right.
 7        A.  You know, maybe -- maybe they share --
 8   I can't even think of an example that -- that I'd
 9   want to throw out there but there might be
10   something.  They're, you know, big organ -- you
11   know, big companies, there are no employees but --
12   and we also haven't defined relationship but I do
13   know as we discussed they passed the accounts and
14   receivables together -- I'm sorry, through the path
15   we talked about so accounts go to MHC to FNBM and
16   that is a big important relationship but I don't
17   know if there are other little -- and that's why
18   they were formed but I don't know if there's --
19        Q.  Okay.
20        A.  -- other little things out there.
21        Q.  Other than -- other than holding the
22   receivables that MHC receives from Credit One Bank,
23   does FNBM do anything else?
24        A.  I don't believe it does but again -- so
25   I can tell you what I do know so I can say yes to
```

Page 101

```
 1   some things --
 2        Q.  Um-hum.
 3        A.  -- but I'm not going to be the --
 4        MR. BRESSLER:  Object, beyond the
 5   scope.
 6        THE WITNESS:  Yeah.  I'm not going to
 7   be the guy to say no --
 8   BY MR. SHELLY:
 9        Q.  Okay.
10        A.  -- but I -- you know, I don't know of
11   anything.
12        Q.  Okay.  PYOD, does it have any sort of
13   direct relationship with Credit One Bank?
14        MR. BRESSLER:  Objection, form.
15        THE WITNESS:  No.
16   BY MR. SHELLY:
17        Q.  Resurgent Capital Services, LP, do they
18   have any sort of direct relationship with Credit
19   One Bank?
20        MR. BRESSLER:  Objection, form.
21        THE WITNESS:  I don't believe it does,
22   you know.  I can't think of any.
23   BY MR. SHELLY:
24        Q.  Okay.  We talked about the bankruptcy
25   scrubbing.
```

Page 102

1   A. Yep.
2   Q. That's done by Resurgent, isn't it?
3   A. We had talked about trying to find ways
4   for Resurgent to supplement Credit One Bank's
5   bankruptcy scrubbing but I don't know if that ever
6   happened or the scope of it.
7   Q. Okay. So you don't know if Resurgent
8   does any -- any work for Credit One Bank -- you say
9   you discussed that. Who -- who discussed it?
10      MR. BRESSLER: Objection, form.
11      THE WITNESS: It would have been
12  myself, Dan Picciano, Brian Fallaro so people who,
13  you know, kind of -- we have a bankruptcy detection
14  engine --
15  BY MR. SHELLY:
16      Q. We being Resurgent?
17      A. Resurgent, yes, sorry. Resurgent has a
18  robust bankruptcy detection engine that is a -- an
19  asset that is out there and we looked to -- for
20  ways to use it but if the -- the things you have to
21  do in terms of IT and everything else, it made it
22  impractical to use it so Credit One Bank has
23  continued to rely on whoever they're relying on.
24  There are third-party vendors who do that --
25      Q. Okay.

Page 103

1   A. -- but I'm not sure who they use.
2   Q. Okay. LVNV Funding, do they have any
3   sort of direct relationship with Credit One Bank?
4   A. No.
5   Q. Sherman Capital Markets, LLC, do they
6   have any sort of direct business relationship with
7   Credit One Bank?
8   A. No.
9   Q. Okay. It sounds like from what you've
10  said the only one that you're aware of, the only
11  entity here that we've been testifying -- that
12  you're here testifying for today that has a
13  business relationship with Credit One Bank is MHC
14  Receivables, is that correct?
15      A. Yes.
16      Q. Okay. There are no other entities
17  affiliated or owned by Sherman Financial Group that
18  you're aware of that have a direct business
19  relationship with Credit One Bank, are there?
20      MR. BRESSLER: Objection, form.
21      THE WITNESS: I don't believe there
22  are.
23  BY MR. SHELLY:
24      Q. Are there any other Sherman -- Sherman
25  entities that do any work that's connected in any

Page 104

1   way with the various processes you were describing
2   for me today with respect to the sale of the
3   charged-off nonperforming debt that originated with
4   Credit One Bank?
5   A. I don't believe there are. It's a very
6   clean, relatively simple process similar to what
7   everybody uses, the accounts -- you have the buyer,
8   they prepare the file and bring it into your
9   system.
10      Q. Okay. I note -- I note you -- you used
11  we a lot when you were --
12      A. Yeah, I'm sorry.
13      Q. -- talking about Resurgent -- no, when
14  you were talking about Resurgent but I just want to
15  be clear, you don't work for or at Resurgent?
16      A. Correct.
17      Q. Your involvement there has to do how --
18  why is that, why are you so heavily involved there?
19      MR. BRESSLER: Objection, form.
20      THE WITNESS: Yeah. On an hours basis
21  it's -- it's, you know, not a heavy involvement
22  there but they are the master servicer for the
23  accounts. All the -- every account -- every
24  charged-off account that we have bought from Credit
25  One they are the master servicer and I keep an eye

Page 105

1   on the liquidation performance and if they need a
2   different set of documents or a change to the data
3   tape, I will be the guy who tries to obtain that.
4       MR. SHELLY: Okay. I'm going to
5   suspend the deposition at this time. I'm going to
6   make some requests for some additional documents.
7   I think there's some areas he testified to today
8   that he -- he was not prepared to testify on in
9   terms of some of these entities in terms of what it
10  was they actually did in terms of their
11  relationship with Credit One Bank, if any. He was
12  uncertain and if -- if Credit One Bank -- or if the
13  Sherman entities and Sherman Financial Group
14  doesn't know the answers to that, that's fine but
15  if they do know them, I think we're entitled to
16  those answers.
17      MR. BRESSLER: Obviously I disagree --
18      MR. SHELLY: Sure.
19      MR. BRESSLER: -- that he was not fully
20  prepared or --
21      MR. SHELLY: Sure.
22      MR. BRESSLER: -- did not give full
23  answers but --
24      MR. SHELLY: Sure.
25      MR. BRESSLER: -- feel free to give us