# Exhibit D

Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Adv. Proc. No. |
| ORRIN S. ANDERSON, | ) 15-08214 (RDD) |
| | ) |
|      Debtor. | ) Bankr. Case No. |
| _____ | ) 14-22147 (RDD) |
| | ) |
| ORRIN S. ANDERSON, a/k/a ORRIN | ) |
| ANDERSON, a/k/a ORRIN SCOTT | ) |
| ANDERSON, | ) |
| | ) |
|      Debtor and Plaintiff on | ) |
|      behalf of himself and all | ) |
|      others similarly situated, | ) |
| | ) |
|    v. | ) |
| | ) |
| CREDIT ONE BANK, N.A., | ) |
| | ) |
|      Defendant. | ) |
| _____ | ) |

DEPOSITION OF VICKI SCOTT

Taken on June 3, 2016

At 9:28 A.M.

300 South Fourth Street, Suite 800

Las Vegas, Nevada


Reported by:  Jennifer Clark, RDR, CRR, CCR #422

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 6

1    that would stop Credit One Bank from doing
2    that.
3        A.    All I know is Credit One Bank
4    reports accurately to the credit bureau on
5    accounts that we sell.
6        Q.    Do you know if Credit One Bank
7    does report to the credit bureaus that debts
8    that it has sold have been discharged in
9    bankruptcy?
10        A.    No.
11        Q.    No, you don't know, or no, it
12    doesn't do that?
13        A.    No, it doesn't do that.
14        Q.    Okay. Do you know what is
15    stopping it from doing that?
16        A.    We don't own the account.
17        Q.    And the fact that you don't own
18    it stops you from letting the credit bureaus
19    know that you know that this debt has been
20    discharged in bankruptcy.
21        A.    The bank does not know.
22        Q.    The bank does not know.
23        If the bank does know, what does
24    the bank do?
25        A.    The bank reports on accounts that

Page 7

1    it owns.
2        Q.    But you said the bank does not
3    know. Are you telling me that the bank --
4    after the bank sells a debt, it never knows
5    whether or not that debt has been discharged
6    in bankruptcy?
7        A.    We are not notified, that is
8    correct.
9        Q.    If a customer -- so customers
10    have never called up Credit One Bank that you
11    know of and said, hey, why does my debt to
12    Credit One Bank still show up on my credit
13    report? Why hasn't it been corrected because
14    it's been discharged in bankruptcy? And when
15    the bank hears that, it doesn't do anything?
16        A.    If the account is sold, we
17    instruct the customer that their account is
18    sold and who they need to contact.
19        Q.    Okay. But what's stopping the
20    bank -- after the customer tells you that,
21    you do instruct the customer to do that.
22    What's stopping the bank from letting the
23    credit bureau agencies know? The bank
24    itself.
25        A.    The bank instructs the customer

Page 8

1    to contact the person the account was sold
2    to.
3        Q.    I understand that's what the bank
4    does, but what's stopping the bank from doing
5    that itself?
6        A.    Once the accounts are sold, after
7    six months, we purge the accounts from our
8    system because we no longer own them.
9        Q.    What do you mean, you purge them
10    from your system?
11        A.    We don't -- do not keep them on
12    our system of record. They are purged.
13        Q.    Okay. But a customer calls you
14    up after six months and they say, hey, my
15    account is showing up on my credit report as
16    being charged off but it's been discharged in
17    bankruptcy. Why is that? You're telling me
18    that you tell the customer to notify the
19    credit reporting agencies or the party that's
20    purchased this themselves.
21        My question to you is, when that
22    happens, what is stopping the bank at that
23    point from notifying the credit reporting
24    agencies that that debt has been discharged
25    in bankruptcy?

Page 9

1        MR. SLODOV: Objection. Vague
2    and ambiguous. Compound as to form.
3        You can answer.
4        THE WITNESS: The account is
5    purged from our system.
6    BY MR. SHELLY:
7        Q.    I understand it's purged from
8    your system. So you're telling me when it's
9    purged from your system, the fact that you've
10    purged it, that prevents you from notifying
11    the credit reporting agency about this
12    discharge in bankruptcy even though the
13    customer has called up and said, hey, my
14    account -- that debt has been discharged in
15    bankruptcy?
16        A.    The bank does not own the
17    account.
18        Q.    You're telling me these facts.
19    The bank does not own the account. It's been
20    purged from the system. I understand both of
21    those things, okay?
22        A.    Uh-huh.
23        Q.    The bank now doesn't own the
24    account. It's purged from the system. The
25    bank now gets a call from its customer -- at



Page 22

1    Q.    Okay.  First of all, when you say
2    "Sherman," who are you referring to there as
3    Sherman?
4    A.    Specifically?
5    Q.    Yes.
6    A.    Jon Mazzoli.
7    Q.    But when you say "Sherman," I'm
8    not aware of an entity that's just called
9    Sherman.  Are you talking about the Sherman
10    Financial Group or some other entity owned by
11    the Sherman Financial Group?
12    A.    Oh, I'm talking about Sherman
13    Financial Group.
14    Q.    So the work that you're doing at
15    Credit One Bank regarding the sale of this
16    debt to these third-party buyers, that's
17    overseen by Sherman Financial Group?
18    A.    And the bank has a role in that,
19    yes.
20    Q.    Who has the final say on whether
21    or not debt is going to be sold to one of
22    these third-party buyers?  Is it Jon Mazzoli?
23    A.    The bank jointly makes the
24    decision with Sherman.
25    Q.    Would the bank ever sell any debt

Page 23

1    to a third-party buyer that Jon Mazzoli said,
2    no, you can't sell that to that third-party
3    buyer?
4    A.    No.
5    Q.    Do you understand Jon Mazzoli's
6    position at Sherman?
7    A.    Based on his E-mail signature
8    line, it states he's a director.
9    Q.    Okay.  You said signing
10    affidavits and bills of sale post sale.  What
11    were you referring to there?
12    A.    The general paperwork that goes
13    with selling a pool of accounts.
14    Q.    And you're actually signing those
15    affidavits and bills of sale?
16    A.    Yes.
17    Q.    And you're signing them on behalf
18    of Credit One Bank?
19    A.    And MHC and FNBM.
20    Q.    So you're signing it on behalf of
21    all three entities.
22    A.    Yes.
23    Q.    How are you affiliated with --
24    first of all, MHC, what are you referring to
25    there?

