# Exhibit F

Page 1

```
              *** C O N F I D E N T I A L ***
               UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK
In re:                          )
                                )
Orrin S. Anderson, aka          ) Case No.
Orrin Anderson, aka Orrin       ) 14-22147 (rdd)
Scott Anderson,                 )
                                ) Chapter 7
        Debtor.                 )
_____  )
                                )
In re:                          )
                                )
Orrin S. Anderson, aka          ) Adv. Case No.
Orrin Anderson, aka Orrin       ) 15-08214 (rdd)
Scott Anderson                  )
                                )
        Debtor and Plaintiff,)
        on behalf of himself )
        and all others          )
        similarly situated,     )
                                )
     v.                         )
                                )
CREDIT ONE BANK, N.A.,          )
                                )
        Defendant.              )
_____  )
```

```
                 DEPOSITION OF HELEN LANHAM
          Taken on January 27, 2016 at 9:28 A.M.
            300 South Fourth Street, Suite 800
                    Las Vegas, Nevada
       Reported by:  Jennifer Clark, RDR, CRR, CCR #422
                   MAGNA LEGAL SERVICES
                     (866) 624-6221
                    www.MagnaLS.com
```



Page 6

```
1        *** C O N F I D E N T I A L ***
2           MR. SLODOV:  Right.
3           MR. SHELLY:  Right.
4           MR. SLODOV:  And I guess within
5     14 days of production of the transcript.
6           MR. SHELLY:  That's fine.  Sure.
7           MR. SLODOV:  Okay.
8
9               EXAMINATION
10    BY MR. SHELLY:
11        Q.    All right.  I'm going to start
12    off by asking you, prior to this lawsuit, was
13    Credit One aware of plaintiff's discharge in
14    bankruptcy and the discharge of the debts
15    plaintiff owed to Credit One?
16        A.    No, we were not.
17        Q.    So Credit One became aware of his
18    discharge in bankruptcy after this lawsuit
19    was commenced.
20        A.    Correct.
21        Q.    Okay.  Have you been deposed
22    before?
23        A.    Yes, I have.
24        Q.    How many times?
25        A.    Just once before.
```

Page 7

```
1        *** C O N F I D E N T I A L ***
2        Q.    Okay.  What sort of a case was
3     that?
4        A.    It was an adverse action
5     notification as part of a credit application
6     and denial.
7        Q.    As an individual case?
8        A.    Yes, it was for an individual
9     case.
10        Q.    If, during the deposition, you
11    want to take a break at any time, just let me
12    know.  If you don't understand something that
13    I say, just let me know, and I'll try to
14    repeat it so that you do understand it.
15    Okay?
16        A.    Okay.  Thank you.
17        Q.    And one other thing you're doing
18    well so far.  A lot of people just want to
19    shake their head yes or no, you know, but you
20    need to verbalize that so --
21        A.    Right, right.  Absolutely.  It
22    can't come out on the transcript if it's not
23    audible.
24        Q.    Right, right.
25              If you could describe for me the
```

Page 8

```
1        *** C O N F I D E N T I A L ***
2     overall corporate structure, at least, first,
3     of Credit One Bank National Association.
4           I'm probably going to refer to it
5     as Credit One throughout the day; is that
6     okay?
7        A.    Yes, certainly.
8        Q.    Okay.
9        A.    So Credit One is owned by -- it's
10    a fully owned subsidiary of Credit One
11    Financial, so that's the general structure.
12    What other specific details are you looking
13    for?
14        Q.    Well, it's owned by Credit One
15    Financial.  Is Credit One Financial owned by
16    anybody?
17        A.    No, it's not.
18        Q.    What other entities does Credit
19    One Financial own, if any?
20        A.    It only owns Credit One Bank.
21        Q.    How is Credit One related to the
22    Sherman Financial Group?
23        A.    Sherman previously owned Credit
24    One Financial, and in 2012, Sherman --
25    Credit One Financial became its own
```

Page 9

```
1        *** C O N F I D E N T I A L ***
2     subsidiary.
3        Q.    Of the Sherman Financial Group?
4        A.    I'm sorry.  Credit One Bank
5     became a fully owned subsidiary of Credit One
6     Financial.
7        Q.    And what's the relationship of
8     Credit One Financial to the Sherman Financial
9     Group?
10        A.    Sherman has an interest in Credit
11    One Financial.
12        Q.    Do you know what percentage of
13    that interest?
14        A.    No, I do not.
15        Q.    Do you know of anyone else, other
16    than Sherman Financial Group, that has an
17    interest in Credit One Financial?
18        A.    No, I do not.
19        Q.    How is it that you're aware of
20    the interest that Sherman Financial Group has
21    in Credit One Financial?
22        A.    Because they previously owned --
23    they previously owned Credit One Financial.
24        Q.    They previously owned Credit One
25    Financial or Credit One Bank?
```


MAGNA
LEGAL SERVICES

Page 10

```
1          *** C O N F I D E N T I A L ***
2      A.    They previously owned -- I'm
3   sorry.  They previously owned Credit One
4   Bank.
5      Q.    Okay.  And when Sherman Financial
6   Group owned Credit One Bank, did Credit One
7   Financial exist?
8      I'm not -- I'm not sure.
9      A.    Okay.  Do you have any
10  understanding as to when Credit One Financial
11  was created?
12     A.    I believe it was in 2012.
13     Q.    Is it your understanding that the
14  reason it was created was to own Credit One
15  Bank?
16     A.    Yes.
17     Q.    Do you have any understanding as
18  to why Sherman Financial Group set up Credit
19  One Financial to own Credit One Bank?
20     A.    No, I do not.
21     Q.    Other than Credit One Financial,
22  are you aware of any other entities owned by
23  Sherman Financial Group?
24         MR. SLODOV:  Objection.
25  Relevance.
```

Page 11

```
1          *** C O N F I D E N T I A L ***
2   BY MR. SHELLY:
3      Q.    He's going to object, but unless
4   he directs you not to answer, you can go
5   ahead and answer the questions.
6          MR. SLODOV:  You can answer.
7          THE WITNESS:  I believe they
8      have an interest in MHC Receivables
9      and -- which is an LLC, and FNBM, LLC.
10     I don't know the exact nature of the
11     ownership.
12  BY MR. SHELLY:
13     Q.    Other than MHC Receivables and
14  FNBM, LLC, are you aware of any other
15  entities owned by Sherman Financial Group?
16         MR. SLODOV:  Objection.
17  Relevance.
18         THE WITNESS:  I believe they're
19     associated with Sherman Financial --
20     Sherman Financial Markets.  I'm sorry.
21     That's, like, Sherman Capital Markets.
22  BY MR. SHELLY:
23     Q.    Does Credit One Bank have any --
24  strike that.
25         What do you understand to be the
```

Page 12

```
1          *** C O N F I D E N T I A L ***
2   business of MHC Receivables?
3          MR. SLODOV:  Objection.
4   Relevance.
5   BY MR. SHELLY:
6      Q.    He's going to object as to
7   relevance but --
8      A.    Right.
9          So it's my understanding that
10  when Credit One Bank originates an account,
11  the receivables associated with that account
12  are sold to MHC Receivables.
13     Q.    And is that true of every
14  receivable generated by Credit One Bank?
15     A.    Yes.
16     Q.    How are those receivables sold to
17  MHC Receivables?
18         MR. SLODOV:  Objection.  Vague.
19         THE WITNESS:  There's a process
20     where, once the receivable is -- you
21     know, once the -- once the account has
22     been originated by Credit One, there's a
23     process then where the money is -- you
24     know, for the receivables, is
25     transferred to MHC Receivables.
```

Page 13

```
1          *** C O N F I D E N T I A L ***
2   BY MR. SHELLY:
3      Q.    Is that process set forth in
4   certain documents?
5      A.    Yes, I believe it is.
6      Q.    And what would those documents
7   be?
8      A.    I believe there's a contract,
9   between either Credit One and MHC Receivables
10  that would outline all the specifics and
11  details of how that financial transfer would
12  transpire.
13     Q.    And do those contracts cover a
14  given time period?  Like on a yearly basis,
15  they will cover every receivable generated by
16  Credit One Bank?
17     A.    I do not know that.
18     Q.    How quickly are those receivables
19  sold to MHC Receivables?
20     A.    I believe it's within, you know,
21  a 30-day period of when the credit card is
22  originated.
23     Q.    Would it ever be longer than
24  30 days?
25     A.    I don't believe it would be.
```


MAGNA
LEGAL SERVICES

Page 14

*** C O N F I D E N T I A L ***
1
2    Q.    Are there documents within Credit
3  One Bank describing how its employees should
4  handle the sale of these receivables to
5  MHC Receivables?
6    A.    I believe that's dictated --
7  would be dictated in the -- in the contract,
8  how the, you know, financial money transfer
9  part of that would work.
10    Q.    Is there a certain department
11  within Credit One that handles the sale of
12  these receivables?
13    A.    Well, our treasury and finance
14  department is the department that's
15  responsible for, you know, the financial, you
16  know, dealings of the bank.  So that
17  department would be responsible for funds
18  transfer as well as, you know, other
19  functions related to finance and accounting.
20    Q.    Any particular people within
21  treasury and finance that handle the sale of
22  these receivables?
23    A.    Not anyone -- not anyone
24  specific.  There are teams of people that,
25  you know, work on different functions within

Page 15

*** C O N F I D E N T I A L ***
1
2  that department.
3    Q.    And how long has Credit One been
4  selling its receivables to MHC Receivables?
5    A.    I believe since 2009.
6    Q.    And what did Credit One do with
7  its receivables prior to 2009?
8    MR. SLODOV:  Objection.
9  Relevance.
10    THE WITNESS:  I'm not aware of
11  what they did with the receivables prior
12  to 2009.
13  BY MR. SHELLY:
14    Q.    Would there be somebody within
15  Credit One that would be aware of that?
16    A.    Yes, there would be.
17    Q.    Who would that be?
18    A.    Our CFO would be more aware of
19  those types of, you know, financial
20  transactions.
21    Q.    And who is that?
22    A.    It's George Hughes.
23    Q.    And was he at Credit One back --
24  prior to 2009?
25    A.    Yes.

Page 16

*** C O N F I D E N T I A L ***
1
2    Q.    And was he CFO at that time as
3  well?
4    A.    He was the head of the
5  department.  I don't remember exactly when he
6  became the -- when he became the chief
7  financial officer.
8    Q.    Do you have an understanding as
9  to why Credit One began selling its
10  receivables to MHC Receivables in 2009?
11    A.    No, I do not.
12    Q.    Do you have an understanding
13  today as to why Credit One, the bank, sells
14  its receivables to MHC Receivables?
15    A.    No, I do not.
16    Q.    You've been designated as Credit
17  One's designee on these topics today.  You
18  don't have an answer to that question?
19    MR. SLODOV:  Objection.  What
20  topic are you referring to?  The
21  question you asked has nothing to do
22  with any of the topics in your notice of
23  deposition.
24    MR. SHELLY:  Are you going to
25  direct her not to answer the question?

