UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                                  Chapter 7

Orrin S. Anderson,                                      Case No.: 14-22147 (RDD)

                        Debtor.
------------------------------------------------------------x
Orrin S. Anderson, a/k/a Orrin Anderson,
a/k/a Orrin Scott Anderson,

                        Debtor and Plaintiff, on
                        behalf of himself and all      Adv. Pro. No. 15-08214 (RDD)
                        others similarly situated

            v.

Credit One Bank, N.A.

                        Defendant.
------------------------------------------------------------x

## CORRECTED MEMORANDUM OF DECISION ON MOTIONS FOR SANCTIONS AND CLASS CERTIFICATION

Appearances:

BOISE, SCHILLER & FLEXNER LLP, by George F. Carpinello, Esq. and Adam R. Shaw, Esq., and CHARLES JUNTIKKA & ASSOCIATES LLP, by Charles Juntikka, Esq., for Plaintiff Orrin S. Anderson, on behalf of himself and all others similarly situated

WHITE & CASE, by J. Christopher Shore, Esq. and Andrew E. Tomback, Esq., for Defendant Credit One Bank, N.A.

Hon. Robert D. Drain, United States Bankruptcy Judge

        Plaintiff Orin S. Anderson ("Plaintiff" or "Anderson") brought this adversary proceeding

for himself and as a putative class action to enforce his and the other class members' bankruptcy

discharge under 11 U.S.C. § 727(b) of their unsecured debts to defendant Credit One Bank, N.A.

("Defendant" or "Credit One") and its successors and assigns, and the injunction protecting the

discharge under 11 U.S.C. § 524(a)(2). The basis for the claimed discharge violation was Credit

One's conceded systematic refusal after the discharge of an unsecured debt upon which it was a reporting entity to notify credit reporting agencies of the debt's changed status from "charged off" to being subject to the bankruptcy discharge.

As noted in *Anderson v. Credit One Bank, N.A.* (*In re Anderson*), 884 F.3d 382, 385 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 144 (2018), "charging off" a delinquent debt "means the bank changed the debt from a receivable to a loss on its own accounting books." The fact that such a debt has been charged off thus does not mean that it is uncollectible as a matter of law. In contrast, an obligor on a debt discharged under section 727(b) of the Bankruptcy Code and subject to the statutory injunction under section 524(a)(2) of the Bankruptcy Code cannot be compelled to pay it. *See Montgomery v. Wells Fargo Bank, N.A.*, 2012 U.S. Dist. LEXIS 162912, at *9, *13-14 (N.D. Cal., Nov. 13, 2012) ("A bankruptcy discharge relieves a consumer of any legal obligation to repay a discharged debt, see 11 U.S.C. § 727(b), whereas a consumer may be liable to repay a debt that has been charged off."). *See also Persinger v. Southwest Credit Systems, L.P.*, 20 F.4th 1184, 1196 (7th Cir. 2021) ("a discharged debt cannot be collected (indeed, it is unlawful to try")); *Long v. Turner*, 134 F.3d 312, 317-18 (5th Cir. 1998); *Alsibai. v. Experian Info. Sols., Inc.*, 488 F. Supp. 3d 840, 844-46 (D. Mn. 2020); *Torres v. Chase Bank USA, N.A.* (*In re Torres*), 367 B.R. 478, 487 (Bankr. S.D.N.Y. 2007). (To protect the discharge, Congress permits a debtor to *voluntarily* reaffirm a debt only in the limited circumstances detailed in 11 U.S.C. § 524(c).) Credit One acknowledged the distinction, see May 5, 2015 Transcript [Adv. Dkt. 16] ("5/5/15 Tr.") of hearing on Credit One's motion to dismiss, at 78-79,[1]

---

[1] "The Court: 'This is important, so think carefully about this. When. . .Credit One puts zero balance charged off on a credit report for a debt, is its view that that is the same as a legal matter as a discharge? So in essence that debt should be viewed as having been discharged in bankruptcy? . . .Yes or no?'. . . . "Mr. Slodov [Credit One's counsel]: 'No.' See also id. at 73.

notwithstanding its repeated contention (including as recently as its objection to the present class

certification motion) that a "charge off" is no different than a bankruptcy discharge.

Extensive case law and commentary recognize that, given the importance of accurate

credit reporting to consumers' access to credit (or at least consumers' widely held belief in its

role), the pressure to pay debt exerted by the repeated, unexcused refusal to correct a credit

report to reflect a bankruptcy discharge subjects the violator to contempt sanctions under *Taggert*

*v. Lorenzen*, 139 S. Ct. 1795, 1801-02 (2019).  *See Dibattista v. Selene Fin. LP* (*In re Dibattista*),

615 B.R. 31, 43 (S.D.N.Y. 2020); *Minech v. Clearview Fed. Credit Union* (*In re Minech*), 632

B.R. 274, 281-84 (Bankr. W.D. Pa. 2021), and the cases cited therein; *see also* 4 Collier on

Bankruptcy, ¶ 524.02[b] (16th ed. 2022) ("The failure to update a credit report to show that a

debt has been discharged is also a violation of the discharge injunction if shown to be an attempt

to collect the debt.  Because debtors often feel compelled to pay debts listed in credit reports

when entering into large transactions, such as a home purchase, it should not be difficult to show

that the creditor, by leaving discharged debts in the credit report, is attempting to collect the

debt."); Micah A. Smart, "Dawn of the Debt: The Increasing Problem of Creditors Infecting the

Discharge Injunction with Zombie Debt," 70 Me. L. Rev. 36, 47-8 (2018) ("Refusing to update

credit reports post-discharge when requested, absent a legitimate reason should be considered a

violation of the discharge.").

Here, Credit One never offered a legitimate reason for persisting in its policy not to

correct obligors' credit reports to reflect their bankruptcy discharge, with the exception,

discussed below, that it had sold the underlying debt before the discharge and therefore allegedly

had no duty to update the reports and its related contention that because of such sales it had no continuing motive to pressure its former obligors to pay.[2]

This Memorandum of Decision explains the Court's reasons for granting Plaintiff's motion for sanctions [Adv. Dkt. 140] (the "Sanctions Motion") based on Credit One's repeated, lengthy, and willful discovery failures, including its submission of false affidavits and repeated misrepresentations to the Court -- made as late as the middle of oral argument on the Sanctions Motion -- before it conceded the falsity of such affidavits and representations, which thwarted Plaintiff's efforts to disprove Credit One's "no duty" and "no motive to collect" defenses.  Thus the Court will enter a default judgment on liability and a partial judgment on sanctions against Credit One in favor of Plaintiff under Fed. R. Civ. P. 37(b)(2)(A)(vi), incorporated by Fed. R. Bankr. P. 7037.

This Memorandum of Decision also explains the Court's reasons for granting in part and denying in part Plaintiff's motion for class certification [Adv. Dkt. 109] (the "Class Certification Motion"), by (a) certifying an opt-out class under Fed. R. Civ. P. 23(b)(3), incorporated by Fed. R. Bankr. P. 7023, comprising "all individuals who: [a]fter May 2, 2007, have had a consumer credit report relating to them prepared by any of the credit reporting agencies in which one or more of their Tradeline [unsecured] accounts or debts with Credit One was not reported as discharged despite the fact that such debts had been discharged as a result of their bankruptcy under Chapter 7 of the Bankruptcy Code,"[3] with customary carve-outs, and (b) denying to certify an injunctive class under Fed. R. Civ. P. 23(b)(2) comprising the same people, on the basis that such request is now, albeit belatedly, moot in the light of a Stipulation and Order agreed by Credit One on March 29, 2017 [Adv. P. Dkt. 104] after its discovery failures came to light.

---

[2] It also contended that it was precluded from changing its policy, but, as discussed below, that contention eventually was revealed by its own and its affiliates' actions to be false.

[3] See Memorandum of Law in Support of Plaintiff's Motion for Class Certification [Adv. Dkt. 109], at 4-5.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended General Order of Reference, dated January 31, 2012 (Preska, C.J.).  As noted in *Anderson v. Credit One*, 884 F.3d at 388, the parties agree that Anderson's claim is a core proceeding under 28 U.S.C. § 157(b), and it is in fact "core" under that provision and under Article III of the United States Constitution, as it is "well established that the discharge is the foundation upon which all other portions of the Bankruptcy Code are built."  *Id.* at 889; *see also Montano v. First Light Fed. Credit Union* (*In re Montano*), 398 B.R. 47, 55 (Bankr. D.N.M. 2008).  Further, the Circuit determined that because the enforcement of the discharge is "central to the statutory scheme" and the bankruptcy courts' power to enforce it, this dispute would not be subject to arbitration under the Federal Arbitration Act, and "the class action nature of this case does not alter our analysis."  *Id.* at 389-91.

*Belton v. GE Capital Retail Bank* (*In re Belton*), 961 F.3d 612, 615-17 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1513 (2021), adhered to that that analysis, including in the light of the Supreme Court's post-*Anderson* decision in *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018). *See also Henry v. Educ. Fin. Serv.* (*In re Henry*), 944 F.3d 587 (5th Cir. 2019).  *Belton* also noted, however, that "we have not endeavored to address whether a nationwide class action is a permissible vehicle for adjudicating thousands of contempt proceedings, and neither our decision today nor *Anderson* should be read as a tacit endorsement of such," *id.* at 617, leaving the issue "for another day." *Id.* at 618.

Credit One previously moved for, among other things, an order striking Plaintiff's class allegations of a nationwide class based on jurisdictional arguments in favor of arbitration, see Credit One Bank, N.A. and Credit One Financial's Motions to Compel Arbitration, to Strike

Class Allegations, to Dismiss or Stay [Adv. Pro. Dkt. 7] at 21-23 (the "Motion to Dismiss and

Strike"), which the Court denied by order dated May 14, 2015 [Adv. Dkt. 15], but it did not raise

the separate issue of the Court's jurisdiction to determine whether Credit One violated the

discharge orders of other judges,[4] nor did it do so in its opposition [Adv. Dkt. 118, 143, 152] to

the Class Certification Motion.  Because *Belton* observed in dicta, however, that "we question

whether a bankruptcy court would even have jurisdiction [over a nationwide class action] to hold

a creditor in contempt of another court's [discharge] order." 961 F.3d at 617, the Court addresses

that jurisdictional issue here as a question of law, *Golden v. Discover Bank* (*In re Golden*), 630

B.R. 896, 917 (Bankr. E.D.N.Y. 2021); *Haynes v. Chase Bank (USA), N.A.* (*In re Haynes*), 2014

Bankr. LEXIS 3111, at *4 (Bankr. S.D.N.Y., July 22, 2014), that cannot be waived.

The issue is not the easiest to parse,[5] but I conclude that the well-recognized proposition

that "[s]anctions for violations of an injunction are . . . generally administered by the court that

issued the injunction," *Baker v. GMC*, 522 U.S. 222, 236 (1998), is -- as indicated by Justice

Ginsburg's use of the word "generally" in *Baker* -- not a *jurisdictional* limitation.  The Fifth

Circuit addressed the issue in *Crocker v. Navient Sols. L.L.C.* (*In re Crocker*), 941 F.3d 206, 216

(5th Cir. 2019), in which it declined to follow Eleventh Circuit precedent that the bar to seeking

enforcement of an injunction outside of the issuing court is jurisdictional.  Instead, the *Crocker*

---

[4] It is conceivable that its counsel did so in a passing reference during oral argument on the Motion to Dismiss and Strike, 5/5/15 Tr. at 54-55, but he did not further elaborate, and the argument was more likely raised as an objection to the Court's jurisdiction based on arbitration agreements. Credit One listed the jurisdictional issue among its potential defenses in the parties' Rule 26(f) Join Report, dated April 30, 2015 [Adv. Dkt. 14] and it raised the issue of the propriety of a nationwide class action when it sought an interlocutory appeal in the District Court of this Court's May 14, 2015 order denying the Motion to Dismiss and Strike. *See Credit One Fin. v. Anderson* (*In re Anderson*), 550 B.R. 228, 236 (S.D.N.Y. 2016) (denying motion for interlocutory appeal).

[5] The Second Circuit also may decide it in the relatively near future.  *See Citigroup, Inc. v. Bruce* (*In re Bruce*), 2021 U.S. Dist. LEXIS 245804 (S.D.N.Y., Dec. 27, 2021), which certified a direct appeal under 28 U.S.C. § 158(d)(2) of an order denying a motion to strike nationwide class allegations in another similar discharge enforcement action. Although my ruling on the Class Certification Motion was delayed by the parties' settlement discussions and appellate litigation, including through the denial of *certiorari*, in the closely similar *Belton* adversary proceeding, I have decided in the light of my impending retirement not to await the outcome of that appeal.

court found the "usual enforcement rules for injunctions" emanate from at least "respect for judicial process" and should not be cast aside without good reason. *Id.*[6]  *See also Geltzer v. Brizinova* (*In re Brizinova*), 565 B.R. 488 (Bankr. E.D.N.Y. 2017), which noted the general rule as a matter of propriety and the wisdom behind it, but stated, "That is not to say that it is never appropriate for one judge to enforce an order that was entered by another judge in a different case.  For example, in the bankruptcy context, courts may distinguish between whether they are asked to enforce a 'purely statutory order' such as . . . the discharge injunction set forth in Bankruptcy Code section 524, on the one hand, and an injunction 'individually crafted by the bankruptcy judge,' on the other.  And sometimes it may not be feasible for the parties to return to the courtroom of the issuing judge." *Id.*  at 503 (internal quotation and citation omitted).

As discussed in *In re Haynes*, 2014 Bankr. LEXIS 3111, at *21-25, as well as in *In re Golden*, 630 B.R. at 918-20, 926-27; *Ajasa v. Wells Fargo Bank, N.A.* (*In re Ajasa*), 627 B.R. 6, 23-25, 26-31 (Bankr. E.D.N.Y. 2021); and *Walls ex rel. Herself v. Wells Fargo Bank, N.Y.* (*In re Walls*), 262 B.R. 519, 528 (Bankr. E.D. Cal. 2001), the discharge order entered in individual, consumer bankruptcy cases is a national form from which the bankruptcy courts may not deviate; it is, moreover, supported by a statutory injunction under section 524(a)(2) of the Bankruptcy Code and the power conferred on the Court by section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"[7] -- including Bankruptcy Code sections 524(a)(2) and 727(a) -- that, unlike the All Writs

---

[6] The Eleventh Circuit decision that *Crocker* declined to adopt was *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 969-70) (11th Cir. 2012).  That decision, however, based its ruling on 28 U.S.C. § 1334(e)(1), which provides for subject matter *in rem* jurisdiction over the debtor's property and property of the debtor's estate in the district court in which a bankruptcy case is filed, without considering 28 U.S.C. § 1334(b), which gives district courts subject matter jurisdiction over all civil proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code and is the proper jurisdictional source for enforcement of the discharge under section 727(b) of the Bankruptcy Code as implemented by section 524(a) of the Bankruptcy Code and which exists only because of the bankruptcy case.  *See generally In re Haynes*, 2014 Bankr. LEXIS 3111, at *17-20.

[7] 11 U.S.C. § 105(a).

Act's grant of power to federal courts "in aid of their respective jurisdictions,"[8] confers power on courts exercising bankruptcy jurisdiction to enforce and carry out the Bankruptcy Code. *See generally Bessette v. Avco Fin. Servs.*, 230 F.3d 439 (1st Cir. 2000), which reversed an order that precluded bringing class action claims except in the court that issued the original discharge orders. *Bessette* observed that the power to enforce the discharge resides in both common law contempt and section 105(a) of the Bankruptcy Code and that because "[a]ppellant seeks enforcement of the statutory injunction set forth in § 524, not one individually crafted by the bankruptcy judge, in which that judge's insights and thought processes may be of particular significance . . . few of the practical reasons for confining contempt proceedings to the issuing tribunal apply here. *Id.* at 446.[9] *See also Solow v. Kalikow* (*In re Kalikow*), 602 F.3d 82, 97 (2d Cir. 2010): "[A] court may invoke § 105(a) if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provided in the Code. These powers are in addition to whatever inherent contempt powers the court may have and must include the award of monetary and other forms of relief to the extent such awards are necessary and appropriate to carry out the provisions of the Bankruptcy Code and provide full remedial relief." (internal citation and

---

[8] 28 U.S.C. § 1651.

[9] In remanding to the district court to decide class certification, the *Bessette* court clearly assumed that the jurisdiction of a bankruptcy court to enforce discharge orders was not confined to orders issued by that court. 230 F.3d at 446. That the district court then limited the class to all debtors in a multi-judge district, *Bessette v. Avco Fin. Servs.*, 279 B.R. 442 (D. R.I. 2002), as have other courts, *see, e.g., McNamee v. Nationstar Mrtg., LLC,* 2018 U.S. Dist. LEXIS 54787 (S.D. Ohio, March 30, 2018), app. denied, 2019 U.S. App. LEXIS 11986 (6th Cir., Apr.23, 2019); *Brannan v. Wells Fargo Home Mortg., Inc.* (*In re Brannan*), 485 B.R. 443, 448, 460 (Bankr. S.D. Ala. 2013); *In re Montano,* 398 B.R. at 59; and *Beck v. Gold Key Lease, Inc.* (*In re Beck*), 283 B.R. 163, 176 (Bankr. E.D. Pa. 2002), highlights that the "issuing court" debate is not properly over subject matter jurisdiction, but, rather, the exercise of discretion in certifying a class. *In re Haynes,* 2014 U.S. Bankr. LEXIS 3111, at *25-26. *See generally* Jonathan S. Herman, "Restoring Bankruptcy's Fresh Start," Fordham L. Rev. 189, 212-16 (Oct. 2017), collecting cases on class actions to enforce discharge and concluding, "Without debtors' ability to collectivize, discharge injunction violations will be underenforced." *Id*. at 226.

quotations omitted);[10] *Cano v. GMAC Mortg. Corp.* (*In re Cano*), 410 B.R. 506, 549-55 (Bankr.
S.D. Tex. 2009).

Importantly, the Supreme Court's most recent decision applying section 524 of the
Bankruptcy Code, *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019), consistent with *Kalikow*,
confirms the dual nature of the power conferred by the Judicial Code's grant of bankruptcy
jurisdiction to enforce the discharge. *Taggart* found the source of power to enforce the discharge
in sections 105(a) and 524(a)(2) of the Bankruptcy Code, *id.* at 1801, not just the contempt
power. Instead, it applied the *standard* for holding one in contempt to the exercise of power
under sections 105(a) and 524(a)(2). *Id. See also Law Office of Francis O'Reilly, Esq v. Selene
Fin., L.P.* (*In re DiBattista*), 2022 U.S. App. LEXIS 13236, at *6 (2d Cir., May 17, 2022)
(stating that sections 524 and 105 empower a bankruptcy court to enforce civil contempt
sanctions under traditional principles of equity practice).

Jurisdiction flowing from those sections of the Bankruptcy Code and 28 U.S.C. §§
157(a)-(b) and 1334(b) therefore can be exercised to determine whether, in recognition of the
power conferred by Bankruptcy Rule 7023, the Court should certify a nationwide class of
debtors whose identical discharge orders were allegedly breached by implementation of the
same, uniformly applied policy, the issue presently before this Court.

*Taggart* is important for another reason bearing on the issue of whether only the court
that issued the discharge order has the power to preside over an action to enforce the discharge
injunction. It held that the standard for finding a violation of the discharge "is an objective one.
A court may hold a creditor in civil contempt for violating a discharge order where there is no

---

[10] Although recognizing that the court could invoke section 105(a) to enforce section 524(a)(2) in addition to the court's available inherent contempt powers, *Kalikow* found that the complained-of actions did not, in fact, violate the debtor's discharge injunction under section 524(a) and thus section 105(a) could not be a source of power to sanction. *Id.* at 96-97.

'fair ground for doubt' as to whether the creditor's conduct might be lawful under the discharge order." *Id.* at 1804. When the same, systematic violation, for the same systematic reason, is alleged with respect to the breach of many identical, "not detailed" discharge orders, *id.* at 1802, a court's application of that objective standard would not necessarily undercut "judicial process," jurisdictionally or otherwise. It would instead fulfil Congress' desire to protect a crucial pillar "central to the statutory scheme" and the bankruptcy system. *In re Ajasa*, 627 B.R. at 28-29, citing *In re Anderson*, 884 F.3d at 386, 390.