Page 24

1    A.    As a representative of MHC.
2    Q.    But MHC -- I know what I think
3    MHC is from the facts here, but from your
4    perspective, what is MHC?
5    A.    MHC is an entity.
6    Q.    Is it an entity affiliated or
7    owned by Credit One Bank?
8    A.    I don't know for sure how the --
9    Q.    But you understand it to be an
10    entity separate and apart from Credit One
11    Bank, in any event.
12    A.    Yes.
13    Q.    And FNBM, what is that?
14    A.    First National Bank of Marin.
15    Q.    And that's a separate entity
16    similar to MHC, separate and apart from
17    Credit One Bank.
18    A.    Yes.
19    Q.    Why are you signing affidavits on
20    behalf of them regarding these sales?
21    A.    It's part of my duties as owning
22    the asset sale piece and the recovery piece
23    of my job responsibilities.
24    Q.    Who owns the asset sale piece and
25    the recovery piece that you're referring to

Page 25

1    there?  You said, "It's part of my duties as
2    owning the asset sale piece and the recovery
3    piece of my job responsibilities."
4    A.    It's part of my responsibility to
5    sign those documents.
6    Q.    Okay.  But who owns the asset
7    sale piece that you're signing off on?
8         MR. SLODOV:  Objection as to
9    form.
10         Go ahead and answer if you can.
11         THE WITNESS:  Ultimately, the
12    bank owns the process.
13    BY MR. SHELLY:
14    Q.    What do you mean, "the process"?
15    The bank owns what?  Are you talking --
16    you're not talking in an actual, like, I own
17    my car sort of ownership.
18    A.    No.
19    Q.    You're talking about owning a
20    process that's used sort of in a vernacular
21    that businesses use on a daily basis.  You're
22    the one, you mean, like, responsible for the
23    process; correct?
24    A.    Yes.
25    Q.    Okay.  But I'm asking you in

7 (Pages 22 to 25)



Page 30

```
 1    Z-U-A-R-D-O.
 2        Q.    And what's her position at Credit
 3    One Bank?
 4        A.    She is a recovery manager.
 5        Q.    Who is it that told you that you
 6    were authorized to sign these affidavits and
 7    documents on behalf of MHC and FNBM?
 8        A.    The general counsel who is no
 9    longer with the bank when I took over the
10    position.
11        Q.    Is that Mr. Shutt?
12        A.    Yes.
13        Q.    And did you have any -- do you
14    recall what exactly he said to you?  He just
15    said -- or did he just say it's okay for you
16    to sign these documents?
17             MR. SLODOV:  Objection.  Calling
18        for legal advice.
19             And beyond acknowledging that the
20        statement was made, I'd instruct you not
21        to answer.
22    BY MR. SHELLY:
23        Q.    Did he have any duties there
24    other than general counsel?
25        A.    I believe he also managed the
```

Page 31

```
 1    compliance department.
 2        Q.    Do you know, when he was telling
 3    you that you should go ahead and sign these
 4    affidavits, whether he was advising you as an
 5    attorney or as an officer of Credit One Bank?
 6        A.    I don't understand what you mean.
 7        Q.    Yeah.  Was he acting -- do you
 8    know, if you know, was he acting as an
 9    attorney when he told you to sign these
10    documents, or was he acting as an officer of
11    the bank, telling you to go ahead and sign
12    these?
13        A.    I don't recall any special
14    language around it, no.
15        Q.    So you didn't have an
16    understanding at that time whether he was
17    giving you -- whether he was giving you
18    direction as a senior officer there or
19    whether he was giving you direction as an
20    attorney; is that correct?
21        A.    I don't -- I don't recall there
22    being a distinction.
23        Q.    So you don't -- you don't recall
24    feeling he was doing one thing or the other;
25    is that correct?
```

Page 32

```
 1        A.    That's correct.
 2        Q.    So do you know why he told you it
 3    was okay for you to go ahead and sign these?
 4        A.    I had taken over the position
 5    from someone who was no longer at the bank,
 6    and he was advising me that it was my duty to
 7    sign those documents and I had the authority
 8    to do so.
 9        Q.    Who was it that was signing them
10    before you?
11        A.    Prior to me having the recovery
12    team, I believe it was Arturo Perez.
13        Q.    Does anybody else sign any
14    documents in terms of these sales of debt on
15    behalf of MHC and FNBM other than yourself?
16        A.    Yes.
17        Q.    Who else signs documents?
18        A.    They sign after me.
19        Q.    Okay.
20        A.    And so there's a notary that
21    signs with me, and then the documents are
22    sent to Sherman, and they're also signed by
23    various representatives there.
24        Q.    So before -- okay.  So in any
25    sale that goes to a third party, you're
```

Page 33

```
 1    Credit One Bank, MHC, and FNBM's
 2    representative with respect to those
 3    documents, but those documents also are then,
 4    after you sign them, co-signed by someone on
 5    behalf of Sherman; is that correct?
 6        A.    Yeah, different parts of the
 7    chain of title, yes.
 8        Q.    What part of the chain of title
 9    are you signing off on?
10        A.    The bill of sale.
11        Q.    And what specifically are you
12    attesting to in those affidavits?
13        A.    That the accounts are eligible
14    for sale and that I have knowledge that
15    they're eligible for sale and that I'm a
16    representative of Credit One Bank, MHC, FNBM,
17    and that they were conforming accounts.
18        Q.    How do you make the determination
19    that they're eligible on behalf of those
20    three entities?
21        A.    It's based on preexisting
22    criteria via contracts that creates the pool
23    of accounts to sell.
24        Q.    And you go and -- are these pools
25    arranged on a monthly basis?
```



Page 34

1    A.   Yes.
2    Q.   And you actually physically look
3  at what's in that pool to make sure that what
4  you're attesting to, that they're eligible
5  for sale, that, in fact, they are eligible
6  for sale?
7    A.   Yes.  There is a spot audit done.
8    Q.   A spot audit?
9    A.   Uh-huh.
10   Q.   What's that mean?
11   A.   A random sample of accounts.
12   Q.   And you do that random sampling?
13   A.   Yes.
14   Q.   How do you do that?
15   A.   I review 30 accounts in the
16 system of record.
17   Q.   And how many accounts make up a
18 pool?
19   A.   It depends on the charge-off
20 volume that month or the bankruptcy volume or
21 the deceased volume.
22   Q.   So there are three different
23 pools each month.  There's a charged-off, a
24 bankruptcy, and a deceased pool?
25   A.   Yes.