Page 17

*** C O N F I D E N T I A L ***
1
2    MR. SLODOV:  I'm just asking if
3  you could clarify, for the record, what
4  topic.
5  BY MR. SHELLY:
6    Q.    Okay.  Can you answer the
7  question?
8    A.    So which specific question now
9  are you asking?  What the --
10    Q.    Why Credit One Bank sells its
11  receivables to MHC Receivables.
12    A.    I'm not sure what the business
13  justification for that is.  I've read the
14  documents, and I'm aware of, you know, the
15  chain of ownership on the receivable and the
16  account, but I do not know what the business
17  purpose for that is.
18    Q.    What benefit does Credit One Bank
19  receive by selling its receivable to
20  MHC Receivables?
21    A.    I don't know what benefit they
22  receive.
23    Q.    Do they receive financial
24  remuneration?
25    A.    They receive -- the bank receives



Page 18

```
 1      *** C O N F I D E N T I A L ***
 2   financial remuneration when the account is --
 3   when the account is sold, the account
 4   receives -- or the bank receives money for
 5   the -- you know, for the sale of -- of the
 6   account.
 7       Q.     When you're talking about the
 8   sale now, we're talking about the sale to
 9   MHC Receivables, or you're talking about a
10   different sale further down the line?
11       A.     Further down the line, the bank
12   receives financial compensation for the sale
13   of the debt.
14       Q.     But at the time it first sells it
15   to MHC Receivables, it does not receive any
16   financial benefit?
17       A.     The bank receives, you know,
18   financial -- the bank is paid to service the
19   account, and it is paid for the origination,
20   you know, expense of the account.
21       Q.     And who pays it for the servicing
22   and origination of the account?
23       A.     I believe it's MHC Receivables.
24       Q.     And when you say "servicing the
25   account," what does that entail?
```

Page 19

```
 1      *** C O N F I D E N T I A L ***
 2       A.     So all the functions related to
 3   customer service operations, handling the
 4   account, taking payments on the account, all
 5   the normal, you know, functions of servicing
 6   a credit card account, customer service.
 7       Q.     So basically, it runs the entire
 8   end of the business that deals with the
 9   customer.
10       A.     Right, exactly.
11       Q.     And when you say "origination," I
12   think I understand what you mean by that, but
13   could you tell me what, in fact, you do mean
14   by "origination."
15       A.     So origination means -- means
16   acquiring -- opening up a new credit card
17   account.
18       Q.     And that might include
19   advertising, soliciting people to actually
20   enroll in an account with Credit One.
21       A.     Correct.
22       Q.     And you also said FNBM, LLC.
23   What sort of business relationship, if any,
24   does Credit One have with FNBM, LLC?
25       A.     Once the receivables -- once the
```

Page 20

```
 1      *** C O N F I D E N T I A L ***
 2   account is originated and the receivables are
 3   initially sold to MHC, LLC, MHC, LLC sells
 4   the receivable to FNBM.
 5       Q.     Do you have any understanding as
 6   to why MHC Receivables sells that receivable
 7   to FNBM?
 8       A.     No, I do not.
 9       Q.     And are you aware of the
10   contracts that govern the sale from MHC to
11   FNBM?
12       MR. SLODOV:  Objection.
13       THE WITNESS:  No, I am not.
14   BY MR. SHELLY:
15       Q.     Are you aware of the fact that --
16   strike that.
17       Do you have an understanding as
18   to why MHC sells the receivable to FNBM?
19       A.     No, I do not.
20       Q.     And at the time MHC sells it to
21   FNBM, is that the time that Credit One
22   receives financial benefit for the sale?
23       A.     I believe that Credit One
24   receives benefit from the sale of the
25   receivable at the time that Credit One sells
```

Page 21

```
 1      *** C O N F I D E N T I A L ***
 2   the receivable to NHC. I'm not aware of that
 3   financial benefit being predicated on the
 4   additional sale to FNBM.
 5       Q.     Well, just earlier you said
 6   that -- I asked you do they receive financial
 7   remuneration.  You said they receive -- the
 8   bank receives financial remuneration when the
 9   account is -- when the account is sold, the
10   account receives -- or the bank receives
11   money for the -- you know, for the sale of
12   the account.  And then I asked you, when
13   you're talking about the sale now, we're
14   talking about the sale to MHC Receivable, are
15   you talking about a different sale further
16   down the line, you said further down the
17   line, the bank receives financial
18   compensation for sale of the debt.
19       A.     Well, there are two --
20       MR. SLODOV:  Objection as to
21   the -- what's the question?
22   BY MR. SHELLY:
23       Q.     You understood the question,
24   didn't you?  You were just going to tell me
25   an answer.
```



CONFIDENTIAL

Page 22

```
 1      *** C O N F I D E N T I A L ***
 2      A.    Well, I'm just trying to clarify.
 3   There's two points in this process where the
 4   bank receives, you know, financial
 5   compensation.  So to my understanding, the
 6   first time is after we've originated the
 7   account, the receivables are sold to MHC,
 8   LLC.
 9      Q.    Okay.
10      A.    And during the time that we own
11   the account and the account is in good
12   standing, we receive a servicing fee for that
13   account for -- for servicing the account, you
14   know.  I said previously we receive -- we
15   receive money for the expense of the account
16   origination, so that's one part.
17          So if the account is a
18   discharge -- I'm sorry.  If the account is
19   sold, so if the account is charged off and we
20   sell the account, the bank then receives
21   financial compensation for the sale of that
22   debt.
23      Q.    Okay.
24      A.    So there are two points during
25   the process where the bank receives financial
```

Page 23

```
 1      *** C O N F I D E N T I A L ***
 2   compensation.
 3      Q.    So the financial compensation it
 4   receives from MHC Receivables is for the
 5   servicing and the origination, not for the
 6   actual sale of that debt to MHC; is that
 7   correct?
 8      A.    In the first part of the -- yes.
 9   That's why -- in the first part of that, you
10   know, the bank then -- when the -- you know,
11   when the account is, you know, charged off
12   and sold, the bank sells the remaining --
13   sells that to MHC Receivables.
14          So they would again be -- you
15   know, the bank would be getting compensation
16   for the sale of the debt at that point in
17   time as well, to my understanding.  So
18   there's two -- there's basically two parts of
19   the process where the bank is compensated in
20   some way for the account or the receivable.
21      Q.    So it sells all of its
22   accounts -- all of its receivables to MHC.
23   When the account is charged off, it then
24   charges -- it then sells that charged-off
25   debt to MHC at that time; is that correct?
```

Page 24

```
 1      *** C O N F I D E N T I A L ***
 2   Is that what you're saying?
 3      A.    That's my understanding, yes.
 4      Q.    But when MHC sells the receivable
 5   to FNBM, Credit One does not receive any
 6   financial benefit from that.
 7      A.    Not to my knowledge, no.
 8      Q.    When the debt -- the charged-off
 9   debts are sold to MHC, do you have an
10   understanding what happens to that debt that
11   MHC now owns?
12      A.    Yes.  That -- MHC sells that debt
13   to Sherman Originator III.
14      Q.    The sold -- at the time that
15   Credit One sells the charged-off debt to MHC,
16   does Credit One receive money from MHC for
17   that sale?
18      A.    Yes.
19      Q.    And that's governed by a contract
20   as well?
21      A.    Yes.
22      Q.    Do you have any understanding as
23   to why MHC sells the debt to Sherman
24   Originator?
25      A.    No, I do not.
```

Page 25

```
 1      *** C O N F I D E N T I A L ***
 2      Q.    And do you know what Sherman
 3   Originator does with the charged-off debt
 4   that it received from MHC?
 5      A.    Sherman Originator will sell that
 6   debt to other buyers.
 7      Q.    What other buyers are you aware
 8   of that Sherman Originator sells to?
 9      A.    I know Midland Funding is one.  I
10   believe Encore.  I'm not sure if Encore and
11   Midland were the same.  Sometimes these
12   entities change names.  Those are two that
13   I'm aware of.
14      Q.    Okay.  Any others that you're
15   aware of?
16      A.    No, I'm not.
17      Q.    Sherman Originator -- I think you
18   said III, but I'm just going to refer to it
19   as Sherman Originator, if that's okay.
20      A.    Right.
21      Q.    Is that also an entity owned by
22   Sherman Financial Group?
23      A.    I believe so, yes.
24      Q.    Getting back to Credit One
25   itself, what sort of divisions is it divided
```



CONFIDENTIAL

Page 26

1     *** C O N F I D E N T I A L ***
2   up into?
3       A.    Like, I talked about our treasury
4   and finance department, so that's one of the
5   major departments.  The risk management
6   department, operations, compliance and legal,
7   marketing, and information technology.
8       Q.    I think you described treasury
9   and financial as being the one that handles
10  the sale of the receivable to MHC.  Do they
11  also handle the sale of the debt to MHC?
12      A.    In terms of the monetary
13  transaction piece of it, they do.
14      Q.    In terms of the actual moving of
15  the debt from Credit One to MHC, do they
16  handle that?
17      A.    The administration and processing
18  of that is handled by our operations unit.
19      Q.    Do you have an understanding as
20  to why Credit One sells the charged-off debt
21  to MHC Receivables?
22          MR. SLODOV: Objection.  Asked
23  and answered.
24          THE WITNESS:  I'm sorry?
25          MR. SLODOV:  You can answer.  You

Page 27

1     *** C O N F I D E N T I A L ***
2   can answer.
3          THE WITNESS:  It's a standard
4   practice for credit card issuers to sell
5   charged-off debt rather than trying to,
6   you know, continue to collect that debt
7   themselves.
8   BY MR. SHELLY:
9       Q.    Do you have an understanding as
10  to why Credit One has chosen MHC to be the
11  entity that it sells its charged-off debts
12  to?
13      A.    I'm not aware of any particular
14  reason why MHC was -- was chosen to -- to --
15  to purchase the debt, to be the debt buyer.
16      Q.    Do you know who made that
17  decision?
18      A.    I would assume it was the --
19          MR. SLODOV:  Objection.
20          THE WITNESS:  I would assume it
21  was the -- the president of the bank,
22  with the chief financial officer,
23  deciding, you know, who the -- who the
24  debt is sold to.
25          MR. SLODOV:  Objection.