The proper focus here, then, is not on this Court's jurisdiction, which is clear under 28 U.S.C. §§ 157(a)-(b) and 1334(b),[11] but, rather, on whether the putative class should be certified under Fed. R. Civ. P. 23, incorporated by Fed. R. Bankr. P. 7023, which is discussed later in this Memorandum of Decision. *See Bessette*, 230 F.3d at 446; *Ajasa*, 627 B.R. at 26 ("[T]his Court's subject matter jurisdiction to consider these Plaintiffs' claims, including their request to proceed as class representatives in a Rule 23 class, should not be limited by the scope of that request -- including a request to proceed as a nationwide class. If the Plaintiffs meet their burden as a nationwide class, then they will prevail, and an appropriate class will be certified -- and if they do not, then a class will not be certified."). *See also In re Cano*, 410 B.R. at 555 ("Where it is clear that this Court has authority over the named plaintiffs' claims, the Court will not dismiss the suit based on concerns more appropriately addressed during a class certification hearing."). *See generally*, Kara Bruce, "The Debtor Class," 88 Tul. L. Rev. 21, 51-71 (Nov. 2013).[12]

## Consideration of the Sanctions Motion Before Consideration of the Class Certification Motion

---

[11] *See Wilborn v. Wells Fargo Bank, N.A.* (*In re Wilborn*), 609 F.3d 748, 753-54 (5th Cir. 2010).
[12] This returns us to the fact, discussed above, that in response to the Class Certification Motion Credit One did not raise the propriety of the proposed class's inclusion of former debtors whose discharge orders were issued by different judges (and indeed never raised that issue with this Court except when arguing for arbitration).

"[C]ourts within the Second Circuit and other circuit courts have held that that 'in general, issues relating to class certification should be decided before a decision on the merits is rendered.'" *Ddmb, Inc. v. Visa, Inc.*, 2021 U.S. Dist. LEXIS 249783, at *143 (E.D.N.Y., Sept. 27, 2021), quoting *Mendez v. Radec Corp.*, 260 F.R.D. 38, 44 (W.D.N.Y. 2009). Two policies -- embodied in Rule 23(c)(1)'s requirement that the court determine whether to certify an action as a class action "[a]t an early practicable time after a person sues or is sued as a class representative"[13] and Rule 23(c)(2)'s notice requirements -- underly this practice: fairness to absent, putative class members and fairness to the defendant. *Mendez v. Radec Corp.*, 260 F.R.D. at 47-48. The latter point is reflected in the advisory committee's notes to the 1966 amendment to Rule 23(c) regarding the drafters' concern with "one-way intervention" -- the unfairness that occurs when potential members of a class are allowed to await final judgment on the merits without risk to themselves in order to determine whether participation in the class would be favorable to their interests. *Weissman v. Collecto, Inc.*, 2019 U.S. Dist. LEXIS 8600, at *25-26 (E.D.N.Y., Jan. 17, 2019).

A defendant can waive an objection to the early disposition of a putative class plaintiff's claims against it, however. *Id.* at *26. *See also Ddmb, Inc. v. Visa, Inc.* 2021 U.S. Dist. LEXIS 249783, at *144-45, and the cases cited therein. Generally, a waiver, either express or implied, is found where the defendant has also moved for dispositive relief before determination of class certification or where the parties have decided to proceed with merits discovery leading to a merits determination before or simultaneously with class action discovery and determination of class certification. *Mendez v. Radec Corp*, 260 F.R.D. at 46-47. *See also Chery v. Conduent Educ. Servs., LLC*, 2022 U.S. Dist. LEXIS 10859, at *9-10 (N.D.N.Y, Jan 20, 2022) (finding implied waiver where defendant sought a schedule for the filing of dispositive motions and there

---

[13] Fed. R. Civ. P. 23(c)(1).

was low risk of a large number of opt-outs in the event of a ruling in plaintiff's favor); *Blitzko v. Weltman, Weinberg & Reis Co., LPA*, 2019 U.S. Dist. LEXIS 161495, at *32-33 (N.D.N.Y., Sept. 23, 2019); *Alig v. Quicken Loans, Inc.*, 2016 U.S. Dist. LEXIS 195216, at *24-28 (D. W.Va., Aug. 25, 2016); *Vu v. Diversified Collection Servs.*, 293 F.R.D. 343, 351 (E.D.N.Y. 2013).

Here, Credit One has not raised the ordinary timing sequence, and indeed the procedural history of this litigation confirms its waiver of it. First, Credit One pursued its Motion to Dismiss and Strike [Adv. Dkt. 7], in which it asserted not only its arbitration-related jurisdictional defenses but also alleged dispositive defenses on the merits. Id. at 28-29. The parties' Joint Report under Fed. R. Civ. P. 26 [Adv. Dkt. 14] focused on merits discovery, id. at 5-6, and proposed "any motion schedule be stipulated by the Parties with the consent of the Court." Id. at 7. On February 10, 2016, allegedly after the completion of discovery on the merits, Credit One sought leave under Local Rule 7056-1 to file a motion for summary judgment based on its substantive defenses against Plaintiff. Adv. Dkt. 53. After the Court found that discovery was not in fact complete, Credit One proposed a pre-trial order "consistent with either the parties' Rule 26(f) report or the proposed scheduling order accompanying this filing." Adv. Dkt. 56, at 3. The accompanying proposed order contemplated the completion of merits discovery and the filing and consideration of Credit One's motion for summary judgment on a parallel track with a motion for class certification. Adv. Dkt. 56-3. After considering Plaintiff's response, which essentially argued that Credit One had continued to fail to comply with its discovery obligations, the Court entered a scheduling order that set a date for the completion of fact discovery, subject to extension "if the Court concluded that a party has not properly responded to discovery demands or for other good cause," as well as expert discovery, and

reserved the parties' rights to seek to move for summary judgment before or after the filing of a class certification motion. Adv. Dkt. 59. Thereafter, Plaintiff filed the Sanctions Motion. After its bench ruling on the Sanctions Motion, the Court held a conference, attended by replacement counsel for Credit One, regarding the next steps in the litigation. The Court stated, "I have concluded, based on the post-trial briefing, that the appropriate sanction here is a default judgment on the merits, but not with respect to class certification or damages," November 10, 2016 Transcript of Case Status Conference [Adv. Dkt. 101], at 4, and continued, "That does leave issues remaining in the case, obviously. I don't believe that -- I think the law is clear on this, that the default should [not] extend to the class certification point -- and certainly not the damages. I haven't established damages.[14] So if the class is certified, then that's it. I mean, I don't need to hear the merits as to the breach of a discharge. So I think the parties should be focusing on discovery related to the class, and if you want to bifurcate it still, you can, or discovery can also at that point deal with damages." Id. at 5. Neither party disagreed with this approach, which the parties thereafter followed, including as set forth in the Court's amended scheduling order. Adv. Dkt. 102.

Under the foregoing caselaw, therefore, the Court will follow the sequence previously adopted in this proceeding, starting by explaining its reasons for entering a default judgment against Credit One based on its discovery failures. Although this is not a necessary factor, following this sequence is especially warranted because consideration of the Sanctions Motion

---

[14] Courts have taken differing positions on requests to certify a class based on the defendant's discovery failings. *Compare Addison v. Monarch & Assocs.*, 2017 U.S. Dist. LEXIS 222679, at *14-15 (C.D. Cal., May 8, 2017), adopted, *Addison v. Monarch & Assocs.*, 2017 U.S. Dist. LEXIS 222678 (C.D. Cal., June 5, 2017) (recommending certification of class and default judgment as sanction for defendant's discovery failures), *and Masters v. Wilhelmina Model Agency, Inc.*, 2003 U.S. Dist. LEXIS 8060, at *9-11 (S.D.N.Y., May 13, 2002) (denying class certification as a sanction because of its potential adverse effects on third parties). *See also Weidner v. Carroll*, 2008 U.S. Dist. LEXIS 135465, at *6-7, 13 (S.D. Ill., Mar. 31, 2008) (finding that default judgment on liability only should be entered as a discovery sanction and then separately considering class certification). Here, as discussed below, the Court has separately considered Plaintiff's request for class certification.

was not just a matter of both parties' choice but was dictated by Credit One's improper discovery conduct.

### Anderson's Right to a Default Judgment Based on Credit One's Extraordinary Discovery Abuse

**A. Applicable Standard.**  Fed. R. Civ. P. 37, incorporated by Fed. R. Bankr. P. 7037, addresses the consequences of the failure to provide required disclosure or discovery.  Fed. R. Civ. P. 37(b)(2)(A) establishes the power of the court where the action is pending to award sanctions for not obeying a discovery order, and Fed. R. Civ. P. 37(c)(1) establishes that power for a party's failure to provide information or identify a witness as required by Fed. R. Civ. P. 26(a) or (e).[15]  Rule 37(b)(2)(A) states that

> [i]f a party or a party's officer, director, or managing agent -- or a witness designated under Rule 30(b)(6) or 31(a)(4) -- fails to obey an order to provide or permit discovery,  including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.  They may include the following:

> (i)      directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

> (ii)     prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

> (iii)    striking pleadings in whole or in part;

> (iv)    staying further proceedings until the order is obeyed;

> (v)     dismissing the action or proceeding in whole or in part;

> (vi)    rendering a default judgment against the disobedient party; or

> (vii)   treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

---

[15] Fed. R. Civ. P. 26(e) requires a party to supplement or correct its prior disclosure or response "(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court."

Rule 37(c)(1) states that

[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order the payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Rule 37's sanctions serve three purposes:  "[f]irst, they ensure that a party will not benefit from its own failure to comply.  Second, they are specific deterrents and seek to obtain compliance with the particular order issued.  Third, they are intended to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed is at some sense at fault."  *Roberts v. Bennaceur*, 658 Fed. Appx. 611, 614 (2d Cir. 2016), quoting *S. New Engl. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010).  *See also NHL v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976); Gregory P. Joseph, 1 Sanc. Fed. Law of Lit. Abuse § 47 (2022) ("Rule 37 authorizes the Court to sanction certain types of discovery abuses for the purpose of (1) penalizing the culpable party or attorney; (2) deterring others from engaging in similar conduct; (3) compensating the court[16] and other parties for the expense caused by the abusive conduct; and (4) compelling discovery.").

---

[16] This consideration, related to the general deterrent effect of such sanctions, should not be minimized.  A court's time addressing discovery abuse perverts our adversarial adjudication model and keeps the court from addressing the needs of those appearing before it who follow the rules. *See PHH Mortg. Corp. v. Sensenich* (*In re Gravel*), 6 F.4th 503, 515 (2d Cir. 2021) (without discovery sanctions '[a] party might otherwise abuse or delay discovery, embroiling trial judges in day-to-day supervision") (internal quotation and citation omitted).

The trial court has "wide discretion" in imposing sanctions under Rule 37," *Ayinola v. Lajaunie*, 855 Fed. Appx. 30, 32 (2d Cir. 2021); *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 135 (2d Cir. 2007), but that discretion is limited in three ways.

First, sanctions can be imposed under Fed. R. Civ. P. 37(b)(2)(A) only when a party fails to obey an order to provide or permit discovery.[17]  *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir. 1991).  However, "The language of Rule 37(b)(2) requires a prior order but does not by its terms require an order issued pursuant to Rule 37(a)," and the order need not have been in writing; it just needs to be clear and to have been breached.  *Id.*; *see also Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787 (9th Cir. 2011); *Penthouse Int'l, Ltd. v. Playboy Ent., Inc.*, 663 F.2d 371, 388 (2d Cir. 1981) ("The fact that the March 22 order was oral rather than written, and that it was not issued on a formal Rule 37(a) motion, does not deprive it of any of its binding force and effect."); *Pavarini McGovern, LLC v. Waterscape Resort LLC* (*In re Waterscape Resort LLC*), 2015 Bankr. LEXIS 183, at *36-37 (Bankr. S.D.N.Y., Jan. 21, 2015); 1 <u>Sanc. Fed. Law of Lit. Abuse</u> at § 48.

Second, to satisfy due process, the sanction must be "just," consistent with the plain language of Rule 37(b).  *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982) (noting that "[a] proper application of [Rule 37(b)] will, as a matter of law," be presumed to comply with due process); *Linde v. Arab Bank, PLC*, 706 F.3d 92, 115 (2d

---

[17] Fed. R. Civ. P. 37(c), on the other hand, does not have such a requirement, although the court must determine whether the party's failure to provide information as set forth in the Rule "was substantially justified or harmless," which implicates whether the party was properly informed of the duty to provide the information at issue. Under Fed. R. Civ. P. 16(f)(1)(C), incorporated by Fed. R. Bankr. P. 7016, a court also may issue "just" sanctions on motion or on its own, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), based on the failure of a party or its attorney to obey a scheduling or other pretrial order, and the Court also has inherent power to punish for contempt of its orders.  *See generally S.E.C. v. Smith*, 710 F.3d 87, 97 (2d Cir. 2013) (noting inherent power of the court to award sanctions for a false statement to the court made in bad faith); *Ali v. Dainese USA, Inc.*, 2021 U.S. Dist. LEXIS 242649, at *25 n.3 (S.D.N.Y.. Dec. 17, 2021); *Arrowhead Capital Fin., Ltd. v. Seven Arts Entm't, Inc.*, 2017 U.S. Dist. LEXIS 67421, at *11 n.3 (S.D.N.Y., May 2, 2017).  However, because the relief granted here satisfies the arguably more onerous standard under Rule 37(b)(2), the Court has addressed the Motion's request for sanctions under the rubric of Rule 37(b)(2).

Cir. 2013); *Daval Steel Prods. v. M/V Fakredene*, 951 F.2d at 1366 ("[T]he Supreme Court [in

*Insurance Corp. of Ireland*] has indicated that in determining whether a sanction is 'just' the

record should be reviewed to ascertain whether the district court abused its discretion.").

As noted above, the trial court's discretion in imposing "just" sanctions under Rule 37(b)

is wide. *Emamian v. Rockefeller Univ.*, 823 Fed. Appx. 40, 44-45 (2d Cir. 2020) ("A district

court has wide discretion in imposing sanctions, including severe sanctions, under Rule 37(b)(2).

. . . In reviewing the exercise of discretion, we afford considerable deference to the district

court's familiarity with the proceedings.") (internal quotations and citations omitted); *Funk v.

Belneftekhim*, 861 F.3d 354, 365 (2d Cir. 2017) ("We accord deferential review to a district

court's imposition of Rule 37 discovery sanctions, and we will reverse only for abuse of

discretion, which we will not identify absent an error of law, a clearly erroneous finding of fact,

or a decision that cannot be located within the range of permissible options available to the

district court."); *S. New Engl. Tel. Co.*, 624 F.3d at 144.

In evaluating the exercise of such discretion, courts generally consider the following:

"(1) the willfulness of the non-compliant party or the reason for the noncompliance; (2) the

efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the

non-compliant party had been warned of the consequences of  noncompliance." *Funk v.

Belneftekhim*, 861 F.3d at 366; *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*,

694 F.3d 155, 159 (2d Cir. 2012).  However, "these factors are not exclusive, and they need not

each be resolved against the party challenging the district court's sanctions for us to conclude

that those sanctions were within the court's discretion." *SEC v. Razmilovic*, 738 F.3d 14, 25 (2d

Cir. 2013); *World Wide Polymers, Inc.*, 694 F.3d at 159.

The imposition of a default judgment sanction, or a sanction that on its face is lesser but would have much the same effect as a default, is generally limited to "extreme situations, as when a court finds willfulness, bad faith or any fault on the part of the noncompliant party," *Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 450-51 (2d Cir. 2013). Also, such sanctions should be imposed "usually after consideration of alternative, less drastic sanctions," *World Wide Polymers, Inc.*, 694 F.3d at 159 (internal quotation and citation omitted); *John B. Hull, Inc. v. Waterbury Pet. Prods., Inc.*, 845 F.2d 1172, 1176-77 (2d Cir. 1988). However, consideration of lesser sanctions also is one of the general factors to apply under Rule 37(b)(2), and, even in connection with the imposition of a default judgment, each of those factors, with the exception of the need to find willfulness, bad faith, or fault on the part of the noncompliant party, need not be resolved against the party challenging the sanction, *Roberts v. Bennaceur*, 658 Fed. Appx. 611, 613-14, especially if the noncompliant party's conduct is truly egregious. *Id.* at 614-15; *see also S. New Engl. Tel. Co.*, 624 F.3d at 148 ("[D]istrict courts are not required to exhaust possible lesser sanctions before imposing dismissal or default if such a sanction is appropriate on the overall record."); 1 Sanc. Fed. Law of Lit. Abuse at § 49. Thus at some point, assuming the requisite willful, bad faith, or otherwise egregious conduct is established, speculation as to whether an effective lesser sanction could be identified is unavailing. *See Sieck v. Russo*, 869 F.2d 131, 134 (2d Cir. 1989):

> Defendants now complain that the district court abused its discretion because softer sanctions than a default judgment were available. This argument fails to take into account that when soft sanctions were imposed, the defendants continued to defy the court. In effect the defendants' argument is that somewhere between the imposition of a $2,000 fine and the entry of a $1 million default there exists a sanction that would have convinced them to appear for deposition. Apparently, defendants perceive that the function of a reviewing court is to search, like Goldilocks, for a sanction that is not too hard, not too soft, but one that is just right. We, however, prefer to play the other role in that story, and

provide the teeth to enforce discovery orders by leaving it to the district court to determine which sanction from the available range is appropriate.

*See also Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) ("[W]here counsel clearly should have understood his duty to the court the full range of sanctions may be marshalled."); *Abreu v. City of N.Y.*, 208 F.R.D. 526, 530-31 (S.D.N.Y. 2002) (explaining that the "availability of lesser sanctions" analysis is relative to Rule 37's three goals: "Considering the full record before it, it is this Court's opinion that none of the lesser sanctions are likely to serve Rule 37's three goals.").

"Non-compliance may be deemed willful when the court's orders have been clear, when the party has understood them, and when the party's non-compliance is not due to factors beyond the party's control.  In addition, a party's persistent refusal to comply with a discovery order presents sufficient evidence of willfulness, bad faith or fault." *Id*. at 530 (internal quotations and citations omitted.).  *See also Joint Stock Co. Channel One Russ. Worldwide v. Infomir LLC*, 2019 U.S. Dist. LEXIS 166373, at *93 (S.D.N.Y., Sept. 26, 2019), *aff'd*, 2020 U.S. Dist. LEXIS 63099 (S.D.N.Y., Mar. 26, 2020).  The key inquiry into willfulness, bad faith, or fault may take into account, moreover, the overall context, including the sophistication of, and prior or repeated misconduct by, the noncompliant party, even if some of that misconduct was not directly in breach of an order.  *Id.*, 2019 U.S. Dist. LEXIS 166373, at *62 ("the district court is free to consider the full record in the case in order to select the appropriate sanction") (quoting *S. New Engl. Tel. Co.*, 624 F.3d at 144); 1 Sanc. Fed. Law of Lit. Abuse, at § 49; *see also Ayinola v. Lajaunie*, 855 Fed. Appx. at 33 (sanction of a default judgment not warranted because it was not apparent from the entire record that non-compliance was willful or the

result of bad faith:  noncompliance with the only deadline defendant failed to meet was

for less than two months; further, defendant tried to comply but faced administrative

challenges including a strained relationship with counsel who ultimately resigned leaving

defendant to complete discovery); *City Merch., Inc. v. Tian Tian Trading, Inc.*, 2022 U.S.

Dist. LEXIS 34618, at *12-13 (S.D.N.Y. Feb. 28, 2022) (although *pro se* litigants, like all

litigants, have an obligation not to flout court orders, "discretion typically leads Courts to

afford *pro se* litigants at least more than one warning before imposing sanctions").

    Especially when considering a severe sanction, courts also consider prejudice to

the moving party, *Medina v. Gonzalez*, 2010 U.S. Dist. LEXIS 101601, at *47

(S.D.N.Y.,, Sept. 23, 2010),[18] and the client's, as opposed to its counsel's, complicity.

*Metro Opera Ass'n v. Local 100, Hotel, Emples. & Rest. Emples Int'l Union* 212 F.R.D.