Page 35

1    Q.   And you sell each and every one
2  of those pools?
3    A.   Yes.
4    Q.   And in a charged-off pool, what's
5  the least and what's the most that a monthly
6  pool would consist of?
7    A.   I don't understand.
8    Q.   Just so I have a range, what's
9  the least you've seen -- in terms of a
10 charged-off pool for, say, the month of
11 April, you know, that would get sold, you
12 said it varies.  What would be -- what would
13 be the smallest amount you've seen on a
14 monthly basis within that pool being sold and
15 what's the largest?  Just roughly.
16   A.   Are you talking units, or are you
17 talking dollars?
18   Q.   I'm talking units in terms of
19 accounts.  That's what you mean by "units";
20 right?  Accounts?
21   A.   Uh-huh.
22   Q.   Yeah.
23   A.   I mean, smallest is probably
24 somewhere around 500, largest maybe 50,000.
25   Q.   And same thing for the bankruptcy

Page 36

1  pool, what's the smallest and largest in
2  terms of units?
3    A.   Oh, well, I was lumping those all
4  together so --
5    Q.   Oh, okay.  So you don't
6  actually -- even though you're selling three
7  separate pools, you're talking, in terms of
8  that monthly amount of all three of those
9  pools, would be from 500 accounts to 50,000
10 accounts.
11        (Pages 37 through 41 were
12        deemed confidential and are
13        bound separately.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 42

1              *   *   *   *   *
2  BY MR. SHELLY:
3    Q.   So the actual -- can you describe
4  for me the actual sale process itself, how
5  that occurs.  I understand the documents that
6  you are signing off on with respect to this
7  sale, but as to your understanding as to how
8  this sale originates, the pooling together of
9  these things right through the actual sale to
10 the third party, can you walk me through that
11 process, please.
12   A.   On or about the 5th of the
13 month -- and this is an example for
14 contractual charge-off.
15   Q.   Okay.
16   A.   A ticket is opened with FDR to
17 gather the pool of accounts eligible for sale
18 based on certain criteria.  FDR cuts the sale
19 file.  They send it back to the bank.  We
20 send it to Resurgent to scrub for
21 nonconforming for the pool.  They send the
22 file back to us separated based on the two
23 buyers.  Once all the paperwork and bill of
24 sale is signed, the accounts are released to
25 the buyer, and the paperwork is signed and --

10 (Pages 34 to 42)



Page 47

1     A.    I don't know who made the
2  decision.
3     Q.    Okay.  Do you have an
4  understanding as to why they are purged after
5  six months?
6     A.    There's a cost associated with
7  housing them on the Recovery One system.
8     Q.    Do you know what that cost is?
9     A.    No, not off the top of my head.
10    Q.    So if Credit One were to maintain
11  those records, say, for a year or two years
12  after an account was no longer performing,
13  they'd incur an additional charge from FDR
14  just to maintain that in that system of
15  record.  That's your understanding?
16    A.    In addition to the -- the
17  majority of accounts housed in Recovery One,
18  we don't own anymore, which is why they're
19  purged.
20    Q.    What accounts are in Recovery One
21  that you do own?
22    A.    Accounts that we do not sell.
23    Q.    And which accounts don't you
24  sell?
25    A.    Accounts that we do not sell

Page 48

1  include charge-off balances less than $50.
2     Q.    Okay.
3     A.    Accounts that previously settled
4  with us or did a principal balance payoff
5  with us, are in litigation, bankrupt accounts
6  that are less than $100, they're in there for
7  a period of time, and then they're purged.
8     Q.    And then they're purged.
9     So there are -- so if a bankrupt
10  account for less than $100 were in your
11  system for six months, and at the time of
12  that six months coming up, you didn't know
13  the status of that bankruptcy proceeding,
14  you'd go ahead and purge that account
15  anyways; is that correct?
16    A.    Yes.
17    Q.    And if eight months after getting
18  into that R1 system and two months after it
19  was purged, that bankruptcy debt was
20  discharged in bankruptcy, what would the bank
21  do?
22    A.    Accounts that are $100 or less
23  that were bankrupt, those tradelines get
24  deleted once they move into a different
25  warehouse, because we won't actively get

Page 49

1  ongoing information.
2     Q.    Why don't you get ongoing
3  information at that point?
4     A.    We don't receive notices on
5  accounts that we sell or no longer are
6  performing for us.
7     Q.    Why don't you?
8     A.    That's the process that's in
9  place.
10    Q.    Okay.  And who set that process
11  up?
12    A.    That process was set up years
13  ago, and I can't tell you who.  I do not
14  know.
15    Q.    So in the scenario I was talking
16  about earlier, somebody calls up and said --
17  I got you.  Okay.  So you actually delete
18  that tradeline.
19    So there wouldn't be an
20  instance -- when you've deleted that
21  tradeline, do you notify the credit reporting
22  agency that you deleted that tradeline and
23  that that charged-off debt no longer exists?
24    A.    We send it to -- through a
25  decision master, a file is sent to the

Page 50

1  bureaus to delete the tradeline.
2     Q.    So when that notification goes to
3  the bureaus, that debt that is less than $100
4  on this bankrupt account, that debt no longer
5  shows up on that person's credit report.
6  It's gone completely.  There's not a notation
7  on there that says charged off, is there.
8     A.    No.
9     Q.    And when you say there are
10  accounts that are in litigation that are in
11  this R1, what do you mean by "litigation"?
12  You're not talking about bankruptcy there, I
13  take it.
14    A.    No.
15    Q.    You're talking about when someone
16  is actually suing the bank and has some sort
17  of dispute with the bank; is that correct?
18    A.    Yes.
19    Q.    Do you know why, when the bank
20  sells debt that is in bankruptcy to a third
21  party, it doesn't delete the tradeline,
22  similar to the way it does when six months
23  have passed on a bankruptcy of less than
24  $100?
25    A.    The bank reports accurately.  The