Page 28

1     *** C O N F I D E N T I A L ***
2   BY MR. SHELLY:
3       Q.    Do you know how long Credit One
4   has been selling that debt -- that sort of
5   debt to MHC Receivables?
6       A.    I believe it's been since 2009.
7       Q.    And the person that you were
8   talking about before, George Hughes, he's the
9   person that is the CFO that would know about
10  why the bank sells this to MHC Receivables;
11  is that correct?
12      A.    Yes.
13      Q.    Prior to 2009, do you know who
14  Credit One sold its charged-off debt to?
15      A.    I believe there were a variety of
16  buyers.
17      Q.    Do you know who -- the names of
18  any of those?
19      A.    I wouldn't know any of those
20  specific names.
21      Q.    Do you know if any of those
22  buyers were in any way owned by Sherman
23  Financial Group at that time?
24      A.    I do not know that.
25      Q.    So as far as you know, the debt

Page 29

1     *** C O N F I D E N T I A L ***
2   may have been sold to non-Sherman entities
3   prior to 2009; is that correct?
4       A.    That's my understanding, or
5   sometime prior to that.
6       Q.    Are the debts -- the charged-off
7   debts, are they sold to MHC Receivables at
8   the moment they're charged off?
9       A.    It's difficult to answer when you
10  say "at the moment."  Right when the -- when
11  the account is charged off, there's a
12  process.  Obviously it takes some time to --
13  you know, it's immediately after the
14  charge-off, but it may take a couple days for
15  the processing to take place from an
16  administrative standpoint.
17      Q.    But individual accounts, as
18  they're charged off, they go through this
19  process, and then they're then sold to
20  MHC Receivables; correct?
21      A.    Yes.  There may be, you know, a
22  couple-week lag where maybe the sale takes
23  place once a month, and so an account would
24  charge off when the account cycles.  So I
25  believe there's a -- like, there's a monthly



Page 30

1      *** C O N F I D E N T I A L ***
2    process.  So all the accounts that charged
3    off the previous month then would sell.
4        So I don't believe that every
5    account is sold every day that it charges
6    off.  Like, I believe that there's some kind
7    of batch process where, you know, at the end
8    of the month, those accounts are all sold.
9        Q.    Other than what you said, do you
10   have any further understanding of that batch
11   process?
12       A.    No, I do not.
13       Q.    If I understand, what you're
14   saying is that there may be -- say for the
15   month of December, throughout the month,
16   there are certain accounts that become
17   charged off.
18       A.    Uh-huh.
19       Q.    They're then held by Credit One
20   until the end of the month, and at that time,
21   there may be 50 or 100 charged-off accounts,
22   and they, as a group, are then sold to
23   MHC Receivables.
24       A.    Yes, that's my understanding of
25   how that happens, just to facilitate the

Page 31

1      *** C O N F I D E N T I A L ***
2    administrative process of doing that.
3        Q.    Who handles that actual -- that
4    process?  Is there a department or an
5    individual that handles that?
6        A.    The financial transfer of the
7    money or the administrative process of --
8        Q.    The administrative process.
9        A.    It would be our operations unit.
10       Q.    Anybody in particular there that
11   handles that?
12       A.    There's a team of people who work
13   on the administration of that process.
14       Q.    Okay.  And does that team have a
15   name?
16       A.    It's part of the collections
17   group.  So under operations at Credit One,
18   there's customer service, and then there's a
19   collections branch.  So it's part of the
20   collections department that's responsible for
21   that part of the administration.
22       Q.    And this batch process that you
23   described, are there documents describing how
24   that process is to be carried out?
25       A.    I believe that there are

Page 32

1      *** C O N F I D E N T I A L ***
2    procedures that dictate how the actual
3    function through the system of the -- of
4    that -- of the account transfer is executed,
5    so just the administration of that.
6        Q.    So there are procedures that
7    would describe the way that this team is to,
8    first, charge off the account, then hold it
9    until the batch is organized, and then at
10   that point, sell it to MHC Receivables.
11       A.    Correct.
12       Q.    And in those procedures -- are
13   they written down somewhere?
14       A.    I'm not -- I believe -- I believe
15   they -- I believe they -- they would be.
16   It's, you know, specific procedures to --
17   just for the administration of the -- of the
18   sale if there are different buyers which --
19   or I'm sorry.  I'm trying to describe this
20   process as it relates to the systems in the
21   bank.
22       Q.    Is all this done via a computer
23   program?
24       A.    Yes, yes.
25       Q.    Okay.  So the procedures that the

Page 33

1      *** C O N F I D E N T I A L ***
2    people are to follow, they have been
3    implemented onto a computer program that
4    handles this whole processing that you just
5    described?
6        A.    Correct, correct, yes.
7        Q.    Do you know who created that
8    procedure?
9        A.    I believe it would have been
10   someone in the collections department that's
11   responsible for that piece of the
12   administration.
13       Q.    You don't know who, though?
14       A.    No, I do not.
15       Q.    Do you know when that procedure
16   was created?
17       A.    It's probably been -- it
18   probably -- I'm not aware of the time frame,
19   but the sale of the charge-off, as we've
20   discussed, occurred before the charged-off
21   debt was sold to MHC Receivables, so prior to
22   that.
23       And, you know, prior, you know,
24   we sold debt to various buyers.  So the
25   actual function, how this works in the



Page 34

1    *** C O N F I D E N T I A L ***
2    system, was, you know, designed, you know,
3    probably prior to 2005.
4         At whatever point the bank chose
5    to sell its debt, then those procedures would
6    have been created so that the teams working
7    on that would understand how to execute that
8    process through the computer system.
9    Q.    So your understanding is that
10   this procedure that's followed has been
11   consistent and the same throughout Credit
12   One's history.
13   A.    That's my understanding.
14   Q.    There have been no changes to it
15   that you're aware of?
16   A.    Not to -- unless something in the
17   system changed in the systems that we manage
18   that, you know, a file has to be called
19   something different or -- you know, again,
20   things related to the administration of how
21   that -- how that works.
22   Q.    Okay.
23   A.    There might have been updates to
24   our system that, you know, needed to be --
25   needed to be clarified for the folks that are

Page 35

1    *** C O N F I D E N T I A L ***
2    actually administering that.  You know, if
3    part of the underlying system changed from a
4    logistical standpoint, those procedures may
5    have been updated over time just to reflect
6    that system.
7    Q.    But you're not aware of any right
8    now?
9    A.    No, I'm not.
10   Q.    And if there were updates, there
11   would be some record of those procedures
12   being changed and updated?
13   A.    It's my understanding that there
14   would be.
15   Q.    Okay.  You described operations
16   as being broken up into two different
17   departments.  Are the other areas that you
18   described broken into smaller departments as
19   well?  And I can go -- like, you mentioned
20   treasury and financial, risk management.  Do
21   they have smaller departments underneath
22   them?
23   A.    There are some departments
24   under -- for example, risk management,
25   there's a department responsible for

Page 36

1    *** C O N F I D E N T I A L ***
2    originating new accounts, managing the risk
3    of new account origination.  There's a
4    department that's responsible for portfolio
5    management.  Just the logical function areas
6    underneath those larger departments.
7    Q.    What department makes the
8    determination that an account will be charged
9    off?
10   A.    A definition of a charged-off
11   account is, you know, ultimately made through
12   our compliance and legal department, because
13   we follow the -- our regulator, the OCC's
14   guideline on when an account can and should
15   be charged off.
16   Q.    And do you always charge off an
17   account when it can and should be according
18   to the regulation you were talking about?
19   A.    Yes.
20   Q.    So compliance and legal makes the
21   determination that an account should have
22   been charged off, and then they notify
23   operations to go through the process that you
24   were describing?
25        MR. SLODOV:  Objection as to

Page 37

1    *** C O N F I D E N T I A L ***
2    form.
3         THE WITNESS:  I'm sorry.  I
4    didn't hear what you said.
5         MR. SLODOV:  You can answer.
6         THE WITNESS:  So the
7    responsibility of compliance and legal
8    at the bank is to make sure that the
9    bank complies with, you know,
10   regulator's guidelines and with any
11   other applicable, you know, laws,
12   statutes.  So generally, they're the
13   ones, you know, creating the policy, and
14   the operations units are responsible
15   for, you know, following that policy.
16   BY MR. SHELLY:
17   Q.    Okay.  So compliance and legal
18   created the policy to determine when an
19   account should be charged off, and they let
20   the operations unit know when -- through that
21   policy --
22   A.    Right.
23   Q.    -- operations knows how to charge
24   off an account; is that correct?
25        MR. SLODOV:  Objection.



Page 46

```
 1      *** C O N F I D E N T I A L ***
 2    know, the December, you know, bankruptcy
 3    charge-offs, you know, in the same kind of
 4    batch process as the contractual charge-offs,
 5    so it wouldn't be selling one account at a
 6    time.
 7        Q.    And how does Credit One become
 8    aware of these bankruptcies?
 9        A.    There are a couple of different
10    ways that the bank may be informed of a
11    bankruptcy.  We may receive correspondence
12    from a cardholder with documentation of the
13    bankruptcy.  We have a process with -- with
14    Resurgent, where Resurgent is getting the
15    feed from the -- from all the courts that
16    automatically report bankruptcy, and they
17    look at our account file on a nightly basis
18    to see if there's a match to a bankruptcy on
19    that file from the court.
20        Q.    And you just said "Resurgent."
21    Can you tell me what Resurgent is.
22        A.    It's my understanding that --
23    that the bank uses Resurgent to perform this
24    function to notify the bank of a -- of a --
25    of a bankruptcy.
```

Page 47

```
 1      *** C O N F I D E N T I A L ***
 2        Q.    Do you know if Resurgent is owned
 3    by Sherman Financial Group?
 4        A.    I believe that it's at least
 5    partially owned by Sherman.
 6        Q.    Okay.
 7        A.    I'm not a hundred percent sure.
 8        Q.    Are you aware of anyone other
 9    than Sherman that owns Resurgent?
10        A.    I am not -- I am not aware of
11    that.
12        Q.    And what work does Resurgent do
13    other than the work that you're talking about
14    right now?
15            MR. SLODOV:  Objection.
16    Relevance.
17            THE WITNESS:  I'm not aware of
18    what other work that they do.
19    BY MR. SHELLY:
20        Q.    Do they do any other work for
21    Credit One other than this?
22        A.    I'm not aware that they do any
23    other work besides this process for Credit
24    One.
25        Q.    So every day, if I understand you
```

Page 48

```
 1      *** C O N F I D E N T I A L ***
 2    correctly, Resurgent -- they have access to
 3    your account files; correct?
 4        A.    Correct.
 5        Q.    They go through your account
 6    files and compare that to the feeds that it's
 7    getting from the bankruptcy courts to see if
 8    any of those accounts that you currently hold
 9    are in bankruptcy; is that correct?
10        A.    Correct.
11        Q.    Do you know where Resurgent is
12    located?
13        A.    I believe at one point, they had
14    offices in South Dakota.  I'm not sure where.
15    They may have multiple offices.  I'm not
16    aware of that.
17        Q.    Do you know if they do work for
18    any of the other Sherman entities that you've
19    mentioned, like MHC or FNBM or Sherman
20    Originator?
21        A.    I'm not aware of that.  I don't
22    know much about it.
23        Q.    Where is MHC located?
24        A.    I believe it's in Charlotte, but
25    I'm not a hundred percent sure.
```

Page 49

```
 1      *** C O N F I D E N T I A L ***
 2        Q.    Do you know if MHC does any other
 3    business besides acquiring the receivables
 4    and debts from Credit One?
 5            MR. SLODOV:  Objection.  Asked
 6    and answered.
 7            THE WITNESS:  I don't have any
 8    knowledge of that.
 9    BY MR. SHELLY:
10        Q.    How about FNBM?  Do you know
11    where they're located?
12            MR. SLODOV:  Objection.  Asked
13    and answered.
14            THE WITNESS:  I don't.  I do not
15    know.
16    BY MR. SHELLY:
17        Q.    How about Sherman Originator?  Do
18    you know where they're located?
19        A.    I believe they're located in
20    Charlotte.
21        Q.    Do you know if they're located at
22    the same location as MHC?
23        A.    I do not know that.
24        Q.    Resurgent, on a daily basis,
25    determines which of your accounts are in
```