178, 227-28 (S.D.N.Y. 2003), *mot. for reconsideration den.*, 2004 U.S. Dist. LEXIS

17032 (S.D.N.Y. Aug. 27, 2004); *Medina v.* Gonzalez, 2010 U.S. Dist. LEXIS 101601, at

*47.[19]

    Third, and last, to satisfy due process, a Rule 37 sanction "must be specifically related to

the particular 'claim' which was at issue in the order to provide discovery."  *Insurance Corp. of*

*Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. at 707; *S. New Engl. Tel. Co. v.*

*Global NAPs Inc.*, 624 F.3d at 147.

---

[18] However, "[a]lthough prejudice [to the moving party] may serve as a compelling consideration in support of dispositive relief, a lack of prejudice should not be given significant weight in the overall analysis." *Ramgoolie v. Ramgoolie*, 333 F.R.D. 30, 34 (S.D.N.Y. 2019) (internal quotations and citations omitted). *See also S. New Engl. Tel. Co.*, 624 F.3d at 148 ("[W]e, along with the Supreme Court, have consistently rejected the 'no harm, no foul' standard for evaluating discovery sanctions. . . .").

[19] However, this analysis is not always undertaken, *Medina*, 2010 U.S. Dist. LEXIS at *73, courts recognizing that "A litigant chooses counsel at his peril, and here, as in countless other contexts, counsel's disregard of his professional responsibilities can lead to extinction of his client's claim." *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d at 1068; *Joint Stock Co. v. Channel One Russ. Worldwide v. Infomir LLC*, 2019 U.S. Dist. LEXIS 166373, at *88.

**B. Credit One's Conduct of Discovery.**  As noted above, although courts and commentators recognize that the refusal to correct a credit report by a reporting entity to reflect a bankruptcy discharge may be proscribed under section 524 of the Bankruptcy Code, most courts require something more than simply showing the existence of an inaccurate report before they award sanctions.  A reporting entity's systematic refusal in the face of a debtor's repeated requests to correct the report may be enough evidence of pressure to pay the debt (as the only way to get it off the report).  *See In re Van Pelt*, 599 B.R. 1, 6-7 (Bankr. E.D. Ky. 2019); *Russell v Chase Bank USA, NA* (*In re Russell*), 378 B.R. 735, 743 (Bankr. E.D.N.Y. 2007).  Or a refusal coupled with a motive to do so, either expressed ("we won't change the report unless you pay") or implied (such as the retention of an interest in the debt after its sale to another entity, or evidence that the creditor's policy not to correct enhances its ability to sell the debt) may suffice. *See generally In re Minech*, 632 B.R. at 283-84:

> [T]o cast the otherwise innately ambiguous act of credit reporting as something more coercive requires evidence to objectively connect it to collection activity. Although not required, other collection activity helps to place the credit report in context.  Similarly, a refusal to change a knowingly inaccurate report may suggest that the creditor is seeking to collect a debt.  Beyond these situations, '[i]t is largely a matter of the court knowing [pressure] when it smells it.'

(Internal citations omitted.)

In response to the claim that its systematic refusal, even after the commencement of this adversary proceeding, violated the bankruptcy discharge, Credit One asserted several defenses in addition to its arbitration-based arguments:  (1) Plaintiff's claim was time-barred in whole or in part, (2) reporting that the claim is "charged off" is synonymous with reporting that the obligor owes nothing on the account, (3) because Credit One sold the debt before the obligor's discharge, reporting the debt as "charged off" was in any event accurate when it was reported, pre-sale, and Credit One had no obligation to update the report, (4) because Credit One had no

ongoing relationship with the debt after its sale, including no agency relationship with the purchaser, Credit One had no motive to enforce the debt by refusing to correct the credit report even if it had the obligation to do so, (5) under the circumstances, Credit One's refusal to correct reports was not an act to collect the debt, and (6) in any event, Anderson lacked standing, including to request class treatment (although it is not clear whether this argument was based on the arbitration provisions of Anderson's credit card agreement or on the argument that he was not harmed by Credit One's refusal to update credit reports to reflect the discharge).[20] By Order dated May 14, 2015 [Adv. Dkt. 15], the Court denied Credit One's Motion to Dismiss and Strike on the first and second defenses listed above, as well as on its arbitration-based defenses.[21] The last defense is discussed later in this Memorandum of Decision's section on the Class Certification Motion. The third through fifth defenses noted above clearly raised the need for discovery, being fact-based.

As discussed below, Credit One consistently thwarted such discovery on those issues -- including in the face of the Court's orders directing it to provide such discovery -- and thus a sanction for such prolonged and willful noncompliance is "specifically related to the particular 'claim' at issue in the order to provide discovery" for purposes of the first and third requirements for imposing Rule 37 sanctions discussed above.

Early in this adversary proceeding, both the Plaintiff and the United States Trustee (the branch of the Department of Justice responsible for protecting the integrity of the bankruptcy system, including as to conduct that might violate the bankruptcy discharge), had the understanding that most, and perhaps all, of Credit One's debt sales were to one or more of its

---

[20] See Credit One's Motion to Dismiss and Strike [Adv. Dkt. 7] and the parties' Rule 26(f) Joint Status Report at ¶a.2 [Adv. Dkt. 14].
[21] See also 5/15/5015 Tr. [Adv. Dkt. 16].

affiliates.  This was in fact borne out by later testimony[22] and admissions, although the degree of

Credit One's ties to such entities[23] with respect to the sale, servicing, and credit reporting of the

consumer accounts at issue remained unclear -- one could say was obfuscated -- because of

contradictory statements by Credit One and failures by it and its affiliates during discovery.

When Plaintiff deposed Credit One's 30(b)(6) witness, Plaintiff was told that Credit One

remained the servicer of the sold debt at least for some unspecified period (and that it, not the

purchaser, remained on the tradeline),[24] while counsel for the affiliated purchasers disclaimed

their own responsibility for credit reporting.[25]

---

[22] See January 27, 2016 deposition transcript of Helen Lanham, Credit One's designated Rule 30(b)(6) witness [Adv. Dkt. 78-7, Ex. F.] ("Lanham Depo. Tr. "), at 11-15, 20-24 (stating that at least since 2009 every receivable generated by Credit One was sold to a related entity, MHC Receivables, "within a 30-day period of when the credit card is originated" and thereafter, when the debt is charged off, the account is sold to MHC, which separately sells the receivables to another related entity, FNBM and the post-charged off debt to another related entity, Sherman Originator III).

[23] Eventually these entities, owned by the Sherman Financial Group, were identified as Sherman Originator III; FNBM, LLC; MHC Receivables, LLC; PYOD, LLC ("PYOD"); Resurgent Capital Services, LP ("Resurgent"); and LVNV Funding, LLC ("LVNV," with the other entities, the "Sherman Entities").  See Defendant Credit One Bank N.A.'s Post-Hearing Brief, dated October 16, 2016 [Adv. Dkt. 93] at 3.  Credit One is indirectly owned by indirect owners of the Sherman Entities, and Credit One now acknowledges that they are affiliates.  Id. at 10 n.12.  Credit One's online "Privacy Policy & Online Privacy Statement" [Main Case Dkt. 71, Ex. A] informed its consumer customers that Credit One shares its customer's information with affiliates, defined as including the Sherman Entities, including Resurgent, "for [Credit One's] everyday business purposes, such as to . . . report to credit bureaus" and "for [Credit One's] affiliates' everyday business purposes," including "information about your transactions and experiences, and information about your creditworthiness."  Id. at 1.

[24] Lanham Depo Tr. [Adv. Dkt. 78-7, Ex. F.] at 18-19 : "Q:  'So basically, [Credit One] runs the entire end of the business that deals with the customer.'  A. 'Right, exactly.'" Ms. Lanham also testified that, even post-sale, one of the affiliates, Resurgent, is tasked with informing Credit One of the cardholder's bankruptcy case and his or her bankruptcy discharge, id. at 46-48, 49-50, 53, and that Resurgent knows how to check for such accounts by "looking for the Credit One name on the tradeline or in the bankruptcy report.  They search the file based on identifying Credit One Bank, and that's how they identify." Id. at 65. Finally, she testified that none of the buyers of bankruptcy accounts report the tradeline to the credit reporting agencies.  Id. at 260.  (On the other hand, Resurgent's Rule 30(b)(6) designee denied this, see June 16, 2016 deposition transcript of Jon C. Mazzoli [Adv. Dkt. 78-3, Ex. B], at 101-103.)

[25] 12/9/15 Tr. at 23. That disclaimer was eventually corroborated by a Meghan Emmerich, the designated witness for the Sherman Entities.  See June 16, 2016 deposition transcript of Meghan Emmerich [Adv. Dkt. 78-4, Ex. C] ("Emmerich Depo. Tr.").  Ms. Emmerich testified that Credit One remained the servicer and reporter for FNBM and MHC post-sale, id. at 16-17, 24-25, that when those entities sold the debt to LVNV and PYOD, Resurgent became the servicer, although Resurgent also checked obligors' dockets for Credit One's benefit, including to see whether the debtor had received a discharge, id. at 20, 32-34, and, in any event, upon an obligor's bankruptcy LVNV and PYOD have always deleted their tradelines, id. at 4-6, and thereafter no Sherman Entity considered that it had any credit reporting responsibility. Id. at 5-6, 37. Another Credit One witness, Lisa Cooper-Tippett, testified that before

This raised the possibility of the following maze for consumers in response to Credit One's "no responsibility to update" argument:  Credit One is listed on the obligor's tradeline, while affiliated purchasers (who apparently disclaimed any credit reporting responsibility) are not, but Credit One was no longer the owner of the debt, so, conveniently for Credit One and the Sherman Entity purchasers, *no one* in the Sherman Entity family took the post-sale, post-discharge responsibility to correct the credit report to reflect the discharge.  That most purchasers of the debt, either primary or secondary, were Sherman Entities affiliated with Credit One, and may have worked closely with Credit One on the sales and servicing of the debt, made testing that logic even more important in the context of this proceeding:  the entire organization could benefit from the pressure the foregoing reporting, or non-reporting, construct placed on the obligors.

The United States Trustee and Plaintiff sought discovery of those relationships, including the underlying buy/sell documents, whether and how Credit One retained any remaining agency or economic interest or credit reporting role after its sale of the debt, the degree of affiliation between buyer and seller, as well as any policies or procedures of Credit One or communications between it and its debt buyers, including its affiliates, and/or credit reporting agencies pertaining to credit reporting of discharged debt -- all of which would illuminate the strength or weakness of Credit One's third through fifth defenses discussed above.  Indeed, such discovery also could shed light on the meaningfulness of Credit One's "charge off" of the debt:  a systematic policy of transferring distressed debt, especially to an affiliate, at least suggests that the owners of Credit One and its affiliated transferee(s) may have believed the debt to be collectible notwithstanding Credit One's accounting write off, at least opening the door to the temptation to improperly

_____

2014, the "goodbye letters" sent by Credit One to its obligors upon the sale of the debt informed them only of the sale, not of the buyer, and that after 2014, the letter added the name of the debt's servicer.  June 1, 2016 deposition transcript of Lisa Cooper-Tippett [Adv. Dkt. 81-27, Ex. 26] ("Cooper-Tippett Depo. Tr."), at 5-7.

pressure obligors to pay by refusing to correct their credit reports after they received a bankruptcy discharge.

The United States Trustee sought such discovery under Bankruptcy Rule 2004, which request was granted by an order dated February 5, 2015 [Main Case Dkt. 33] (the "Rule 2004 Order"); the Plaintiff did so under Fed. R. Bankr. P. 7026, 7030, and 7034 incorporating Fed. R. Civ. P. 26, 30 and 34.

This should not have been an onerous process. Credit One is a sophisticated, regulated financial institution.[26] There has never been a credible suggestion that it does not understand how discovery under the Federal Rules works or that it lacked the administrative ability to produce documents, including electronically stored information, responsive to the foregoing types of requests. Counsel for Credit One and the Plaintiff indeed agreed early in this proceeding on a Rule 26(f) Joint Status Report, dated April 30, 2015 [Adv. Dkt. 14] providing for the completion of fact discovery by December 31, 2015, a deadline consistent with those in the similar proceedings brought against other credit card companies by counsel for the Plaintiff.

Nevertheless, it was clear from Credit One's initial responses to the Rule 2004 Order and Plaintiff's attempt to take discovery that it aimed to delay and thwart such requests. See letter of Greg M. Zipes from the Office of the United States Trustee, dated April 28, 2015, requesting a discovery conference on Credit One's response to the Rule 2004 Order [Main Case Dkt. 36]; Credit One's Motion for Protective Order, dated May 29, 2015 [Adv. Dkt. 23]; and the letter from counsel for Plaintiff to the Court, dated May 29, 2015 [Adv. Dkt. 24], regarding Credit One's refusal to participate in discovery.

---

[26] See Credit One's website, creditonebank.com: "Credit One Bank is a technology and data-driven financial services company located in Las Vegas Nevada. As a leader in the credit card industry, we offer a full spectrum of credit card products. . . ."

The Court addressed Credit One's noncompliance with the Rule 2004 Order at the May 5, 2015 hearing. 5/5/2015 Tr. [Adv. Dkt. 16] at 13-34. The United States Trustee complained that Credit One (a) was not providing any internal communications, including emails, responsive to the Rule 2004 Order, id. at 16-17, and (b) took the position that the requested documents would be limited to those specifically referencing Anderson's account only. Id. at 21-23. On the former point, the Court made it clear that Credit One would have to provide such internal communications, id. at 17 and 30, to the extent it could locate them, and that it would not be excused from locating them based on its views of the merits of the inquiry, as Credit One's counsel had argued. Id. at 22-23. The Court found Credit One's narrowing of the request to documents referencing only Anderson's account to be "just ridiculous," id. at 24, and when its counsel pressed the argument the Court pointed out that when a subpoena seeks documents pertaining to the parties' "respective rights and responsibilities in connection with an account" it is obvious that a bank would not have individual memos, emails or policies limited to specific accounts, but, instead, would generate policies covering accounts in general and discuss them in general. Id. When counsel for Credit One still pressed the point, the Court ended the discussion by stating, "If you're going to make this argument, I will entertain a motion for sanctions. This is the stupidest argument I've heard in a long time. . . . I mean, that really is putting blinders on. And if that's how you're approaching this discovery, you'd better stop. You're smarter than that, I know it," to which Credit One's counsel responded, "I appreciate that, Your Honor, and I will endeavor to satisfy the Court's concerns." Id. at 25.

Despite that pointed colloquy, three weeks later Plaintiff's counsel filed a letter [Adv. Dkt. No. 24] stating that Credit One was refusing to provide discovery because of its pending motion for a stay pending appeal of the Court's order denying the Motion to Dismiss and Strike -

- in essence awarding itself a discovery stay pending appeal before the Court determined its

motion for a stay -- and on the same day Credit One filed a motion for a protective order [Dkt.

No. 23] in which, in addition to making the argument that no discovery should proceed pending

the Court's determination of its motion for a stay pending appeal, Credit One contended that it

should not have to provide discovery that was "irrelevant" based on (a) its arbitration arguments,

(b) its argument that most, and perhaps all, of Plaintiff's claims were time-barred, (c) its

argument that a report of "charged off, zero balance" allegedly "reflect[s] the fact that the

consumer is no longer liable for the discharged debt," and (d) its argument that in any event it

sold the debt at issue before the discharge, the first three points having been denied by the

Court's ruling on Credit One's Motion to Dismiss and Strike and the last clearly a fair subject for

discovery.

 The Court held a hearing on Credit One's Motion for a Protective Order on June 15,

2015, at which it told Credit One's counsel that it was improper for Credit One to refuse to

provide discovery based on arguments that the Court had already denied in its ruling on Credit

One's Motion to Dismiss and Strike, or to ignore the current posture of the proceeding.  6/15/15

Tr. at 42-45 [Dkt. 34].  This led to the following ruling:  "The Court:  'There will be no -- no, let

me be absolutely clear on this.  This is in capital letters, N-O, withholding of documents on the

basis of a position that's contrary to any ruling I have given in this case that permits this case to

go forward.  You are on notice right now that if you do that, you'll be subject to Rule 11."  Id. at

45-46.  The Court went on to warn Credit One's counsel that "Credit One's practices and

policies dealing with the sale of debt that's subsequently discharged and credit reporting are front

and center in this discovery," that Credit One's objection to the production of "Communications

with buyers of consumer debt regarding your" and the buyer's "practices reporting bankruptcy

discharges to credit reporting agencies," as "irrelevant" made the Court "extremely skeptical of how Credit One intends to engage in discovery in this case," and that if the Court hears "that you're not producing documents on these grounds or not identifying people with knowledge on it, it will not be pleasant." Id. at 46-47.

Nonetheless, Plaintiff asserted that Credit One continued to resist discovery on such grounds, as detailed in exchanges of letters between Plaintiff's counsel and Credit One's counsel on September 11, September 18, September 28, and October 1, 2015, copies of which are attached to a November 25, 2015 letter from Credit One's counsel to the Court [Adv. Dkt. 41], responding to a November 18, 2015 letter from Plaintiff's counsel requesting another discovery conference.  Adv. Dkt. 39.

Importantly, in his November 25, 2015 letter, counsel for Credit One made an additional argument in response to Plaintiff's request for responsive document production, stating, "[T]here are no 'withheld' documents or other documents the Court could order Credit One to produce," Adv. Dkt. 41 at 2-3, and "In response [to Plaintiff's inquiry re: additional responsive documents] Credit One advised that it has no additional responsive documents to any of these documents requests.  In sum, Credit One cannot be compelled to create documents it does not have, or produce documents it does not possess." Id. at 10.[27]

The Court held a discovery conference in response to these letters on December 9, 2015. Plaintiff's counsel summarized the few documents produced to date by Credit One and then

---

[27] Credit One's counsel also wrote regarding the third issue identified in Plaintiff's September 28, 2015 letter -- the asserted incomplete production of documents pertaining to Credit One's policies and procedures concerning its treatment of consumer tradelines -- that "Credit One advised that it had no other responsive documents." Id.  The letter to the Court also stated -- notwithstanding later making a lengthy argument attempting to justify the withholding of documents based either on arguments upon which Credit One had already lost or that assumed facts in its favor without giving Plaintiff the opportunity to develop them through discovery -- that, in any event, "Credit One did not withhold any documents on the basis of Objection B." Id. at 11.

stated "Now, we have no emails.  We have no emails with relation to goodbye letters.[28]  We have

no emails relating to this policy. We have no notes. We have no minutes. We have no

correspondence.  I mean, there's no paper trail of any kind relating to the issue in this case, . . .

which is [Credit One's] policy with regard to [its] refusal to change credit reports or update

credit reports when someone's debt has been discharged in bankruptcy."  12/9/2015 Tr. at 10

[Adv. Dkt. 45].  In response, the Court stated, "[I]t's always conceivable they don't have any

[documents], id. at 11, to which Plaintiff's counsel stated, "If they're going to make

representation to the Court that no such documents exist and no such documents did exist or have

been destroyed, then we'll go to depositions and we'll probe that." Id.  The Court then had the

following colloquy with Credit One's counsel:

> "The Court:  'Is there any other responsive --'
>
> "Mr. Slodov: 'There's no other documents.'
>
> "The Court:  'There's no other responsive documents?'
>
> "Mr. Slodov:  'That's what I've been told, Your Honor.'
>
> "The Court:  'No, no.  I want that under oath from the person responding to the

production.  That needs to be -- it's implicit, but I think I need it.'

> "Mr. Slodov:  'Well, then if --'
>
> "The Court:  'Okay.  And, of course, obviously if there is any later introduction of any

sort of policy, then there will be hell to pay.  So that just needs to be done. . . . It's implicit in

every document production that it's completely responsive.  All right?  But from your answer to

me, I got the impression that you thought it wasn't, so I want it under oath that I have diligently

---

[28] A "goodbye letter" is a letter from a credit card issuer to a customer when it sells the debt to another party informing the customer of the sale.  12/9/15 Tr. at 9.

pursued with my client and they are prepared and they will state under oath that they have no
responsive documents.'

"Mr. Slodov: 'You want me to sign the declaration --'

"The Court: 'No, no, no. I want you to get that from them.'