Page 51

1  bankruptcy and charge-off is sold to another
2  lender when we sell that account.
3      Q.    Okay. But my question is, do you
4  know why they don't actually just go ahead
5  and delete the tradeline the same way they do
6  with a bankruptcy of less than $100 after six
7  months have passed in the R1 system?
8      A.    We are reporting the account
9  accurately that -- we are bound to do so by
10  the FCRA upon selling the account.
11      Q.    Okay. I'm not asking you if
12  you're doing anything accurately or not. I'm
13  asking you if you know why the bank does not
14  do exactly the same thing that it does on
15  bankruptcies of less than $100 that's purged
16  from its system after six months in the R1
17  but are less than $100.
18      A.    That would be reporting
19  inaccurately, and the bank is reporting the
20  account accurately.
21      Q.    Is the bank -- when the bank
22  deletes the tradeline that's less than $100
23  as being deleted, is it reporting accurately
24  at that time?
25      A.    We've already taken the loss for

Page 52

1  that account, and we are purging it from our
2  system, and we are reporting it accurately
3  because we have already recognized it as a
4  loss.
5      Q.    So when you -- but when you're
6  selling it to somebody else as a charge-off
7  of zero dollars, you don't recognize it as a
8  loss then?
9      A.    The bank recognizes it has a loss
10  upon charge-off.
11      Q.    So why doesn't it delete the
12  tradeline then?
13      A.    The bank reports the tradeline as
14  sold to another lender because that is what
15  has happened.
16      Q.    Do you know if there's anything
17  preventing the bank from deleting the
18  tradeline at that point in time?
19          MR. SLODOV: Objection. Asked
20      and answered.
21          You can answer.
22          THE WITNESS: The bank is
23  reporting the tradeline accurately.
24  BY MR. SHELLY:
25      Q.    Okay. I hear that, and I know --

Page 53

1  I know, you know, you've got that drilled
2  into your head, that they're reporting it
3  accurately. I understand that. I'm not
4  asking you if it's accurate or not.
5          I'm asking you if there's
6  anything that's actually preventing the bank
7  from deleting that tradeline at that point in
8  time.
9          MR. SLODOV: Objection. Asked
10      and answered.
11          You can answer.
12          THE WITNESS: The bank is
13  reporting it accurately per our
14  responsibilities for the FCRA.
15  BY MR. SHELLY:
16      Q.    So are you telling me there's
17  nothing preventing you from doing that?
18      A.    The bank is reporting it
19  accurately as --
20      Q.    Could they -- go ahead.
21      A.    As they're bound to do so.
22      Q.    Could the bank delete the
23  tradeline at that point in time?
24      A.    The bank needs to report it
25  accurately.

Page 54

1      Q.    Okay. Could the bank delete it
2  at that point in time, though?
3          MR. SLODOV: Objection. Asked
4      and answered four times now.
5          MR. SHELLY: She hasn't answered
6      it once yet, but when she does, I'll let
7      you know.
8          THE WITNESS: I don't know.
9  BY MR. SHELLY:
10      Q.    Okay. That's an answer. You
11  don't know. The bank could delete it. They
12  couldn't delete it. You really don't know,
13  do you?
14          And do you know why they do one
15  thing or the other, why they choose not to
16  delete it as opposed to deleting it? Do you
17  know why?
18          MR. SLODOV: Objection. Asked
19      and answered.
20          THE WITNESS: The bank is
21  reporting accurately on accounts that
22  they sell.
23  BY MR. SHELLY:
24      Q.    But when I asked you could the
25  bank delete it at that point in time, you

13 (Pages 51 to 54)



Page 55

1    said you don't know.  You don't know if the
2    bank could delete it at that point in time,
3    do you?
4        A.    I stated I don't know.
5        Q.    Is there anyone at Credit One
6    Bank that would be able to answer that
7    question, whether or not the bank could
8    delete it at that point in time?
9        A.    I don't know.
10       Q.    If you wanted to know, you were
11   curious and you thought, jeez, could we just
12   delete this at this point in time, who would
13   you ask?
14       A.    I would ask general counsel.
15       Q.    Do you know if any decision has
16   ever been made at Credit One Bank not
17   actually affirmatively -- an affirmative
18   decision not to delete such tradelines at
19   that point in time?
20       A.    Can you repeat that, please.
21       Q.    Sure.  Do you know if any
22   decision has affirmatively been made at
23   Credit One not to delete those tradelines at
24   that point in time?
25       A.    The bank is reporting those

Page 56

1    accounts accurately, as it's bound to do so.
2        Q.    Okay.  I understand that, and I
3    really do get that, okay.  I understand that
4    from your perspective, what they're doing is
5    what they're bound to report accurately, and
6    you're telling me they do report accurately?
7            Then my question is, could they
8    nevertheless delete it, and you said you
9    don't know, okay.
10           I'm asking you if you know if
11   there's ever been an affirmative decision
12   made at Credit One Bank not to delete those
13   things at that point in time.
14       A.    I don't know.
15       Q.    Okay.  We talked about this.  We
16   were going through this process.  We talked
17   about you generate a ticket.  It goes to FDR,
18   which is the system of record, to gather a
19   pool, and that they use certain criteria.
20           What criteria do they use to
21   gather these pools at that point in time?
22       A.    That criteria is based on what is
23   in the contract for that particular pool.
24       Q.    And that would be a contract that
25   exists between Credit One and a third-party

Page 57

1    buyer?
2        A.    It would be a contract between a
3    third-party buyer and MHC.
4        Q.    Why just MHC?
5        A.    When the accounts charge off, the
6    account and receivable are married up with
7    MHC at that charge-off.  The bank is just a
8    servicer.
9        Q.    When you say "married up," can
10   you describe that married-up process.
11       A.    The bank services the receivable
12   up until the point the account is charged
13   off.  Then the receivable and the charge-off
14   come together at MHC.
15       Q.    What's the difference between the
16   receivable and the charge-off?  Who has the
17   charge-off and who has the receivable that's
18   married up at MHC?
19       A.    Who has the account and who has
20   the receivable?
21       Q.    Well, you said what's married up
22   there -- you said -- I'm not trying to
23   confuse you.  I'm just trying to understand,
24   from your perspective, what's going on here.
25           You said that the charge-off and