CONFIDENTIAL

| | |
|---|---|
| Page 50 | Page 52 |

**Page 50**

*** C O N F I D E N T I A L ***
1
2    bankruptcy.  They then notify your -- Credit
3    One that a given account is in bankruptcy,
4    and then Credit One puts that in some sort of
5    group that it waits to then sell; is that
6    correct?
7        A.    Correct.
8        Q.    Okay.  And that process of
9    putting them into these groups, that's a
10   process that's done through the computer that
11   someone has set -- developed within Credit
12   One; correct?
13       A.    Correct.  Again, it's -- it's
14   processed through the systems that are
15   available from our processor, FDR.
16       Q.    Right.  But somebody at Credit
17   One had to set up the procedure to direct FDR
18   how to set that up.
19       A.    Correct, correct.
20       Q.    Who would have set up that
21   procedure?
22       A.    Are you asking who physically
23   programs that, or are you asking who sets
24   that policy?
25       Q.    The policy, yeah.  Who

**Page 51**

*** C O N F I D E N T I A L ***
1
2    developed --
3        A.    Again, it would be our compliance
4    and legal department that would decide how --
5    you know, how those -- how those functions
6    should be managed.
7        Q.    Okay.  And that process that
8    you've described has been going on for how
9    long?
10       A.    I believe it's only -- you know,
11   it's been in the past, you know, maybe five
12   to six years that all of this was done on an
13   automated basis.  I believe, you know, prior
14   to the automated, you know, process that's in
15   place now, there was a more manual process
16   to, you know, basically accomplish the
17   same -- the same objective.
18       Q.    Okay.
19       A.    I'm not aware of when -- when all
20   the courts got automated in their reporting
21   and this functionality, you know, became
22   available.
23       Q.    And all that manual work, was
24   that all done within Credit One at that time?
25       A.    I'm not aware -- I'm not aware of

**Page 52**

*** C O N F I D E N T I A L ***
1
2    that.
3        Q.    Okay.  Do you know if Resurgent
4    was involved in any way when it was done
5    manually?
6        A.    I'm not -- I'm not -- I'm not
7    positive.  I believe that they were, but I'm
8    not a hundred percent sure.
9        Q.    The procedure that's in place,
10   once an account is designated as being
11   petitioned in bankruptcy and is put into this
12   group, is there any further monitoring of
13   that account while it's in that group waiting
14   to be sold?
15           MR. SLODOV:  Objection.
16   Monitoring is the question?
17           MR. SHELLY:  Yes.
18           THE WITNESS:  I'm unclear what
19   you mean by -- by -- by "monitoring."
20   I --
21   BY MR. SHELLY:
22       Q.    As an example, okay, December 1
23   rolls around.  You become notified by
24   Resurgent that an account is in bankruptcy,
25   that there's a petition.

**Page 53**

*** C O N F I D E N T I A L ***
1
2        A.    Uh-huh.
3        Q.    You then put it into this group
4    to send on December 1.  You hold it till the
5    end of December for the sale.  In the middle
6    of the month, there's a discharge of the
7    debt.  Is there something within your
8    procedure that would notify you at Credit One
9    that that discharge had occurred?
10       A.    I believe that we would also
11   receive that information from -- from
12   Resurgent through the automated process.
13       Q.    So Resurgent continues -- they're
14   the ones that continue to look at the
15   accounts, even the ones that are going to be
16   sold during this monthly period.  They
17   continue to look at them throughout the
18   month.
19       A.    It's my belief that that's what
20   happens.
21       Q.    You're not sure, but you believe
22   that's the case.
23       A.    Yes, yes.
24       Q.    Who would know that?  Who would I
25   go to to find out if that, in fact, actually



Page 62

```
 1        *** C O N F I D E N T I A L ***
 2   mean, what is a relationship manager?  What
 3   did you do in that role?
 4        A.    I -- you know, I facilitated
 5   communication between the credit bureau and
 6   the bank in terms of the bank's purchase of
 7   credit bureau data for credit prescreen, for
 8   a number of different -- different services
 9   that the bank purchased from -- from two of
10   the credit bureaus.
11        Q.    And which two credit bureaus are
12   those?
13        A.    Experian, Equifax.
14        Q.    But at that time, you weren't
15   involved in the credit reporting at all; is
16   that correct?
17        A.    Well, like I said, in 2010, I
18   became -- you know, I became involved in
19   the -- in the credit bureau reporting.
20        Q.    But prior to that when you just
21   were the manager of the relationship, you
22   weren't involved in the credit reporting.
23        A.    Correct, I was not.
24        Q.    Did you receive any -- any
25   guidance or training or -- with respect to
```

Page 63

```
 1        *** C O N F I D E N T I A L ***
 2   credit reporting when you took over that role
 3   in 2010?
 4        A.    I read the CDIA's credit
 5   reporting manual and asked questions of the
 6   credit bureau when I didn't understand
 7   different -- you know, different aspects of
 8   that.
 9        Q.    So if you needed guidance on how
10   to report something with the credit bureaus,
11   you sought guidance from the credit bureaus
12   themselves; is that correct?
13        A.    Correct.
14              MR. SHELLY:  Why don't we take,
15   like, a five-minute break.
16              (A recess was taken from
17              10:34 A.M. to 10:44 A.M.)
18   BY MR. SHELLY:
19        Q.    Is there only one E-mail system
20   utilized by Credit One?
21        A.    Correct.
22        Q.    Is there any other messaging
23   system that's used within Credit One other
24   than E-mails?
25        A.    Not that I'm aware of.
```

Page 64

```
 1        *** C O N F I D E N T I A L ***
 2        Q.    And the computer data system that
 3   Credit One has, is it a singular data system,
 4   or are there several different data systems?
 5        A.    There are several different data
 6   systems, depending on the function.
 7        Q.    Could you tell me how it's broken
 8   up.  Is it broken up, like, each department
 9   has their own data system?  Or exactly how
10   are they broken up, if you could describe
11   that for me.
12        A.    Primarily it's two separate
13   systems.  There's a data warehouse that, you
14   know, is the repository for -- you know, for
15   the bank's data.  I mentioned FDR, the
16   processor, so there's an FDR system that
17   retains, for example, the transaction
18   information on the account.  So those are the
19   two primary data systems.
20        Q.    Are you aware of any other data
21   systems other than those two?
22        A.    No, I'm not.
23        Q.    And Resurgent has access to both
24   or just one of those systems?
25        A.    I believe that Resurgent sends
```

Page 65

```
 1        *** C O N F I D E N T I A L ***
 2   the bank the file on a nightly basis, and
 3   then our IT department matches that file up.
 4   So Resurgent, you know, sends the file.
 5   After they've gone through, you know, the BK
 6   filings or whatever for that day, they send
 7   it to the bank on a nightly basis, and then
 8   the bank matches that up to the -- to the
 9   cardholder file.
10        Q.    How does Resurgent know what
11   names or accounts to check on bankruptcy if
12   it doesn't have daily updates of your
13   accounts?
14        A.    I believe what they're looking
15   for in the filing is looking for the Credit
16   One name as a tradeline or in the -- in the
17   bankruptcy report.  They search that file
18   based on identifying Credit One Bank, and
19   that's how they identify.
20        Q.    You say you believe this.  You
21   don't know this to be true, but you believe
22   that to be true; is that correct?
23        A.    That's my understanding of how it
24   works.
25        Q.    Who would I talk to to find out
```

**MAGNA** ◗
LEGAL SERVICES

Page 66

1    *** C O N F I D E N T I A L ***
2    if that is how it works?
3        A.    It would be someone in the
4    operations department.
5        Q.    Anyone in particular?
6        A.    No one in particular.
7        Q.    Who heads that department?
8        A.    It's Matt Krall, who is the COO.
9        Q.    So he would be the person to go
10    to initially to find out if that's how that
11    process occurs.
12        A.    Correct.
13        Q.    What are Credit One's policies
14    and practices relating to the retention,
15    storage, and deletion of documents and data,
16    both your databases and your E-mails?
17        A.    Our compliance and IT department
18    maintain a data retention policy on, you
19    know, different types of data that have
20    different requirements for, you know,
21    retaining different data over certain time
22    periods. There's different categories of
23    data, so there's a policy that outlines what
24    the data retention policy is for each one of
25    those categories of data.

Page 67

1    *** C O N F I D E N T I A L ***
2        Q.    Do you know what those time
3    periods are?
4            MR. SLODOV:  Objection.
5    Relevance.
6            THE WITNESS:  I do not know
7    specifically. I know that based on
8    different -- different regulations, some
9    data is required to be kept for a
10    certain amount of time versus -- versus
11    other data, so that -- that is what
12    would be outlined in that policy.
13    BY MR. SHELLY:
14        Q.    You're aware that you were
15    designated to testify on those policies and
16    practices here today?
17            MR. SLODOV:  I'll note for the
18    record -- I'll note for the record that
19    we served objections to the notice of
20    deposition and specifically objected to
21    the lack of reasonable specificity as to
22    the subject matters for examination.
23            And the particular topic that, I
24    believe, Counsel is referring to is
25    paragraph 3E which refers to the

Page 68

1    *** C O N F I D E N T I A L ***
2    identification of departments and
3    individuals within Credit One Bank
4    involved with or responsible for
5    creating, implementing, or updating
6    documents or information related to
7    policies -- I'm sorry.
8            MR. SHELLY:  Just to correct you,
9    I'm referring, actually, to paragraph 7
10    topic 7.
11            MR. SLODOV:  Topic 7?
12            MR. SHELLY:  Yes.
13            MR. SLODOV:  All right. Again,
14    my objection is that it fails to specify
15    with reasonable clarity what the scope
16    of the examination is you're --
17    BY MR. SHELLY:
18        Q.    Okay. And you've just testified
19    as to the policies and practices that you
20    know exist. You just don't know the time
21    periods; is that correct?
22        A.    Correct.
23        Q.    Do you know who -- who is the
24    person responsible for carrying out those
25    retention and deletion practices?

Page 69

1    *** C O N F I D E N T I A L ***
2        A.    It's our information technology
3    department that would be responsible for
4    actually, you know, purging data according to
5    what the policy is.
6        Q.    Do you know who created those
7    policies and practices?
8        A.    I believe that the policy was
9    created as a joint effort between our IT
10    department and our compliance and legal
11    staff.
12        Q.    Anybody in particular you're
13    aware of that was involved in that?
14        A.    No one specifically.
15        Q.    Do you know when those policies
16    and practices were put in place?
17        A.    I believe in -- I believe in,
18    like, 2005, 2007 was when, you know, the
19    initial -- the initial policies were
20    documented.
21        Q.    Do you know if they've been
22    altered since then?
23        A.    Yes, I believe they've been
24    altered since then.
25        Q.    When?