"Mr. Slodov: 'Okay.'" Id. at 13-14.

Because Credit One was still reading Plaintiff's discovery requests too narrowly, or
refusing them based on arguments that it had either lost or that were inconsistent with the posture
of the proceeding, the Court also made it clear that the foregoing statement would not be limited
by some reformulation of Plaintiff's discovery requests by Credit One or Credit One's unilateral
view of the merits of the underlying dispute: "The Court: '[Y]ou are not allowed to pick and
choose what you think the issues are. That's for a motion to dismiss or a summary judgment.
Discovery is different.' "Mr. Slodov: 'That's not what I'm saying, Your Honor.' "The Court:
'Well it was very clearly what you were saying, and I've had enough. . . . [Y]ou've heard it
twice now. If you do this one more time, if you pick and choose what you are free to respond to
on discovery based on your sense of what the merits are, I will rule against your company. . . .
Are we clear?' "Mr. Slodov: 'Yes, Your Honor.' . . . "The Court: 'I don't want to hear one-
tenth of a second of your saying that's not the issue in this case. I know what the issue is in this
case, and so do you, and you will respond and you'll do it through your client under oath, and if
they don't have the documents, fine, we'll move on. If it turns out they did, there will be hell to
pay. All right?'" Id. at 15-17. The matter concluded as follows:

"The Court: 'And one reason I'm being a stickler on this is because of the way you have
cavalierly treated this process already.'

"Mr. Slodov: 'And --'

"The Court:  'And I don't say that lightly.'

"Mr. Slodov.  'Okay.'

"The Court:  'So get your act together, check the documents, make sure you haven't

given your clients a free pass on what they can produce and not produce and produce it or risk

sanctions or provide a declaration under oath.'"  Id. at 17-18.

On January 18, 2016, Credit One submitted a verification under penalty of perjury by its

Senior Vice President of Risk and Rule 30(b)(6) witness, Helen Lanham.  Adv. Dkt. 78-14, Ex.

K.  The verification stated,

    A.  To the best of my information, knowledge, and belief, Credit One Bank N.A.'s
       responses to Plaintiff Orin Anderson's first request for production of documents are
       true and correct.

    B.  The documents included among the 2,203 pages of materials produced are the only
       documents responsive to the requests that have been located.

    C.  I am not aware of any other responsive documents in the possession, custody, or
       control of Credit One Bank N.A., which have not been produced.

Id. ¶ 2.

Later, having reviewed Credit One's request for leave under Local Bankruptcy Rule

7056-1 to move for summary judgment, the Court responded by asking whether discovery was

complete. Credit One's counsel replied in a letter to the Court dated February 11, 2016 [Adv.

Dkt. 54 at 2-3], stating, "[T]o the extent Plaintiff opposes summary judgment on the grounds that

additional discovery is needed, Plaintiff's remedy is to make that showing under Fed. R. Civ. P.

56(d)," clearly implying that, as far as Credit One was concerned, its responses to Plaintiff's

discovery demands were complete and putting the onus on Plaintiff to show otherwise.[29]

---

[29] Rule 56(d), incorporated by Fed. R. Bankr. P. 7056, states that the Court may defer consideration of or deny a
summary judgment motion, allow time for additional discovery or the obtaining of affidavits or declarations, or
issue any other appropriate order "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it
cannot present facts essential to justify its opposition."

Counsel for Plaintiff responded to this letter in a letter to the Court also dated February 11, 2016 [Adv. Dkt. 54], stating, "discovery has just begun and . . . Credit One has not provided discovery about its practices and policies concerning credit reporting after bankruptcy or treatment of its sold and charged off accounts."  The Court therefore addressed the status of discovery at a conference on February 22, 2016, at which counsel for Credit One stated, "And I think it's disingenuous for the [P]laintiff's counsel to say that they've gotten next to nothing from Credit One.  Credit One has produced what it has." 2/22/2016 Tr. at 16.  Credit One's counsel then reminded the Court of Ms. Lanham's prior verification and offered, "If they want us to go ahead and catalog the efforts that were undertaken to identify responsive documents that were in the request for production of documents, if that's what the Court wants us to do, we can go ahead and do that. . . . But the end result is, you know, that Credit One doesn't have further documents to provide."  Id. at 16-17.

The Court took counsel up on his proposal:  "Well, I think what you suggested is warranted, particularly given the verification that you provided, as to basically what was actually -- what were the instructions to Credit One to locate."  Id.[30]

A month later, Ms. Lanham, Credit One's Rule 30(b)(6) witness, executed Credit One Bank, N.A.'s Amended Verification, dated March 22, 2016. Adv. Dkt. 76-1, Ex. 1.  After referencing her first verification, id. ¶ 2, she stated under penalty of perjury that she made the supplemental verification to "provide a step by step description of where documents were looked

---

[30] As if there was any doubt by this time, Plaintiff's counsel again stated the issue for discovery:  "I do want to emphasize, Judge, that [Credit One's counsel] made a statement to you just now that Credit One is not involved in post-discharge credit reporting.  They are involved because it's their line of credit.  They are the creditor listed on the credit report, so the action or inaction is their decision. We want to know who made that decision; why, when, and how." Id. at 20-21. Clearly the January 27, 2016 deposition testimony of Credit One's Rule 30(b)(6) witness had left open many issues regarding those questions.  Lanham Depo. Tr. [Adv. Dkt. 78-7, Ex. F.], at 50-52, 66-67. Ms. Lanham was unprepared to describe how Credit One manages accounts in bankruptcy other than referring generically to "our compliance and legal department" and that for five or six years past the records were automated and she was not aware how they were kept before then.

for and what documents were looked for." Id. ¶ 3.  She listed four places where Credit One

maintains data regarding customers' credit card accounts, policies, emails, and records of

charged off accounts:  its Credit Account System or "CAS;" its Microsoft Office Sharepoint

Workspace Program; its Microsoft Outlook email server; and its First Data Resources, or "FDR"

program for all R1 charged off accounts, id. ¶¶ 8-11, as well as its use of OpenText Case 360 as

a searchable document management system. Id. ¶ 12.  She stated that "Upon information, in-

house counsel directly handled this document request, and therefore directed Credit One's efforts

to identify responsive documents and locate responsive documents."  Id. ¶ 13.  Further, Ms.

Lanham stated, "Upon information, responsive documents were provided to in-house counsel by

[supervisory] staff after performing a search of the CAS system, the Sharepoint Workspace

program, R1 system, and the email server system to locate responsive documents."  Id. ¶ 17.

Ms. Lanham's Amended Verification noted that additional in-house searches for

documents later turned up more responsive documents in a separate system, id. ¶ 22, and noted

additional documents retrieved from the previously identified systems, id. ¶ 23, all of which had

recently been provided to Plaintiff.  She did not repeat Credit One's counsel's and her own prior

representations to the Court that Credit One's discovery responses were complete, but because it

was an Amended Verification, the clear implication was that the responses were complete.

After depositions in which Credit One employees stated that their documents had not

been searched[31] and identified documents that had not been produced or listed on the privilege

log,[32] and Credit One still not having produced types of documents that might well be expected

---

[31] See June 3, 2016 deposition of Vicki Scott, Credit One's Vice President of Collections [Adv. Dkt. 78-6, Ex. D] ("Scott Depo. Tr."), at 177-78 (never searched "recovery drive" or her computer hard drive until before deposition).
[32] Lanham Depo. Tr. [Adv. Dkt. 78-8, Ex. F] at 117-22.

to have been created and in its possession or control,[33] Plaintiff's counsel concluded that such representations were, in fact, false.  Plaintiff also formed the view that Credit One and its Sherman Entity affiliates were continuing to stonewall on discovery regarding their respective relationships vis-à-vis the debt at issue and credit reporting responsibilities.  Accordingly, on July 11, 2016 [Adv. Dkt. 74] Plaintiff requested another discovery conference, to which Credit One's counsel replied in a letter to the Court dated July 18, 2016 [Dkt. 76], stating, among other things, "Credit One has produced all documents responsive to Plaintiff's July 2015 document requests."  Id. at 8.  On August 8, 2016, Plaintiff filed the Sanctions Motion under Fed. R. Civ. P. 37.  Adv. Dkt. 78.

In its objection, dated August 31, 2016 [Adv. Dkt. 85] to the Sanctions Motion, Credit One again stated, this time in all caps and bold print, "**CREDIT ONE HAS PRODUCED ALL RESPONSIVE DOCUMENTS,**" id. at 32, as well as represented, "Credit One complied with the Court's prior oral directives to verify the completeness and steps taken to locate documents responsive to Plaintiff's document requests," id. at 2, and "Credit One has complied with its obligations to provide documents responsive to Plaintiff's document request."  Id. at 14.  Its objection at least suggested otherwise, however, as it reverted again to Credit One's practice of arguing the merits of its defenses, including those already rejected by the Court, and its own version of the facts, id. at 3 (stating, "having sold [Platintiff's] charged off account two years prior to his bankruptcy filing. . . Credit One was not [Plaintiff's] creditor at the time of his

---

[33] Scott Depo. Tr. [Adv. Dkt. 86-2, Ex. A] at 244 (acknowledging that her department is responsible for updating the credit reporting agencies when Credit One receives a notice of bankruptcy filing, although Credit One apparently did not produce any documents relating to this topic); Scott Depo Tr. [Adv. Dkt. 86-2, Ex. A] at 22 (testifying that when debt transferred by Credit One to an affiliate is then sold to a third-party buyer, "The bank [i.e. Credit One] jointly makes the decision with [the affiliate]"), although Credit One apparently did not produce any documents relating to such decision-making); Cooper-Tippitt Depo. Tr. [Adv. Dkt. 81-27, Ex. 26], at 27, 42-43, and 95-97 (referring to logs and data reports of customer complaints about credit reporting, none of which were produced and, Mis Cooper-Tippitt thought, may not have been searched for).

bankruptcy filing in January 2014, and had no duty to investigate, update, correct or change its . . . credit reporting post-discharge"), 39-40 (stating "The Credit One policy manual answers the central issues in this case"), 27 (stating, contrary to Ms. Lanham's and Ms. Emmerich's deposition testimony regarding Resurgent's role in providing notice to Credit One of the accounts of obligors in bankruptcy[34] and its own Privacy Policy & Online Policy Statement,[35] that "there is no evidence to support a finding that Credit One has the practical ability to obtain documents on demand in the ordinary course of business from . . . Resurgent"), and 65 (stating "The fact that Vicki Scott, Lisa Cooper-Tippett or George Hughes testified that they were not personally asked to search for responsive documents, does not mean that Credit One did not search for responsive documents").

The September 22, 2016 hearing on Plaintiff's sanctions motion was one of the most extraordinary that I have held during 20 years on the bench. After Plaintiff's counsel summarized the history of the parties' discovery disputes, the Court asked Credit One's counsel, Michael Slodov, "Are you . . . saying . . . that, in fact, Credit One did produce all of the documents responsive to the request?" 9/22/16 Tr. [Adv. Dkt. 89] at 15. After Mr. Slodov temporized and the Court repeated, "Are you taking the position that we did produce all of those documents?" Mr. Slodov replied, "With respect to each document request, yes, Your Honor, we did fully respond with --." Id. at 15-16. After the Court probed whether Credit One's discovery response was preceded by "actually going and looking at all the sources, email files, et cetera, and responding with any documents that might be responsive?" Mr. Slodov equivocated, which led to a lengthy colloquy regarding an argument raised by Credit One for the first time, other than in initial boilerplate objections to each discovery request, that doing so would be unduly

---

[34] See n.22 and n.24-25, above, respectively.
[35] See n.23, above.

burdensome, id. at 16-19, which ended, after the Court focused on a specific type of request for customer's complaints to Credit One about credit reporting, in Mr. Slodov's admission that "I don't believe that they did or have not yet done a search of that system for [such documents]." Id. at 19.

The Court then turned to Credit One's responses, or lack thereof, regarding its relationships with Resurgent "whereby Resurgent acts in various ways to provide Credit One with information relating to bankruptcies." Id. Again Mr. Slodov temporized, referring to "recovery manuals" as if those were the only responsive documents. Id. at 20-21. When the Court probed, with a considerable degree of skepticism, whether there was any record of this relationship regarding the types of accounts at issue besides the manuals, Mr. Slodov responded, "I can say that I haven't been provided it, and I know that won't satisfy you. So I can go back and ask again." Id. at 24-25. When the Court probed further as to the lack of records beyond the manuals and stated its frustration with Mr. Slodov's again trying to justify non-production by suggesting, despite the Court's prior ruling and warning, that the document request was limited to Plaintiff's own account, Mr. Slodov stated, "I'm using that as a way of explaining and trying to get you to understand what it is that -- it may be a shortcoming in their system, you know, because it seems logical to you and me that if a file came in from Resurgent, they should have a record that [Plaintiff's] or anybody's bankruptcy was on the list. But they're not recording that in their system. . . [and] [t]here's no contract [between Credit One and Resurgent]." Id. at 26-27.

Mr. Slodov then offered that "The information that is shared [between Credit One and Sherman Entities], as I understand it, relates to accounts that are sold," id. at 28, apparently to excuse there being no responsive documents, emails, etc. on the basis that such sharing was not important to Credit One and the Sherman Entities. The Court replied, "What else is involved in

36

their relationship beyond that? You're saying that as if that's, you know, a minor thing. But

what else do they do together?" to which Mr. Slodov eventually replied after the Court repeated

"What other business do they have other than dealing with the accounts?" "As far as I know

Your Honor, none." Id.

Mr. Slodov then tried to steer the inquiry away from the production of documents by

reciting his version of the facts regarding the relationships of Credit One and other Sherman

Entities regarding the accounts, their servicing, and credit reporting. Id. at 29-39. The Court

steered the discussion back to what records were available to Credit One regarding those asserted

relationships, id. at 40-41, to which Mr. Slodov responded by saying that at least as to customer

complaints regarding credit reporting, they were not available or would require searching. Id. at

42.

Plaintiff's counsel took issue with much of Mr. Slodov's factual recitation and expressed

great skepticism regarding the failure to produce documents beyond manuals, and the parties

again discussed Credit One's belated "burdensomeness" response. The discussion concluded

with Mr. Slodov stating, "I go through the document requests and to the extent that there are

requests for searches of documents that concern bankruptcy discharge, post-discharge, you

know, it's tantamount to asking the Court to verify that there are no cats at the courthouse." Id.at

51.

The Court again steered the discussion to the production, or not, of responsive

documents: "What sort of instruction . . . was given to Credit One's personnel about emails and

disclosure?" Id. at 53.

Then -- THEN -- the following colloquy occurred:

"Mr. Slodov: 'My understanding, Your Honor, after going through the --'

37

"The Court: 'Didn't you do it?  Who did it?'

"Mr. Slodov: 'My understanding, Your Honor, after going through the process of securing the amended verification, [is] that Credit One did not do any email searches.'

"The Court: 'None.'

"Mr. Slodov: 'None.'

"The Court: 'No email searches.'

"Mr. Slodov: 'None.'

"The Court: 'Even though the amended verification says -- refers to email, the central email?'

"Mr. Slodov: 'It refers to it, but it doesn't say it was searched.'

"The Court: 'Well, I'm glad we're hearing that now two hours into this hearing.  I'm astonished.  What's the reason for that?'

"Mr. Slodov: 'It had to do with in-house counsel, who is no longer at Credit One Bank, who dropped the ball on that.'

"The Court: 'And when did you learn this?'

"Mr. Slodov: 'It would have been in March.'

"The Court: 'In March?'

"Mr. Slodov: 'Yep.'

"The Court: 'And I just learned of it now. . . .  So if I hadn't pressed you for the last 10 minutes, would you have told me?'

"Mr. Slodov: 'Yes, Your Honor.'

"The Court: 'Oh, really?'

"Mr. Slodov: 'Yes, Your Honor.'

"The Court: 'It's not in the 129-page brief [sic; the brief was 133 pages] you filed, even though this argument has been front and center not only in the motion, but in chambers conferences, discovery conferences, and the like." Id. at 53-54.

After Mr. Slodov offered, "We are willing to work with [P]laintiff's counsel on protocols for email searches," the Court stated, "I just don't believe it anymore." Id. at 55. And indeed the Court had, and has, no confidence that Credit One, even with new and reputable counsel (who soon after this September 22, 2016 hearing replaced Mr. Slodov and his firm, Sessions, Fishman, Nathan & Israel, LLC) would ever comply with its discovery obligations.

Another remarkable aspect of the September 22, 2016 hearing helped confirm that view, although additional confirmation was not really necessary. Mr. Slodov offered up an email dated May 29, 2015, which had not previously been produced to Plaintiff, from the Sherman Entities' Jon Mazzoli, identified as "an important person in this overall organization," id. at 57-58, copied to Mr. Slodov as well as to in-house counsel and other officers or employees of Credit One. Id. at 66-68, 69, 81. The email contained Mr. Mazzoli's own analysis of the issues in this proceeding, his acknowledgment that there might well be responsive emails, and his cavalier conclusion that there should not be further searches and that he instead would simply send along certain letter agreements on third-party sales. Id. at 67-70. Apparently Mr. Slodov offered this to the Court to shift some of the blame for Credit One's non-production off himself, id. at 57-58, to which the Court responded "[A]t some point you can't just put on blinders. . . . So, to say this is all I got -- but, you know, even if what you yourself did, Mr. Slodov, is somehow not an utter failure, the clients also failed. So, I mean, why should I trust them now?" Id. at 58. The Court had a similar reaction to Mr. Slodov's bizarre attempt to place blame on Ms. Lanham, which only had the effect of placing blame on them both. Mr. Slodov represented that the failure came

to light as part of part of her certification process and that "Ms. Lanham's [certification] was intended to address the email issue." Id. at 59. The following colloquy ensued:

"The Court:  'It was?  How?'

"Mr. Slodov: 'Well, my instruction, Your Honor, was that we should address the searches that were done on the email server to explain what was searched and why, you know, won't -- what results -- '

"The Court:  'Did she say anything in her certification about that?'

"Mr. Slodov: 'No.'

"The Court: 'No.'

"Mr. Slodov: 'And the reason is that I came to learn in the process of assisting Credit One with the verification that they --'

"The Court:  'But you filed this knowing at the time that they hadn't searched their emails?'

"Mr. Slodov: 'Yes, Your Honor, but if you'll hear me out.'

"The Court: 'Okay.'

"Mr. Slodov: 'I did ask them to conduct a search of the --'

"The Court: 'But didn't you recall when I told you to do it over again that it better be right and show the steps that you'd actually done, or otherwise there would be hell to pay and I would draw an adverse inference?'

"Mr. Slodov:  'I do recall what you said, Your Honor.'

"The Court: 'And you disclose -- and yet, nevertheless, the certification, which was prepared, with your assistance, by Ms. Lanham where both you and she -- at least you, I'm

assuming she knew, too, that there had not actually been a search of any emails, didn't disclose that fact.'

"Mr. Slodov: 'Yes, Your Honor.'" Id. at 59-60.

In the light of the hearing's revelations, the Court stated that it was now considering entering a default judgment on the Plaintiff's Rule 37 motion but requested post-hearing briefing on the issue. Id. at 102-03. Nothing in those briefs changed the Court's initial view at the close of the September 22, 2016 hearing that a default judgment was warranted under Rule 37 and the caselaw discussed above.

Credit One's conduct violated the Court's July 15, 2015, December 9, 2015, and February 22, 2016 bench orders on discovery, which were clear and which Credit One's counsel acknowledged he understood. Those orders were accompanied by warnings of severe consequences to Credit One if they were not complied with.[36] As previously discussed, Credit One's discovery failures also pertained directly to the claims at issue in this adversary proceeding.

A default judgment sanction here also is "just" as provided in Rule 37(b).[37] As for the key inquiry, discussed above, whether Credit One's conduct was willful, extreme or egregious, and in bad faith, or Credit One was "at fault," Credit One falsely stated to the Court nine different times (on November 25, 2015, December 9, 2015, January 18, 2016, February 11, 2016, February 22, 2016, March 22, 2016, July 18, 2016, August 31, 2016, and during the first half of the hearing on September 22, 2016 -- in counsel's letters, counsel's representations during

---

[36] *See Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 448-49 (2d Cir. 2013) (admonitions about serious consequences flowing from "overall obstruction of the discovery process"); *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d at 159.