Page 58

1    the receivable are married up with MHC.  How
2    does that --
3        A.    The account -- the account and
4    the receivable.
5        Q.    Okay.  So the account -- the
6    charged-off account.  And who has the
7    charged-off account that's going to MHC
8    that's being married up with the receivable?
9        A.    FNBM.
10       Q.    FNBM has the account, or FNBM has
11   the receivable?
12       A.    Now you're confusing me.  I
13   don't -- I don't know.
14       Q.    Okay.  I'm not trying to confuse
15   you, so let's just -- let's just -- really
16   let's just bring it down to a real simple
17   level?
18           Before this thing is married up
19   at MHC, there's a receivable, and it hasn't
20   charged off or anything like that, okay.
21   What exists at FNBM?
22       A.    I don't know.  I can't answer it.
23   I can't --
24       Q.    Okay.
25       A.    You've got my brain all turned

14 (Pages 55 to 58)



Page 85

1    pools, wherever they're going, are really
2    sold through whatever contractual
3    relationship Sherman Originator has with
4    whoever ultimately buys that pool; is that
5    correct?
6        A.    Yes.
7        Q.    You said a portion of these pools
8    goes to Midland. Where does the remaining
9    portion go?
10       A.    Sherman.
11       Q.    Not -- does it stay at Sherman
12   Originator, or it goes to Sherman Financial?
13       A.    It's sold to Sherman
14   Originator III.
15       Q.    So they just keep it. The
16   portion that isn't sold to Midland, they
17   keep?
18       A.    Yes.
19       Q.    So currently -- currently, all
20   the sold debt goes from MHC to Sherman
21   Originator III, and then Sherman
22   Originator III, through its contractual
23   relationships with Midland, is selling a
24   portion of that -- those pools to Midland,
25   and Sherman Originator III is keeping the

Page 86

1    remaining portion of those pools. Am I
2    understanding that correctly?
3        A.    Yes.
4        Q.    Okay. Currently, are there any
5    other third-party buyers that are being sold
6    to other than Midland?
7        A.    No.
8        Q.    Are you aware of it -- and I know
9    we talked about some of those earlier.
10           You are aware that in the past,
11   other third-party buyers other than Midland
12   were buying this debt from Sherman
13   Originator III; correct?
14       A.    Yes.
15       Q.    Okay. Having gone through an
16   hour of the deposition and a little break, do
17   you recall any of the other third-party
18   purchasers other than the ones you mentioned
19   this morning like RAzOR and UHD?
20       A.    RAzOR, UDH.
21       Q.    UDH. I'm sorry.
22       A.    MSW. Yeah, I wasn't thinking
23   about that on break. No.
24       Q.    That's okay. That's okay. I
25   wasn't either. I was just worried about

Page 87

1    getting my coffee so -- but do you know when
2    did it change that -- when did it become that
3    all of this debt was being sold just to
4    Midland?
5        A.    It's not.
6        Q.    It's not?
7        A.    You said --
8        Q.    As far as a third party. In
9    other words, Sherman --
10       A.    You said all of it is sold to
11   Midland. That's --
12       Q.    Well, all of the debt that is not
13   going to be retained by Sherman
14   Originator III is sold to Midland; correct?
15       A.    Correct.
16       Q.    Okay. When did that become the
17   norm? In other words, when did Sherman
18   Originator stop selling to anyone other than
19   Midland?
20       A.    We -- they stopped selling --
21   actually, MSW stopped purchasing.
22       Q.    Okay.
23       A.    So -- and that was, I believe,
24   May of 2015.
25       Q.    Okay.

Page 88

1        A.    And I believe UDH was some time
2    early -- or in 2015 as well. I'm not -- I
3    don't recall the date, though.
4        Q.    Do you know if UDH stopped
5    purchasing, or did -- was it a decision not
6    to sell to them anymore?
7        A.    It was a decision not to sell.
8        Q.    And what about RAzOR?
9        A.    That was prior to me.
10       Q.    Prior to you. Okay.
11           Do you know why -- if that was a
12   decision not to sell to them, or was that a
13   decision by RAzOR not to purchase?
14       A.    I do not have knowledge of that.
15       Q.    Do you have an understanding as
16   to why -- MSW is an entity different than
17   Midland; correct?
18       A.    Yes.
19       Q.    Do you have an understanding as
20   to why Midland decided to stop purchasing in
21   May of '15?
22       A.    Midland didn't decide to stop
23   purchasing.
24       Q.    I'm sorry. Why MSW decided to
25   stop purchasing in May of '15.

21 (Pages 85 to 88)


MAGNA
LEGAL SERVICES

Page 101

1  match from the cardholder system of record,
2  FDR, to what's on the file, and if there's a
3  match, then the account is properly coded as
4  bankrupt, and it will charge off the next
5  day.
6      Q.   So IT -- in-house IT at Credit
7  One Bank gets this file from Resurgent, and
8  they match that information up with the
9  system of record to determine if the given
10 account that's in that system of record is,
11 in fact, this bankrupt account.  Is that
12 correct?
13     A.   Yes.
14     Q.   And then once IT makes that
15 determination, how do they notify or do
16 they -- you said it's coded.  Who actually
17 does the coding after IT has made that match?
18     A.   Well, it's automatic.  It's
19 systemic.
20     Q.   Okay.
21     A.   So they'll put a bankruptcy code
22 on the account, which will force the account
23 to go into a queue.
24     Q.   So there's not somebody at IT
25 actually comparing the file from Resurgent

Page 102

1  and the system of record.  It comes into IT,
2  and there's some sort of a program that
3  matches --
4      A.   That matches it.
5      Q.   -- that file from Resurgent up
6  with the system of record.
7           A match is made, and it's just
8  automatically, by the system of record, coded
9  as bankrupt; is that correct?
10     A.   Yes.  The maintenance behind the
11 scene, once the match is made, codes it and
12 moves the account to where it needs to be.
13     Q.   I got you.
14          And you don't know who set up
15 that system in terms of using Resurgent to do
16 that and the IT doing that match and how that
17 all occurs.  It's just always been that way
18 as far as you know.
19     A.   Yes.
20     Q.   Okay.  Any other work that
21 Resurgent does for the bank that you're aware
22 of?
23     A.   Resurgent houses all of our media
24 that we use or we package together with
25 sales.