Page 70

```
 1      *** C O N F I D E N T I A L ***
 2      A.    I believe they've been altered,
 3  you know, a number of different times, again,
 4  based on change of -- of business need and
 5  maybe clarification of how long, you know,
 6  specific data is -- is required to be kept.
 7      Q.    Do you know any specific reasons
 8  why it was altered?
 9      A.    No, I do not.
10      Q.    And do you know who made the
11  decision to alter them?
12      A.    It, again, would have been a
13  collaboration between our information
14  technology department and our compliance and
15  legal department.
16          MR. SLODOV:  Is there a specific
17      question you have about policies and
18      procedures for retention?
19          MR. SHELLY:  Well, I'd like to
20      know --
21          MR. SLODOV:  Other than data,
22      generally.
23          MR. SHELLY:  The question, I
24      think, is how long do they keep their
25      E-mails, how long do they keep their
```

Page 72

```
 1      *** C O N F I D E N T I A L ***
 2  policy.  I believe there's communication
 3  between our legal department and our IT
 4  department to indicate we are under a
 5  litigation hold.  You know, cease any, you
 6  know, scheduled purge of data.
 7      Q.    Okay.  So there isn't in place
 8  already a policy or procedure concerning
 9  discovery in litigation in a general sense.
10  It's done on a case-by-case basis; is that
11  correct?
12      A.    Correct.  That's my
13  understanding.
14      Q.    Okay.  Are you aware of any
15  actual or threatened lawsuits, arbitrations
16  or demands, or any polling agreements,
17  settlements, or resolutions of such lawsuits,
18  arbitrations, or demands between Credit One
19  and any party related to consumer debt
20  discharge?
21      A.    I'm --
22          MR. SLODOV:  Objection as to
23      relevance as to prior acts trying to
24      prove action nonconforming.
25          But if you're aware, you can
```

Page 71

```
 1      *** C O N F I D E N T I A L ***
 2  data.  She can't tell me that.
 3  BY MR. SHELLY:
 4      Q.    Can you?
 5      A.    Not specifically, no.
 6      Q.    Can you describe for me the
 7  procedures that Credit One has concerning
 8  discovery or discovery obligations generally
 9  in litigation?
10      A.    Can you -- can you clarify?
11      Q.    Well, in this case, is there a
12  hold on documents or E-mails relating to the
13  issues in this case?
14      A.    In this specific case?
15      Q.    Yes.
16      A.    I believe that there is, yes.
17      Q.    And does that document hold cover
18  all of Credit One or just a certain
19  department?
20      A.    It would cover all of Credit One.
21      Q.    Does Credit One have
22  procedures -- policies and procedures related
23  to document holds in litigation, a general
24  policy and procedure as to that?
25      A.    I don't believe there's a written
```

Page 73

```
 1      *** C O N F I D E N T I A L ***
 2  answer.
 3          THE WITNESS:  I'm only aware of
 4      the discussion that we had as part of
 5      the deposition prep that other things of
 6      this nature had come out of your office.
 7  BY MR. SHELLY:
 8      Q.    Well, what are you referring to,
 9  "other things of this nature"?
10          MR. SLODOV:  I'll instruct the
11      witness not to answer questions
12      concerning conversations with counsel.
13          THE WITNESS:  Okay.
14          MR. SLODOV:  To the extent that
15      you're aware of other information,
16      you're free to answer.
17  BY MR. SHELLY:
18      Q.    So other than conversations you
19  had with counsel, are you aware of any -- I
20  won't go through that litany again, but any
21  lawsuits against Credit One having to do with
22  consumer debt discharge?
23      A.    No, I'm not.
24      Q.    This is the only lawsuit you're
25  aware of.
```



Page 78

```
 1        *** C O N F I D E N T I A L ***
 2     Q.    Is CDIA a trade organization?
 3     A.    That's my understanding, yes.
 4     Q.    Do you know if Credit One is a
 5  member of CDIA?
 6     A.    I don't believe that we are.
 7     Q.    Do you have any idea why you're
 8  not?
 9     A.    I believe that the CDIA limits
10  membership, so it's my understanding that
11  we're not eligible to be a member.
12     Q.    Why did you feel it was important
13  to look at the Metro 2011 and 2015 in
14  preparation for today's deposition?
15     A.    Well, the 2011 was included in
16  the discovery, and as part of my job function
17  I had, prior to this, downloaded the updated
18  copy.  So I wanted to see if there were any
19  changes in the -- in that.
20     Q.    Okay.  So it had nothing to do
21  with the procedures set forth in there that
22  you thought would be at issue in this
23  deposition.  It's simply because that
24  document had been produced in discovery, you
25  thought you should review it in preparation
```

Page 79

```
 1        *** C O N F I D E N T I A L ***
 2  for today; is that correct?
 3     A.    Correct.
 4     Q.    Are there any other industry
 5  standards similar to the CDIA guidelines that
 6  Credit One follows?
 7     A.    Not other industry standards.
 8     Q.    Okay.  What laws does Credit One
 9  follow in reporting to the credit bureaus?
10     A.    Well, the Fair Credit Reporting
11  Act --
12     Q.    Okay.  Any others?
13     A.    -- primarily.
14           I believe the Fair Debt
15  Collection Act also -- also has provisions
16  for -- for credit bureau reporting.  I'm most
17  familiar with -- with our obligations under
18  FCRA.
19     Q.    Any others?
20     A.    Not that I am aware of that
21  relate specifically to credit bureau
22  reporting.
23     Q.    So you're the person at Credit
24  One now that handles credit reporting; is
25  that correct?
```

Page 80

```
 1        *** C O N F I D E N T I A L ***
 2     A.    Correct.
 3     Q.    You're in charge of it.  Okay.
 4  You follow the CDIA.  You follow the credit
 5  FCRA, the FDCA.  Anything else that you look
 6  to for guidance in reporting to those credit
 7  bureaus?
 8     A.    As I mentioned before, if I have
 9  questions, I reach out to our credit bureau
10  partners to, you know, ask them about
11  different -- you know, different questions
12  that I might have.
13     Q.    Are there any practices or
14  procedures set up at Credit One for the
15  reporting that you do to the bureaus?
16        MR. SLODOV:  Objection as to
17     form.
18        THE WITNESS:  Not -- not
19     specifically, other than the fact that
20     we are in compliance with FCRA and any
21     other applicable law that relates to
22     bureau reporting.
23  BY MR. SHELLY:
24     Q.    How do you actually do the
25  reporting that you do to the credit bureaus?
```

Page 81

```
 1        *** C O N F I D E N T I A L ***
 2  How is that implemented?
 3     A.    So our -- again, our -- the
 4  bank's processor, FDR, has a process where,
 5  you know, FDR is the -- you know, basically
 6  the -- the file of record for the account
 7  performance.  So FDR has a process where
 8  it -- as an account cycles, it will push that
 9  information to each one of the CRAs.  So it
10  will push the -- the information that's
11  required as part of the Metro reporting
12  package.  It will push all that data to the
13  CRAs when the account cycles.
14     Q.    That process that FDR follows,
15  was that set up by FDR, or was that set up by
16  Credit One?
17     A.    It was set up by -- by FDR.
18     Q.    Okay.  So you just give raw data
19  to FDR, and they make the determination what
20  to report to the credit bureaus; is that
21  correct?
22     A.    Yes, based on -- based on those
23  industry guidelines.
24     Q.    How do you know that they're
25  following the industry guidelines?
```



Page 114

*** C O N F I D E N T I A L ***
1
2      A.    No.  They're managed through the
3   operations units.
4      Q.    Do you have people underneath you
5   in terms of this credit reporting that you
6   do, the function?
7      A.    I have a couple -- a couple
8   analysts who have assisted me over -- over
9   time.  I don't have a designated person right
10  now.
11     Q.    This e-OSCAR system, do you ever
12  report back to the credit bureaus on the
13  debts that have been sold to third parties
14  who those third parties are?
15     A.    As part of our -- as part of our
16  bureau reporting, we report -- there's a
17  segment in the -- in the Metro guideline, the
18  K2 segment, that gives the bank the
19  opportunity to say who -- who the purchaser
20  of the debt was so that then the consumer,
21  you know, can look at it on their credit
22  report.  And it says sold to Midland Funding,
23  for example.  So there's a provision, you
24  know, as part of the guidelines of the
25  reporting.  There's a space -- there's a

Page 115

*** C O N F I D E N T I A L ***
1
2   segment for the bank to populate who the debt
3   is being purchased by.
4      Q.    You said it gives the bank the
5   opportunity to do that.  Is the bank required
6   or obligated to do so under the CDIA
7   guidelines?
8      A.    It's the best practice to do
9   that.  That's my understanding, that it's the
10  best practice.  And at the time that we --
11  you know, so also in 2014, you know, we
12  implemented -- we implemented that.
13     Q.    Okay.
14     A.    Prior to that, we had just
15  indicated that it was sold to another lender
16  in the reporting, but we didn't populate
17  the -- you know, who the actual buyer of the
18  debt was.  So we did make that change in
19  2014.
20     Q.    How far back prior to 2014 did
21  you report that the debt was sold, though?
22     A.    We always reported that the debt
23  was sold to another lender.  There's a
24  specific code in the reporting that it can be
25  statused as sold to another lender.

Page 116

*** C O N F I D E N T I A L ***
1
2      Q.    You said the K2 section.  What's
3   K2?
4      A.    It's just a segment of the -- and
5   again, the Metro guideline is -- you know, is
6   the guideline for reporting, you know.
7   There's a data file that goes out with, you
8   know, different account information, you
9   know, the balance, the open date.  There's
10  also what they refer to as appendages, so
11  additional data fields that further describe
12  the account status as we're reporting it.  So
13  K2 is just the name of one of those
14  appendages where the information goes to say,
15  you know, this is -- this is the actual text
16  of who we sold the debt to.
17     Q.    Does Credit One ever receive
18  communications directly from the U.S.
19  Bankruptcy Court?
20     A.    I don't believe that we do.
21     Q.    Other than the two credit bureaus
22  that you mentioned before, does Credit One
23  utilize the services of any other credit
24  reporting agency?
25     A.    We report to Experian, Equifax,

Page 117

*** C O N F I D E N T I A L ***
1
2   and Transunion.  We only purchase data or
3   engage in other services with Experian and
4   Equifax.  So we report to all three of them.
5      Q.    Other than the scenario that you
6   described for me where there may be fraud,
7   are there other instances where Credit One
8   deletes consumer debts from credit reports?
9      A.    I believe only if it's -- only if
10  we don't feel that we could make a reasonable
11  investigation of the consumer's dispute.
12     Q.    Has Credit One had any
13  communications with these third-party buyers
14  regarding either Credit One's practice or the
15  third-party buyer's practice of reporting
16  bankruptcy discharges to credit reporting
17  agencies?
18     A.    I believe that we had some
19  communication to try to understand if there
20  was any further obligation outside of what we
21  were already doing by reporting the account
22  accurately at the time that we sold the -- at
23  the time that we sold the account.
24     Q.    Was there a particular reason why
25  you had some doubt as to whether or not there