[37] As discussed in n.17, above, the following analysis is not required to impose the same sanction under Rule 37(c) for Credit One's clear and knowing failure to update its prior discovery responses, and the Court's findings and conclusions also would support the imposition of a default judgment under Rule 37(c) as they establish that Credit One's failures were not "substantially justified or harmless" for purposes of that Rule.

hearings and in pleadings, and twice in verifications under penalty of perjury by its Rule 30(b)(6)

witness -- that it had provided a complete response to Plaintiff's document requests. The falsity

of these representations was neither minor nor a matter of excusable neglect; indeed, Credit One

has not offered any excuse for its knowing failures.  Instead, counsel belatedly acknowledged

that both he and Ms. Lanham knew that Ms. Lanham's March 22, 2016 Amended Verification

was false (meaning that her first, January 18, 2016 verification also was false), yet she signed

and he filed it and kept its falsity from the Plaintiff and the Court for the next six months. In

addition to the authorities cited above, *see Metro. Opera Ass'n v. Local 100, Hotel Emples. &*

*Rest. Emples. Int'l Union*, 212 F.R.D. at 222, which gave "great weight" in imposing a default

sanction to defendant's "aggressively willful" noncompliance in the face of "high-decibel

allegations of [discovery] failure where defendant "continually professed full compliance --

falsely and . . . without making a reasonable inquiry," instead making "repeated, baseless

representations that all documents had been produced."[38]  *See also Joint Stock Co. Channel One*

*Russ. Worldwide v. Infomir LLC*, 2019 U.S. Dist. LEXIS 166373, at *78, *81-82 ("Even if not

perjurious, these statements were made so cavalierly, with so little regard for counsel's duties of

candor and diligence, as to rise to the level of bad faith.").

Credit One's noncompliance during the ten months from its November 25, 2015 letter to

the Court claiming that it had no further documents to produce, to its admissions at the

September 22, 2016 hearing, was lengthy under any circumstances.[39]  *See Agiwal v. Mid Island*

---

[38] As in *Metro. Opera*, counsel also violated "an affirmative duty . . . to make a reasonable inquiry into the basis of their discovery responses and to stop and think about the legitimacy of those responses," id. at 221 (internal quotation and citation omitted), and the client itself was complicitous in the discovery failures, not only based on the falsity of Ms. Lanham's verifications but also because of the failures of in-house counsel described by Mr. Slodov, which was corroborated by Ms. Lanham's description in her verifications of in-house counsel's role in the discovery process.  Id. at 227.

[39] It was not complying with its discovery obligations even before then, either, its discovery failures have started in April, 2015 as discussed above.

*Mortg. Corp.*, 555 F.3d at 303 (no abuse of discretion to have dismissed a claim after six months

of noncompliance); *Joint Stock Co. Channel One Russ. Worldwide v. Infomir LLC*, 2019 U.S.

Dist. LEXIS 166373, at *97 (collecting cases finding noncompliance for at least approximately

six months to be "long overdue" and thus warranting serious sanctions); *Local Union No. 40 of

the Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers v. Car-Win Constr., Inc.* 88 F.

Supp. 3d 250, 265-66 (S.D.N.Y. 2015) (collecting cases finding that "periods of six months or

more weigh . . . heavily towards" dispositive sanctions).

Such delay was prejudicial to the Plaintiff beyond, moreover, the prejudice that delay

normally causes, such as the enhanced likelihood of the ordinary course destruction of evidence

by third parties like the Sherman Entities and the departure of knowledgeable personnel from the

defendant's employ.  First, having agreed in April 2015 to a December 31, 2015 discovery cut-

off date in the parties' Rule 26(f) Joint Status Report, Credit One then used the expiration of that

date, notwithstanding its failure to provide *any* discovery by the December 9, 2015 hearing and

its continued willful failures thereafter, against the Plaintiff in seeking leave to file a summary

judgment motion and thereafter in contesting Plaintiff's requests for an extension of the

discovery cut-off date.  Second, during the course of the litigation through the end of the

September 22, 2016 hearing, Credit One never proposed to correct its credit tradelines to

accurately address the obligors' discharges, with the exception -- apparently for tactical reasons -

- of Mr. Anderson's tradeline.  It continued to take this position during that period, moreover,

without ever offering a legitimate reason[40] and notwithstanding (a) its counsel's admission that

---

[40] Ms. Lanham testified that Credit One had sought regulatory guidance on the issue and stated that "I believe the opinion that we got back was as long as the account is accurately reporting at the time that it sold, that we didn't have any other obligation to update that tradeline after the sale." Lanham Depo. Tr. [Adv. Dkt. 78-7, Ex. F.] at 119. However, Credit One's counsel represented to the Court at a hearing after Ms. Lanham's deposition that Credit One had not received any guidance from its regulators regarding the updating of credit reports.  2/22/16 Tr. [Main Case Dkt. 64], at 25-26: "Mr. Slodov:  'And the essential guidance was we're not going to provide you with any

43

nothing precluded it from doing so, 2/22/16 Tr. at 25-26 [Main Case. Dkt. 64], (b) its knowledge

that other credit card issuers had decided to delete obligors' trade lines post-discharge,[41] (c)

testimony that Sherman Entities LVNV and PYOD deleted their obligors' tradelines when their

obligors filed a bankruptcy case,[42] and (d) the fact, later admitted, that as to accounts with a

balance of $99 or less on the date the holder of the account filed for bankruptcy, as a matter of

policy Credit One did not sell such accounts and its systems automatically instructed the credit

reporting agencies to delete the associated Credit One tradelines within 30 days of Credit One

receiving notice of the bankruptcy petition.[43]

Credit One itself, in addition to its counsel, was equally in bad faith and at fault. Not only

is it a sophisticated financial institution with experience in conducting discovery, its Rule

30(b)(6) witness signed two false verifications, was unprepared and unresponsive in her Rule

30(b)(6) deposition, and, as represented by both that witness and Mr. Slodov, Credit One's

woefully inadequate response to Plaintiff's discovery requests was led by its in-house counsel.[44]

The Court therefore apportions responsibility jointly and severally between client and counsel.

*See Joint Stock Co. Channel One Russ. Worldwide v. Infomir LLC*, 2019 U.S. Dist. LEXIS

166373, at \*88; *cf. Merck Eprova AG v. Gnosis S.P.A.*, 2010 U.S. Dist. LEXIS 38867, at \*22

(S.D.N.Y. Apr. 20, 2010) ("The Court has elected not to apportion liability between Defendants

and defense counsel, under the belief that they are best suited to make that decision, and out of

---

guidance." In addition, and remarkably given Ms. Lanham's other statements under oath, Credit One later
acknowledged in its Responses and Objections to Plaintiff's Third Set of Interrogatories, dated April 19, 2017 [Adv.
Dkt. 109-2, Ex.A] at 7, "With respect to Accounts that had a balance of $99 or less as of the date the holder of the
account filed for bankruptcy, as a matter of policy, during the Relevant Period, Credit One did not sell such
Accounts, and Credit One's systems automatically instructed the credit reporting agencies to *delete* the Credit One
tradelines associated with the Accounts within 30 days of Credit One receiving notice of the bankruptcy petition."
(Emphasis added.)

[41] Lanham Depo. Tr. [Adv. Dkt. 78-7, Ex. F], at 118.

[42] See n.25, above

[43] See note 40, above.

[44] This is no excuse, however, for the failures by its outside counsel to supervise Credit One's discovery responses
and his misrepresentations to the Court.

concern that requiring them to disclose information sufficient to determine apportionment could compromise attorney-client confidentiality.  If, however, Defendants and defense counsel are unable to agree on apportionment of these sanctions, they may ask the Court to intercede.").

It is unavailing that after it was caught Credit One offered up (a) compliant discovery (although the Court is skeptical, notwithstanding new, reputable counsel, that such discovery would be compliant given Credit One's own prior failures) and (b) a voluntary deletion of the tradelines for the debt at issue.  A contrary approach would vitiate prime purposes of Rule 37(b). *See NHL v. Metro Hockey Club*, 427 U.S. at 643 (affirming dismissal under Rule 37 because "of respondents' flagrant bad faith and their counsel's callous disregard of their responsibilities" even though it "might well be that these respondents would faithfully comply with all future discovery orders entered by the District Court in this case").  *See also S. New Engl. Tel. Co. v. Global NAPs Inc.*, 624 F.3d at 149 (noting that purposes informing Rule 37 may justify a default sanction "[e]ven when a party finally (albeit belatedly) complies with discovery orders after sanctions are imposed"); *In re Resulin Prods. Liab. Litig.*, 223 F.R.D. 109, 117, 118 (S.D.N.Y. 2004) (to allow willfully non-compliant party to avoid dismissal sanction based on promises of future compliance "would render the sanctions provision of Rule 37 a 'paper tiger'") (citing *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d at 1068); *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2d Cir. 1995); *cf. Jones v. Synergy One Fed. Credit Union* (*In re Jones*), 2007 Bankr. LEXIS 2020, at *8 (Bankr. E.D. Va., June 8, 2007) ("A creditor's voluntary correction of a discharge violation after a debtor has suffered damages or incurred counsel fees to redress the violation would not immunize a creditor from a finding of civil contempt and from an award of compensatory sanctions.").

45

Finally, the Court has carefully considered the efficacy of imposing a lesser sanction than a default judgment, although, as discussed above, "courts are not required to exhaust possible lesser sanctions before imposing dismissal or default if such a sanction is appropriate on the overall record." *S. New Engl. Tel. Co. v. Global NAPS Inc.*, 624 F.3d at 148. However, the imposition of a monetary sanction in the form of payment of counsel fees related to Plaintiffs' efforts to get to the bottom of Credit One's discovery abuses, perhaps coupled with yet another warning, would insufficiently address Credit One's prolonged, willful, bad faith conduct and the prejudice, discussed above, to the Plaintiff.

Moreover, because appliable law as discussed above views the refusal to correct a credit report as a violation of the discharge if there is evidence of the refusal's coercive purpose, imposing sanctions such as precluding the admission of evidence favorable to Credit One or drawing an adverse inference against it would have substantially the same effect as a default judgment. Indeed, Credit One's failure to provide a legitimate reason, notwithstanding repeated opportunities to do so, for its policy not to correct its tradelines to reflect the bankruptcy discharge, coupled with its extraordinary efforts to thwart discovery designed to test its asserted defenses, as well as the dribs and drabs that, despite those efforts, emerged during discovery to show the falsity of those defenses, makes it hard to see how Credit One would ever defeat Plaintiff's claim that its policy violated the discharge.

Like most of my colleagues, I do not view enforcement of the bankruptcy discharge as a profit center for former debtors and their attorneys. If a defendant promptly corrects its violation of the discharge and its prior actions did not rise to the level of a calculated or systematic violation, little or no sanction will ensue. But the opposite occurred here, and a default judgment is warranted.

46

### The Measure of Credit One's Default Sanction

In *PHH Mortg. Corp v. Sensenich* (*In re Gravel*), 6 F.4th at 503, the Second Circuit on direct appeal reversed the bankruptcy court's imposition[45] of non-compensatory, or punitive sanctions on a mortgage servicer for charging debtors amounts that were inconsistent with their confirmed chapter 13 plans.  Noting that "it is imperative that the court explain its sanctions order with care, specificity, and attention to the sources of power," *id*. at 516 (internal quotation and citation omitted), *Gravel* held that it would confine its review to the authority invoked by the lower court and not consider potential alternative sources of power to award a sanction.  *Id.* at 512.  It then reversed the first sanction imposed by the bankruptcy court, which was expressly based on its inherent contempt power, because the orders that were allegedly breached did not clearly enjoin the defendant's complained-of conduct.  *Id.* at 512-13. Concluding that the bankruptcy court's express source of power for the second sanction was Fed. R. Bankr. 3002.1, it then held that Rule 3302.1 could not serve as a basis for a punitive sanction.  *Id*. at 513-15.  In doing so, *Gravel* distinguished the relief available under that Rule from discovery sanctions under Fed. R. Civ. P. 37, which "are deterrents (specific and general) meant to punish a recalcitrant or evasive party," *id*. at 515, although it then noted that it has never decided whether punitive monetary sanctions are proper under Rule 37.  *Id*.[46]

This Court has used a two-step analysis regarding the source of its power to sanction Credit One.

First, a default judgment should be issued under Fed. R. Civ. P. 37 against Credit One based on, as discussed above, Credit One's prolonged, willful, bad faith discovery misconduct.

---

[45] *In re Gravel*, 601 B.R. 873, 903 (Bankr. D. Vt. 2019).

[46] The Court acknowledged the dissent's agreement with "the overwhelming majority of courts [that] have concluded that such authority [to award punitive, or non-compensatory sanctions] exists under Rule 37.  *Id*. at 522-2 (listing cases).

47

The consequence of that default judgment is the deemed admission of all well-pleaded factual allegations in the complaint, except for those relating to damages. *Greyhound Exhibitgroup Inc. v. E.L.U.L. Reality Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).[47] "Only in very narrow, exceptional circumstances may a court find an allegation not "well pleaded," and "[a] defaulting party cannot contest the merits of plaintiff's claim absent indisputable contradictory evidence." *Williams v. Goldman & Steinberg, Inc.*, 2006 U.S. Dist. LEXIS 102120, at *6 (E.D.N.Y., May 12, 2006), adopted by 2006 U.S. Dist. LEXIS 50222 (E.D.N.Y., Jul. 21, 2006). No such circumstances or indisputable contradictory evidence were established here.

Second, because, notwithstanding the issuance of a default judgment, the burden is still on the Plaintiff to prove that it is entitled to the damages he seeks, *Greyhound Exhibitgroup*, 973 F.2d at 158, "[e]stablishing the appropriate amount of damages involves two steps: (1) determining the proper rule for calculating damages on a claim; and (2) assessing plaintiff's evidence supporting the damages to be determined under this rule." *Macquarie Mexico Real Estate Mgmt. S.A. DE D.V. as Attorney-in-Fact for Cibanco v. Hoiston Int'l Enter.*, 2021 U.S. Dist. LEXIS 191265, at *8-9 (S.D.N.Y., Oct. 1. 2021) (internal quotations and citations omitted). "Upon entry of a default, a plaintiff's claims for damages generally must be established in an evidentiary proceeding at which the defendant is afforded the opportunity to contest the amount claimed. . . . [A] district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence." *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contrs. Inc.*, 699 F.3d 230, 234 (2d Cir. 2012) (internal citations and quotations omitted). The moving

---

[47] As discussed below, a default judgment under Rule 37 in favor of Plaintiff also does result in class certification; the Court must still consider all elements necessary for class certification, and it is possible that the damages for the class may differ from the damages for the individual putative class representative.

party is entitled to all reasonable inferences from the evidence it offers. *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).

The Court therefore will determine the *measure* of the sanction for the default judgment against Credit One based on the "proper rule for calculating damages" on a claim for violation of the bankruptcy discharge under sections 105(a) and 524(a) of the Bankruptcy Code, using the "old soil" of the standard for exercising the contempt power, as stated by *Taggert v. Lorenzen*, 139 S. Ct. at 1801, *liability* for such claim having been established as a sanction under Rule 37.[48]

It has long been recognized that a variety of sanctions is available for the violation of the bankruptcy discharge, including (a) compensatory damages, such as for payments made to the creditor because of the violation; attorneys' fees and litigation costs incurred in enforcing the discharge; other actual losses, such as lost wages or business income and travel expenses; and, in appropriate circumstances, (b) emotional distress damages and (c) non-compensatory sanctions. *See generally In re Dogar-Marinesco*, 2016 Bankr. LEXIS 4111, at *41 (Bankr. S.D.N.Y., Dec. 1, 2016); *In re Haemmerle*, 529 B.R. 17, 29-31 (Bankr. E.D.N.Y. 2015); *In re Perviz*, 302 B.R. 357, 370-74 (Bankr. N.D. Oh. 2003). *See also Bessette v. Avco Fin. Servs.*, 230 F.3d at 445 ("[B]ankruptcy courts across the country have appropriately used their statutory contempt power to order monetary relief in the form of actual damages, attorneys fees, and punitive damages, when creditors have engaged in conduct that violates § 524"); *In re Beschloss*, 2018 Bankr. LEXIS 1364, at *15-17 (Bankr. S.D.N.Y., May 8, 2018); *Cherry v. Arendall* (*In re Cherry*), 247 B.R. 176, 187 (Bankr. E.D. Va. 2000).

---

[48] The Court nevertheless takes one exception to this approach. An award of Plaintiff's reasonable attorneys fees and expenses related to enforcing Credit One's discovery obligations, while a subset of Plaintiff's reasonable attorneys fees and expenses in enforcing his discharge, is a proper sanction under Rule 37 itself, and the Court imposes such a sanction on that alternative basis if for some reason an appellate court concludes that Plaintiff's attorneys fees and expenses in enforcing his discharge should not have been included in Plaintiff's damages for Credit One's willful violation of the discharge.

Because the bankruptcy discharge is a court-ordered injunction in furtherance of a statutory injunction, the discharge violation need not succeed in coercing payment for sanctions to be imposed. Congress enjoined "the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset" any debt as a personal liability of a discharged debtor, 11 U.S.C. § 524(a)(2), not just such acts that result in collection or recovery on the debt. Congress intended the discharge injunction "to eliminate any doubt concerning the effect of the discharge as a total prohibition of debt collection efforts" and to ensure that "once a debt is discharged, the debtor will not be pressured in any way to repay it." S. Rep. No. 989, 95th Cong., 2d Sess. 80-81 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 365-66 (1977). The cessation of pressure to pay in and of itself is a prime purpose of the discharge, a tradeoff for debtors having subjected themselves to the rigors of the bankruptcy process. *Mooney v. Green Tree Serv., LLC* (*In re Mooney*), 340 B.R. 351, 362 n.29 (Bankr. E.D. Tex. 2006). *See, e.g., In re Adams*, 2011 U.S. Dist. LEXIS 158090, at *12-14 (E.D. N.C., Jan. 24, 2011) (affirming compensatory damages including attorneys fees and punitive damages although creditor's inaccurate updating and communication of its accounts did not result in collection); *In re Haemmerle*, 529 B.R. at 17 (awarding attorneys fees and punitive sanctions for willful collection activity that did not result in debt payment).

Although *Taggert v. Lorenzen*, 139 S. Ct. at 1795, clarified the standard for liability for breach of the bankruptcy discharge -- met here because of the default sanction imposed on Credit One under Rule 37 -- it did not change the standard for determining remedies for such violations. It simply confirmed that while "the absence of willfulness does not relieve from civil contempt, . . . subjective intent is [not] always irrelevant. Our cases suggest, for example, that civil contempt sanctions may be warranted when a party acts in bad faith. . . . [A] party's record of

50

continuing and persistent violations and persistent contumacy justified placing the burden of

uncertainty in the decree on the shoulders of the party who violated the court order.  On the flip

side of the coin, a party's good faith, even where it does not bar civil contempt, may help to

determine the appropriate sanction." *Id*. at 1802 (internal quotations and citations omitted).

Monetary sanctions for technical or unintended violations of the discharge that are

promptly corrected generally are not warranted.  *Nicolas v. Oren* (*In re Nicholas*), 457 B.R. 202,

226 (Bankr. E.D.N.Y.); *In re Dabrowski*, 257 B.R. 394, 415 (Bankr. S.D.N.Y. 2006).  As noted,

above, litigation over such violations should not become a profit center for former debtors or

their counsel.  This has led to some confusion in the case law, however, when courts have

considered the proper standard for awarding attorneys fees and expenses incurred in enforcing

the discharge.  Some courts address such fees and expenses as a form of compensatory damages,

asking how else would the former debtor stop the breach of the discharge if the violator does not

do so voluntarily except by hiring counsel to enforce it, and would not the incurrence of such

fees simply be another form of proscribed pressure if the violator were not ultimately liable for

them? *See Eastman v. Baker Recovery Servs.* (*In re Eastman*), 2010 Bankr. LEXIS 4928, at *7-8

(Bankr. W.D. Tex., Dec. 28, 2010) (fees necessary to enforce injunction are a species of actual

damages resulting from defendant's violation:  "It defies logic to suggest that a Plaintiff be

required to incur a cost in order to enjoy the benefits of an injunction designed for his benefit,

then be denied the right to be reimbursed those costs simply because that cost happens to be

attorneys' fees."); *Sprague v. Williams* (*In re Van Winkle*), 598 B.R. 297, 301-02 (Bankr. D.