Page 103

1      Q.   So that would be, like, mailers,
2  anything at all, you know, in terms of
3  marketing.  Am I correct there?
4      A.   No.
5      Q.   What do you mean, then?
6      A.   The media we supply to buyers
7  upon sale is the media that they will house
8  for us.
9      Q.   I got you.  Okay.  What does that
10 media consist of?  When you say "media," what
11 are you referring to?
12     A.   Generally, it will consist of up
13 to 24 months of statements, the application,
14 a copy of the application, and the most
15 recent account agreement and the -- that's
16 it.
17     Q.   Okay.
18     A.   Those three things.
19     Q.   And after you sold -- so this is
20 for sold now.  Okay?
21     A.   Yes.
22     Q.   Who has access to that data
23 that's being housed by Resurgent.  Does the
24 bank and the buyer both have -- do they both
25 have access to that?

Page 104

1      A.   Resurgent has access to it.
2      Q.   Okay.
3      A.   We send it to them.  They store
4  it.  They have access to it.
5      Q.   And who do they give that
6  information out to, if anyone?
7      A.   They'll -- the accounts that are
8  sold to Midland, they'll send those -- that
9  media to Midland for those accounts.
10     Q.   And the ones that aren't sold to
11 Midland, what happens to that media?
12     A.   It stays at Resurgent.
13     Q.   So any of the debt that's
14 retained by Sherman Originator, if they need
15 to access that information, they would go to
16 Resurgent and access that media there.  Is
17 that the way it works?
18     A.   They would -- Resurgent services
19 the accounts for Sherman.
20     Q.   Okay.
21     A.   So Resurgent are -- they're the
22 only ones who have access.
23     Q.   I got you.  Okay.
24          So Resurgent is doing the
25 servicing, so if any question came up about



Page 109

1    A.    I don't know for sure.
2    Q.    Do they do any -- if you already
3  have -- is that the way all the bankrupt
4  pools are set up as a result of that
5  scrubbing process, or is there a bankrupt
6  pool that's generated right at FDR that comes
7  to the bank and then to Resurgent?
8    A.    The bank can be notified in a
9  variety of ways of a bankruptcy before the
10  account has charged off.
11    Q.    Okay.
12    A.    So for example, the customer can
13  call and tell us and give us their attorney
14  information.  We could receive a letter from
15  a customer, in which case, once we obtain all
16  that, we code it bankruptcy, and it goes into
17  the proper queue.
18    Q.    Okay.
19    A.    Okay.
20    Q.    And it -- and that queue would be
21  at the system of record.
22    A.    Right, in addition to the file we
23  receive from Resurgent that we scrub up
24  against.  So between those ways, that's what
25  creates the pool for the bankruptcy.

Page 110

1    Q.    So you already have some accounts
2  in the system of record that you know are in
3  bankruptcy that you're going to want to sell,
4  and then you also come across some of these
5  through the scrubbing process, and all that
6  is paired together or put together in a
7  bankrupt pool on a monthly basis, and then
8  that bankrupt pool is sold.  Is that correct?
9    A.    Yes.
10    Q.    And then what happens after the
11  scrubbing process at Resurgent in terms of
12  the charged-off accounts?  They've scrubbed
13  out the bankrupt stuff.  They're now left
14  with a charged-off pool with no bankruptcies
15  in it.  What does it do with that?
16    A.    Once the bankruptcies are out of
17  it, that's when the cut is made for what's
18  going to be sold to Midland and what is
19  retained by Sherman.
20    Q.    Okay.  The cut is made.  That
21  pool is sort of -- that pool is cut, so some
22  of that pool would go to Midland and some of
23  it will go to Sherman?
24    A.    Yes.
25    Q.    How is that cut determined?  How

Page 111

1  is that made?  Is there criteria used to make
2  that cut?
3    A.    The contractual agreement between
4  Sherman Originator III and Midland determines
5  what goes into their pool.
6        (Pages 112 through 115 were
7        deemed confidential and are
8        bound separately.)

Page 116

1        *   *   *   *   *
2  BY MR. SHELLY:
3    Q.    And how about the deceased pool,
4  is that sold to Midland, or is that always
5  retained by Sherman Originator III?
6    A.    It's an entity of Sherman.
7    Q.    Do you know what entity that is?
8    A.    PYOD.
9    Q.    PYOD.  Is that like capital PYOD?
10    A.    Yes.
11    Q.    I've seen that in the past.  So
12  is that an acronym for something?
13    A.    Not -- I -- I don't know.
14    Q.    Okay.  But they receive all the
15  deceased accounts; is that correct?
16    A.    Yes.
17    Q.    Do you know how Sherman
18  Originator III -- strike that.
19        Is it your understanding that the
20  charged-off accounts that Midland buys, that
21  they try to collect on those accounts?  Is
22  that why they're purchasing them, to try to
23  get some money back from those people on
24  those charged-off accounts?
25    A.    Yes.



Page 117

1      Q.     And the stuff that gets culled
2   out of there -- you know, you said that under
3   the contractual relationship between Sherman
4   and Midland, it can only be a certain
5   percentage that can be the first payment
6   default.
7      A.     No.
8      Q.     Oh, I'm sorry.
9      A.     I referenced that as an example
10  of what could be excluded from a pool.
11     Q.     Okay.
12     A.     I didn't say it was directed to
13  Midland.
14     Q.     I appreciate that.  Okay.  I
15  understand that.
16         But whatever the criteria is that
17  puts certain things to -- let's just use that
18  as an example.  I understand that's not
19  necessarily -- but as an example of what you
20  were talking about, if the contract criteria
21  required that only 5 percent of what goes to
22  Midland can be first payment default, what
23  happens to the remaining first payment
24  defaults?  Would they be retained by Sherman
25  Originator?