Page 118

*** C O N F I D E N T I A L ***

1  might be another obligation, an additional
2  obligation?
3      A.    Well, I think in reaction to --
4  and I believe it's JP Morgan and Citi's, you
5  know, decision to perhaps delete their
6  bankruptcy tradeline.  It's a topic that has,
7  you know, been in the news.
8      Q.    And can you tell me the nature of
9  those communications that you had.
10     A.    I believe there were
11 conversations or E-mails basically, you know,
12 trying to -- trying to understand, you know,
13 what this decision by two major issuers that,
14 you know, would mean for -- you know, what
15 the bank should -- should -- should -- you
16 know, if the bank should change what we
17 already feel is -- is an accurate reporting
18 of that account.
19     Q.    And did those communications help
20 the bank make a decision whether or not to
21 make that change?
22     A.    I believe that they did, because
23 I believe as part of that communication, we
24 also communicated with -- with our regulator

Page 119

*** C O N F I D E N T I A L ***

1  on the topic as well.  You know, as part of
2  the general discussion, you know, do we need
3  to change what we're doing?
4      And I know we did reach out to
5  our regulator for opinion on that.  You know,
6  I believe the opinion that we got back was as
7  long as the account is accurately reporting
8  at the time that it sold, that we didn't have
9  any other obligation to update that tradeline
10 after the sale.
11     Q.    And have you made any changes in
12 terms of updating?
13     A.    No, we did not.
14     Q.    Okay.  So the information you
15 received from the credit reporting agencies
16 and the information you received from your
17 regulator were the bases for your decision
18 not to make any change in that regard; is
19 that correct?
20     MR. SLODOV:  Objection.
21 Mischaracterizes testimony.
22     THE WITNESS:  Based on those
23 conversations and the opinion of our
24 regulator, we did not feel at this time

Page 120

*** C O N F I D E N T I A L ***

1  that it necessitated any change to how
2  our tradelines were currently reported.
3  BY MR. SHELLY:
4      Q.    My question was, though, the
5  conversations that you had with the credit
6  reporting agencies and the information you
7  got from the regulator, they were used to
8  make that decision, is what you're saying.
9      Was there anything that Credit
10 One did internally to determine whether or
11 not they should make any changes?
12     A.    I mean, outside of just general
13 conversation on the topic, understanding that
14 we, you know, are relying on accurate credit
15 information to originate new accounts and
16 evaluate the -- evaluate our risk of opening
17 a new account to a consumer, you know,
18 changing -- you know, deleting BK tradelines,
19 doing some of these different things, you
20 know, we're trying to understand how that
21 might impact our ability not only --
22     You know, obviously, you know, we
23 follow FCRA.  We're committed to accurately
24 reporting.  We also understand that the whole

Page 121

*** C O N F I D E N T I A L ***

1  credit bureau reporting system is something
2  that we're using, as a lender, to make a
3  decision about a consumer.  So the
4  conversation about, okay, so you know, if
5  tradelines get deleted off the credit record,
6  how can we accurately assess the risk of the
7  consumer?
8      Q.    Who at Credit One made the
9  ultimate decision not to delete bankruptcy
10 tradelines similar to JP Morgan and Citi?
11     A.    Ultimately, it would be our
12 president and CEO.
13     Q.    And that's whom?
14     A.    Robert Dejong.
15     Q.    So he had -- as -- the
16 information he had in making that decision,
17 came from the credit bureaus, the regulator,
18 and there was some internal discussions at
19 Credit One about that topic.
20     A.    Correct.
21     Q.    Who was involved in those
22 internal discussions at Credit One?
23     A.    Myself, our previous counsel,
24 inside counsel.  That was primarily -- to my

Page 122

\*\*\* C O N F I D E N T I A L \*\*\*

1  remembrance, that was primarily either the
2  people talking -- talking about this as it
3  specifically related to Credit One's
4  practice.
5      Q.    So the internal discussions were
6  between yourself, Mr. Dejong, and in-house
7  counsel.
8      A.    Correct.
9      Q.    Do you recall any of those
10 discussions with Mr. Dejong taking place
11 without counsel being present?
12     A.    I don't -- I don't recall.
13     Q.    Do you recall that all of your
14 discussions with Mr. Dejong occurred with
15 counsel present?
16     A.    I believe that they did.
17     Q.    And they were all verbal
18 communications?  None were E-mails?
19     A.    There were some -- there was some
20 E-mail as it specifically related to our
21 regulator's opinion on -- on what we should
22 do.  I think that's part of the discovery.
23     Q.    But anything in the E-mails
24 that -- where either you or Mr. Dejong are

Page 123

\*\*\* C O N F I D E N T I A L \*\*\*

1  discussing your views on whether or not you
2  should do this?
3      A.    No, I don't believe that was
4  in -- there was any E-mail correspondence on
5  it.
6      Q.    Was there any telephone
7  conversations between yourself and Mr. Dejong
8  about that?
9      A.    I don't believe there were any
10 telephone conversations.  I, you know,
11 remember just speaking with him directly.
12     Q.    Do you know when he made this
13 decision not to make that change?
14     A.    I believe it's not that the bank
15 decided not to make the change; that we're
16 just trying to understand what we're
17 obligated to do.  We believe that we're
18 reporting accurately at the time that we sell
19 the account.
20     Obviously, this other, you know,
21 decision by two other issuers -- you know,
22 we -- we talked about that, but you know, we
23 still feel like -- we still feel that we're,
24 you know, following FCRA.  We're accurately

Page 124

\*\*\* C O N F I D E N T I A L \*\*\*

1  reporting the account at the time of sale, so
2  we didn't -- you know, at that point, we
3  didn't feel that we needed to -- to change
4  what we were doing.
5      Q.    So it's Credit One's position
6  that Citi and JP Morgan are, in fact, doing
7  more than they're obligated to do?
8      A.    In my personal opinion, yes.
9      Q.    What recommendations did you give
10 Mr. Dejong with respect to this issue?
11     MR. SLODOV:  With respect to the
12 communications, if counsel was present
13 during those communications, I'll
14 instruct you not to answer.
15     THE WITNESS:  I believe counsel
16 was present when we had the
17 conversations.
18 BY MR. SHELLY:
19     Q.    As you sit here right now, what
20 are your thoughts as to whether or not Credit
21 One should make that change?
22     MR. SLODOV:  You can answer.
23     THE WITNESS:  I mean, my -- in my
24 personal opinion, I believe that we

Page 125

\*\*\* C O N F I D E N T I A L \*\*\*

1  should not make the change.  I believe
2  that the account is accurately reported
3  at the time that we sold the account.
4  So once we sell the account, it's a
5  final status, and so that -- plus, you
6  know, by reporting accurately when we
7  sell the account and ensuring that that
8  account is reported accurately, our
9  obligation to further update that
10 account does not exist.
11 BY MR. SHELLY:
12     Q.    It's your view that there's no
13 obligation to make that change; correct?
14     A.    Correct.
15     Q.    Do you think there could be any
16 benefit to the consumer if Credit One were to
17 make that change?
18     MR. SLODOV:  Objection.  Calling
19 for speculation.
20     You can answer if you know.
21     THE WITNESS:  I mean, in my
22 personal opinion, I don't believe that
23 they will -- there will be a long-term
24 benefit to the consumer.  You would have



**MAGNA**
**LEGAL SERVICES**

CONFIDENTIAL

Page 178

*** C O N F I D E N T I A L ***
1  account is the one that has not been
2  produced in this case.
3
4  MR. SLODOV: So if you want a
5  copy of the policy statement that was in
6  effect in 2012 when his account was
7  sold, say so. We'll get it for you.
8  MR. SHELLY: Well, we did say so
9  in the first request, and that's why you
10 gave us these policy manuals from 2015
11 and '14. My question is, why didn't we
12 get the ones in response to that first
13 request when we asked for them?
14 MR. SLODOV: This is news to me.
15 I'm sorry. I didn't know that you were
16 looking for something else so --
17 MR. SHELLY: Why did you think we
18 wanted these two manuals?
19 MR. SLODOV: These are the
20 manuals that the bank has.
21 MR. SHELLY: But they also have
22 the earlier manuals.
23 MR. SLODOV: Well, that's not
24 been established by the evidence, has
25 it?

Page 180

*** C O N F I D E N T I A L ***
1  And you stated:
2  "I believe that they do,
3  because through our compliance
4  department, I believe that
5  they would keep prior
6  versions."
7  Was that a true statement that
8  you made at that time?
9  A.    Yes.
10 Q.    Okay. That's fine.
11 The third document there, can you
12 tell me what that is.
13 A.    This is the 2011 --
14 Q.    It's Exhibit 7.
15 A.    7, the 2011 Credit Reporting
16 Resource Guide.
17 Q.    Okay. What is that exactly?
18 A.    So this is the guideline for
19 credit reporting that's created by the CDIA,
20 Consumer Data Industry Association.
21 Q.    And how do you use this? How
22 does Credit One use this document?
23 A.    We use this to ensure that our
24 credit reporting is accurate.
25

Page 179

*** C O N F I D E N T I A L ***
1  MR. SHELLY: Well, the evidence
2  established that she doesn't know what
3  documents exist at Credit One other than
4  what sits in the redwells that you
5  produced to me. She believes that they
6  exist based upon her almost -- well,
7  15 years at the bank. I don't know if
8  she started before then. She's seen
9  them over and over again. She expects
10 them to exist somewhere.
11 MR. SLODOV: No. She said that
12 they were in place throughout her tenure
13 at the bank. She doesn't say -- she
14 didn't testify that they have prior
15 copies laying around somewhere.
16 BY MR. SHELLY:
17 Q.    Do you expect that there are
18 prior copies of these? I think you did
19 testify, actually, and I'll go back and find
20 it if we really need to do that. I stated
21 before:
22 "Do you know if Credit One
23 maintains copies of the prior
24 versions of these documents?"
25

Page 181

*** C O N F I D E N T I A L ***
1  Q.    And is this the document that you
2  were relying on when you said that there's no
3  obligation to delete the credit report of an
4  account that has been charged off and sold to
5  a third party?
6  A.    Correct.
7  Q.    Is there a more recent version of
8  this, or is the 2011 the latest version of
9  this?
10 A.    Yes. I previously said that I
11 had reviewed the 2015 version of that.
12 Q.    You did. I apologize. Thanks.
13 Okay.
14 Is there anything specific in
15 this reporting guide -- strike that. That's
16 fine.
17 Other than these manuals and
18 resource guides, are there any other manuals
19 or guides or aids that Credit One uses to
20 determine the proper reporting of -- on
21 someone's credit report?
22 A.    As I've stated before, if I have
23 a question about this, I reach out to our
24 credit bureau contacts to ask their opinion.
25