N.M. 2019); *Peyrano v. Sotelo* (*In re Peyrano*), 2016 Bankr. LEXIS 3750, at *2-3 (Bankr. E.D.

Okla., Oct. 17, 2016), *aff'd* 2017 Bankr. LEXIS 1756 (B.A.P. 10th Cir., June 26, 2017); *Holley

v. Kresch Oliver, PLLC* (*In re Holley*), 473 B.R. 212, 216 (Bankr. E.D. Mich. 2012), *aff'd* 2013

U.S. Dist. LEXIS 29670 (E.D. Mich., Mar. 4, 2013); *In re Bechloss*, 2018 Bankr. LEXIS 1364, at *14-15. These courts consider whether the fees and expenses were in fact necessary and proper as part of their evaluation of the reasonableness of the fee and expense request.

On the other hand, some courts have stated that attorneys fees and expenses should not be awarded unless the violator acted willfully, in bad faith, vexatiously, wantonly, or for oppressive reasons. *In re Haemmerle*, 529 B.R. at 29 (collecting cases). It should be noted, though, that such courts generally equate willful, bad faith, or oppressive conduct with "going forward with collection activity knowing or having reason to know that the debtor was in bankruptcy and has received a discharge." *Id.*; *In re Nicholas*, 457 B.R. at 226-27 (attorneys fees and expenses awarded when violator knew of the discharge and had "not ceased his efforts to pursue his discharged claims, even after the Debtor reopened his bankruptcy case to bring his motion").

Confusion also exists in the case law regarding the bankruptcy courts' power to award non-compensatory, or punitive sanctions for violation of the discharge injunction. Indeed, although "[B]ankruptcy courts often award punitive damages as a noncompensatory sanction for contumacious behavior," including violation of the discharge, *In re Van Winkle*, 598 B.R. at 304 (collecting cases); *In re Haemmerle*, 529 B.R. at 27, 30 (collecting cases); *Mejia v. Partners for Payment Relief LLC* (*In re Mejia*), 2018 Bankr. LEXIS 1754, at *13-15 (Bankr. D. Md., June 13, 2018) (collecting cases); Linda L. Schlueter, 2 Punitive Damages, § 19.10 (2022) (collecting cases), "[t]he United States Courts of Appeals have been deeply divided for many years on the question of whether bankruptcy courts have the power to . . . impose punitive sanctions." *PHH Mortg. Corp. v. Sensenich*, 2017 U.S. Dist. LEXIS 207801, at *16 (D. Vt., Dec. 18, 2017).

Courts holding that bankruptcy courts lack such power employ two rationales, usually together. First, some courts reason that any statutory power under section 105(a) in furtherance

of another related section of the Bankruptcy Code, here section 524(a), does not extend to imposing punitive sanctions because compensatory sanctions suffice.[49]  *See Adell v. John Richards Homes Bldg. Co., LLC* (*In re John Richards Homes Bldg. Co. LLC*), 552 Fed. Appx 401, 415 (6th Cir. 2013); *Knupfer v. Lindblade* (*In re Dyer*), 322 F.3d 1178, 1193 (9th Cir. 2003); *In re Hipp*, 895 F.2d 1503, 1515 (5th Cir. 1990).  This interpretation of what is "necessary or appropriate" under section 105(a) would seem to usurp the trial courts' fact-finding role, however, and indeed in two of the above decisions it was almost immediately qualified by an exception recognizing that some types of non-compensatory sanctions may nevertheless be appropriate.  *See In re John Richards Homes Bldg. Co.*, 552 Fed. Appx at 415  ("§ 105(a) grants bankruptcy courts the authority to award mild noncompensatory punitive damages"); *In re Dyer*, 322 F.3d at 1194 (recognizing that "'relatively mild' non-compensatory fines may be necessary under some circumstances").

Second, such courts reason that bankruptcy judges are not permitted under the U.S. Constitution to impose *criminal* sanctions because they are not Article III judges.  *Adell v. John Richards Homes Bldg. Co, LLC*, 552 Fed. Appx at 416; *In re Hipp*, 895 F.2d at 521 ("Bankruptcy courts have no inherent or statutory power -- and none granted them by 11 U.S.C. § 105 or by 28 U.S.C. § 157 or by [Bankruptcy] Rule 9020 -- to preside over section 401(3) criminal contempt trials for violation of bankruptcy court orders.").

Other circuit courts have, however, ruled that bankruptcy courts can impose non-compensatory sanctions in the exercise of their general contempt power or their power under section 105(a) in furtherance of section 524(a) of the Bankruptcy Code.  *Charbono v. Sumski* (*In re Charbono*), 790 F.3d 80, 85 (1st Cir. 2015); *Isaacson v. Manty*, 721 F.3d 533, 538-39, 541

---

[49] Section 105(a) provides that "The Court may issue any order, process, or judgment that is *necessary or appropriate* to carry out the provisions of this title."  11 U.S.C. § 105(a) (emphasis added).

(8th Cir. 2013), although in each case, consistent with the dicta in *John Richards Homes Bldg.* and *Dyer*, the non-compensatory sanction was mild, $100 and $500 per incident, respectively. *See also Brown v. Ramsay (In re Ragar)*, 3 F.3d 1174, 1179 (8th Cir. 1993) (disagreeing with *Hipp's* reading of section 105(a) as never permitting the imposition of non-compensatory sanctions -- "[W]e think this is simply wrong" -- and further noting "it is difficult for us to see a substantial constitutional question here"). *See generally*, John A. Pottow and Jason S. Levin, "Symposium: Rethinking Criminal Contempt in Bankruptcy Courts," 91 Am. Bankr. L.J. 311, 313 (Spring 2017) ("Pottow & Levin") (discussing the conflict among the courts before concluding that bankruptcy courts are not precluded by the Constitution, statutes, or policy from issuing non-compensatory contempt sanctions). Courts have also pointed out that all non-compensatory sanctions are not necessarily criminal in nature, including when protecting the discharge. *See, e.g., In re Mooney*, 340 B.R. at 362 n. 29:

> The imposition of punitive damages under the authority granted under § 105 in this context does not carry this court into the realm of criminal contempt as contemplated by 18 U.S.C. § 401 and *Griffith v. Oles (In re Hipp)*, 895 F.2d 1503, 1515 (5th Cir. 1990). Clearly every assessment of punitive damages does not occur in that forbidden realm. . . . This Court is not assessing these punitive sanctions for contempt of this Court's authority. It is assessing these sanctions . . . for the violation of the statutory protections provided to [the debtor] under § 524 and to which she is entitled as the *quid pro quo* for properly disclosing and surrendering all of her non-exempt property to the trustee for the benefit of her creditors. . . . Issuing reasonable sanctions of this type under the proper circumstances is clearly 'necessary and appropriate' to insure that the bankruptcy system actually works. Although language utilized in some jurisprudence has unfortunately blurred the lines in this area, [the creditor] committed no crime here, nor is it being punished for one.

*See also Bmw of N. Am. v. Gore*, 517 U.S. 559, 582 (1996), which recognized situations warranting punitive damages where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine;" *In re Latanowich*, 207 B.R. 326, 337-38 (Bankr. D. Mass. 1997).

The Second Circuit clarified some but not all the foregoing issues pertaining to bankruptcy courts' power to award non-compensatory sanctions in *Rossellini v. United States Bankr. Ct.* (*In re Sanchez*), 941 F.3d 625 (2d Cir. 2019). In *Sanchez*, a bankruptcy judge sanctioned, under her general, inherent contempt power, a debtor's attorney $1,000 for failing to comply with multiple orders to show cause to prosecute his client's chapter 7 case. *Id.* at 626. In analyzing whether the court had jurisdiction to do so, *Sanchez* concluded that "inherent sanctioning powers are not contingent on Article III [of the Constitution], but rather are, as their name suggests, inherent in the nature of federal courts as institutions charged with judicial functions," *id.* at 627, and that such inherent powers "include the power to impose relatively minor non-compensatory sanctions on attorneys appearing before the court in appropriate circumstances." *Id*. at 628. The sanction imposed by the bankruptcy court fell into that category, although *Sanchez* expressed "no opinion on the outmost bounds of bankruptcy courts' inherent sanctions powers, including their power to impose more substantial punitive sanctions." *Id.*, citing *In re John Richards Homes Bldg. Co.*, and *In re Dyer*, having previously cited *In re Charbono* in support of the bankruptcy court's power to issue non-compensatory sanctions. Notably *Sanchez* did not air any concern that the $1,000 non-compensatory sanction imposed by the bankruptcy court was barred on the basis that it was an exercise of criminal jurisdiction.

The questions left open by *Sanchez*, in addition to what constitutes a "substantial punitive sanction," include how far the court's inherent power extends beyond conduct directly before the court, if nevertheless in violation of court orders, and whether an alternative source of power exists in section 105(a) of the Bankruptcy Code in furtherance of another section of the Code, such as section 524(a)(2).

As for the former question, the Supreme Court has noted that courts' inherent power to punish for contempt "reaches both conduct before the court and that beyond the court's confines, for 'the underlying concern that gave rise to the contempt power was not . . . merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of the trial.'" *Chambers v. NASCO*, 501 U.S. 32, 44 (1991), quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798 (1987). In wrestling with the "somewhat elusive" distinction between civil and criminal contempt in the context of deciding the contemnor's due process rights, the Supreme Court noted in *Int'l Union v. Bagwell*, 512 U.S. 821 (1994), however, that "[s]ummary adjudication becomes less justifiable once a court leaves the realm of immediately sanctioned, petty direct contempts," and "[s]till further procedural protections are afforded for contempts occurring out of court." *Id.* at 832-33. Nevertheless, while finding that the fines at issue for violation of an injunction required additional due process, the Court stated that "courts may still impose noncompensatory, petty fines for contempts such as the present ones without a jury trial." *Id.* at 838-39.

*CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91 (2d Cir. 2016), also is instructive. After observing that "a district court's civil contempt power waxes when the contemptuous act occurs in its presence and wanes when the act occurs outside of Court," *id.* at 102, citing *Bagwell*, 512 U.S. at 833-34, *FilmOn.com* nevertheless stated, again citing *Bagwell*, "When the contempt involves a simple disobedient act, however, the risk of an erroneous deprivation from the lack of a neutral factfinder is diminished, and the court's ability to exercise its inherent civil contempt power is amplified." *Id.* at 103 *FilmOn.com* also recognized that if a defendant has engaged in serial violations of injunctions with clear consequences for the failure to comply,

"courts have recognized that previous court orders afforded the defendant an opportunity to

purge" that could keep the subsequent non-compensatory sanction at issue sufficiently coercive

to be civil rather than criminal. *Id.* at 102. Weighing the facts, which included its determination

that a $90,000 non-compensatory sanction for defendant's "repeated disregard for federal

injunctions . . . throughout the country," that were "relatively simple" was in a "relatively minor

amount which is not large enough to warrant concern with the adjudication process," the Court

concluded that the sanction was civil and affirmed the lower court. *Id.* at 102-04.

As for whether section 105(a) of the Bankruptcy Code permits the imposition of non-

compensatory sanctions "if necessary or appropriate to carry out the provisions of" section

524(a)(2), decisions holding to the contrary should be subject to revision in the light of *Taggert*

*v. Lorenzen* having grounded liability for violation of the discharge, as discussed above, in such

sections in addition to the courts' contempt power, 139 S. Ct. at 1801, as well as the Supreme

Court's recognition of the power available in section 105(a) as long as it is used in furtherance of

another section of the Bankruptcy Code. *Marrama v. Citizens Bank*, 549 U.S. 365, 375-76

(2007).[50] *See* Pottow & Levin, 91 Am. Bankr. L.J. at 348-53, 374 (finding "no problem reading

§ 105 for what it is -- an expansive conferral of statutory authority (assuming, arguendo, that

such a grant is required in the first place) for bankruptcy courts to exercise contempt powers,"

including the power to impose non-compensatory sanctions, though recognizing that prudential

considerations grounded in due process may constrain such imposition.); *In re Mooney*, 340 B.R.

at 361-62:

> To limit the Debtor to compensatory damages in this context would send a clear
> and damaging signal to [the creditor] and other institutional creditors who are

---

[50] *Law v. Siegel*, 571 U.S. 415 (2014), does not, as some contend, cut back on this power. There, the Court held only that section 105(a) cannot be used if it would contravene explicit mandates of other sections of the Bankruptcy Code, *id*. at 421-22, not where its use would be in furtherance of another Bankruptcy Code section, such as one as fundamental as section 524(a).

routinely involved in bankruptcy cases that its attorneys and other agents are free
to ignore a discharge injunction . . . by quickly retreating and paying only a
nominal amount of attorney's fees if its illegal acts are actually exposed, thereby
making the attendant risks of such conduct palatable. Such a message would
clearly undermine one of the most fundamental and significant objectives of the
bankruptcy system. The Court therefore finds that under these circumstances an
award of punitive damages to the Debtor is 'necessary and appropriate to carry
out the provisions of the Bankruptcy Code' [under sections 105(a) and 524(a)].

Finally, there is some confusion in the proper standard for bankruptcy courts to follow

when considering non-compensatory sanctions. One commentator after conducting a lengthy

survey of the cases has identified four variations: (1) where the violator acted with malevolent or

malicious intent, (2) where the violator acted in an egregious, intentional manner, (3) where the

violator acted in reckless disregard of a protected right, and (4) where the violator acted with

arrogant defiance of federal law. Linda L. Schlueter, 2 <u>Punitive Damages</u> at § 19.10.[51] Frankly,

though, there is little meaningful difference among these standards except perhaps the third, each

of which except the third requiring a knowing and egregious disregard of the discharge in

violation of section 524(a).

Courts in the Second Circuit when imposing non-compensatory sanctions for violation of

the discharge have based their rulings on (a) a knowing disregard or disrespect for the

bankruptcy law, *In re Beschloss*, 2018 Bankr. LEXIS 1364, at *15-17 (awarding $4,000 punitive

damages because defendant, while not acting malevolently, was a sophisticated law firm that

continued its conduct even after clear notice); (b) "a clear disregard" of the debtor's discharge

including continuing violations after notice and without "any credible explanation," *In re

Haemmerle*, 529 F.R. at 30-31 (awarding $500 for each knowing violation, for a total of

$69,000, "to deter Wells Fargo from further efforts to collect a discharged debt from this Debtor

---

[51] Moreover, some courts have awarded a modest non-compensatory sanction based only on the knowing violation of the discharge. *See In re Anderson*, 348 B.R. 652, 662 (Bankr. D. Del. 2006) (awarding a $500 sanction "[a]bsent any 'loss' on the part of the Debtors, as the Court found such sanction "will be sufficient to deter the Creditor from including such language in future correspondence with these (or other) debtors.").

or from any other debtor"); and (c) a finding of "particularly egregious creditor misconduct" in acting in clear disregard of the discharge, including the failure to comply when given the opportunity to do so, *In re Nicholas*, 457 B.R. at 227 (awarding $50,000 of punitive damages "to deter [defendant] and others from similar conduct in the future"). *See also Watkins v. Guardian Loan Co. of Massapequa, Inc.* (*In re Watkins*), 240 B.R. 668, 680-82 (Bankr. E.D.N.Y. 1999) (imposing $1,792 of non-compensatory sanctions, equal to three times debtor's out-of-pocket damages, for actions taken with either malevolent intent or a clear disregard and disrespect of the bankruptcy laws); *In re Cruz*, 254 B.R. 801, 817 (Bankr. S.D.N.Y. 2000) (requiring a finding of "malicious or egregious" conduct for the imposition of punitive damages). Many courts outside of the Second Circuit also follow such a formulation, sometimes by referring to an "egregious and intentional violation" and taking into account the violator's sophistication and disregard of opportunities to correct a violation. *See, e.g.*, *Romanucci & Blandin, LLC v. Lempesis*, 2017 U.S. Dist. LEXIS 71526, at *21-22 (N.D. Ill., May 4, 2017) (affirming $50,000 non-compensatory sanction based on clear disregard of discharge by sophisticated defendant, including after notice of motion for sanctions); *Nibbelink v. Wells Fargo Bank, N.A.* (*In re Nibbelink*), 403 B.R. 113, 121-22 (Banrk. M.D. Fla. 2009) (awarding non-compensatory sanction of $15,000); *Poindexter v. Southwest Mo. Bank* (*In re Poindexter*), 376 B.R. 732, 739 (Bankr. W.D. Mo. 2007); *In re Perviz*, 302 B.R. at 372.

Here, Plaintiff seeks three forms of sanction, although only two for himself, for Credit One's violation of the discharge. As for himself, he seeks (i) payment of his reasonable attorneys fees and expenses in enforcing the discharge as well as his own related costs, and (ii) "relatively small compensatory[52] and punitive damages," leaving the determination of the

---

[52] Apparently this reference to such "compensatory" damages is akin to those cases awarding punitive or exemplary damages where "a particularly egregious act has resulted in only a small amount of economic damages:

amount of such sanctions to the Court.  Memorandum of Law in Support of Plaintiff's Motion

for Class Certification, dated April 27, 2017 [Adv. Dkt. 109-1], at 15, 17.  Plaintiff also seeks

certification of a subclass that would be entitled not only to the foregoing sanctions (subject to

one satisfaction of the attorneys fees and expenses) but also damages equal to any amounts that

the subclass members actually paid on account of their discharged debt.  Id. at 16.

Credit One has not addressed payment of Plaintiff's attorneys fees and expenses as

damages, and, whether one applies the reasonableness standard of cases such as *In re Eastman*,

2010 Bankr. LEXIS 4928, at *7-8, or the arguably heightened standard of cases such as *In re*

*Haemmerle*, 529 B.R. at 29, discussed above, such fees and expenses are appropriate

compensatory damages for Credit One's systematic violation of the discharge.[53]

Credit One's systematic refusal to correct its credit tradelines to reflect debtors'

discharges was, as alleged in the complaint [Adv. Dkt. 1] and required to be accepted as true

based on its Rule 37(b) default, willful, knowing, and intended to pressure obligors like

Anderson to pay their debts based on the obligors' reasonable belief that the inaccuracy of such

information provided to the credit reporting agencies would adversely affect their ability to

obtain credit, housing, and employment.  Complaint ¶¶ 9, 11, 13, 36, 44 51-56 and 58.  Credit

One, the sole reporter on the tradelines, id. ¶¶ 33, 45, refused to correct them although knowing

them to be inaccurate, id. ¶¶ 10, 44, knowing that other similarly situated credit reporting entities

had corrected them, id ¶ 35, and even after it was repeatedly requested to do so, id. ¶ 26, 27,

---

or "injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Bmw of N. Am. v. Gore*, 517 U.S. at 582, or perhaps nominal damages for the violation of a legal right, the discharge injunction, that is not susceptible to further quantification but is still a proper form of redress. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-02 (2021)..

[53] The Court believes the former line of cases represents the better reasoned analysis, as this is not a question of an exception to the "American rule" on attorneys fees but, rather, of calculating damages emanating from the violation of the discharge injunction, which include money spent to correct the violation.  *In re DiBattista*, 2022 U.S. App. LEXIS 13236, at *8-9 ("Put plainly, DiBattista's appellate fees were caused by Selene's contempt.").

while knowing that the failure to do so would damage credit ratings. Id. ¶ 58.  It refused to do so

to pressure obligors to pay their discharged debt to remove the "charge off" notation, id. ¶ 62,

and for its own monetary benefit as a seller of the debt, including to its affiliates. Id. ¶¶ 14, 59-

60.  Considering just these factual allegations, deemed to be true based on Credit One's default

under Rule 37, Credit One's systematic conduct was in bad faith and in full knowledge that it

was violating Anderson's discharge under the Bankruptcy Code.