Page 118

1      A.     Sherman Originator III would
2   purchase them.
3      Q.     And I take it that -- so that
4   Sherman Originator III is purchasing kind of
5   the leftover charged-off accounts that aren't
6   being sold to Midland.  That's one pool;
7   correct?
8      A.     I don't know that I would
9   classify it as that.
10     Q.     Okay.
11     A.     I don't know how they -- I mean,
12  I know they have to meet Midland's criteria,
13  but what is retained, that's -- I don't know.
14     Q.     So if it doesn't meet Midland's
15  criteria, it remains as a pool.  You don't
16  know what happens to that pool or -- I'm not
17  asking if you can tell me what makes up that
18  pool.  I understand you don't know what makes
19  up that pool.  I'm just wondering what
20  happens to that remaining pool that doesn't
21  meet Midland's criteria.  What happens to
22  that pool?
23     A.     It's with Sherman Originator III.
24     Q.     So Sherman Originator has that
25  pool.  It also has all the bankruptcy

Page 119

1   pool, and it also has all of the deceased
2   pool; is that correct?
3      A.     Yes.
4      Q.     And you don't know what, if
5   anything, Sherman Originator does with any of
6   those pools, do you?
7      A.     I have knowledge of that, yes.
8      Q.     Okay.  What do they do?
9      A.     The contractual charge-off is
10  worked through their network of agencies for
11  recoveries.  They file proof of claims on
12  Chapter 13s if it meets certain criteria,
13  balance cuts.  And then Chapter 7s, they just
14  sit there.
15     Q.     They just sit there.
16     A.     They are not worked.  They are
17  not actively worked or lettered.
18     Q.     Do you know if any payments are
19  ever received on those Chapter 7s that are
20  just sitting there?
21     A.     I don't know.
22     Q.     Who would know?
23     A.     Someone at Resurgent would know.
24     Q.     Do they do anything else with
25  that account in terms of the way they work

Page 120

1   at --
2      A.     What are you referring to?
3      Q.     The contractual charge-off.  You
4   said they worked through their network of
5   agencies for recoveries.  They file proof of
6   claims on Chapter 13s if it meets that
7   criteria.  You said "balance cuts."  What did
8   you mean by "balance cuts"?
9      A.     I believe there's -- there's a
10  balance cut criteria for filing a proof of
11  claim.  I don't recall what that is.
12     Q.     Okay.  I don't understand what
13  that means.  Can you -- do you know -- when
14  you say that, what are you referring to?
15     A.     A proof of claim?
16     Q.     A balance cut with respect to a
17  proof of claim.
18     A.     There's -- I mean, at some point,
19  there's no -- you wouldn't file a proof of
20  claim on something maybe $115.
21     Q.     Okay.
22     A.     But you would on something $500.
23     Q.     That's what I thought you meant.
24     A.     Yeah.
25     Q.     I just wanted to make sure that



Page 161

1    A.    There was an update done last
2  year.  I think there's a revision page.
3    Q.    And do you recall what update did
4  occur last year in terms of that procedure?
5    A.    I recalled the org chart being
6  added for the debt buying committee so --
7    Q.    Anything else that you recall?
8    A.    Not off the top of my head.
9    Q.    But nothing in terms of the
10 process you've described has changed.  It's
11 been the same for the whole time that you've
12 been there; correct?
13   A.    The only change that's happened,
14 and I don't know that it's updated in the
15 manual, is we used to house the media, but
16 now Resurgent does.
17   Q.    And why is that?
18   A.    Storage space from IT.
19   Q.    Does Credit One pay Resurgent to
20 house that media?
21   A.    No.
22   Q.    So they house it free of charge
23 for the bank.
24   A.    For Sherman.  It's not ours.
25   Q.    Okay.

Page 162

1    A.    We sold the accounts.
2    Q.    So the bank used to house
3  Sherman's media.
4    A.    Right.
5    Q.    And you basically just didn't
6  have enough room, so Resurgent does it.
7           Now, is the bank paid by Sherman
8  to house that media?
9    A.    No.
10   Q.    Do you know if there was any sort
11 of contract or any sort of a document
12 outlining the fact that the bank should, in
13 fact, house that media for Sherman?
14   A.    It's not that we house it.  It's
15 just we retained it.
16   Q.    Okay.
17   A.    I mean, we sent it to them with
18 the sales file, but we also retained a copy
19 of it.
20   Q.    So what goes to Resurgent now is
21 the copy, or is it just there's no copy kept?
22 It's just like one --
23   A.    It's just all the media.  We
24 would have to re-create it.
25   Q.    Is that the only reason you

Page 163

1  understand that change occurred, just the
2  lack of space?
3    A.    That was the reason that I knew
4  of.
5    Q.    And are you aware of any -- that
6  the procedure -- prior to you coming onboard
7  three years ago, if that procedure manual --
8  if the procedures relating to this sale and
9  transfer process were any different prior to
10 your coming onboard?
11   A.    I don't know.
12   Q.    Okay.  We were talking earlier
13 about the sold accounts and these pools, and
14 certain pools go to Midland based if they
15 meet the contract criteria between Midland
16 and Sherman, and then the other ones that
17 don't meet that criteria stay with Sherman
18 Originator?
19           Could you give me an estimate of
20 the quantity of units, accounts -- not dollar
21 amounts but accounts within a given pool that
22 are retained by Sherman Originator and that
23 actually go to Midland on a monthly basis in
24 these pools.
25   A.    I mean, I lump everything

Page 164

1  together for my tracking as the number of
2  units sold, so I don't -- I don't track the
3  volume.
4    Q.    Whether or not you track it, if
5  you're just aware, does most of the pooled
6  sold debt go to Midland, or does most of that
7  pooled debt stay with Sherman Originator?
8    A.    It's my understanding it's
9  approximate 50/50.
10   Q.    Okay.  And that's good.  That's
11 your understanding.  About half of it goes to
12 Midland, half of it stays with Sherman?
13   A.    And that's on a contractual
14 charge-off only.
15   Q.    Right.  Okay.  On the contractual
16 charge-off only.  What other charges are we
17 talking about?
18   A.    The bankruptcy and deceased.
19   Q.    So they always stay either with
20 Sherman or, in the case of the deceased,
21 PYOD.
22   A.    Right.
23   Q.    So it's just a contractual
24 charge-off that's split roughly 50/50?
25   A.    Uh-huh.

31  (Pages 161 to 164)



Page 173

1    onboard?
2        A.    No.
3        Q.    Can you explain to me what a
4    process flow is.
5        A.    The purpose of it is to depict
6    the end-to-end activities that occur and the
7    decisioning that has to occur when you're
8    executing a procedure.
9        Q.    Do you know what documents or
10    information was utilized to create these
11    process flows or this process flow?
12        A.    I know the -- in talking with
13    Mary, that it was just -- it was face-to-face
14    meetings, and they just talked through how
15    everything went.
16        Q.    Okay.  The various manuals that
17    are in-house at Credit One, they weren't
18    utilized in any way to help flesh out these
19    process flows?
20        A.    I don't know 'cause I wasn't a
21    part of the process.
22        Q.    You said you first became aware
23    of these this week.  Can you explain the
24    circumstances by which you became aware of
25    this document.