Page 218

1    *** C O N F I D E N T I A L ***
2    MR. SLODOV: To you.
3    MR. SHELLY: Okay. I believe, in
4    fact, there are three versions of that
5    letter in here, in the document.
6    BY MR. SHELLY:
7    Q.    Could you look at the page he's
8    referring to, about halfway through the
9    document, 1756. And could you confirm for me
10   that that, in fact, is the attachment
11   referenced on the first page?
12   MR. SLODOV: They're out of
13   sequence.
14   BY MR. SHELLY:
15   Q.    Well, they're in the exact
16   sequence that they were produced originally,
17   with the redactions.
18   MR. SLODOV: It's after page
19   2268.
20   THE WITNESS: Okay. I must have
21   a different copy because I --
22   MR. SHELLY: Let's switch. I
23   don't know why that would be missing.
24   That doesn't make any sense. I
25   apologize for that. I don't know how

Page 219

1    *** C O N F I D E N T I A L ***
2    that happened.
3    BY MR. SHELLY:
4    Q.    So if you could just take a look
5    at that page that your attorney had
6    mentioned, 1756. Is that the attachment
7    referenced on the first page, if you know?
8    MR. SLODOV: Just for
9    clarification, there are three letters,
10   1756, 7, and 8.
11   MR. SHELLY: Right.
12   MR. SLODOV: Three versions of
13   the same letter, I believe.
14   THE WITNESS: And you're talking
15   about this page?
16   MR. SHELLY: Correct. For the
17   record, the deponent pointed to the top
18   of page 1, the attachment line.
19   THE WITNESS: Yes. To my
20   knowledge, these are the attachments
21   that are referenced in the E-mail.
22   BY MR. SHELLY:
23   Q.    So they're just out of sequence
24   in the way they were originally produced to
25   the plaintiff. They would have been attached

Page 220

1    *** C O N F I D E N T I A L ***
2    to that first E-mail -- or why don't you look
3    at that. Is everything before that just one
4    long E-mail chain?
5    A.    I'm sorry. Was that a question?
6    Are you asking if everything before this was
7    just a long E-mail chain?
8    Q.    Yeah. If you know.
9    A.    I believe so. I don't see any
10   other references to attachments on any of the
11   other exchanges.
12   Q.    Okay. Great. At the top of the
13   first page there, it says, "I left COB off
14   this E-mail." Who is COB?
15   A.    It's an abbreviation for Credit
16   One Bank.
17   Q.    How is it that Credit One Bank
18   produced an E-mail that it didn't receive?
19   MR. SLODOV: I'll represent for
20   the record that I got this E-mail from
21   one of the individuals on the E-mail
22   chain.
23   MR. SHELLY: Which E-mail? Which
24   person?
25   MR. SLODOV: It was Jon Mazzoli.

Page 221

1    *** C O N F I D E N T I A L ***
2    MR. SHELLY: And who does he work
3    for?
4    MR. SLODOV: I believe he's with
5    Sherman.
6    MR. SHELLY: Which Sherman?
7    MR. SLODOV: That is a good
8    question.
9    MR. SHELLY: Okay.
10   MR. SLODOV: There are different
11   iterations of the Sherman name, but his
12   specific job title is -- I'm not
13   entirely sure. I do see that one of the
14   E-mails refers to him as director of
15   Sherman Capital Markets, LLC.
16   MR. SHELLY: So when the 1700
17   series was produced to plaintiff, you
18   were producing to plaintiff a document
19   you had received from a nonparty to this
20   action; is that correct?
21   MR. SLODOV: I'm going to waffle
22   on that.
23   MR. SHELLY: Okay.
24   MR. SLODOV: Because I have to go
25   back and actually follow and make sure



CONFIDENTIAL

Page 222

1    *** C O N F I D E N T I A L ***
2    that this specific E-mail came from
3    them, 'cause I'm not entirely sure.
4         MR. SHELLY:  Okay.  And I realize
5    you're not the deponent, but since
6    you're making the representation that
7    you got it from somebody else, did they
8    redact the document that we originally
9    received, or did you redact that?
10        MR. SLODOV:  I did.
11        MR. SHELLY:  Okay.
12   BY MR. SHELLY:
13   Q.    So Mr. Umstetter is the person
14   that works at Sherman.  Do you know any of
15   the other people in that To line there?  I'm
16   asking you.  I'm sorry.
17   A.    I believe that Jon Mazzoli and
18   Dan Picciano are employed in some -- you
19   know, in some capacity by Sherman.  I know
20   that Scott Silver is -- is one of the
21   counsels for Sherman.  Again, I don't know
22   which specific entities.
23   Q.    Okay.  At the top there it says,
24   "I left COB" -- which you said is Credit One
25   Bank -- "off this E-mail.  Here's another

Page 223

1    *** C O N F I D E N T I A L ***
2    thought," and there's a colon.  I don't see
3    another thought there.  Do you have any idea
4    what that other thought is?  Because directly
5    below that is an E-mail from Dan Picciano
6    that you were copied on.
7    A.    I believe this is in reference to
8    the attachments, so I believe what this is
9    saying is that here's another thought in
10   terms of here's another version of the
11   letter.  That is my understanding.
12   Q.    Okay.  So in other words, his
13   thoughts or his thought is put forth in the
14   various revisions on those three versions of
15   the letter.
16   A.    I believe that to be true.
17   Q.    Okay.  It's talking about a
18   goodbye letter, and what is that exactly?
19   A.    This is a letter to send to a
20   cardholder to make it specifically clear to
21   them who the buyer -- that their debt was
22   sold and who the buyer of the debt is.
23   Q.    And does Credit One send these
24   goodbye letters out now?
25   A.    I believe that they do, yes.

Page 224

1    *** C O N F I D E N T I A L ***
2    Q.    Do you know how long they've been
3    sending them out?
4    A.    I believe since the end of last
5    year.
6    Q.    So since the end of 2015 until
7    now, they've been sending out these goodbye
8    letters.
9    A.    I believe that's correct, yes.
10   Q.    Prior to that, had they ever sent
11   out anything similar to these goodbye
12   letters?
13   A.    It's my understanding that there
14   was a more generic letter that went out, but
15   that did not have, you know, some of the, you
16   know, more specific information for the
17   buyer.
18         It's my understanding that a
19   letter was sent out saying that your debt was
20   sold but not saying exactly who the -- who
21   the specific buyer was.  But I'm not -- I
22   believe that to be true, but I'm not a
23   hundred percent sure.
24   Q.    Somebody at Credit One would
25   know, though?

Page 225

1    *** C O N F I D E N T I A L ***
2    A.    Yes.
3    Q.    Do you believe copies of the
4    generic letter, as you described it, that
5    existed prior to the end of last year still
6    exist at Credit One?
7    A.    I don't know that for sure.
8    Q.    The goodbye letters that are sent
9    out now, does Credit One maintain copies of
10   each and every goodbye letter that's sent
11   out?
12   A.    I don't believe there's a record
13   of each individual letter.  There would be a
14   record that the letter was sent to the card
15   member.
16   Q.    Okay.  What there is within the
17   documents of Credit One, the goodbye letter
18   that's being sent out today, at least a
19   template in which you'd fill in the name of
20   the person from that list; correct?
21   A.    I'm sorry.  Can you repeat that?
22   Q.    You basically described a list of
23   the people who would receive the letter.  I
24   assume, and correct me if I'm wrong, that you
25   have a template in which the computer takes

MAGNA
LEGAL SERVICES

CONFIDENTIAL

Page 254

```
 1        *** C O N F I D E N T I A L ***
 2  BY MR. SHELLY:
 3      Q.      Don't you think that could cause
 4  confusion to a cardholder?
 5          MR. SLODOV: Objection. Calling
 6  for speculation.
 7  BY MR. SHELLY:
 8      Q.      That they're getting no
 9  information that they owe any debt from
10  Credit One but then some third party comes
11  around and says, hey, you owe us money?
12          MR. SLODOV: Objection.
13  Compound.
14          THE WITNESS: My understanding
15  was that the purpose of the letter was,
16  again, to try to make it clear to our
17  cardholder that we had -- we had sold
18  the debt and who the debt was sold to.
19  Whether we put the balance or not is --
20  you know, it could be construed as being
21  confusing either way.
22          If we put the -- if we put the
23  dollar amount down, the cardholder might
24  misconstrue that and somehow think that
25  they still owe us the money versus owing
```

Page 256

```
 1        *** C O N F I D E N T I A L ***
 2  asset-holding -- you don't know who -- or do
 3  you know who does LVNV Funding, LLC -- who
 4  owns that?
 5      A.      I don't -- I don't know.
 6      Q.      Do you know who owns PYOD, LLC?
 7      A.      No, I do not know that.
 8      Q.      And do you know what he means
 9  when he says asset-holding entities -- that
10  they are asset-holding entities?
11      A.      I don't know what that
12  terminology means.
13      Q.      He's saying the buyer for PYOD --
14  and this letter has to do with third-party
15  buyers; correct? That's what the goodbye
16  letter is for, to let the customer know who
17  the third-party buyers are; correct?
18          MR. SLODOV: Objection as to
19  form.
20          THE WITNESS: I believe it was
21  for third-party buyers, because it was
22  my understanding that Sherman Financial
23  Group -- the Sherman Originator then,
24  you know, would sell the debt to other
25  buyers.
```

Page 255

```
 1        *** C O N F I D E N T I A L ***
 2  the buyer. There's no -- you know, in
 3  my opinion, there's no perfect way to
 4  communicate about this without it
 5  potentially being, you know,
 6  misconstrued or misinterpreted, whether
 7  you put the balance or not or you're
 8  relying on the buyer to communicate with
 9  your former cardholder about what the
10  balance is.
11  BY MR. SHELLY:
12      Q.      Further down on that page, the
13  response number 1:
14          "The buyer for PYOD" --
15          that's in capitals -- "is
16          going to be listed as 'Sherman
17          Financial Group' and the
18          servicer will be listed as
19          'LVNV Funding, LLC.' Please
20          confirm this."
21      What is or who is PYOD?
22      A.      Well, as it says below,
23  LVNV Funding and PYOD, LLC are asset-holding
24  entities. Beyond that, I don't know.
25      Q.      Okay. If PYOD is an
```

Page 257

```
 1        *** C O N F I D E N T I A L ***
 2  BY MR. SHELLY:
 3      Q.      Right. The buyers that are being
 4  referred to are the buyers that purchase from
 5  Sherman Originator; correct?
 6          MR. SLODOV: Objection. Calling
 7  for speculation.
 8          THE WITNESS: That's my
 9  understanding.
10  BY MR. SHELLY:
11      Q.      So this buyer here that bought
12  from Sherman Originator, PYOD, in these
13  letters, they're going to be listed as
14  Sherman Financial Group. Do you have any
15  reason -- do you know why that is?
16      A.      No, I do not.
17      Q.      Does that indicate to you that
18  Sherman Financial Group has an interest in at
19  least one of the third-party buyers?
20          MR. SLODOV: Objection. Calling
21  for speculation.
22          THE WITNESS: Well, I would say,
23  obviously, if they're going to be listed
24  as Sherman Financial Group, there would
25  have to be some relationship there.
```

**MAGNA** ►
**LEGAL SERVICES**

65 (Pages 254 to 257)