This is not all, however.  During the litigation, Credit One engaged in prolonged,

extraordinary, wrongful efforts to prevent the exploration of its defenses to the complaint's

allegations; it never articulated a valid basis for its continued refusal to correct its credit reports

with the exception of its offer, for tactical reasons, to correct Anderson's report; it lied not only

about its discovery efforts but also misrepresented to the Court and obfuscated in discovery (a)

the nature of its relationships with its affiliates, the Sherman Entities that bought "charged off"

debt from it, (b) its understanding of how those entities would not report the debt of their

obligors in bankruptcy, and (c) the supposed regulatory limitations on Credit One's own ability

to do so, as well.

Finally, failing to report the discharge while reflecting a bankruptcy on a credit report

would reasonably be understood by a former debtor to state to the world that he had been in

bankruptcy but had not received a discharge.  This is important not only because it would

incorrectly reflect an outstanding debt.  When filing for bankruptcy, debtors are impressed with

the principle that the bankruptcy discharge is for the "honest but unfortunate debtor," *Grogan v.

Garner*, 498 U.S. 279, 287 (1991), and will not be provided to someone who filed bankruptcy in

bad faith, failed to report assets, fraudulently transferred assets, engaged in reprehensible pre-

bankruptcy conduct such as fraud, defalcation or embezzlement, or caused willful and malicious

injury.  11 U.S.C. §§ 727(a), 523(a).  Thus showing a bankruptcy *and* an outstanding debt on the credit report also would reasonably suggest to a debtor that those reviewing the credit report were being told that he was guilty of a bad act for which he did not deserve a discharge.

Accordingly, Anderson shall have judgment for the reasonable attorneys fees and expenses of his counsel, as well as his own reasonable costs, in enforcing his discharge.  To enable the Court to determine the amount of such fees and expenses -- which, given the unduly protracted and difficult discovery process and litigation that brought Credit One's misconduct to light, undoubtedly will be high -- counsel shall file a fee application with supporting time and expense records within 60 days of this Memorandum of Decision, and serve it on Credit One, which shall have 30 days to file and serve an objection to the reasonableness of such fees and expenses.  If the class is certified, these attorneys fees and expenses will also constitute compensatory damages of the ultimate class members, subject, of course, to only one recovery, because Credit One's policy was equally applicable to them.

Credit One objected to the imposition of any non-compensatory sanction here, even a mild one, for its violation of the discharge, on the basis that any such sanction would be criminal and thus unavailable in this Court's exercise of its civil contempt power.  Defendant's Corrected Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification, dated May 18, 2017 [Adv. Dkt. 118], at 27-28.  This argument is too narrow, however, for two related reasons.

First, as discussed above, the inherent civil contempt power of bankruptcy courts includes the power to issue mild non-compensatory, or punitive sanctions, *In re Sanchez*, 941 F.3d at 628, and such sanctions have for decades been widely imposed against those who have violated the discharge and has been even more widely recognized as an available remedy in the right circumstances, including by the many circuit, district, and bankruptcy court decisions cited

above.  Such civil non-compensatory sanctions are warranted in the light of Credit One's

repeated, serial, systematic violation of discharges around the nation and the continuing violation

of them, after notice, in Anderson's case and, if the class is certified, as to each other class

member, as well, so as to discourage such violations in the future.  *In re Nibbelink*, 403 B.R. at

122; *In re Dogar-Marinesco*, 2016 Bankr. LEXIS 4111, at *55-57 (Bankr. S.D.N.Y. Dec. 1,

2016); *cf.  CBS v. FilmOn.com Inc.*, 814 F.3d at 102-04.

Second, this last point highlights the role of section 105(a) as a source of power along

with the Court's inherent contempt power to issue "any order necessary or appropriate to carry

out" section 524(a), as recognized by *Taggert v. Lorenzen*, 139 S. Ct. at 1801, and *In re

DiBattista*, 2022 U.S. App. LEXIS, at *6.  As discussed above, section 524(a)(2) of the

Bankruptcy Code enjoins acts to collect a discharged debt, acts to coerce, not just acts that result

in collection.  The remedy for a systematic, willful, egregious practice by a sophisticated

financial institution in violation of that injunction should include a mild uniform non-

compensatory civil sanction.  The failure to recognize such a sanction would leave discharged

debtors to endure in derogation of the statute until they experience an added consequence of the

violation, and encourage others to engage in similar acts until caught.

Credit One's willful, knowing, systematic disregard of section 524(a)(2) clearly meets the

standard discussed above for awarding a mild non-compensatory civil sanction to Anderson and,

if the class is certified, to the class members who do not opt out.  Credit One's arguments against

the imposition of such sanctions in favor of Anderson and the putative class members, namely

that (a) Credit One's conduct probably did not result in obtaining payments from many people,

and none from Anderson, (b) lenders, landlords, prospective employers and others who use credit

reports to evaluate prospective relationships with people who have gone through bankruptcy do

not really distinguish between how Credit One inaccurately reported discharged debt and debt

that is accurately reported as discharged, and (c) changing the reporting to be accurate might well

not improve people's credit scores [Adv. Dkt. 118, 119, 120, 122, 123,[54] 148, and 149], miss the

point.  The congressionally proscribed harm is the act to pressure debtors to pay, not causing

them to pay, and it is unavailing in this context that there may be no real difference between an

accurate and an inaccurate report's effect on one's credit score.  It is clear from the record that

the mix of inputs that ultimately generates a credit score is opaque, indeed guarded as a trade

secret by the credit reporting agencies,[55] but it is equally clear that everyone, including former

debtors, expects accurate information to be used in deriving a credit score.  Given the widely

held view, supported by an industry of "credit score improvers," that one's credit score is

critically important,[56] the unexcused, systematic refusal (highlighted even more here by Credit

One's extraordinary efforts to thwart discovery) to correct reports that reflect a debt as still

owing when it is not, *is* the pressure to pay, the only other way to correct the report being the

payment of the debt.[57]

---

[54] Based on the prior record, including the filing of two false declarations and Ms. Lanham's being woefully unprepared as Credit One's Rule 30(b)(6) witness, as well as Mr. Mazolli's email, described above, that blithely disclaimed his discovery obligations, I find Ms. Lanham's and Mr. Mazolli's self-serving allegations, at Adv. Dkt. 122 and 123, regarding Credit One's bona fides not to be credible.

[55] *See*  Janine S. Hiller and Lindsay Sain Jones, "Article:  Who's Keeping Score?:  Oversight of Changing Consumer Credit Infrastructure," 59 Am. Bus. L.J. 61, 82 (Spring 2022): "Consumers' chief complaint about credit scoring is that no one knows exactly how their score is calculated.  Although an individual may be turned down for a loan, a lease, or a job because of this number, the formula used for its calculation is protected as intellectual property and is not even accessible to government regulators."

[56] *Id.* at 63 ("The importance of accurate and widely available individual credit ratings is difficult to overstate and is a bi-partisan issue.); Christopher A. Guzelian, Michael Ashely Stein, and Hagop S. Akiskal, "Article:  Credit Scores, Lending, and Psychosocial Disability," 95 B.Y.U. L. Rev. 1807, 1809 (Dec. 2015) ("Credit Scores have become a near-universal passport for meeting common personal needs such as employment, loans, insurance, and home and car purchases or leases.").

[57] Credit One's declarations as to the alleged negligible effect of changing how bankruptcies are reflected in credit reports also is unreliable given the opaque nature of credit reporting. *See* Katherine Porter, "Article:  Life After Debt:  Understanding the Credit Restraint of Bankruptcy Debtors," 18 Am. Bankr. Inst. L. Rev. 1, 41 (Spring 2010) ("Porter") ("[W]ithout extensive credit bureau data and access to the bureaus' quantitative models, it is impossible to discern the exact effect of [credit reporting discharged debt] on consumers' credit scores."). It is also worth noting that credit scoring of the effect of an individual's bankruptcy case, which until roughly 2007 did not widely

I have carefully considered the proper amount of such a per capita sanction, but I do not believe that it can be established definitively on this record, other than that it should be "mild," because I do not yet know the size of the class, including after the opportunity to opt-out, nor do I know the amount of the compensatory damages, having not set the amount of Plaintiff's reasonable attorneys fees and expenses. Most of the factors discussed in *Bmw of N. Am. v. Gore*, 517 U.S. at 574-84, to consider when awarding punitive damages exist here: Credit One's conduct was reprehensible and protracted; the harm is economic but stems from the systematic nationwide violation of statutory and court-ordered injunctions; those injunctions protected financially vulnerable people; Credit One continued that misconduct during this litigation, to the extent of warranting sanctions under Rule 37(b); and non-compensatory sanctions for comparable misconduct when applied to individual debtors historically have ranged, as discussed above, from $500 to the mid five figures, with the circuit courts focusing on the lower end of that range. 517 U.S. at 575-80, 583-84.[58] On the other hand, until knowing the size of the class, after opt-outs, as well as the amount of compensatory damages in the form of attorneys fees and expenses, the Court cannot determine the other *Bmw of N. Am. v. Gore* factor, the ratio of the actual harm to the class members as against the per capita punitive sanction, *id.* at 580-83, although the *Gore* was careful to point out that higher or lower ratios are appropriate in the light

---

reflect the bankruptcy discharge, has been criticized as a self-fulfilling, self-reinforcing prophecy: those who emerged from bankruptcy receive low credit scores, therefore have less access to credit or pay more for it, pay more for housing, and are denied jobs, therefore "confirming" the original conferral of a poor credit score. Luke Herrine, "Article: Credit Reporting's Vicious Cycles," 40 N.Y.U. Rev. L. & Soc. Change 305, 322-28 (2016); ("[U]ntil more than nine years after filing [bankruptcy] (and notably after the bankruptcy is removed from the person's credit report), those who have filed bankruptcy have a statistically significant lower likelihood of having a credit card than non-filers."); Deborah Thorne, "Personal Bankruptcy and the Credit Report: Conflicting Mechanisms of Social Mobility," 11 No. 4 Journal of Poverty 23, 25, 40 (2007); *see also* Porter, 18 Am. Bankr. Inst. L. Rev. at 41 ("If policymakers wanted to enhance the quality of credit available to bankruptcy debtors, they could create penalties for misreporting discharged debt. Such changes might facilitate consumers' credit rehabilitation by raising their credit scores and lowering the price of credit, thus encouraging consumers to borrow after bankruptcy.").

[58] *See also Jennings v. Yurkiw*, 18 F.4th 383, 390-95 (2d Cir. 2021). There has been no suggestion that Credit One will be placed in financial distress by the imposition of the sanctions discussed here.

of other factors, such as particularly egregious conduct that results in only a small amount of economic damages or whether "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id*. at 582. Today, therefore, one can posit that only a non-compensatory sanction should be imposed in a range between $50.00 and $1,000 for Anderson and for each non-opting-out class member. Such sanction should not be less than the bottom of that range, as it would then cease to reflect the seriousness of the breach as it pertains to Credit One's individual consumer customers, each of whom could legitimately think that such "relief" meant that their discharge was worth little more than the paper on which it was written.

### The Class Certification Motion

As noted above, while as a general principle the factual allegations in a complaint are deemed admitted upon the defendant's default, Fed. R. Civ. P. 23(c), incorporated by Fed. R. Bankr. P. 7026, imposes an independent duty to satisfy the requirements for class certification after employing the "rigorous analysis"[59] required by that Rule. *Partington v. Am. Int'l Specialty Lines Ins. Co.*, 443 F.3d 334, 340-41 (4th Cir. 2006) ("although a default judgment has the effect of deeming all factual allegations in the complaint admitted, it does not also have the effect of 'admitting' the independent legal question of class certification"); *Davis v. Hutchins*, 321 F.3d 641, 648-49 (7th Cir. 2003); *Williams v. Kucoin*, 2021 U.S. Dist. LEXIS 204334, at *11 (S.D.N.Y., Oct. 1, 2021) (accepting as true all well-pleaded allegations, but separately conducting class action analysis). And "Class damages cannot be awarded if no class is certified." *Davis*, 321 F.3d at 648; *Partington*, 443 F.3d at 340.

The Rule 23 analysis "is designed to protect absent class members whose rights could be affected by the certification" and are not yet before the Court. *Partington*, 443 F.3d at 340;

---

[59] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

*Davis v. Hutchins*, 321 F.3d at 349, quoting *Davis v. Romney*, 490 F.3d at 1366.  Contrary to Credit One's position, the defendant is, however, bound by the allegations in the complaint to the extent they establish facts relevant to class certification; it does not get a do-over on the underlying factual determinations as to the putative class representative to the extent that they overlap with the factual determinations that must be made when considering class certification. *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992) ("[A] challenge to class certification is not the type of potential defense to the merits which the party loses through its default, *except* to the extent that it depends on the court's resolution of factual issues which defendants could have addressed at the scheduled hearing or in required filings had they not defaulted.") (emphasis added).  *Brown v. City of Detroit*, 2012 U.S. Dist. LEXIS 139266, at *5 (E.D. Mich. Sept. 27, 2012) ("Here, when default was entered in April 2011, its scope extended to all well-pleaded facts in the complaint. And the factual allegations in the complaint are not limited to Plaintiff.  They extend to the three proposed classes as well. The scope of the default thus extends to these classes.  This does not mean, however, that the Defendant is liable to each of the three classes.") (internal quotation and citation omitted).  Nor does the fact that a default judgment establishes an injury to the putative class representative mean that all class members are similarly injured. *Williams v. Kucoin*, 2021 U.S. Dist. LEXIS 204334, at *14, or that, as discussed above, without class certification the default judgment can be entered in favor of the putative class members. *Aleobua v. United Wellness Cmty., LLC*, 2014 U.S. Dist. LEXIS 159550, at *2 (E.D. Mich. Nov. 13, 2014).

The first element of the class certification analysis requires consideration of the constitutional standing of both the class representative and each member of the class.  *Barrows v. Becerra*, 24 F.4th 116, 1127, 1128 (2d Cir. 2021).  In each case Plaintiff must demonstrate "(1)

an 'injury in fact' that is (2) fairly traceable to the challenged action of the defendant and is (3) likely to be redressed by a favorable decision." *Id.* at 172, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). *See also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan* factors and stating that for there to be a case or controversy under Article III of the Constitution, plaintiffs must demonstrate a "concrete harm" based on a "personal stake" in the case "to sufficiently answer the question: 'What's it to you?'"); *Maddox v. Bank of N.Y. Mellon Trust Co., N.A.*, 19 F.4th 58, 62-63 (2d Cir. 2021). *TransUnion* explained that whether a harm qualifies as "concrete" hinges on "whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." 141 S. Ct. at 2204. As summarized by *Maddox*, "The Court recognized that physical and monetary harms, along with other traditional tangible harms, readily qualify as concrete, and that certain intangible harms, such as reputational harm, qualify as well." 19 F.4th at 63.

For the reasons discussed above, Plaintiff has satisfied his burden to show both his own and each class member's standing under this test. The injury here was Credit One's violation of the discharge injunction by Credit One's systematic policy of refusing to correct its tradelines to pressure Anderson and the putative class members to pay their discharged debts. That discharge injunction is the fundamental statutory and decretal protection for consumer debtors under the Bankruptcy Code. From the Bankruptcy Code's inception, breach of the discharge has been recognized as an injury,[60] and the Supreme Court in *Taggert v. Lorenzen* confirmed that liability for such breach is to be determined under the "old soil" standard for finding one in civil contempt. 139 S. Ct. at 1801. The injury is concrete from the very act, repeated thousands of times -- for no valid reason and in the face of repeated requests to correct it -- of publishing a tradeline in violation of the discharge injunction by showing the debt as still owing. As

---

[60] *See, e.g., In re Barrup*, 51 B.R. 318, 319-20 (Bankr. D. Vt. 1985), and the cases cited therein.

discussed above, to violate the injunction, pressure is enough, not, in addition, actual payment of the debt, because freedom from such pressure is the tradeoff for going through a bankruptcy case. Both *TransUnion*, 141 S. Ct. at 2208-09, and *Maddox*, 19 F.4th at 65,[61] recognized that publication of false information causing reputational injury is a sufficiently concrete act to confer standing. Publication as pressure to pay is similarly "concrete."

Similarly, it does not suffice for Credit One to argue that if Plaintiff and the class members had only known (based only on reading Credit One's witness declarations, because such information was not public in any way before then) that their credit scores would on average not be meaningfully affected by accurate correct reporting, they would not have been pressured. They did *not* know this (and indeed given the black box nature of credit reporting as discussed at notes 55 and 57, above, one cannot really know this today). What they did know was that the information was inaccurate, that credit reports play a key, public role in enabling access to credit and other important things, such as obtaining jobs and housing, and that the creditor listed on the tradeline refused to correct it to reflect that the debt was no longer owing -- an injury in fact under *TransUnion* and *Maddox* traceable to Credit One's conduct.

Faced with such a breach and Credit One's refusal to correct it, indeed its wrongful actions in this litigation to prevent discovery pertaining to the validity of its defenses for such refusal, Plaintiff incurred substantial fees and expenses to enforce the injunction, all of which redounded to the benefit of the other class members, as well, a second concrete harm.

The Court's ability to compel payment of those damages also satisfies the third standing factor as to Plaintiff's request for certification of damages class under Fed. R. Civ. P. 23(b)(3), that the injury is likely to be redressed by a favorable decision, as would the Court's power to

---

[61] *See also Persinger v. Southwest Credit Systems, L.P.*, 20 F.4th at 1189-93; *Gambles v. Sterling Infosystems, Inc.*, 234 F. Supp. 3d 510, 521-23 (S.D.N.Y. 2017); *Prindle v. Carrington Mort. Servs., LLC*, 2016 U.S. Dist. LEXIS 108386, at * (M.D. Fla. Aug. 16, 2016).

impose "mild" non-compensatory civil damages for Anderson and each class member. Indeed, even nominal damages would satisfy the "redress" factor. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798-802 (2021).

The "redressable" injury standing factor is not satisfied, however, as to Plaintiff's request for certification of an injunctive class under Fed. R. Civ. P. 23(b)(2), because the parties eventually entered into a Stipulation and Order, "so ordered" by the Court on March 22, 2017 [Adv. Dkt. 104], that effectively mooted such request for relief by providing for Credit One's deletion of the applicable tradelines. Clearly the Stipulation and Order was not a mere tactical step by Credit One to try to render the litigation moot, as was its earlier proposed correction of Anderson's tradeline. Instead, the parties agreed to Credit One's[62] deletion of the tradelines of "all accounts for which Credit One furnishes information to a credit reporting agency and, subsequent to the date of this Order, Credit One receives notice that such account was discharged in a Chapter 7 bankruptcy proceeding." Id. ¶ 2.[63] Further, the Sherman Entities, including Resurgent, certified that to the extent any of them report tradelines to any of the major credit reporting entities on any credit card debt on accounts issued by Credit One, (a) "as a matter of policy, such entities do not report on such accounts that are the subject of a bankruptcy petition as of the date any such entity acquires the account," and, further, (b) it is the policy of such entities to instruct the credit reporting agencies to delete such tradelines within 61 days of the filing of a bankruptcy petition that includes any such accounts. Id. ¶ 6.[64] Finally, the parties

---

[62] Including any of Credit One's "present officers, directors, employees, members, agents, representatives and any others acting on their behalf," Id. ¶ 1.

[63] The Stipulation and Order also recognizes the right of a consumer to request in writing a reinstatement of the tradeline associated with the consumer's discharged debt, upon receipt of which Credit One agreed to request the applicable credit reporting agency to reinstate the tradeline. Id. ¶ 3.

[64] They further agreed to notify the Court and Plaintiff of any change in these policies within seven years of the date of the Stipulation and Order and that upon such notification Plaintiff may seek such relief as Plaintiff deems appropriate. Id.

agreed in the Stipulation and Order that "Compliance with the terms of this Stipulation and Order by Credit One, the Sherman Entities and Resurgent *shall resolve* the second Request for Relief for a permanent injunction in the January 30, 2015 Amended Complaint in this adversary proceeding." Id. ¶ 9 (emphasis added).

The Stipulation and Order therefore satisfies the "formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" and thus that the request for certification of an injunctive class is moot. *Already LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). As in *Already*, the Stipulation and Order definitively encompasses the proscribed conduct that the Plaintiff sought to enjoin, and Plaintiff has not raised any questions as to any loose ends that the Stipulation and Order leaves open, *id.*, at 93-95, with the exception that the parties' agreement does not specifically confer on all class members the right to enforce it. Given the Stipulation and Order's mandated uniform changes to Credit One's reporting policy, however, it is sufficiently binding on Credit One, as well as the Sherman Entities/Resurgent to render Plaintiff's request for relief for certification of an injunctive class under Fed. R. Civ. P. 23(b)(2) moot. *Holland v. Goord*, 758 F.3d 215, 223-24 (2d Cir. 2014).