Page 174

1        A.    Mary wanted to make sure I had
2    items to review for the deposition today.
3        Q.    When you say "Mary," Mary who?
4        A.    Mary who reports to me.  Despina.
5    She also goes by -- Despina is her legal --
6        Q.    I just wanted to make sure
7    that's --
8        A.    Despina is her legal name.  She
9    goes by Mary.
10        Q.    Why was she the person who wanted
11    to make sure you had items to review for the
12    deposition?
13        A.    Because I was on vacation and
14    traveling for several weeks so --
15        Q.    Okay.
16        A.    First time I've been back in the
17    office, basically, is this week.
18        Q.    Did you ask her -- did you say to
19    her, Mary, I need to review documents.  I'm
20    going to be deposed this week.  I want you to
21    get -- did you tell her to get X, Y, and Z,
22    or did you tell her to get a type -- you
23    know, get me all the documents?  Get me
24    certain types of documents?  What did you
25    actually tell her to get together for you to

Page 175

1    review?
2        A.    Documents related to what the
3    case was about, which is what I was told was
4    credit bureau reporting on a bankrupt
5    account.
6        Q.    So do you know what she did to
7    locate such documents for you?
8        A.    She got them from the recovery
9    drive.
10        Q.    And what did she do?  She went on
11    the recovery drive and looked for anything
12    that had to do with credit bureau reporting
13    or anything to do with bankruptcies?
14        A.    Right.
15        Q.    And what sort of document --
16    other than this document, what documents did
17    she come up with for you to review that were
18    relating to credit bureau reporting or
19    bankruptcy accounts?
20        A.    The recovery manual, the recovery
21    procedures, and this.
22        Q.    Okay.
23        A.    And the contracts.
24        Q.    And the contracts.  Okay.
25            Did you ask her to go through

Page 176

1    E-mails to locate any documents that might
2    have to do with those subjects?
3        A.    No.
4        Q.    And is there a reason you didn't
5    do that?
6        A.    I just didn't think of it.
7        Q.    Do you think there might be
8    E-mails of yours that relate to those
9    subjects?
10        A.    Of mine?
11        Q.    Yes.
12        A.    That relate to credit reporting?
13        Q.    Or bankruptcies.
14        A.    Or bankruptcies?  Just having to
15    do with a sale.
16        Q.    How about people within your team
17    that you would oversee, would you expect
18    there to be E-mails there relating to any of
19    those subjects?
20        A.    No, 'cause Mary was the only one
21    on my team that dealt with the recovery
22    process.
23        Q.    Okay.
24        A.    Everybody else deals with
25    something else.



Page 177

1    Q.    How about Mary, did you ask her
2    to look at her E-mails to see if she has
3    anything relating to those subjects?
4    A.    No, I didn't ask her.
5    Q.    Do you think she would have
6    E-mails relating to those subjects?
7    A.    I don't know.
8    Q.    But she did come up with those
9    manuals and this document.  Where was this
10   document located, do you know?
11   A.    In the recovery drive.  She had
12   mentioned she had forgotten it, because the
13   person who put it together has been gone from
14   the bank for over a year.
15   Q.    The person that put this
16   flowchart together has been --
17   A.    Yes.
18   Q.    But who manages the recovery
19   drive that you're talking about?
20   A.    Mary and I do.
21   Q.    Had you ever searched that
22   recovery drive, prior to your request to Mary
23   last week, for documents that are responsive
24   in this case?
25   A.    No.

Page 178

1    Q.    And did you search, at any point
2    in time, your hard drive on your computer for
3    any documents that might be responsive in
4    this case?
5    A.    No.
6    Q.    Maybe you could -- first of all,
7    you said something like Sig Six or something
8    like that.  Is that what --
9    A.    Six Sigma.
10   Q.    Okay.  What is that?
11   A.    It's a discipline for reducing --
12   let's see.  Six Sigma is a discipline -- it's
13   the DMAIC approach, define, measure, analyze,
14   improve, control.  It's a process improvement
15   tool -- discipline.
16   Q.    On the first page here, there's a
17   triangle up at the top there.  It has
18   Route 60.  It says process improvement,
19   process design, process management.  Is that
20   relating to this discipline that you're
21   referring to?
22   A.    Yes, 'cause in the middle of the
23   triangle is a symbol for Six Sigma.
24   Q.    Okay.  So that's not a 60.  I
25   even have glasses on now so --

Page 179

1    A.    Yeah, that's not Route 66.
2    Q.    Yeah, it looks like Route 60.
3    Okay.  I got you.  It's a play off of
4    Route 66.  I got you.  Okay.
5           And is that a criteria set up by
6    some industry group or what exactly?
7    A.    Well, it's a certification
8    process, and the history of it started back
9    in the manufacturing world with Motorola.
10   And you go through a process to get
11   certified, and the goal is that you help
12   people improve their processes and reduce
13   defects.
14   Q.    So I take it at the time this
15   flow was created and this was going on,
16   Credit One Bank was attempting to get
17   certified under that standard; is that
18   correct?
19   A.    No.
20   Q.    No?  Okay.
21   A.    We were attempting to document
22   our processes.  Barb, who did the flow, is a
23   certified Six Sigma black belt.
24   Q.    So there was no -- there was no
25   need or attempt to get certified.  What was

Page 180

1    created here was a way to show that the bank
2    either could or was meeting that
3    certification standard in-house?
4    A.    It had -- this had nothing to do
5    with any certification.
6    Q.    Okay.
7    A.    It just was an attempt to
8    document our processes.
9    Q.    So it's just -- all she did was
10   take the knowledge she had, as being
11   certified for this, herself.  She took that
12   knowledge and applied that knowledge to what
13   the bank did to create flow charts, basically
14   showing here's what the bank does.
15   A.    Right.
16   Q.    For in-house.  Okay.
17          What was the purpose of that for
18   the bank?  I mean, why did the bank want that
19   at that time?
20   A.    Well, the goal of Six Sigma is to
21   reduce defects, so once you flow something
22   out, you can see if there's redundancy or if
23   there's a step that doesn't need to happen or
24   if there is a step that does need to happen.
25   That's the purpose.

35 (Pages 177 to 180)