Page 258

*** C O N F I D E N T I A L ***
1    What that is, I don't know.
2    BY MR. SHELLY:
3        Q.    Right.  But for Credit One to put
4    Sherman Financial Group down as the buyer,
5    Sherman Financial Group would either have to
6    have an interest in PYOD, or Sherman
7    Financial Group itself would have to be the
8    buyer of that debt; correct?
9        A.    I would assume so.
10        Q.    Do you have any idea why someone
11    other than Credit One would be listed as the
12    servicer?
13        A.    Again, this is after the sale of
14    the account, so Credit One would not be
15    listed as the current servicer.  So after
16    the -- after the account is sold, Credit One
17    would no longer be the servicer, because
18    Credit One has no interest in that after --
19    after the sale.
20        Q.    A few pages on, the page ending
21    2264, at the very bottom of that page,
22    there's a paragraph numbered 2, and at the
23    very end of that paragraph, it says that
24    there is a "generic goodbye letter used for

Page 259

*** C O N F I D E N T I A L ***
1    all buyers, some of which do not report a
2    tradeline."
3        Can you explain to me what is
4    meant there by that some of these buyers did
5    not report a tradeline?
6        A.    You said 2264.  Which paragraph?
7        Q.    Paragraph number 2 at the very
8    bottom of the page and in the last sentence
9    there.
10        A.    I think this was just referring
11    to that Credit One has -- that it's up to the
12    individual debt buyers how they interpret
13    credit bureau reporting, how that -- how they
14    report the debt that they -- debt that they
15    purchased.
16        Q.    But when it says some of which do
17    not report a tradeline, does that indicate a
18    knowledge by Credit One that some of these
19    buyers do not report a tradeline?
20        A.    Do not report the tradeline of
21    the sold account?
22        Q.    Correct.
23        A.    I believe that -- I believe that
24    none of the buyers of bankruptcy accounts

Page 260

*** C O N F I D E N T I A L ***
1    report -- or BK 7, I'm sorry.  It's my
2    understanding that when BK 7s are purchased,
3    that the buyer of that debt does not report
4    that tradeline.
5        Q.    What about other debt?  Are you
6    aware of any other debt that is not reported
7    by any other third-party buyers?
8        A.    I'm not aware of that.
9        Q.    Do you know why the BK 7 is not
10    reported?
11        A.    It's my understanding when the BK
12    is purchased -- it's my understanding that
13    there's no attempt to collect on that debt
14    unless that debt -- unless the -- unless the
15    bankruptcy has been -- I want to make sure
16    I'm using the right term -- so dismissed.
17        So if someone files a petition,
18    we sell the BK 7.  The owner of that paper
19    gets notification that the, you know, BK 7
20    petition was not discharged.  It was -- it
21    was dismissed, meaning it was not valid and
22    the debt was still owed.  Then that buyer
23    could attempt to collect on that debt.
24    That's my understanding.

Page 261

*** C O N F I D E N T I A L ***
1        Q.    Let's turn to page 2266.  And in
2    the middle of that page, there's a question
3    that says:
4        "Who will be indicated in
5        the buyer field for the LVNV
6        or PYOD accounts given the
7        process that the accounts go
8        through an intermediate
9        owner?"
10        Do you know what is being
11    referred to there?
12        MR. SLODOV:  Objection.  Calling
13    for speculation.
14        THE WITNESS:  I'm not certain
15    what specifically that's referring to.
16    BY MR. SHELLY:
17        Q.    Is MHC considered an intermediate
18    owner by Credit One?
19        A.    What do you mean by
20    "intermediate"?  What time are you --
21        Q.    Well, from my view, it would be
22    an intermediate when it gets a receivable
23    from Credit One and then it moves it down the
24    line to the next entity, it's, to me, an

CONFIDENTIAL

---

Page 282

*** C O N F I D E N T I A L ***

1    answer to that.
2    BY MR. SHELLY:
3        Q.    Let's look at page 2270. First
4    of all, who is Scott Silver?
5        A.    I believe he's counsel for
6    Sherman.
7        Q.    Do you see anybody from Credit
8    One on this E-mail chain?
9        A.    The one that starts at the bottom
10   of page 2270 or the one that starts at the
11   bottom of page 2269?
12       Q.    Top of 2269.
13       A.    No, there's no one from Credit
14   One.
15       Q.    Okay. Let's look at that 2270
16   page that I referenced. The second
17   paragraph, the last sentence reads:
18           "A sold/transferred status
19       is considered by the bureaus
20       as a 'terminal' status for
21       that account/data furnisher
22       combo and, as such, is a
23       static tradeline."
24           Can you explain that to me, and

---

Page 283

*** C O N F I D E N T I A L ***

1    in particular, what the terms "terminal" and
2    "static tradeline" mean.
3        MR. SLODOV: Objection. Calling
4    for speculation. Calling for hearsay.
5        THE WITNESS: I understand this
6    to mean that once the account is
7    statused and sold, no further update
8    would be made on that tradeline.
9    BY MR. SHELLY:
10       Q.    So does "terminal" mean sold, or
11   can "terminal" mean something more than just
12   sold?
13       A.    It's my understanding that
14   "terminal" in this case would mean that's the
15   final status for the account.
16       Q.    From whose perspective?
17       A.    From the credit bureau's
18   perspective and from Credit One Bank's
19   perspective.
20       Q.    That would be the final thing for
21   Credit One to do but not necessarily the
22   final thing that would happen to that
23   person's credit report on this particular
24   tradeline; is that correct?

---

Page 284

*** C O N F I D E N T I A L ***

1        A.    It would be the final, you know,
2    report that Credit One would make to reflect
3    the status of the account at the time that it
4    was sold.
5        Q.    Two paragraphs down:
6           "If the data furnisher
7       updates the DOAI to June 2014,
8       then they are reporting a
9       tradeline beyond the time
10      frame they have a legal right
11      to do so based on ownership or
12      assignment."
13          Is that your understanding as
14   well.
15       A.    Yes, that's my understanding,
16   because if I'm reading through the whole
17   example, it says if -- if we report the
18   status in, you know, March of 2012, when I'm
19   presuming it's charged off and sold. Based
20   on the charge-off, the account -- the date of
21   account information on a charge-off --
22   updating the date of account information to
23   reflect the bankruptcy would then be outside
24   of the -- outside of the time frame.

---

Page 285

*** C O N F I D E N T I A L ***

1        Q.    But he uses the words "legal
2    right." Are you aware of any legal
3    requirement that doesn't permit that?
4        MR. SLODOV: Objection. Calling
5    for legal conclusion.
6    BY MR. SHELLY:
7        Q.    Whether -- well, you're the
8    credit reporting person at Credit One.
9        A.    So the date of account
10   information relates to the date that that
11   account -- for example, a charge-off with
12   them, the date of the account information, my
13   understanding, is the one that starts the
14   clock for them when that -- when that
15   account -- the bad debt -- the charge-off
16   would roll off the bureau.
17          So different statuses require
18   different dates of account information to
19   make sure that if that charge-off is only to
20   be on the credit bureau for seven years,
21   that's the date that the credit bureau uses
22   to determine when that debt no longer appears
23   on the consumer's report.
24       Q.    That's not my -- that doesn't

---

Page 286

1      *** C O N F I D E N T I A L ***
2    really answer my question.
3        My question is, are you aware of
4    any legal requirement that would not allow
5    Credit One to update the DOAI in June of
6    2014, in this example, an actual legal
7    requirement that doesn't permit it because he
8    uses the words "legal right"?
9        MR. SLODOV:  Objection.  Calling
10    for legal conclusion.
11   BY MR. SHELLY:
12       Q.    Well, as the credit reporter for
13   Credit One, would you understand that you
14   couldn't do this because it would be illegal?
15       MR. SLODOV:  Objection.  Calling
16    for legal conclusion.
17       THE WITNESS:  I would -- I
18    understand that we would not do that,
19    because that's not what the guidelines,
20    as presented in the reporting
21    guidelines, allow us to do.
22   BY MR. SHELLY:
23       Q.    Right.  So the guidelines don't
24   permit it, but there's no law that says you
25   can't, is there?

Page 287

1      *** C O N F I D E N T I A L ***
2        A.    Not to my knowledge.
3        Q.    Okay.  Just as an aside, this is
4    Paul Eaton writing this from Resurgent
5    Capital Services, Greenville, South Carolina.
6    Does that refresh your memory that they're
7    located in Greenville?
8        A.    Oh, yeah, right, right.
9        Q.    You believe Resurgent, then,
10   would be the Greenville resources that were
11   referred to earlier?
12       MR. SLODOV:  Objection.  Calling
13    for speculation.
14       THE WITNESS:  Yes, it's logical
15    that Resurgent is located in Greenville.
16    To my knowledge, they may be located
17    other places as well.
18   BY MR. SHELLY:
19       Q.    The next page, 2271, there's no
20   one from Credit One in the From or To or CC
21   area.  It's from SFG.com.  I assume that
22   means Sherman Financial Group?
23       A.    Yes, that's correct.
24       Q.    And then the fellow from
25   Resurgent again.  It says:

Page 288

1      *** C O N F I D E N T I A L ***
2        "Credit One is trying to
3        sort through how they report
4        accounts that file for BK
5        after they have been sold."
6        Do you have any understanding why
7    somebody from SFG would be writing to
8    somebody at Resurgent about a problem that
9    Credit One is trying to resolve?  Why
10   wouldn't somebody from Credit One write to
11   them?
12       MR. SLODOV:  Objection as to
13    form.
14       THE WITNESS:  My understanding is
15    that in order for Credit One to make
16    sure that the way that it currently and
17    has reported sold accounts -- I guess I
18    would use the example of I may call the
19    credit bureau to ask, you know, how --
20    do you have any knowledge of how this --
21    my impression is their conversations
22    that -- you know, then -- conversations
23    about reporting in general, that then
24    someone is reaching out to try to see if
25    they have any information that might

Page 289

1      *** C O N F I D E N T I A L ***
2    help Credit One, in general, on the
3    subject.
4    BY MR. SHELLY:
5        Q.    But I don't understand why Credit
6    One is the one reaching out to Mr. Umstetter
7    as opposed to SFG.  Why would SFG be the one
8    reaching out for this advice?  Why wouldn't
9    Credit One do it directly?
10       MR. SLODOV:  Objection.  Calling
11    for speculation.
12       THE WITNESS:  I'm not sure why,
13    in this E-mail, that it's only someone
14    from Sherman or someone from Resurgent
15    reaching out to Sherman.  I don't know
16    the answer to that.
17   BY MR. SHELLY:
18       Q.    Were you aware of any instance in
19   which Credit One did, in fact, reach out to
20   someone other than its in-house attorneys or
21   separate counsel outside of the firm for
22   advice on how to report bankruptcies after
23   they had been sold?
24       MR. SLODOV:  Objection.  Calling
25    for communications between attorney and

**MAGNA**
LEGAL SERVICES

# Page 307

**Withheld due to Defendant's claim of Confidentiality**

**Provided courtesy copy to Court for *in camera* review**