The next step in the class certification analysis is consideration of the factors set forth in Fed. R. Civ. P. 23(a), as incorporated by Bankruptcy Rule 7023: whether the movant has established by a preponderance of the evidence that "(1) the class is so numerous that the joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy)." *Barrows v. Becerra*, 24 F.4th at 130 (internal quotations and citation omitted). "Additionally, there is an implied requirement of

'ascertainability,' which in the Second Circuit, requires that a class be defined using objective criteria that establish a membership with definite boundaries." *Brecher v. Rep. of Arg.* 806 F.3d 22, 24 (2d Cir. 2015); *Williams v. Kucoin*, 2012 U.S. Dist. LEXIS 204334, at *9.

Numerosity.  The numerosity requirement is satisfied where "the class is so numerous that joinder of all members in impracticable."  Fed. R. Civ. P. 23(a)(1).  "Generally speaking, courts will find that the 'numerosity' requirement has been satisfied when the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer."  *Ansari v. N.Y. Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998); *see also Heather Siler v. Landry's Seafood House-N.C., Inc.*, 2014 U.S. Dist. LEXIS 90088, at *6 (S.D.N.Y. June 30, 2014) (collecting cases). Here, Credit One has acknowledged that it "presently understands that it issued 287,980 Accounts that Credit One reported as 'charged off' that were subsequently discharged under Chapter 7 of the Bankruptcy Code between May 1, 2007 and April 2017, excluding any accounts that were reported as charged off after December 2016."[65] This amount would be reduced by those tradelines reflecting debts of $99 or less, for which Credit One belatedly admitted it deleted its tradelines post-bankruptcy as a matter of policy,[66] but nevertheless the size of the class would clearly satisfy the numerosity requirement.

Commonality. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," *Barrows v. Becerra*, 24 F.4th at 130-31, although "the claims for relief need not be identical for them to be common."  *Id.* at 131 (internal quotation and citation omitted).  Rather, "what matters . . . is not the raising of common questions but, rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.  To demonstrate such a capacity, Rule 23(a)(2) simply requires that there be issues

---

[65] Credit One's Responses and Objections to Plaintiff's Third Set of Interrogatories, dated April 19, 2017 [Adv. Dkt. 109-3-Ex. A], at 6.
[66] Id.

whose resolution will affect all or a significant number of the putative class members." *Id.* (emphasis in original; internal quotations and citations omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Communs. Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). Conversely, "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350.

This standard is easily satisfied here because all the claims arise from Credit One's systematic policy not to correct its tradelines to reflect the discharge; in addition, as discussed above, since 2007, the inception of the class period, the law on the class's underlying claims, discussed above, has been substantially the same throughout the country. *See In re Biery*, 543 B.R. 267, 286-290 (Bankr. E.D. Ky. 2015) (commonality requirement met where alleged wrong was the sending of the same type of billing statement to each customer; commonality not met where alleged wrong involved the sending of different types of billing statements). *See also McNamee v. Nationstar Mortg., LLC* 2018 U.S. Dist. LEXIS 54787, at *17 (S.D. Oh., Mar. 30, 2018) ("[O]nce the class is identified, no thorny questions as to the exact nature of the post-discharge relationship remain live. The only remaining questions are those that would advance the litigation by either establishing or relieving Nationstar of the alleged liability."); *In re Brannan*, 485 B.R. at 457-58; *In re Montano*, 398 B.R. at 56-57 ("In this case, First Light allegedly committed the same conduct with respect to all class members, i.e., knowingly misreporting the credit status of debts in an attempt to collect them post-discharge. Based on these allegations of standardized conduct, the Court concludes that common questions exist as to whether First Light's conduct was contumacious.");[67] *In re Walls*, 262 B.R. at 525-26.

---

[67] The court in *Montano* later de-certified the class of debtors whose credit reports did not accurately reflect the discharge in part because it concluded that the plaintiff had not shown "commonality" after all.

Typicality. "Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Barrows v. Becerra*, 24 F.4th at 131 (internal quotation and citation omitted). Though courts often discuss the commonality and typicality requirements together, *see In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 582 (S.D.N.Y. 2008) (collecting cases), the commonality requirement "tests the definition of the class itself, while the typicality requirement focuses on how the named plaintiff's claims compare to the claims of the other class members." *Traver v. Lowe's Home Ctrs., LLC*, 2016 U.S. Dist. LEXIS 26533, at *6 (E.D.N.Y., Mar. 1, 2016) (internal quotations and citations omitted). The requirement "is not highly demanding and does not require complete symmetry between the class representative's claims and those of the absent class members. . . . [T]he named plaintiff must simply raise claims that arise from the same course of events as the class claims and make similar legal arguments to prove the defendant's liability." *Id.*, at *7 (internal quotations and citations omitted). Once again in the light of Credit One's systematic practice serving as the basis for Anderson's claims as well as those of the other class members, the "typicality" requirement is satisfied here. *In re Brannan*, 485 B.R. at 458.

Adequacy. When considering whether a proposed class representative "will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), courts make a twofold

---

*Montano v. First Light Fed. Credit Union* (*In re Montano*), 488 B.R. 695, 711-712 (Bankr. D. N.M. 2013). It did so because it believed the class included those who owed secured and/or properly reaffirmed debts and debts that were properly reported (perhaps about 20% of the class), *id.*, at 711, and also because it believed that, to be liable, the defendant would need to be shown to have coerced actual payment or exerted pressure on a class-member-by-class-member basis. *Id.*, at 711-713. As discussed above, this is not a requirement for commonality but, in any event, as discussed above, Credit One's policy has been established as an act to cause such pressure based on its Rule 37 default, and that policy was concededly uniform and systematic toward every class member. As also discussed above, that policy also caused a sufficiently concrete injury for purposes of standing.

inquiry: "the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). "A conflict or potential conflict alone will not, however, necessarily defeat class certification -- the conflict must be fundamental." *Id.* In addition, a named plaintiff will not adequately represent the interests of the class if there are serious concerns about his credibility that bear on an issue critical to a cause of action in the litigation. *Fishon v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 10502, at *31-33 (S.D.N.Y. Jan. 19, 2022). Lastly, for purposes of Rule 23(g), proposed class counsel "must be qualified, experienced and generally able to conduct the litigation." *Vincent v. Money Store*, 304 F.R.D. 446, 456 (S.D.N.Y. 2015) (internal quotation and citation omitted).

Here, Anderson has vigorously pursued the underlying claims for himself and the class, having been deposed twice; serious concerns regarding his credibility do not exist; and his counsel clearly are qualified and experienced[68] and to date have conducted this litigation ably, including in the face of Credit One's extraordinary misconduct.

As discussed in more detail below when considering whether Plaintiff has satisfied the requirements of Fed. R. Civ. P. 23(b)(3), Anderson's claim is the same as the other class members', being based on Credit One's systematic credit reporting conduct, but some of those class members could have additional damages than those as found above pertaining to Anderson and all other putative class members. Anderson has sought the formation of a sub-class of one such group comprising those who actually paid their debt post-discharge, proposing repayment of such amounts in addition to the other damages addressed above, and he has vigorously

---

[68] They are experienced not only generally but also in pursuing this type of claim, having represented similar classes in class actions against other credit card issuers regarding their credit reporting of discharged debt, four of which have resulted in settlements on behalf of the class after meaningful litigation.

represented that sub-class's interests.[69]  Other members of the proposed class might want to assert additional damages, though, for example for not receiving a loan, housing, or a job based on Credit One's credit reporting, which are not included in the sanctions found above.

It is also true, of course, that Credit One has asserted that no such additional damages can be shown [Adv. Dkt. 118-120, 123, 148-149].

Under the circumstances, such potential additional damages are not enough to make Anderson an inadequate class representative.  First, if Credit One's experts are correct, it is unlikely that there will be many claims for additional damages.  *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) ("Unless a district court finds that personal injuries are large in relation to statutory damages, a representative plaintiff must be allowed to forego claims for compensatory damages to achieve class certification.  When a few class members' injuries prove to be substantial, they may opt out and litigate independently. . . . Only when all or almost all of the claims are likely to be large enough to justify individual litigation is it wise to reject class treatment altogether."); *Beringer v. Std. Parking Corp.*, 2008 U.S. Dist. LEXIS 72873, at *6-7 (N.D. Ill, Sept. 24, 2008).  *See also  In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 200 (E.D. Pa. 2017) (adequacy found:  "Though they may have suffered different damages, the overall alleged scheme is the same, and the Plaintiffs' claims are the same.").

Second, with liability having been found, the interests of such class members will be sufficiently protected by ensuring that they receive clear notice of their right to opt out of the damages class/sub-class proposed by Plaintiff, including the risks and potential rewards of doing so.  *See Macarz v. Transworld Sys.*, 201 F.R.D. 54, 57-58 (D. Conn. 2001) (court denies motion to decertify class after plaintiff granted summary judgment:  notice to class must inform them of

---

[69] Such damages clearly would be appropriate if proximately caused by Credit One's breach of the discharge, although such proximate cause has not been established by Credit One's Rule 37(b) default.  Credit One has not specifically opposed the formation of such a sub-class.

liability judgment and that they will be bound by it unless they opt out). *Cf. Nnebe v. Daus*, 2022 U.S. Dist. LEXIS 36325, at \*32-34 (S.D.N.Y., Mar. 1, 2022) (where liability had previously been established, proposed class representatives adequately represented class for liability purposes although damages might well differ and thus will require individualized hearings); *Casados v. Safeco Ins. Co. of Am.*, 2015 U.S. Dist. LEXIS 193830, at \* (D. N.M., Nov. 6, 2015) (adequacy of representation concerns can be cured by objector's participation in settlement approval process).

Ascertainability.  The touchstone of the implied requirement that a proposed class be "ascertainable" "is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 339 (N.D.N.Y. 2021), quoting *In re Petrobras Securities Litig.*, 862 F.3d 250, 260 (2d Cir. 2017), *cert. dismissed*, 140 S. Ct. 338 (2019).  Ascertainability is "a modest threshold requirement" precluding certification "only . . . if a proposed class definition is indeterminate in some fundamental way." *In re Petrobras Securities Litig.*, 862 F.3d at 269. Here, given Credit One's systematic policy, the proposed class can be definitionally ascertained from Credit One's own tradeline records, the three main credit reporting agencies' credit reports on the people that appear on Credit One's tradeline records, and electronic case filing discharge records kept by the bankruptcy courts.  Credit One was able to use such criteria to "scrub" the applicable tradelines as required by the parties' Stipulation and Order [Adv. Dkt. 104].  *See Nnebe v. Daus*, 2022 U.S. Dist. LEXIS 36325, at \*28.  Given the filing requirements for a valid reaffirmation agreement under section 524 of the Bankruptcy Code, also ascertainable by checking the electronic case filing records kept by the bankruptcy courts, the class can readily exclude those who properly reaffirmed their debts  The proposed class therefore is ascertainable.

If a named plaintiff has satisfied, as here, the requirements of Rule 23(a), he must then satisfy the requirements of the applicable section or sections of Rule 23(b).  Fed. R. Civ. P. 23(b).  Plaintiff sought certification of a class under either or both Rule 23(b)(2) and 23(b)(3), but, as discussed above, his request for certification of an injunctive class under Rule 23(b)(2) is denied as moot.[70]

Rule 23(b)(3) requires Plaintiff to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3), incorporated by Fed. R. Bankr. P. 7023.  "The 'predominance' requirement is satisfied if: (1) resolution of any material legal or factual questions can be achieved through generalized proof, and (2) these common issues are more substantial than the issues subject only to individualized proof."  *Nnebe v. Daus*, 2022 U.S. Dist. LEXIS 36325, at *17 (internal quotation and citation omitted).  Rule 23(b)(3) lists four factors to consider when making the "predominance" and "superiority" determinations:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against the class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

---

[70] Plaintiff and, if certified, the class incurred damages in the form of attorneys fees and costs in enforcing the discharge injunction, but monetary damages cannot be recovered by a class certified under Rule 23(b)(2) unless they are incidental to the injunctive or declaratory relief sought thereunder. *Wal-Mark Stores v. Dukes*, 564 U.S. 338, 360 (2011).

Here, Credit One chiefly challenges Plaintiff's showing that he has satisfied Rule

23(b)(3) based on the possibility that members of the class will have different damages for Credit

One's violation of the discharge.[71]  This has been a basis for not certifying or for de-certifying a

class of debtors with underlying claims of discharge breach.  *See In re Montano*, 488 B.R. at

713-14 (diversity of potential damages constituting "payment, increased difficulty in obtaining

credit, higher borrowing costs, loss of employment or promotion, and the like" warrant de-

certification);[72] *In re Walls*, 262 B.R. at 528-29 (same).

Nevertheless, and recognizing that the "predominance" analysis is "far more demanding"

than the "commonality" inquiry under Rule 23(a)(2), *Amchem Prods. v. Windsor*, 521 U.S. 591,

623-24 (1997), Plaintiff here satisfies the predominance requirement of Rule 23(b)(3).  Given the

Plaintiff's limitation on the damages that he seeks for the class, as discussed above, to exclude

individualized damages, as well as the Court's determinations regarding Credit One's systematic

conduct, the proposed class is sufficiently cohesive, as the legal and factual questions that qualify

each class member's case can be determined through generalized proof, and these issues are

more substantial than the potential damages issues that may be subject to individualized proof.

*Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96-97 (2d Cir. 2018).  *See also In re*

*Biery*, 543 B.R. at 300; *In re Brannan*, 485 B.R. at 459. This is highlighted by Credit One's own

witness testimony that most putative class members most likely did not suffer additional, unique

---

[71] It also contends that the individualized defense of laches precludes Rule 23(b)(3) certification. However, "the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *In re Visa Check/Mastermoney Antitrust Litig. v. Visa United States*, 280 F.3d 124, 138 (2d Cir. 2001); *Hallmark v. Cohen & Slamowitz LLP*, 2014 U.S. Dist. LEXIS 2173, at *5-6 (W.D.N.Y., Jan. 5, 2014) (insufficient evidence that individual defenses will predominate); *Kelly v. City & County of San Francisco*, 2005 U.S. Dist. LEXIS 31113, at *10-12, 20 (N.D. Cal., Nov. 19, 2005).  Moreover, Plaintiff correctly argues that Credit One's unclean hands would in all likelihood negate any laches defense. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945).

[72] *Montano*  also stated that each member would have to show his or her own individualized proof of violation of the discharge, *id.*, n. 25, but that is not the case here, as discussed above at note 67.  *Montano* also may have equated "harm" for purposes of standing, established here for purposes of Rule 23(a), with "predominance" for purposes of Rule 23(b)(3).

damages. Class members will be given clear notice of the potential remedies available to them if they choose to opt out of the class, including the right to establish individualized damages, as well as the risks of having to prevail on the merits regarding liability raised by that choice, as compared to their potential recovery if they do not opt out, *Macarz v. Transworld Sys.*, 201 F.R.D. at 57-68, and the Court will always have the ability to de-certify the class, or keep it intact only for liability purposes, if the opt-outs far exceed expectations. *Nnebe v. Daus*, 2022 U.S. Dist. LEXIS 36325, at *18-19, 25-26; *Beringer v. Std. Parking Corp.*, 2008 U.S. Dist. LEXIS 72873, at *11-13.

As for the applicability of the factors listed in Rule 23(b)(3)(A)-(D) to the "superiority" requirement, the Court is not aware of any other pending litigation against Credit One that raises the claims asserted by Plaintiff on behalf of the proposed class. The Court has discussed above its jurisdiction to certify a nationwide class. When the alleged misconduct is, as here, a systematic policy undertaken against former debtors who, absent a class action, would be unlikely to incur the cost of litigation, the exercise of that jurisdiction in the collective context of a nationwide class action is superior to individualized lawsuits. Under the circumstances, imposing a district-wide, or even an issuing-judge-only limitation on the class when each is protected by the same statutory injunction and form of discharge order would be an artificial construct antithetical to the purpose of Rule 23, as incorporated by Fed. R. Bankr. P. 7023. Similarly, the systematic nature of Credit One's actions, already addressed herein, makes managing the class action relatively simple. *In re Biery*, 543 B.R. at 301; *In re Brannan*, 485 B.R. at 459-60; *see also Nnebe v. Daus*, 2022 U.S. Dist. LEXIS 36325, at *27-27; *Beringer v. Std. Parking Corp.*, 2008 U.S. Dist. LEXIS 72873, at *15-18. Accordingly, the Plaintiff has carried his burden with respect to his request for certification of a class under Rule 23(b)(3).

## Conclusion

For the foregoing reasons, the Court has determined that, (1) under Fed. R. Civ. P. 37(b),

(a) Credit One shall be held in violation of Plaintiff's discharge injunction under section

524(a)(2) of the Bankruptcy Code; (b) Credit One shall be sanctioned under section 105(a) of the

Bankruptcy Code employing the standard for contempt with respect to such violation (i) for

actual damages comprising Plaintiff's reasonable fees and expenses, including legal fees and

expenses, in enforcing the discharge injunction under section 524(a)(2), and (ii) a mild non-

compensatory sum between $50 and $1000, such amount to be determined in the light of *Bmw of*

*N. Am. v. Gore*, 517 U.S. at 559, and *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021), after

the Court decides the specific amount of Plaintiff's reasonable fees and expenses and the size,

after the time to opt out, of the class certified herein; and (2) a damages class shall be certified

under Fed. R. Civ. P. 23(b)(3) comprising

> all individuals who after May 3, 2007, have had a consumer credit report relating
> to them prepared by any of the credit reporting agencies in which one or more of
> their tradeline accounts or debts with Credit One was not reported by Credit One
> as "discharged" or "included in bankruptcy" but, rather, as "charged off" or "-$0-
> balance"[73] notwithstanding the fact that such debt(s) had been discharged as a
> result of their bankruptcy under chapter 7 of the Bankruptcy Code; provided, that
> such debt(s) shall have been (i) unsecured and (ii) not the subject of a valid and
> enforceable reaffirmation agreement,

with a sub-class comprising the forgoing people who, in addition, paid any of such debt(s), with

the members of such sub-class to be entitled to repayment of such debt payments in addition to

the sanctions set forth in 1(b) above if such repayment is shown to have been proximately caused

by Credit One's credit reporting policy.  Such class members, including the members of the sub-

class, shall have the right to opt out of the class/sub-class, in which case, as to such opt outs, the

Court's findings as to liability and damages shall not be binding on Credit One.  The Court's

---

[73] The class shall not include those people whose debts, being $99 or less, were not sold by Credit One and whose
tradelines were deleted by Credit One promptly after they filed for bankruptcy.

determination of the sanctions to be imposed under (1)(b)(i)-(ii), above (the amount of sanctions under (1)(b)(ii) above being applied per each class member who does not timely opt out) and (2) above as to the subclass shall be binding on each class/sub-class member who does not timely opt out of the class/sub-class.

Plaintiff shall promptly file and serve the proposed notice to the class/sub-class and schedule a hearing on Plaintiff's request for approval of such notice and notice procedures for the class.  Such notice shall clearly set forth the consequences of opting out of the class/sub-class, namely, the fact that (a) any class members who do not opt out of the class/sub-class will be bound by this Court's decision herein, and (b) any class member who opts out of the class/sub-class will have to separately establish Credit One's liability and, if established, the proper sanction therefor, including the potential for proving additional damages than those that would be awarded to class members who do not timely opt out of the class/sub-class.  Plaintiff shall also schedule a hearing on the amount of Plaintiff's reasonable fees and costs, including attorneys fees and expenses, in enforcing the discharge, and on the calculation of the non-compensatory sanction in (1)(b)(ii), above that would apply to himself and, separately, as to each class/sub-class member that does not timely opt out of the class.

The Plaintiff shall promptly email a proposed order and judgment to the Court consistent with the foregoing, copying counsel for Credit One on such email.

Dated:  White Plains, New York
         June 3, 2022

/s/ Robert D. Drain
United States Bankruptcy Judge